Joshua B. Silverman (*pro hac vice*)
Genc Arifi (*pro hac vice*)
POMERANTZ LLLP
10 S La Salle Street, Suite 3505
Chicago, IL 60603-1049
Tel: (312)-881-4859
Fax: (312)-377-1184
Email: jbsilverman@pomlaw.com
       garifi@pomlaw.com

and

Jeremy A. Lieberman (*pro hac vice*)
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
        tprzybylowski@pomlaw.com

*Lead Counsel for the Lead Plaintiff,
Additional Plaintiffs, and the Proposed Class*

- additional counsel on signature page -

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE OUTLOOK THERAPEUTICS, INC. SECURITIES LITIGATION | Case No. 2:23-cv-21862-MCA-CLW |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **CLASS ACTION** |
| | Hon. Madeline Cox Arleo |
| | Motion Day: August 5, 2024 |

**LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF RELEVANT FACTS ................................................................................. 4

    A. Age-Related Macular Degeneration and Known AMD Trial Design Criteria .............. 4

    B. Outlook's Core Focus on ONS-5010 and BLA Submission ........................................ 4

        i.    Outlook's Deficient Manufacturing Partners ...................................................... 5

        ii.    Outlook's Deficient NORSE 1-3 Trials .............................................................. 7

    C. Investors Learn the Truth ............................................................................................. 8

ARGUMENT ........................................................................................................................... 9

   I. Legal Standards ............................................................................................................ 9

    A. Rule 12(b)(6) Motion to Dismiss ................................................................................. 9

    B. Consideration of Documents Not Cited in the Complaint ........................................... 10

  II. The Complaint Adequately Alleges Violations of Section 10(b) ..................................... 11

    A. The Complaint Adequately Alleges Material Misrepresentations and
    Omissions Regarding the Manufacturing of ONS-5010 ................................................ 11

    B. The Complaint Adequately Alleges Material Misrepresentations and
    Omissions Regarding the NORSE 1-3 Trials ............................................................... 16

    C. Defendants' Excuses for their Misrepresentations Fail ............................................... 17

        i.    The Complaint does not involve scientific disagreement ............................... 17

        ii.    The Complaint does not assert fraud by hindsight .......................................... 18

        iii.    Defendants' boilerplate warnings do not immunize their
        misrepresentations and omissions .................................................................. 19

iv.    Defendants' concrete representations about their contract manufacturing and regulatory communications were not puffery ...........................................20

v.    The Complaint does not constitute puzzle pleading .....................................21

D.  The Complaint Adequately Alleges Defendants' Scienter ...........................................22

i.    The Complaint pleads that Defendants had actual knowledge of or access to information contradicting their public statements.......................22

ii.    That Defendants held themselves out as knowledgeable about the misrepresented subjects supports an inference of scienter .............................24

iii.    That the misrepresentations involved Outlook's core operations supports an inference of scienter..................................................................24

iv.    Temporal proximity supports a strong inference of scienter ..........................25

E.  The Complaint Adequately Alleges Loss Causation ....................................................26

III. The Complaint Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act ....................................................................................27

CONCLUSION...................................................................................................................28

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ...................................................................................................23

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP,*
532 F. Supp. 3d 189 (E.D. Pa. 2021) .....................................................................................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................................................9

*In re Bristol-Myers Squibb Sec. Litig.*,
No. CIV.A. 00-1990(SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005) .....................................20

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574, 599 (D.N.J. 2001) ................................................................................22

*Carmack v. Amaya Inc.*,
258 F. Supp. 3d 454 (D.N.J. 2017) ........................................................................................10

*Carmignac Gestion, S.A. v. Perrigo Co. PLC,*
No. CV 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ....................................................24

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ..................................................................................................18

*Dodge v. Cambrex Corp.*,
No. CIVA 03-CV-4896 PGS, 2007 WL 608365 (D.N.J. Feb. 23, 2007) .....................................19

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ..........................................................................................................26, 27

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000) ..................................................................................................26

*Fleisher v. Standard Ins. Co.*,
679 F.3d 116 (3d Cir. 2012) ................................................................................................9, 27

*Flora v. Cty. of Luzerne*,
776 F.3d 169 (3d Cir. 2015) ....................................................................................................3

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ...........................................................................17, 19, 21, 23

*Hall v. Johnson & Johnson*,
No. CV 18-1833 (FLW), 2019 WL 720749 (D.N.J. Dec. 27, 2019) ............................................10

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co*.,
620 F. Supp. 3d 167 (D.N.J. 2022) ...........................................................................................19

*In re Able Labs. Sec. Litig*.,
CIV.A. 05–2681 JAG, 2008 WL 1967509 (D.N.J. Mar. 24, 2008)..............................11, 13, 14, 23

*In re Advanta Corp. Sec. Litig*.,
180 F.3d 524 (3d Cir. 1999)......................................................................................................22

*In re Aetna, Inc. Sec. Litig*.,
617 F.3d 272 (3d Cir. 2010)......................................................................................................14

*In re Allergan Generic Drug Pricing Sec. Litig.*,
No. CV169449KSHCLW, 2019 WL 3562134, (D.N.J. Aug. 6, 2019) .......................................24

*In re Burlington Coat Factory Sec. Litig*.,
114 F.3d 1410 (3d Cir. 1997).........................................................................................9, 10, 11

*In re Celgene Corp. Sec. Litig*.,
No. CV 18-4772, 2019 WL 6909463 (D.N.J. Dec. 19, 2019) .........................................14, 16, 17

*In re Cryolife, Inc*.,
No. Civ.A.1:02CV1868–BBM, 2003 WL 24015055 (N.D. Ga. May 27, 2003)...........................12

*In re: Enzymotec Sec. Litig*.,
No. CV-14-5556 (JLL)(MAH), 2015 WL 8784065 (D.N.J. Dec. 15, 2015)..........................20, 23

*In re Discovery Lab'ys Sec. Litig.,*
No. 06–1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ...........................................................17

*In re Eros Int'l PLC Sec. Litig.*,
No. CV 19-14125, 2021 WL 1560728 (D.N.J. Apr. 20, 2021) ....................................................21

*In re Genzyme Corp. Sec. Litig.,*
754 F.3d 31 (1st Cir. 2014) .......................................................................................................14

*In re Honeywell Int'l Inc. Sec. Litig.,*
182 F. Supp. 2d 414 (D.N.J. 2002) ......................................................................................21, 22

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ..................................................................................18, 19

iv

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)..................................................................................................26

*In re PTC Therapeutics, Inc., Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) ............................................................10, 11, 24, 27

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....................................................................................................26

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)..................................................................................................10

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ..................................................................................16

*In re Viropharma Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014) ..........................................................................20, 22, 23

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)....................................................................................................20

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014).........................................................................................26

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).......................................................................................9, 22, 24, 25

*Kickflip, Inc. v. Facebook, Inc.*,
999 F. Supp. 2d 677 (D. Del. 2013).......................................................................................11

*Lewakowski v. Aquestive Therapeutics, Inc.*,
No. CV213751ZNQDEA, 2023 WL 2496504 (D.N.J. Mar. 14, 2023) ......................................18

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
No. CV 16-112-GMS, 2017 WL 3891676 (D. Del. Sept. 6, 2017) ............................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)............................................................................9, 10, 13, 15, 18

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007)..................................................................................................26

*McGuire v. Dendreon Corp.*,
688 F. Supp. 2d 1239 (W.D. Wash. 2009)..............................................................................12

v

*Medtronic Ave, Inc. v. Bos. Sci. Corp.*,
No. CIV.A. 98-478-SLR, 2001 WL 652016 (D. Del. Mar. 30, 2001)..............................................9

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................24, 25

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
No. 19 CIV. 3354 (VM), 2020 WL 3268531 (S.D.N.Y. June 17, 2020)......................................12

*Ortiz v. Canopy Growth Corp.*,
537 F. Supp. 3d 621 (D.N.J. 2021) .......................................................................20

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
679 F.3d 972 (8th Cir. 2012) ..................................................................14, 15

*Reid v. Hemispherx Biopharma, Inc.*,
No. CV 09-5262, 2010 WL 11710594 (E.D. Pa. Apr. 20, 2010) ....................................................24

*Roofer's Pension Fund v. Papa*,
No. CV 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018).........................................................13

*Schaeffer v. Nabriva Therapeutics plc*,
No. 19 CIV. 4183 (VM), 2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)................................14, 15

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018) ..................................................................17, 21

*Stichting Pensioenfonds ABP v. Merck & Co.*,
No. CIV.A. 05-5060 SRC, 2012 WL 3235783 (D.N.J. Aug. 1, 2012) .......................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...........................................................................10, 22, 23

*Tomaszewski v. Trevena, Inc.*,
482 F. Supp. 3d 317 (E.D. Pa. 2020) .......................................................................16

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*,
659 F.3d 295 (3d Cir. 2011)...........................................................................9

*Wegner v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998) .......................................................................21

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
No. 09–12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ....................................................12

*Yanek v. Staar Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..................................................................12

**Rules & Regulations**

21 C.F.R. §210.1(b) ...................................................................................................5

21 C.F.R. §211.180(f) .................................................................................................5

Fed. R. Civ. P. 9(b) ...............................................................................................9, 21

Fed R. Civ. P. 12(b)(6)...............................................................................................9

SEC Rule 10b-5 .......................................................................................................10

**Statutes**

15 U.S.C. §78u-4(b)(2) .......................................................................................10, 22

15 U.S.C. §78j(b)......................................................................................................10

**Additional Authorities**

FDA "Compliance Program Guidance Manual Chapter – 45 Biological Drug Products"
(Oct. 2010), https://www.fda.gov/media/73834/download……………………………….5, 6

FDA "Contract Manufacturing Arrangements for Drugs: Guidance for Industry"
(Nov. 2016), https://www.fda.gov/media/86193/download ........................................13

Lead plaintiff Jason Solomon and additional plaintiffs Ramzy Alsaidi, Michael Lucas, and Mariam Silverman, trustee for the Mariam Silverman trust UA Mar. 15, 1969 (collectively, "Plaintiffs"), hereby oppose the motion to dismiss filed by Defendants Outlook Therapeutics, Inc. ("Outlook"), C. Russell Trenary III ("Trenary"), and Lawrence A. Kenyon ("Kenyon," and collectively with Outlook and Trenary, the "Defendants").

## PRELIMINARY STATEMENT[1]

Although FDA regulations may be complex, Plaintiffs allege straightforward, highly material, and well-supported misrepresentations.  First, Defendants falsely touted the manufacturing facilities designated for Outlook's sole drug candidate, ONS-5010, when they knew that the FDA had documented severe deficiencies in those same facilities and the deficiencies had not been remedied.  Second, Defendants falsely claimed that the three clinical trials that Outlook submitted in its biological license application ("BLA") seeking approval to market ONS-5010 were jointly planned by the FDA and Outlook, when in fact, the FDA had never agreed to the design of those trials or agreed that the undersized trials could be sufficient to support approval. By choosing to omit known manufacturing deficiencies and misrepresent key regulatory communications with the FDA, Defendants ensured that investors would be misled as to the then-existing problems with the ONS-5010 BLA.  Defendants continued to conceal these problems until the FDA forced disclosure by issuing a complete response letter ("CRL") denying the BLA, which Defendants had no choice but to reveal.

---

[1] Paragraph citations ("¶" or "¶¶") refer to the numbered paragraphs of Consolidated Amended Class Action Complaint ("Complaint") (ECF No. 37). "MTD" refers to the pages of Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint (ECF No. 42-1). Unless otherwise noted, internal citations are omitted and emphasis is added.

Between August 3, 2021 and August 10, 2023, Defendants falsely represented the manufacturing facilities designated for ONS-5010 production on eighteen occasions. ¶¶102, 109, 116, 117, 119, 120, 122, 127, 137, 139, 141, 156, 160, 166, 170, 172, 175, 177. Defendants assured investors that they had confirmed the sufficiency of the facilities, including the required compliance with current Good Manufacturing Practices ("cGMP"), by conducting "mock inspections" of "both of their factories several times." ¶175. These statements did not mention the Forms 483 each manufacturing facility received, setting out numerous cGMP violations, or the deficiencies remained unremediated. ¶¶ 94-97. Defendants never disclosed known manufacturing deficiencies and continued to conceal the Forms 483. At no time were the cGMP violations remedied, and the FDA issued the CRL in large part based on these unremedied violations. ¶181.

Defendants also told investors that Outlook and the FDA jointly designed the NORSE 1-3 trials. ¶¶90, 98, 104, 106, 129, 131, 133, 150. Defendants kept up the charade by comparing the NORSE 1-3 to an industry-accepted and seminal clinical study (¶¶112, 129, 154) and other FDA-approved wet, age-related macular degeneration ("AMD") treatments (¶131). However, the NORSE 1-3 trials were never jointly-designed with the FDA and were not comparable to other FDA-approved treatments involving large patient populations. ¶¶39, 76-77. Contrary to what Defendants told investors, the FDA never jointly planned the NORSE 1-3 trials, and had never agreed that they should be significantly smaller than comparable wet AMD trials.

Defendants' excuses for misleading investors lack merit. They attempt to recharacterize their statements alternately as opinions, aspirational conjecture, or mere scientific disagreements and argue that they were free to hide the truth because they offered a few boilerplate warnings. However, the identified misrepresentations and omissions were concrete and grounded in then-present fact, addressing manufacturing conditions which existed at the time and purported

2

regulatory agreements which Defendants claimed had already been reached.  None of these were forward-looking, and none were accompanied by meaningful risk warnings.  The boilerplate language Defendants reference said nothing about the risks they concealed here: prior cGMP violations left unremediated, and failure to reach agreement on trials portrayed as jointly planned.

Nor do Defendants provide any credible challenge to scienter or loss causation.  The Complaint easily pleads Defendants' knowledge of and access to information contradicting their misleading public statements, all of which involved Outlook's core operation of commercializing ONS-5010.  For example, Plaintiffs allege that the FDA expressly identified, in paperwork that would not only be accessible to Defendants but central to the mock inspections that they claimed to have conducted, that the exact manufacturing facilities in question were grossly deficient.  ¶¶94-97, 175.  Plaintiffs also allege that Defendants had actual knowledge that they had not jointly planned the NORSE 1-3 trials with the FDA, and never obtained the documentation (called a Special Protocol Assessment) that would establish the FDA's agreement on trial design.  ¶91.  For loss causation, Plaintiffs demonstrate a massive stock drop following the receipt of a CRL revealing to the market what Defendants concealed with their Class Period misrepresentations.

Finally, Defendants' heavy reliance upon extraneous materials has no place in a motion to dismiss, and only serves to emphasize that the disputes here belong before a trier of fact.  *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015).  Because Defendants identify no pleading deficiency and the Complaint's allegations easily satisfy applicable pleading standards, Defendants' motion to dismiss should be denied in its entirety.

3

## STATEMENT OF RELEVANT FACTS

### A.      Age-Related Macular Degeneration and Known AMD Trial Design Criteria

AMD is an eye disease that occurs when aging damages the part of the eye that controls sharp, straight-ahead vision. ¶30.  AMD occurs in three stages – early, intermediate, and late. ¶31. Wet AMD is a more severe but less common variant of late-stage AMD.  ¶32.

In 2006, the FDA approved Lucentis as a treatment for wet AMD based on two pivotal Phase III clinical trials that included 1139 dosed patients.  ¶38.  Beginning in 2008, the National Eye Institute of the National Institutes of Health conducted a comparative study trial of Lucentis and bevacizumab to assess the latter as a wet AMD treatment.  ¶39.  The study became known as the CATT Study (Comparison of Age-Related Macular Degeneration Treatment Trials) and, like the Lucentis trials, enrolled approximately 1,200 patients.  *Id.*  Every subsequent wet AMD treatment approved by the FDA included multiple Phase III trials and more than 700 patients dosed – with 5 of 6 treatments enrolling more than 1,100 patients.  ¶76.

On February 6, 2023, the FDA documented standard practice for clinical trials involving wet AMD treatments in published guidance (the "Wet AMD Guidance").  ¶¶70, 73.  The Wet AMD Guidance left no doubt that "safety and efficacy should be demonstrated in at least two adequate and well-controlled, multicenter trials" and that each trial have "approximately 400 or more patients using the investigational drug complete treatment."  ¶¶73-76.  After the Class Period, Outlook announced an additional trial containing at least 400 patients, reflecting its understanding that the NORSE 1-3 trials were undersized.  ¶193.

### B.      Outlook's Core Focus on ONS-5010 and BLA Submission

Before focusing on ophthalmology, Outlook sought to develop biosimilar therapeutics to monoclonal antibodies, or mAbs, for immunology and oncology.  ¶79.  On August 2, 2018, Outlook announced that it was shifting to focus solely on ophthalmology and appointed Defendant

4

Kenyon as CEO and President, claiming that he would be an "ideal fit" as Outlook moved ONS-5010 "into the clinic." ¶80. At all relevant times, ONS-5010 was Outlook's sole clinical product candidate. *Id.*

### i. Outlook's Deficient Manufacturing Partners

Under FDA regulations, a sponsor cannot receive a BLA without proving that commercial manufacturing will conform with cGMP. ¶¶5, 61-63. cGMP regulations ensure that a product is safe to use and has the ingredients and potency it claims to have. ¶62. Under FDA regulations, a drug manufactured in a facility that does not comply with cGMP is considered "adulterated" and is subject to regulatory action. 21 C.F.R. §210.1(b). As part of the BLA process, a sponsor must facilitate FDA inspections of the specified manufacturing sites. ¶63. If the FDA finds material violations, it issues a Form 483 outlining the cGMP violations. ¶64.

For more than 25 years, FDA regulations have required that processes be implemented so that "responsible officials," if not already "personally involved in or immediately aware" of a Form 483 "are notified in writing" that a Form 483 has been received. 21 C.F.R. §211.180(f). And, FDA materials for decades have likewise made clear that "[a]ll inspectional findings reported on the Form FDA-483 *should be resolved prior to the approval of the application or supplement*." *See* "Compliance Program Guidance Manual Chapter – 45 Biological Drug Products" (Oct. 2010), available at https://www.fda.gov/media/73834/download.

On June 3, 2019, Outlook announced its manufacturing partnership with FUJIFILM Diosynth Biotechnologies ("FujiFilm"). ¶86. On September 30, 2020, announced its additional manufacturing partnership with Ajinomoto bio-Pharma Services ("Ajinomoto" and collectively with FujiFilm, the "Manufacturing Partners"). ¶92. Although both were third-party

manufacturers, Defendants were intimately involved in the facility inspection process as Trenary admitted:

> "We have found [the Manufacturing Partners'] CMC capabilities to be outstanding. *We did a lot of work with them on mock inspections. We went through both of their factories several times with our mock inspection teams that we hired* and just felt all along like both of those companies had great capability to not only run a clean shop but be in a position to do what needs to be done to get through FDA inspections in really good shape."

¶175.

Contrary to Trenary's statements to Outlook investors, the Manufacturing Partners were not "outstanding" and did not "run a clean shop." ¶¶109, 175. In truth, but not disclosed to Outlook investors, both had received dire Forms 483 from the FDA detailing significant material deficiencies in the exact same facilities proposed for the manufacturing of ONS-5010. ¶¶94-97. The Form 483s outlined serious deficiencies at both facilities dated from at least 2021 and were not remediated. *Id.* Defendants have never denied knowledge of the Forms 483, and there is no plausible way they could have conducted mock inspections they claimed without having reviewed the recent inspection records of those facilities, particularly because ONS-5010 could not be approved unless those deficiencies were remediated. *See* "Compliance Program Guidance Manual Chapter – 45 Biological Drug Products," at 82.

Despite having actual knowledge of these unremediated manufacturing violations, Defendants concealed the Manufacturing Partners' CMC problems, and the fact that each received multiple Form 483s for the very facilities designated to manufacture ONS-5010. Instead, Defendants repeatedly touted cGMP compliance and manufacturing capabilities in eighteen different statements to investors. *See* ¶¶102, 109, 116, 117, 119, 120, 122, 127, 137, 139, 141, 156, 160, 166, 170, 172, 175, 177.

6

### ii.  Outlook's Deficient NORSE 1-3 Trials

Drug sponsors must obtain FDA approval before commercializing a pharmaceutical product in the United States.  ¶44.  The FDA divides therapeutics into different categories and bevacizumab falls into a category known as "biologics," and can only be marketed in the United States when the FDA has approved a BLA.  *Id.*  A drug sponsor, not the FDA, designs clinical trials and protocols for the trials to be submitted in support of a BLA.  ¶53.  A sponsor generally conducts clinical trials in three phases, with the Phase III trials referred to as "pivotal" clinical trials due to their importance and the fact that such trials are supposed to be large and well-controlled.  ¶54.  The FDA has long advised the industry that "[w]ith regard to quantity [of pivotal clinical trials], it has been the FDA's position that Congress generally intended to require at least two adequate and well-controlled studies, each convincing on its own, to establish effectiveness." ¶48.

On November 6, 2018, Outlook announced that it had commenced NORSE 1, which enrolled only 61 patients in nine sites around Australia and New Zealand.  ¶¶81, 83.  On August 20, 2019, Outlook issued a press release and stated: "[t]he NORSE 1 study design was confirmed in our April 2018 FDA meeting to be one of our two adequate and well controlled clinical trials required to support approval of ONS-5010…"  ¶90.  In a March 1, 2019 press release, Outlook announced NORSE 2 as its "second of two adequate and well controlled phase 3 clinical trials." ¶83.  NORSE 3 was "an open label safety study."  ¶112.  NORSE 1 enrolled 61 patients, NORSE 2 enrolled 228 patients, and NORSE 3 enrolled 195 patients.  ¶¶81, 84, 113.

At no time did Outlook jointly plan any of the undersized NORSE 1-3 trials with the FDA, or reach agreement with the FDA that such small, underpowered studies could provide proof of efficacy sufficient to support approval, especially given the robust trials for other FDA-approved

7

wet AMD treatments.  ¶81.  Despite knowing this, Defendants represented to investors that Outlook, "in consultation with FDA and in communication with FDA, designed a three-study program in order to get approval for [its] version of bevacizumab."  ¶129; *see also* ¶¶90, 98, 104, 106, 131, 133, 150.

### C.    Investors Learn the Truth

On May 31, 2022, Outlook issued a press release announcing that the FDA requested additional information regarding Outlook's ONS-5010 BLA submission.  ¶179.  As a result of the partial disclosure, Outlook's stock price declined by nearly 6.96% from its previous day's closing price of $1.15 on May 31, 2022, to close at $1.07 on June 1, 2022, on heavy trading volume.  ¶180. Then, on August 30, 2023, during pre-market hours, Outlook issued a press release announcing that the FDA had issued a CRL to the ONS-5010 BLA and could not approve the ONS-5010 BLA during the present review cycle because of unresolved CMC and manufacturing site inspection issues, as well as "a lack of substantial evidence" of efficacy.  ¶181.  On this news, Outlook's stock price fell $1.141 per share, or 80.92%, to close at $0.269 per share on August 30, 2023.  ¶183.

After the Class Period, Defendants admitted many of the facts that had been previously concealed.  On August 30, 2023, Defendant Trenary conceded that the problems identified in the CRL consisted in large part of "***old items***" that had not been remedied.  ¶189.  On December 22, 2023, Outlook filed a Form 10-K with the SEC revealing that it required an additional, appropriately sized and well-controlled pivotal trial.  ¶191.  Then, on January 23, 2024, Outlook issued a press release announcing that it had reached a Special Protocol Assessment agreeing with the FDA on trial design for the new sized NORSE 8 clinical trial, confirming that it understood such SPA agreements were necessary for a clinical trial to be "confirmed" or "jointly planned." ¶192.

8

## ARGUMENT

### I.   Legal Standards

#### A.   Rule 12(b)(6) Motion to Dismiss

To withstand a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The question is not whether the plaintiff "will ultimately prevail" but whether it is "entitled to offer evidence to support the claims."  *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011) (internal quotation marks omitted).  On a Rule 12(b)(6) motion to dismiss, courts will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

For §10(b) claims, the PSLRA and Rule 9(b) impose two additional pleading standards. First, misrepresentations must be alleged with particularity.  *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009).  This does not call for an "exhaustive cataloging of facts," but only allegations sufficient to "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred."  *Medtronic Ave, Inc. v. Bos. Sci. Corp.*, No. CIV.A. 98-478-SLR, 2001 WL 652016, at *2 (D. Del. Mar. 30, 2001).  The Third Circuit instructs that particularity requirements are relaxed where, as here, the factual information is peculiarly within defendants' knowledge or control.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Second, the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter. *See* 15 U.S.C. §78u-4(b)(2). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Instead, a complaint alleges a strong inference of scienter so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Scienter may be established by showing that defendants acted either consciously or recklessly. *In re PTC Therapeutics, Inc., Sec. Litig.*, 2017 WL 3705801, at *15 (D.N.J. Aug. 28, 2017). Scienter of executives acting within the scope of employment is imputed to the corporation. *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 468 (D.N.J. 2017). To plead a claim under §10(b), 15 U.S.C. §78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37-38; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The Complaint satisfies each of these elements.

## B. Consideration of Documents Not Cited in the Complaint

Defendants submit the Declaration of Caroline Pignatelli ("Pignatelli Declaration") (ECF No. 42-3) and Exhibits 1-33 thereto (ECF Nos. 44-4 to 44-41) to inject extraneous facts that support their counter-narrative improperly.[2] "As general matter, a district court ruling on a motion

---

[2] For example, Defendants improperly attach as Ex. 22 to argue that their misstatements are vindicated because the European Union had accepted the ONS-5010 application. MTD at 17. However, this case is about FDA approval so a decision by another regulatory body has no bearing but even if it did, the release is from May 18, 2024, almost a year after the end of the Class Period. *See Hall v. Johnson & Johnson*, No. CV 18-1833 (FLW), 2019 WL 7207491, at *10 (D.N.J. Dec. 27, 2019) (declining to take judicial notice, finding that, "[a]though statements from government

to dismiss may not consider matters extraneous to the pleadings." *Burlington Coat Factory*, 114 F.3d at 1426. Third Circuit precedent prohibits consideration of matters outside the pleadings in resolving a motion to dismiss unless the Court first converts the motion into one for summary judgment. *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 682 (D. Del. 2013). "However, an exception to the general rule is that a 'document *integral to or explicitly relied upon* in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Burlington Coat Factory*, 114 F.3d at 1426 (internal citation omitted).

Plaintiffs take no position on Defendants' submission of documents relied upon as part of the moving allegations of the Complaint, except to note that Defendants do not dispute that their statements are accurately reproduced in the Complaint. The Court should not consider the remaining documents in adjudicating Defendants' motion to dismiss, *i.e.*, Pignatelli Decl. Exs. 3-4, 22, 32, & 33.

## II.    The Complaint Adequately Alleges Violations of Section 10(b)

### A.    The Complaint Adequately Alleges Material Misrepresentations and Omissions Regarding the Manufacturing of ONS-5010

The law is clear: "once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading." *PTC Therapeutics*, 2017 WL 3705801, at *14. For that reason, courts have not hesitated to sustain securities fraud complaints against drug manufacturers that misrepresent cGMP compliance or conceal manufacturing deficiencies. *See, e.g., In re Able Labs. Sec. Litig.*, No. CIV.A. 05–2681JAG, 2008 WL 1967509, at *16, 30 (D.N.J. Mar. 24, 2008) (denying motion to dismiss where defendants misrepresented cGMP compliance in the face of a

---

entities are typically appropriate for judicial notice," an exhibit issued three months after the close of the class period "arguably ha[d] minimal relevance to the claims at issue").

11

Form 483); *McGuire v. Dendreon Corp.*, 688 F.Supp.2d 1239, 1241, 1244–45 (W.D. Wash. 2009) (*Dendreon II*) (similar); *Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, No. 19 CIV. 3354 (VM), 2020 WL 3268531, at *14 (S.D.N.Y. June 17, 2020) (finding statements regarding cGMP compliance were misleading based on violations found in Form 483); *Yanek v. Staar Surgical Co.*, 388 F.Supp.2d 1110, 1129 (C.D. Cal. 2005) (finding the FDA's issuance of a Form 483 material to a company's statements about the timing of FDA approval of an implantable contact lenses (ICL) because issuance of the Form 483 was a "fact[ ] bearing on possible delays in FDA approval of the ICL"); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, No. 09–12830, 2010 WL 4184465, at *6 (E.D. Mich. Oct. 21, 2010) (denying motion to dismiss where company represented it was "substantially cGMP compliant" contemporaneously with receiving Form 483s noting serious manufacturing problems); *In re Cryolife, Inc.*, No. Civ.A.1:02CV1868–BBM, 2003 WL 24015055, at *8 (N.D. Ga. May 27, 2003) (denying motion to dismiss where the company receiving Form 483 represented it in was "in compliance with all FDA regulations").

Here, the Complaint adequately alleges that Defendants systematically concealed the known, unremediated deficiencies at the specific facilities they designated to manufacture ONS-5010.    When announcing their manufacturing agreements, Defendants acknowledged understanding that compliance with cGMP was "a required part of the … BLA, submission in wet AMD."  ¶86.  But, Defendants were silent when the Manufacturing Partners received Forms 483 for the ONS-5010 manufacturing facilities on June 10, 2021 and August 31, 2021.  ¶¶94-95. Instead of telling the truth, Trenary told investors that the same manufacturers the FDA had just designated as deficient were "first-class," and that "the product quality that's coming out of our factories…is outstanding."  ¶¶109, 117.  Defendants continually misrepresented the manufacturing facilities for the following 16 months despite knowing that the FDA had already confirmed they

12

did not comply with cGMP.  ¶¶102, 109, 116, 117, 119, 120, 122, 127, 137, 139, 141, 156, 160, 166.

On January 16, 2023 and June 7, 2023, Ajinomoto and FujiFilm received *additional* Forms 483, confirming that most of the prior cGMP violations had not been remedied.  ¶¶96-97.  Instead of revealing the problems, Defendants doubled down on their false statements touting cGMP capabilities.  ¶¶170, 172, 175, 177.  On July 28, 2023, only one month after the newest Form 483 had been issued, Defendants went further, stating that they had conducted "mock inspections" of "both of their [Manufacturing Partners'] factories several times" and that they were "in a position … to get through FDA inspections."  ¶175; *see, e.g., Able Labs*, 2008 WL 1967509, at \*16, 30. Defendants do not, and cannot, dispute that the cGMP violations were repeatedly verified in Form 483s but omitted from investors information about which "there is a substantial likelihood that a reasonable investor would consider it important in deciding how to act." *Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229, at \*8 (D.N.J. July 27, 2018).  The omissions are plausibly alleged, which is all that is required at this stage.  *Matrixx*, 563 U.S. at 46 n.12.

That the cGMP violations involved contract manufacturers neither relieves Outlook from responsibility for those violations, nor permits misrepresentations about those violations to investors.  FDA regulations and guidance expressly recognize that when a drug's "owner uses a contract facility, *the owner's quality unit is legally responsible for approving or rejecting drug products manufactured by the contract facility*, including for final release.  The regulations require that the quality unit's responsibilities and procedures be in writing and that they be followed." *See* FDA, "Contract Manufacturing Arrangements for Drugs: Guidance for Industry" (Nov. 2016), available at https://www.fda.gov/media/86193/download.  Given this legal responsibility, there is no plausible basis to suggest that Defendants were not fully aware of the

13

FDA-documented deficiencies in the manufacturing facilities with which they contracted. *In re Celgene Corp. Sec. Litig*., No. CV 18-4772, 2019 WL 6909463, at *17 (D.N.J. Dec. 19, 2019). Once Defendants chose to speak about Outlook's Manufacturing Partners, they were obligated to do so truthfully, including disclosure of known material cGMP violations. *In re Aetna, Inc. Sec. Litig*., 617 F.3d 272, 283 (3d Cir. 2010).

Defendants' argument regarding materiality misses the point. Plaintiffs do not argue and need not establish that every single Form 483 is material as a matter of law. But neither the facts alleged nor the cases Defendants cite suggest that the Forms 483 here—which identified serious issues in the precise facilities used to manufacture Outlook's sole drug candidate that had to be remedied before a BLA could be issued—were extremely significant to Outlook and its investors. *See, e.g., Able Labs*, 2008 WL 1967509, at *16.

Defendants' cited cases do not hold otherwise. In *In re Genzyme Corp. Sec. Litig.*, the First Circuit noted that materiality in that case "need not be reached," and clarified that a Form 483 "***may very well be material depending on the facts of the case***." 754 F.3d 31, 42 n.4. (1st Cir. 2014). Furthermore, Genzyme disclosed Form 483s instead of actively concealing them as Defendants did here. *Id*. at 41. *Genzyme* also found that the Form 483 did not impact the PDUFA date. *Id*. at 42. Here, by contrast, the FDA noted that cGMP issues from "open observations from pre-approval manufacturing inspections" ***did*** impact the PDUFA date. ¶181.

*Pub. Pension Fund Grp. v. KV Pharm. Co*., 679 F.3d 972 (8th Cir. 2012) is more instructive. There, the court concluded that that "for purposes of pleading a securities fraud claim, the issuance of Form 483s may render a defendant's statement about its compliance with FDA regulations or cGMP false, or at least misleading." *Id*. at 982–83; *see also Schaeffer v. Nabriva Therapeutics plc*, No. 19 CIV. 4183 (VM), 2020 WL 7701463, at *8 (S.D.N.Y. Apr. 28, 2020)

14

(collecting cases).  The court set out a number of factors, including "the number, severity, and pervasiveness of objectionable conditions noted, as well as whether a company has failed to address or correct the deficiencies noted by the FDA" and articulated that the "presence of these factors would be viewed by a reasonable investor as significantly altering the total mix of information made available, irrespective of whether the Form 483 represents the FDA's final say on compliance issues."  *Pub. Pension Fund Grp.* 679 F.3d at 982–83.  The court found that the plaintiffs had adequately pled material, misleading statements based on the number of objectionable conditions "outlined in the Form 483s" the continuing violations of cGMP at the manufacturing facility, and the failure on these points ultimately caused an adverse business impact on the defendant.  *Id*. at 983-84.

Likewise, Plaintiffs have alleged the substance of and attached as exhibits to the Complaint the Forms 483 at issue.  ¶¶94-97; Exs. 1-4.  The Form 483 for Ajinomoto's facility explicitly stated that "***facility and equipment maintenance were deficient in their ability to support cGMP production activities***."  ¶96(a); Ex. 3 at 1.  The eight-page Form 483 for FujiFilm's facility indicated eight separate violations, including a clear conclusion that the "***manufacturing process areas were deficient***."  ¶97(a)-(h); Ex. 4.  Defendants offer no plausible basis for why omitting such devastating information from their statements about manufacturing could possibly be immaterial to investors.  Finally, Defendants now concede that the cGMP violations went unmitigated, involved "***old***" issues, and were at least partially responsible for the denial of the BLA.  ¶181.  That is more than sufficient at this stage.[3]

---

[3] Defendants argument that they had no duty to disclose the Form 483s is wrong.  MTD at 20. "Disclosure is required ... when necessary to make … statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 44; *Schaeffer*, 2020 WL 7701463, at *9.

**B.      The Complaint Adequately Alleges Material Misrepresentations and Omissions Regarding the NORSE 1-3 Trials**

The Complaint also pleads that Defendants misled investors by representing to them that the FDA jointly planned and agreed to Outlook's pivotal trials.  ¶¶90, 98, 104, 106, 129, 131, 133, 150.  As the Complaint explains, trial design and protocol agreements between a sponsor and the FDA are set forth in an SPA, which must be reduced to writing.  ¶53.  However, Outlook never negotiated or received an SPA for the NORSE 1-3 trials.  ¶¶ 53, 91.  Yet, they falsely told investors that trial requirements were "***agreed upon with the FDA***," ¶98, and that the clinical trial plan "***was put together between the company and the FDA***,"  ¶106; *see In re QuantumScape Sec. Class Action Litig*., 580 F. Supp. 3d 714, 735 (N.D. Cal. 2022) (finding statements representing studies "to be one thing [ ] when they were in fact another [ ]" to be misleading).  The misleading nature of these statements was further amplified when Defendants encouraged investors to equate the undersized NORSE 1-3 trials to properly sized and controlled studies, including the CATT Study and those used to support other FDA-approved wet AMD treatments.[4]  ¶¶112, 114, 131, 133, 152, 154, 164.

Courts consistently uphold statements in similar cases where defendants misrepresent regulatory communications or omit adverse information material to assessing clinical trials.  *See Tomaszewski v. Trevena, Inc*., 482 F. Supp. 3d 317, 331 (E.D. Pa. 2020) (actionable omissions where defendant knew that an NDA would be deficient because he knew that Trevena's studies did not conform the primary or secondary endpoints to the FDA's requirements); *see also Celgene Corp.*, 2019 WL 6909463, at *18 ("[t]he fact that Defendants told investors about the positive

---

[4] Defendants doubled down and affirmatively stated that "we've provided all necessary information in both clinical as well as CMS in order to earn approval" (¶173) after the FDA published the Wet AMD Guidance putting Defendants on notice that the NORSE 1-3 trials were insufficient.

clinical study results but failed to disclose the Metabolite discovery was misleading."); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 898 (E.D. Pa. 2018) (falsity alleged where defendants failed to disclose unfavorable data that would inform the FDA's decision); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 348-49 (E.D. Pa. 2014) (defendants "systemically misled investors about the key components of the Ampligen NDA and the nature of FDA feedback while presenting predictions about FDA approval of Ampligen that it should have known were unreasonable under the circumstances.").

### C.    Defendants' Excuses for their Misrepresentations Fail

#### i.    The Complaint does not involve scientific disagreement

This is not a case of divergent interpretation of clinical data or scientific disagreement with the FDA.  On the contrary, Plaintiffs' allegations make clear that Defendants misled investors regarding an agreement with the FDA on the design and sufficiency of the NORSE 1-3 trials. *See*, *e.g.* ¶106 ("the company is engaged in three very important clinical trials in order to gain FDA approval. ***This was a plan that was put together between the company and the FDA***…");[5] ¶129 ("what the company did was, ***in consultation with FDA and in communication with FDA, designed a three-study program in order to get approval for our version of bevacizumab***"); ¶48 (The FDA has long advised the industry that "[w]ith regard to quantity [of pivotal clinical trials], it has been FDA's position that Congress generally intended to require at least two adequate and well-controlled studies, each convincing on its own, to establish effectiveness.").  Whether there was a joint plan or agreement is a question of fact that has nothing to do with different ways of analyzing trial data.  Regardless, as a unanimous Supreme Court decision makes clear, when a

---

[5] This type of statement has been considered to be actionable. *See In re Discovery Lab'ys Sec. Litig.*, No. 06–1820, 2006 WL 3227767, at *12 n. 25 (E.D. Pa. Nov. 1, 2006) ("If [Defendant] had announced 'we are certain that we have conducted sufficient clinical trials to obtain EMEA approval,' this case might be different.").

corporation receives plausible material adverse information, it cannot make misleading statements even if it disagrees with the information or there is some scientific uncertainty. *Matrixx,* 563 U.S. at 45 (plaintiff adequately alleged misrepresentations about anosmia even though Matrixx disagreed its drug caused the symptom).[6]

### ii.   The Complaint does not assert fraud by hindsight

Defendants incorrectly claim that because the fraud was *revealed* by the ONS-5010 CRL (and partially, by the earlier FDA request for additional manufacturing information), then any statement that Defendants made to investors about ONS-5010 should be considered fraud by hindsight.  The Third Circuit has soundly rejected that argument, instructing that although "later developments may allow a reasonable inference that prior statements were untrue or misleading when made," such pleading does not constitute "fraud by hindsight."  *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) (collecting cases).  As *In re MannKind Sec. Litig.* explained in the context of a drug application, misrepresentations about already-existing regulatory communications, agreements, and deficiencies are the opposite of "fraud by hindsight":

> In their motion, Defendants lay heavy emphasis on the fact that in demonstrating falsity, Plaintiffs rely in part upon the FDA's 2011 CRL to demonstrate that no such "agreement" or "blessing" existed, calling this classic fraud-by-hindsight pleading. (Docket No. 59, Mem. at 18.) Defendants' argument misses the mark. ***Fraud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements.*** Courts must of course be careful to distinguish between forward-looking statements later deemed to be unduly optimistic, and statements of historical fact later shown to be *false* when made. The statements that the FDA had accepted, or blessed, or agreed to the Defendants' bioequivalency methodology—which are shown to be false by a later

---

[6] Unlike *Lewakowksi*, the Complaint here alleges that Outlook possessed concrete information plausibly contradicting the statements it made about cGMP compliance and FDA agreements. *Lewakowski v. Aquestive Therapeutics, Inc*., No. CV213751ZNQDEA, 2023 WL 2496504, at *6 (D.N.J. Mar. 14, 2023) ("Nothing in the record suggests…that the topline results were not honestly believed and lacked a reasonable basis…").

revelation  demonstrating that the FDA had not, in fact, done any such thing—do not constitute "fraud-by-hindsight," as Defendants repeatedly allege.

835 F. Supp. 2d 797, 809–10 (C.D. Cal. 2011).   The same is true here.

### iii. Defendants' boilerplate warnings do not immunize their misrepresentations and omissions

Defendants' boilerplate cautionary statements provide no cover for their fraud because the misrepresentations and omissions in question are not forward-looking, the so-called cautionary language says nothing whatsoever about the specific risks concealed, and because the risks had already materialized.  *See, e.g.,* ¶¶124, 126, 127, 168.  Each alleged misrepresentation and omission addressed regulatory communications that had already taken place, purported (but not actual) regulatory agreements that were supposed to have already been reached, and "old" cGMP violations that had already been documented but were never remedied.  Statements that "refer to past interactions with the Agency" are not forward-looking.  *In re MannKind*, 835 F. Supp. 2d at 816; *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 192 (D.N.J. 2022); *Frater*, 996 F. Supp. 2d 335, 348 (E.D. Pa. 2014).  Regardless, there is no safe harbor for statements like the ones alleged here that are made with actual knowledge of falsity. *See, e.g., Dodge v. Cambrex Corp.*, No. CIVA 03-CV-4896 PGS, 2007 WL 608365, at *2-3 (D.N.J. Feb. 23, 2007).  This is in stark contrast to the scenarios in Defendants' cited cases.

Where an alleged misrepresentation addressed already-known issues, "it cannot be that the mere inclusion of 'words of futurity or belief' brings otherwise non-forward-looking statements within the PSLRA safe harbor." *Frater*, 996 F. Supp. 2d 335, 348–49 (E.D. Pa. 2014). Defendants' "risk disclosures" were not only ineffective, but themselves false and misleading because they affirmatively mischaracterized any "risks" to the ONS-5010 BLA as potential when real risks had already come to pass.  For example, Defendants said Outlook might be harmed *if* the contract manufacturers do not "comply with regulatory requirements," when they already

19

possessed written confirmation that the same manufacturers, in the same facilities, had not complied with regulatory requirements. ¶168; *see also* ¶126. "[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996); *see also  In re: Enzymotec Sec. Litig.*, No. CV-14-5556 (JLL)(MAH), 2015 WL 8784065, at *15 (D.N.J. Dec. 15, 2015) ("Lead Plaintiffs specifically allege that these risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect."); *In re Viropharma Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) (citing cases).

### iv.  Defendants' concrete representations about their contract manufacturing and regulatory communications were not puffery

Defendants' misrepresentations addressed documented but not disclosed deficiencies at two specified manufacturing facilities, the concealment of specific Form 483s issued by the FDA, and the misrepresentation of specific regulatory communications about purported agreements with the FDA and joint planning of Outlook's NORSE 1-3 trials. None of these were vague or immaterial. All went to the direct question central to investors: had Defendants fulfilled the regulatory obligations necessary to obtain approval for ONS-5010.

Such statements referring to actual clinical trials or regulatory communications involve identifiable "historical fact" and cannot properly be characterized as puffery. *In re Bristol-Myers Squibb Sec. Litig.,* No. CIV.A. 00-1990(SRC), 2005 WL 2007004, at *24 (D.N.J. Aug. 17, 2005). "Puffery," by contrast, refers to statements that are so vague that no reasonable investor would rely upon them. *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 649 (D.N.J. 2021). But even statements of corporate optimism are actionable where they are "connected to factual assertions." *Id.* Here, they are. None of the alleged misrepresentations assert mere optimism about ONS-5010;

20

each misrepresents (or conceals) specific, identifiable cGMP violations and regulatory communications. *See also In re Eros Int'l PLC Sec. Litig.*, No. CV 19-14125, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021) ("the Court cannot conclude at the motion to dismiss stage that Defendants' statements regarding Eros' 'strong,' 'healthy,' 'solid,' and 'conservative' balance sheet and cash flow are non-material statements of puffery"); *SEB*, 351 F. Supp. 3d at 898 (defendants, while "instilling hope in their investors …. Failed to disclose the unfavorable data that would inform the FDA's decision"); *Frater*, 996 F. Supp. 2d at 348-49 (E.D. Pa. 2014) (plaintiffs adequately pled that "Hemispherx systemically misled investors about the key components of the [ ] NDA and the nature of FDA feedback").

### v.  The Complaint does not constitute puzzle pleading

Defendants wrongly contend the Complaint constitutes a "puzzle pleading."  MTD at 12-13.  A "puzzle pleading" reflects a "'great web of scattered, vague, redundant and often irrelevant allegations.'"  *In re Honeywell Int'l Inc. Sec. Litig.* 182 F. Supp. 2d 414, 426 (D.N.J. 2002) (quoting *Wegner v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998)).  Here, the Complaint plainly alleges Plaintiffs' theories of falsity and Defendants' direct knowledge that their statements were misleading when made.[7]  Pursuant to Rule 9(b), the Complaint specifically identifies the facts explaining how and why each separate Class Period statement was misleading

---

[7] Defendants' cases on puzzle pleading are distinguishable.  In *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, No. CV 16-112-GMS, 2017 WL 3891676, at *3 (D. Del. Sept. 6, 2017), the complaint alleged fifty misstatements before setting forth the reasons why they were misleading. Here, the Complaint follows a pattern whereby each misstatement or omission is followed by a paragraph setting forth concisely the reasons why the preceding statements were false. This satisfies the PSLRA, and is the opposite of puzzle pleading.  Likewise, *Stichting Pensioenfonds ABP v. Merck & Co.*, No. CIV.A. 05-5060 SRC, 2012 WL 3235783, at *7 (D.N.J. Aug. 1, 2012) is inapplicable because the complaint there listed fourteen SEC filings in one paragraph and alleged that they contained misleading statements without specifically identifying which statements and where they were located.  That is also not the case here where each misstatement is identified by date, forum, and speaker.

21

when made. *See In re Honeywell*, 182 F. Supp. 2d at 416 ("The Complaint certainly is not short, but if it is a puzzle, it is meant for a child and can be assembled readily").

### C.     The Complaint Adequately Alleges Defendants' Scienter

Scienter is pled where, as here, a plaintiff alleges facts giving rise to a strong inference that the defendant acted with the required state of mind in making misleading statements and/or omissions. 15 U.S.C. §78u-4(b)(2). In the Third Circuit, scienter is sufficiently alleged when a complaint's allegations give rise to a strong inference of "either reckless or conscious behavior." *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 524, 534-35 (3d Cir. 1999).

The inference of scienter "need not be irrefutable" or "of the 'smoking-gun' genre." *Tellabs*, 551 U.S. at 324. Instead, scienter is satisfied by allegations that, when "accepted as true and taken collectively" support an inference of intent or recklessness at least as strongly as they support any nonculpable inference. *Id.* The analysis must be "case specific" and should "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. The Complaint easily satisfies these standards.

#### i.     The Complaint pleads that Defendants had actual knowledge of or access to information contradicting their public statements

The Complaint plausibly alleges that Defendants had actual knowledge of or access to information contradicting their public statements about their Manufacturing Partners and the FDA's purported (but not actual) agreement to the NORSE 1-3 clinical trial plan. ¶¶90, 104, 110, 112, 116, 119, 124, 129, 131, 133, 135, 146, 150, 154, 162, 175. Defendants' contemporaneous access to information contradicting their statements to investors is classic evidence of scienter. *See In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 599 (D.N.J. 2001); *see also In re*

22

*ViroPharma Inc. Sec. Litig*., 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014); *Frater,* 996 F. Supp. 2d 335, 348 (E.D. Pa. 2014); *Aldridge v. A.T. Cross Corp*., 284 F.3d 72, 83 (1st Cir. 2002) (same).

Here, Trenary admitted that Outlook worked directly with its manufacturers to analyze their cGMP capabilities and executed mock FDA inspections to gauge each facility's readiness for an FDA inspection – when each received a Form 483 detailing their respective cGMP violations. ¶¶175.  Defendants either reviewed the Form 483 documentation establishing that FujiFilm and Ajinomoto failed to comply with cGMP, or were reckless in deciding to speak about cGMP compliance without reviewing the available contradictory information.  *Able Labs*, 2008 WL 1967509, at \*16.

Regarding the NORSE 1-3 trials, Plaintiffs allege that Trenary specifically represented that the clinical program "was a plan that was put together between the company and the FDA…" ¶106.  This was patently false and they either knew it to be so from the regulatory communications with the Company, or was reckless to the prospect of misleading investors by stating without determining whether the FDA had agreed to the NORSE 1-3 trial designs.[8]

Kenyon, likewise, misrepresented the existence of an agreement between Outlook and the FDA regarding the NORSE 1-3 trials and the Manufacturing Partners' cGMP compliance.  ¶¶100, 104, 124, 162.

---

[8] Defendants' assertion that "emails, phone calls, documents" etc. are required to establish scienter, MTD at 25, is incorrect.  As the Supreme Court made clear, no such "smoking-gun" is required. *Tellabs*, 551 U.S. at 324; *see also Enzymotec*, 2015 WL 8784065, at \*7, 18 (D.N.J. Dec. 15, 2015) ("The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness").  Nevertheless, Plaintiffs have attached the Form 483s as exhibits and set forth Defendants' statements evidencing that the information known by and available to Defendants when they made their misleading representations to investors.  That is all the law requires.  *Id.*

### ii. That Defendants held themselves out as knowledgeable about the misrepresented subjects supports an inference of scienter

Defendants repeatedly spoke to investors and analysts about the cGMP compliance of the facilities they selected for ONS-5010 manufacturing and Outlook's regulatory communications with the FDA.  ¶¶100, 104, 106, 108, 111, 112, 119, 124, 129, 133, 150, 162, 175.  By holding themselves out as authorities, Defendants "implied that they had first-hand knowledge" of these subjects. *PTC Therapeutics,* 2017 WL 3705801, at \*17-18. Such acts "tend further to bolster the inference" that Trenary and Kenyon either "knew at the time that [their] statements were false or [were] reckless in disregarding the obvious risk of misleading the public." *Id.*  (quoting *Avaya*, 564 F.3d at 272).

### iii. That the misrepresentations involved Outlook's core operations supports an inference of scienter

Material misrepresentations concerning core matters of central importance to a company may support an inference of scienter when accompanied by some additional allegation of specific information conveyed to management and related to the fraud. *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, No. CV 17-10467, 2019 WL 3451523, at \*16 (D.N.J. July 31, 2019). The misrepresentations alleged in the Complaint involved Outlook's sole drug candidate. *Compare* ¶¶3-4, 185 *with In re Allergan Generic Drug Pricing Sec. Litig.,* No. CV169449KSHCLW, 2019 WL 3562134, at \*12 (D.N.J. Aug. 6, 2019) (applying core operations doctrine where alleged misrepresentations addressed even a "substantial portion" of the defendant company's operations during the class period); *Reid v. Hemispherx Biopharma, Inc*., No. CV 09-5262, 2010 WL 11710594, at \*3 (E.D. Pa. Apr. 20, 2010) (inference of scienter appropriate where Plaintiff alleged that "Hemispherx is a small company that made only one drug besides Ampligen for commercial distribution.").  There is a "logical, and strong, inference that the defendants were aware of the alleged severe and pervasive problems" in light of "the importance of manufacturing and quality

24

control ... and the fact that both areas of operation had been flagged by the FDA." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014).

Additionally, as set forth in Sections II(C)(i)-(ii), Defendants' admissions of knowledge, taken together with the fact that the misstatements and omissions directly concerned Outlook's core operations, support a strong inference of scienter. *See, e.g., Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP,* 532 F. Supp. 3d 189, 232-33 (E.D. Pa. 2021) (holding that the "core business doctrine has relevance" where "some of the individual Defendants possesses personal knowledge giving rise to a strong inference of scienter"). For these reasons, Defendants cited cases are inapposite. *See* MTD at 27.

### iv. Temporal proximity supports a strong inference of scienter

The temporal proximity between the misleading statements and contradictory adverse events further bolsters a strong inference of scienter. *See Avaya*, 564 F.3d at 268 (temporal proximity of misleading statements should be considered in conjunction with other factors evidencing scienter). As late as July 28, 2023, Defendants assured investors that they had "provided all necessary information in both clinical as well as [cGMP] in order to earn approval" and that they had "found [FujiFilm's and Ajinomoto's] [cGMP] capabilities to be outstanding" after going through "both of their factories several times." ¶¶173, 175, 177. Even worse, they told investors that the Manufacturing Partners "run a clean shop" and were "in a position to do what needs to be done to get through FDA inspections in really good shape." *Id.* In truth, the paperwork that was unquestionably part of the mock inspections confirmed that both facilities had received Forms 483 identifying unresolved deficiencies only months earlier. ¶¶96-97. This temporal proximity renders implausible any competing inference that Individual Defendants were unaware of the true facts they concealed.

25

Defendants' awareness is further supported by Trenary's post-class admission that the manufacturing and trial deficiencies were largely "***old items***" of the ONS-5010 BLA and Outlook's press release on January 23, 2024, revealing that Outlook knew an FDA trial design agreement was to be documented in an SPA and had done so for the next trial, NORSE 8.  ¶¶189-192.  *See In re Merck & Co. Sec. Litig*., 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period'" because "'[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'" (*quoting In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001))).

### D.  The Complaint Adequately Alleges Loss Causation

The Supreme Court has made clear that alleging loss causation "should not prove burdensome" as a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  The Third Circuit has further held that loss causation inquiries are generally inappropriate on a motion to dismiss.  *EP Medsystems, Inc. v. EchoCath, Inc*., 235 F.3d 865, 884 (3d Cir. 2000).  Here, there is no pleading deficiency.

A "[p]laintiff may adequately plead loss causation by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." *In re Wilmington Tr. Sec. Litig*., 29 F. Supp. 3d 432, 450 (D. Del. 2014); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007) (holding loss causation can be proven where "defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss," and that materialization of the risk "is consistent with our loss causation jurisprudence.").  The Complaint

expressly alleges that each corrective disclosure and risk materialization provided the market information that had previously been concealed about the ONS-5010 BLA and were promptly followed by declines in the price of Outlook stock. ¶¶179-83. For each disclosure, the Complaint reveals what new information was disclosed to the market and how it related to Defendants' prior concealment. Thus, the Complaint not only satisfies, but exceeds, the "some indication" standard prescribed by *Dura*.

Defendants' attempt to mischaracterize the corrective disclosures as mere "bad news" lacks merit. MTD at 30. Corrective disclosures necessarily involve "bad news." The question is whether a disclosure revealed anything to the market about the misrepresented information (or was a materialization of the concealed risk). Here, it did. The "bad news" – that the FDA had issued a CRL for ONS-5010 – was expressly tied to "old" manufacturing deficiencies and insufficient proof of efficacy, necessarily informing investors that the cGMP violations had not been remedied, and that Outlook had not, in fact, reached agreement with the FDA on the NORSE 1-3 trials. ¶¶179-83. For pleading purposes, the Court must accept these well-pleaded allegations as true and draw inferences in their favor. *See Fleisher*, 679 F.3d at 120. If Defendants claim to have any admissible evidence providing alternative bases for the stock drops alleged, they may present that evidence at trial.

## III.    The Complaint Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act

Defendants contend in a footnote that control person liability pursuant to Section 20(a) must fail if the Section 10(b) claims fail. MTD at 30, n. 17. However, Plaintiffs have sufficiently alleged violations of Section 10(b) and have pled Trenary and Kenyon were also liable as control persons. ¶¶211-216. That is sufficient for this stage of the proceeding. *PTC Therapeutics*, 2017 WL 3705801, at *19.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss should be denied in its entirety. Should this Court find any infirmity in the Complaint, Plaintiffs respectfully request leave to amend.

Dated:  August 8, 2024                              Respectfully submitted,

                                                    POMERANTZ LLP

                                                    */s/Thomas H. Przybylowski*

                                                    Joshua B. Silverman (*pro hac vice*)
                                                    Genc Arifi (*pro hac vice*)
                                                    POMERANTZ LLLP
                                                    10 S La Salle Street, Suite 3505
                                                    Chicago, IL 60603-1049
                                                    Tel: (312)-881-4859
                                                    Fax: (312)-377-1184
                                                    Email: jbsilverman@pomlaw.com
                                                           garifi@pomlaw.com

                                                    and

                                                    Jeremy A. Lieberman (*pro hac vice*)
                                                    Thomas H. Przybylowski
                                                    600 Third Avenue, 20th Floor
                                                    New York, New York 10016
                                                    Telephone: (212) 661-1100
                                                    Fax: (917) 463-1044
                                                    Email: jalieberman@pomlaw.com
                                                           tprzybylowski@pomlaw.com

                                                    *Lead Counsel for the Lead Plaintiff, Additional*
                                                    *Plaintiffs, and the Proposed Class*

                                                    **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
                                                    Peretz Bronstein
                                                    (*pro hac vice* application forthcoming)
                                                    60 East 42nd Street, Suite 4600

28

New York, New York 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
James A. Maro
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net
        jmaro@bm.net

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

29