UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

RAMZY ALSAIDI, Individually and
on Behalf of All Others Similarly
Situated,                                CIVIL ACTION NUMBER

                                         CASE NO. 23-cv-21862

        Plaintiff,                           ORAL ARGUMENT

vs.                                      (MATTER HEARD ON TEAMS)

OUTLOOK THERAPEUTICS, INC.,
C. RUSSELL TRENARY III, and
LAWRENCE A. KENYON, ET AL,

          Defendants.
_____
MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
50 Walnut Street
Newark, New Jersey  07101
February 6, 2025
Commencing at 2:01 p.m.

**B E F O R E:      THE HONORABLE MADELINE COX ARLEO,**
**                  UNITED STATES DISTRICT JUDGE**

A P P E A R A N C E S:

BERGER MONTAGUE PC
BY:  ALEX B. HELLER, ESQUIRE
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
        - and -
POMERANTZ LLP
BY: GENC ARIFI, ESQUIRE  (pro hac vice)
    BRIAN P. O'CONNELL, (pro hac vice)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
        - and -

Diane DiTizii, Official Court Reporter
973-776-7738
diane_ditizii@njd.uscourts.gov
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

United States District Court
Newark, New Jersey

A P P E A R A N C E S (CONTINUED)

POMERANTZ LLP
BY:  THOMAS H. PRZYBYLOWSKI, ESQUIRE
600 Third Avenue, 20th Floor
New York, New York 10016
For the Plaintiff

COOLEY LLP
BY:  SARAH M. LIGHTDALE, ESQUIRE (pro hac vice)
     CAROLINE PIGNATELLI, ESQUIRE
55 Hudson Yards
New York, New York 10001
        - and-
BY: KOJI FUKUMURA, ESQUIRE (pro hac vice)
10265 Science Center Drive
San Diego, California 92121-1117
For the Defendant


A L S O   P R E S E N T

AMANDA JEREIGE, ESQUIRE (Cooley LLP)
TAYLOR BOYLE, ESQUIRE (Cooley LLP)
JANELLE FERNANDES, ESQUIRE (Cooley LLP)

INDEX

TOPIC                                                      PAGE

PARAGRAPH 135

Mr. Arifi                                                    9
Ms. Lightdale                                               16

PARAGRAPH 175

Ms. Lightdale                                               19
Mr. Arifi                                                   26

PARAGRAPH 177

Ms. Lightdale                                               26

PARAGRAPH 98

Ms. Lightdale                                               29, 38
Mr. Arifi                                                   34

PARAGRAPH  106

Mr. Arifi                                                   41

PARAGRAPH 129                                               45

PARAGRAPH 133

Ms. Lightdale                                               46
Mr. Arifi                                                   47

SCIENTER

Ms. Lightdale                                               51

United States District Court
Newark, New Jersey

(PROCEEDINGS held in Via Teams before the Honorable MADELINE COX ARLEO, United States District Court Judge at 2:01 p.m.)

THE COURT: All right. Good afternoon everyone.

Can everyone hear me? All right.

So we're here for oral argument in Outlook Therapeutics versus Securities Litigation.

Could I have appearances, please, beginning with the plaintiff's counsel?

MR. ARIFI: Good afternoon, your Honor. Genc Arifi on behalf of the plaintiffs.

THE COURT: Okay.

MR. O'CONNELL: Good afternoon, your Honor. Brian O'Donnell also on behalf of the plaintiffs.

MR. PRZYBYLOWSKI: Good afternoon, your Honor. Thomas Przybylowski of on behalf of the plaintiffs.

THE COURT: Okay.

MR. HELLER: Good afternoon, your Honor. Alex Heller also on behalf of the plaintiffs.

THE COURT: Okay.

MR. ARIFI: That's everyone from our side, your Honor.

THE COURT: Who do we have for the defendant?

MS. LIGHTDALE: Good afternoon, your Honor. Are you able to hear me all right?

THE COURT: I can, I can.

United States District Court
Newark, New Jersey

MS. LIGHTDALE:  Wonderful.  Thank you.

This is Sarah Lightdale from Cooley, and I'm here with a few colleagues.  I'm happy to just run through their names unless you'd like to hear from them individually.

THE COURT:  Sure.

MS. LIGHTDALE:  Great.  My partner Koji Fukumura and my colleagues Janelle Fernandez, Amanda Jereige, and Taylor Boyle, as well as my colleague Caroline Pignatelli who is admitted in the District of New Jersey.

THE COURT:  Excellent.  So you have a group with you.

MS. LIGHTDALE:  A few.

THE COURT:  Everyone comes with a group.

Thank you, everyone.  I'm glad we can do this by Zoom today because there was a big flood in the courthouse and the building's been closed on top of the bad weather, but there was a pipe break and there's a mess over there; so I'm glad we could all do this by Zoom.

I want to begin by thanking everyone for excellent briefs.  I don't get them in every case and I welcome them and I appreciate all the work that went into really crystallizing the issues and I thank the lawyers.  I know how hard they work to make things perfect and it's much appreciated by the Court.

So this is a securities fraud action.  It is -- it arises out of defendant Outlook's efforts to develop a drug for an age-related macular degeneration, and there was a lot of

hope and optimism about this drug early on back in I guess '19 and '21 when the process started. We can talk about that timeline in a minute.

But suffice it to say, that in 2023, the FDA withheld final approval and the CRL that the company is apparently working to address, but as a result of that CRL, this tanked dramatically and then this securities action was filed.

So there seems to be -- there's an outline of dates that we're all -- that everyone sort of addresses in their briefing starting with the process beginning I guess sometime around April of 2019, and there were two I guess manufacturing partners for the company, and the first, I would say, group of alleged misstatements stem from statements made about these manufacturing partners. In fact, the one I'm going to call it, the defendant's can correct me, one is Fuji and one is -- is it Ajin is a shortened form of the second manufacturer.

Is that a correct pronunciation?

MS. LIGHTDALE: That works, your Honor.

THE COURT: Ajin and Fuji.

Back in August 2021 they received some forms from the FDA highlighting some cleanliness and other product safety issues, or plant and manufacturing issues. Nonetheless, a BLA was submitted in 2022 -- in early 2022; ultimately the FDA accepted that BLA; additional forms were issued to the two manufacturing partners sometime in 2023 -- and we can talk

about those dates more specifically -- and the CRL issued in August of 2023.

So I want to first talk a little bit about the first I'll say bucket or group of issues that had to do with the manufacturing partners.  I'll hear from both sides on this and I'll tell you where I'm headed so you can focus your arguments accordingly.

So there was a lot of statements that the plaintiffs point to early on and many of them appear to be statements of optimism, forward-looking statements.  They're always calling their partners first-class manufacturers.  I'm not sure those kind of opinions, optimistic statements early on are enough to be a misstatement of fact.  We can go through them.  There's a lot of them.  We can go through them quickly.

I'm also concerned about scienter.  I understand I'm not -- I don't work for the FDA and I don't work for those companies.  There's really not a clear allegation that when these Form 483s issued, in 2021 especially, that the company was made aware of them.  So I'm struggling with seeing those as the early statements and there's a lot of them as actionable.

There are two statements that I'm concerned about and they're paragraphs 175 and 177.  They're made at sort of the end of -- right before the CRL did not issue, one in July 28th of 2023, one August 10th, 2023, as they go a little beyond in a very significant way describing their partners.

United States District Court
Newark, New Jersey

So let's look at 175.  175 is a question about the partners.  "But I would like to say we've got two great factory partners in Fuji in their location in College Station, Texas and Ajin in San Diego.  Both are experienced companies in this whole area.  We have found their CMC capabilities to be outstanding.  We did a lot of work with them on mock inspections.  We went through both of their factories several times with our mock inspection teams that we hired and just felt all along like both of those companies had great capability to not only run a clean shop but to be in a position to do what needs to be done to get through FDA inspections in really good shape.  We're confident in those folks and believe that they've got all the capabilities required to get us to the finish line."

Similar, August 10th, "Our factory partners that were working with are Fuji and Ajin.  They are both seasoned companies who have been through the paces of FDA.  We have tremendous confidence in their ability to get through successful FDA audits."

So these two statements follow the June 7th, 2023, second Form 483 from the FDA, and it also follows -- I think the second form came to Fuji came on -- one came on June 7th and one came in January of 2023.

So there's two forms out there that are getting really into the weeds about they're top class; we think they're

going to sail through the FDA; they run a clean shop; went through their factories, mock inspections.

Those trouble me as material misrepresentations.  So I guess -- those are the only two that trouble me.

Why don't I allow plaintiff to talk a little bit about the earlier statements and see if you can convince me that any of the others are actionable, and then I'll let defendants respond.

MR. ARIFI:  Sure.  Thank you, your Honor.

I would point the Court to paragraph 135.  Now, that's an affirmative direct statement by the defendants regarding cGMP specifically.  And they state, "being a cGMP-approved, having those CGMP facilities, processes, and products," and they continue on with, "We did check those boxes."

When they're stating that, they're telling --

THE COURT:  Wait a second.  Let me catch up with you. It's paragraph what?

MR. ARIFI:  135, your Honor.

So here we have defendant Trenary at a virtual conference and he's being asked pointed questions about the manufacturing and he starts off with saying -- by acknowledging that there are cGMP compliance that needs to be met for the BLA to be successful.  And he states unequivocally, "Being a cGMP approved, having those cGMP-approved facilities, processes, and

products."  And then he goes on to say affirmatively, "We did check those boxes."

And that's in relation to cGMP at a time when the Form 483s were already issued and we know that -- sorry, your Honor.

THE COURT:  Let's just break down that statement, right.  So this is before the second form was issued.  This is a year after, and this is after January 25th of 2022.  It's before they received the BLA, right, before the FDA accepted their BLA in October of 2022.  So having -- there's nothing false about saying what FDA will be looking at.  They'll be looking at this.  They'll be having those cGMP approved facilities, processes, and products.  That's true.  That's a true statement.  There's nothing false about that statement.

"We have to check those boxes."  Nothing wrong with that.  They have to check them, right?  I'm not sure that "everything in green" means -- is related back to cGMP.  I don't know what "everything in green" even means.

What does that mean, "everything in green?"

MR. ARIFI:  In the preceding paragraph he's talking about having cGMP compliance.  So in the following paragraph he's going through and affirming that we do have cGMP compliance at our facilities and we did check those boxes.

THE COURT:  But wasn't it at that time the -- well, I'm not sure what "checked the boxes" means.  I don't know if

it means cGMP or not, but "We did check those boxes in order to use the drug solution that was injected during the clinical trials."

Weren't the clinical trials done in-house?

MR. ARIFI:  That's, correct.

THE COURT:  So the clinical trials are done in-house and they're not done with the manufacturing partners.  There's no allegation here that the in-house facilities did not meet cGMP standards.

"We think we bring a level of, pristine level, of safety and efficacy partially associated to meeting the requirements that FDA makes you meet."

So they're talking about the in-house clinical trials.  They're not talking about the manufacturing partners here.

MR. ARIFI:  Well, your Honor, the clinical trials were in-house but the manufacturing was still handled by the same two manufacturing partners.

THE COURT:  But we're not talking about that. They're not talking about manufacturing partners.

Look, the PLSRA requires that these -- this is fraud. It has to be stated with particularity.  This is ambiguous at best.  He's talking about we did.  We did check those boxes in order to use the drug level during the clinical trials.

The clinical trials were done in-house.  I mean,

there's nothing in here that I can see, you're not convincing me, that this would be a materially false statement. I just don't see it. It's not clear. You're reading something into it that's not clear from the surface. There's nothing in here -- the ones I talked about give me greater concern, this does not.

Do you have any other examples?

MR. ARIFI: I would also point the Court to paragraph 173 and in that one, Mr. Trenary affirmatively stated, "As far as we know, we've provided all the necessary information in both clinical as well as CMC in order to earn approval."

I think again that goes directly and affirmatively to the cGMP requirements.

THE COURT: So the statement is "we submitted all necessary information."

What didn't he submit? What was false about it?

MR. ARIFI: We're not saying that it was false that they submitted all necessary information, but he goes on to say -- first off, this isn't in a vacuum. If we go back, the entire time Mr. Trenary is making statements about having an agreement with the FDA. So when we take that into conjunction with this, he's stating that he's provided all the necessary information agreed upon with the FDA in both clinical as well as CMC.

Well, we know that there were issues with the CMC so

he couldn't have provided all the requirements to earn approval, specifically on a CMC issues.

THE COURT:  Anything else you'd like to point to my attention -- bring to my attention?

MR. ARIFI:  Your Honor, one second.

THE COURT:  Because the overwhelming number of statements you've brought to my attention were early on and they are -- let me get to my outline.

102, "We have manufacturing partners who are both excellent partners.  We are working, we've got first class manufacturers.  We're confident about them.  We partnered with some first class drug manufacturers of capacity, that we have all the capacity we'll need."

None of these are doing it for me.  These are optimistic, puffery.  They're just not false statements.

MR. ARIFI:  As far as puffery is concerned, your Honor, our position is that these are tethered to a factual assertion and at the time that these statements were made, the Form 483s from 2021, they were in existence.

THE COURT:  It doesn't make someone not a world class -- I mean, that's an opinion, a world class partner, first of all.

Second of all, let's talk about scienter for a second.  He raised that.  Let's talk about the first two 483s.

I went very carefully over what you pled about

scienter on the 483s and you do not allege specifically that any defendant received or knew about the 483s. Defendants argue that you failed to allege scienter, that plaintiff failed to allege that defendants received or knew about the existence of the 483s. And then in reply you say, well, defendants have never denied knowledge of the 483s and there's no plausible way they could have conducted the mock inspections.

That's the one I worry about the most, I have most concern about without having reviewed the inspection records of the facilities. I agree with that, but that's all inferential, scienter. That's not direct scienter. The early statements before the statements, right, I guess in 2023 before the -- before the CLR issued, none of them talked about -- through that kind of specificity.

All the other statements, the world class facilities, and all those early statements in '21 and '22 in your complaint, do you have any evidence of scienter for those statements that they knew that those 483s issued?

MR. ARIFI: Your Honor, I think it's a little bit absurd for them to contend that they didn't know about these 483s.

THE COURT: Why? Why? Why is that absurd?

MR. ARIFI: Sure. In paragraph 124 they admit that their manufacturing partners are subjected to continual review and inspections to access -- to assess compliance with cGMP.

THE COURT:  Right.

MR. ARIFI:  So they're confirming that.

THE COURT:  Right.

MR. ARIFI:  As far as I'm concerned, they've admitted that they conducted these mock trials, several times.  Several means at least --

THE COURT:  I'm with you on that one.  I'm not fighting you on that one.  I'm saying early on.  Once they're in there and they're saying, we inspected it, they're a first class -- that was at the end.  That's right before the CRL issue they made those statements.

But there were years where they were just saying general comments, whether they're first class or a topnotch facility, and some of those statements were made, like, a year after their companies got the 483s and they were arguably -- we don't even know if they were related to the manufacturing they were doing for Outlook.  They were just 483s a year later and they said they're one of the topnotch facilities.  And, yes, they have to comply with FDA ultimately and they learn that eventually that they didn't comply.  But, you know, scienter is still scienter.  That sounds more like negligence to me than fraud or recklessness, and I'm just not convinced, quite frankly.

MR. ARIFI:  Of course, your Honor.  We also have post class period statements where Mr. Trenary was asked about the

CRL, and he goes on to state that with regards to the cGMP issues, there were new and old issues.  There wouldn't be a need to delineate between new and old if he was only referring to the inspection form 483s in 2023.

THE COURT:  Anything else?

MR. ARIFI:  No, that's all I have, your Honor.

THE COURT:  Okay.  Anything that the defendants would like to respond?

MS. LIGHTDALE:  Absolutely, your Honor.  Thank you for the kind words about the briefing, but as I hear your questions, I feel that we could have done a better job laying out the chronology for you.

THE COURT:  That's not true.  That's not true.  You did a great job.

MS. LIGHTDALE:  Thank you.

Well, I will just emphasize one key thing, which is very important to keep in mind here, which is the acceptance of the Biologics License Application in October of 2022.  That's when Outlook got the FDA to accept the application.  It's only after that that the FDA goes into Outlook's manufacturing facilities to conduct inspections in connection with Outlook's application.

So those 2021 483s that are attached to the complaint we know were conducted by the FDA at these third parties, at these partners of Outlook's, in connection with some other

unknown company's unknown drug, and they may well have been remediated.

Let's remember 483s are interim observations, and you can see that in all caps in the attachments to the complaint as well as FDA guidance.  They encourage companies to put remediation plans in place and to work through issues that are flagged in 483s.

But the one thing we know for sure is that the -- I'm sorry, there are other things -- the 2021 483s are not about Outlook's drug, and the *Discovery Laboratory* case that we cited squarely addresses this scenario and says there is no requirement.  There is no duty to disclose these.  And if you did impose such a duty, you would be risking varying investors in immaterial information and it's not what investors need to know.

So I'm going to address the 2023 483s but I think it's critical to have in mind those 2021 483s are irrelevant.

THE COURT:  I agree with that.  Let's talk about paragraphs 175 and 177 made right before the CLR issued.  They were in July and August of 2023.

MS. LIGHTDALE:  Absolutely.

So in the chronology, we do know that at this point in time these 483s have been issued to the two manufacturing facilities in connection with Outlook's application.  And so the statement that Mr. Trenary makes in paragraph 175 is in

that context.  Although, as your Honor alluded to and I know we'll get to scienter in a little bit, there is no particularized allegation in the complaint that Mr. Trenary had actually received the 483s when he spoke, and the plaintiffs can say all that they want about you should conclude it, but you will not find a case that they have cited or that we are aware of where a court makes that kind of speculation --

THE COURT:  Let me stop you for a minute.  I hear you.

MS. LIGHTDALE:  Sure.

THE COURT:  "We went through both of their factories several times with our teams."  They had two 483s.  How is that not some form of inferential knowledge?

MS. LIGHTDALE:  Absolutely.

THE COURT:  I mean, you're going through and you don't notice -- you go into the restaurant, you don't see it failed.  I mean, you go into the factory.

"We went through both of the factories several times."  That gives an impression to the investors that they're clean, they're good.  We went through them and just -- all along, both these companies had capability not only to run a clean shop but to be in a position to do what needs to be done to get through the FDA.

A month later they get dinged.  They get two 483s. You're telling your investors, we're going through and it's a

clean shop, all is good.

MS. LIGHTDALE:  Let me get directly to this statement.

THE COURT:  Okay.

MS. LIGHTDALE:  In paragraphs 175, when this statement is properly placed in context, it is clear that it would not have misled any reasonable investors.  At the outset, in the sentence that the plaintiff's chose not to bold but it is in the complaint, Mr. Trenary explained that Outlook was not providing the market with a blow by blow on any actual FDA inspections.  So no reasonable investor having heard Mr. Trenary say, We're not giving the market a blow by blow on actual FDA inspections could have understood him to then go on and be speaking about actual FDA inspections that had.

Mr. Trenary in that statement that your Honor is focused on, and I do understand why you're focused on it, stated his opinion that Fuji and Ajin were good manufacturing partners, and he identified facts supporting his opinion.  The facts that he identified to support his opinions were that Outlook had conducted mock inspections at these facilities and that Outlook had been satisfied in the capabilities during these mock inspections that its manufacturing partners had displayed.

Plaintiffs do not allege any facts to show that he did not actually hold that belief that Outlook was not actually

satisfied by those mock inspections and they do not contend that the mock inspections did not occur. They occurred but they were mock inspections and Mr. Trenary was completely clear with the market that that's what I'm giving you my opinion, that's what it's based on.

And he also accurately conveyed in his statement the FDA inspections are a challenging process to get through. He did not leave investors -- if you read that statement, you cannot leave it with the impression that it is a check-the-box exercise, that he was telling investors FDA inspections are no big deal. He said that he thought that they could do what needed to be done to get to the finish line.

There's getting to be done and investors in the biotech space know this. They know that FDA inspections are not a matter of the inspector showing up and having a cup of coffee and saying, all right, all looks good.

There's a lot of detail here and the drug here was to be injected in somebody's eye. So you better bet and I would hope that the FDA was going to be very focused on detail and should be offering some interim observations and suggestions. Excuse me. I don't want to minimize or make suggestions, but should be focused here, and that's ultimately what they were.

But Mr. Trenary's statement was not at all inconsistent with that and would not have left an investor with the impression that they were done with FDA inspections if he

told them at the outset, in the sentence that the plaintiffs are trying very hard not to have you look at when they bold the entire rest of the statement, we're not telling you about actual blow by blow of inspection so nobody could have been misled.

Moreover, Mr. Trenary's statement, if you step back and you look at it, was entirely consistent with a good faith belief that Outlook's partners had the ability to complete a remediation plan.  So even if there were allegations that Mr. Trenary had received the 483 on this date, which there are not, he absolutely could have had a good faith belief that they were working on a remediation plan that they were going to achieve, and the failure of a remediation plan, knowing that it occurred, that it ultimately didn't succeed, you will see from the *Revance* case that we've cited and numerous other courts that have encountered plaintiffs trying to plead fraud by hindsight in this situation.  The fact that you think you've got a path through remediation, you think your partners are going to be able to get you through and they don't get you to the finish line, that is not securities fraud.  That is not in the statement by Mr. Trenary.

Does your Honor have any questions or statements before I move on?

THE COURT:  I appreciate the argument but I just disagree.  Look, I read the statement, Trenary's prefatory

statement, we have not been given the -- "we have not been given the marketplace blow by blow on where FDA has gone in," or things like that, but I will say that "we've been to both their locations.  Their CMC capacity is to be outstanding. We've done mock inspections.  We've been in the factory several times and we believe that they have the great capability to run a clean shop and be in a position to do what needs to be done to get through FDA inspections in really good shape."

This comes at a time -- they've gone through the factory several times.  We don't know exactly what the FDA did but we've been through it.  It's a clean shop.  It will pass.

You know, this is a month before the FDA says no and has issues, one of them, the very same CMC capacities that he is touting in the statement, and after there's been not one but two Form 483s issued against both companies.

MS. LIGHTDALE:  Your Honor, may I respond on one other point you made?

THE COURT:  Yes.

MS. LIGHTDALE:  Mr. Trenary's statement had all the hallmarks of an opinion statement, right?  There's no question -- I think I heard you --

THE COURT:  I disagree.  It's not just an opinion. It's an opinion that captures facts.  If this said we are very confident that we have topnotch manufacturers and they will -- they will succeed with the FDA.  He went beyond that.  He's

offering -- he's assuring them directly, "we have been through several mock inspections, several.  We've been in there.  They run a clean shop."  That is not an opinion.

I don't want to argue with you today.

MS. LIGHTDALE:  Yes, I understand.

THE COURT:  I've heard you and I've looked at this really carefully.  There's a line that gets crossed, right?  So there's puffery, there's optimism, there are nonactionable things, but this comes really over the line for me.  If I'm an investor, I listen to this and say, he can't say I know what the FDA is going to do because the FDA hasn't made their ruling yet which they're going to make in a month, but we've been through and we're pretty confident and everything is good.

That's just what was going on here.  In there several times, you're doing your own inspections, it's a clean shop, there's no problems, when in fact there were multiple problems in both places.

MS. LIGHTDALE:  Your Honor, I hear you and I would just make two very brief points and then move on to the next station -- next statement, unless either of these points you'd like to hear more from me on.

THE COURT:  Sure.

MS. LIGHTDALE:  The first is that there is no allegation, because there really is no allegation, about what anybody at Outlook did in the complaint during the class

period.  It's all speculation.  There's no allegation of when the mock inspections that he is talking about occurred.  Remember, they started this partnership in 2019.  That's disclosed.

THE COURT:  Yes.

MS. LIGHTDALE:  And it's 2022 before they get their BLA approved and they know the FDA is going to be going in.

So the mock inspections he's talking about could have happened any time in that three-year period.  It could have happened before Outlook decided to sign a contract with these suppliers and there's no allegation to that effect.  So there's no basis to infer that he had -- that the 483s existed at the time that the mock inspections that he's referencing in that statement occurred.  That's number one.

Number two.  Sorry, go ahead.

THE COURT:  It would be -- the BLA was submitted in March of 2022.  At that time there already were -- each company had their own 483s issued.  To say it could have happened ten years earlier, eight years earlier, it's not consistent with common sense.

Whatever.  I hear you, but I hear you on that.

MS. LIGHTDALE:  The second point that I make is that the Supreme Court in *Omnicare* set out a very specific and stringent framework for plaintiffs here to plead the falsity of an opinion statement, to make an opinion statement actionable

under the federal securities laws.

The plaintiffs here I think are trying -- where I hear your Honor going is possibly are we in the third prong of *Omnicare*. They haven't pleaded any subjective disbelief and they haven't pleaded any actual falsity in that he didn't hold this opinion or that the -- he didn't conduct the mock inspections that are referenced. And so what they're saying, they're on the omission for *Omnicare* and they're saying that -- I guess, or your Honor is articulating possibly that there could have been an omission that was so -- rose so high, was so misleading, and it was based on -- this is what you need to be in the third prong of *Omnicare* -- facts in the issuer's possession only that go to the inquiry that the issuer did not or did conduct to reach its opinion that an investor -- it rose to that high, high level that an investor would have found the opinion misleading.

This is a very specific area, and I have not seen -- and I've read all of the cases the plaintiffs cited, again, yesterday -- not a single case where the omission of a 483 has been found to fit into that extremely, extremely rare third prong of *Omnicare* when you're in omission territory. The Supreme Court has set an exceedingly high bar for when an omission would be adequately alleged. I don't believe these plaintiffs have met it.

I'm happy to address that or move on to 177, your

Honor.

THE COURT:  I'll let the plaintiffs respond to that point only.

MS. LIGHTDALE:  Thank you.

MR. ARIFI:  Your Honor, we do address cases where the court has found 483s to be a basis for actual misstatements. We cite the *Pension Fund* case, and in there the court held that the fact that the presence of -- in that case, for pleading purposes only, your Honor, the court was very clear, they said that the issuance of a Form 483 may render the defendant's statement about compliance with the FDA regulations false or at least misleading.

Well, here defendants have omitted the fact that these Form 483s existed.

MS. LIGHTDALE:  Counsel, can I ask which Pension Fund case you're referring to?

THE COURT:  Let's move on.  Let's just move on to the next -- to the next point.

MS. LIGHTDALE:  Thank you, your Honor.

THE COURT:  Okay.

MS. LIGHTDALE:  I did not mean to cut you off though.

THE COURT:  That's okay.  That's okay.  No worries.

MS. LIGHTDALE:  Okay.  So paragraph 177, the statement that is in paragraph 177 is I think the part that plaintiffs are challenging:  The Fuji and Ajin "are seasoned

companies who have been through the paces with FDA.  We have tremendous confidence in their ability to get through successful FDA audits."

So again, that tremendous confidence is an opinion that the company holds.  The plaintiffs are not alleging any basis for you to infer that the defendant, meaning Mr. Trenary, did not actually hold that opinion.

When he stated that, the facts that he said, to the extent they're facts, are:  "These are both seasoned companies."  "Seasoned" is an adjective but let's assume that it means companies that have been around the block factually.  No basis to infer that that's not true.  "Who have been through the paces with FDA."

Now, your Honor focused on this case as saying -- so I'll address it -- it's interesting because the plaintiffs I don't believe have any specific allegations about it, but any reasonable investor reading that in context -- again, one minute before Mr. Trenary had said we're not telling you where we are with the FDA in terms of actual inspections, and the market knows full well that the FDA has not proved the BLA.

Nobody's hearing him say we have been through the paces and thinking, oh, they're done with the FDA.  The whole market is waiting to hear if the FDA actually approves the BLA and they know that as soon as Outlook hears, it will tell them.

But this in context, has been through the paces with

FDA, is optimism.  It's his subjective opinion that they're good.  It's just an aversion of the vague statements earlier in the class period that your Honor is correctly noting are not remotely close to being actionable under the securities laws.

THE COURT:  Let's move on to the second category of misstatements -- alleged misstatements, I should say, that concern about planning trials with the FDA.

There are a number of statements about planning the trials with the FDA.  Ultimately, to make sure I understand the facts, the FDA issued a guidance at some point that suggested that the clinical trials had to have more participants than were in the three clinical trials, the NORSE 1, NORSE 2 and NORSE 3 than that they had.  I think -- let me look at my form -- the FDA criteria, I'll call it, came out I think around February of 2023.  That's an important date.  And leading up to that date, they had smaller clinical trials, and I guess the issue is were they misleading about the FDA's involvement with those clinical trials.  A little bit more nuance than the first category we talked about.

There are four things, I'd like to hear first from defense counsel and then I'll let plaintiff respond.  Let's look at paragraph 98, 106, 129, and 133.

MS. LIGHTDALE:  Would you mind giving those numbers again?

THE COURT:  Of course.  I'll give you plenty of time.

98.  I have a lot of paper here.  98, we'll start with 98.

So 98 is a statement that happened in August of 2021 and -- this is the piece I'd like you to focus on.  August of 2021 was early on.  This is right around when the Fuji 483 issued.

"The successful completion of this trial is the final step needed in our clinical evaluation of ONS-5010 to enable us to submit a Biologics License Application to the FDA next year."  That's not the part I'm worried.  I'm going to go forward to the rest of the statement.

"In meeting both the primary and key secondary end points in NORSE 2 with highly significant clinical relevant results, we have achieved the requirements agreed upon with the FDA, and when combined with our previously reported clinical trial results, this completes the clinical package necessary for the submission of our BLA."

So I'm worried about the language that -- different parts of it.  One is we have achieved the requirements agreed upon with the FDA, when combined with our previously reported clinical trials completes our submission.  If you could just address that briefly to me, it would be appreciated.

MS. LIGHTDALE:  Certainly, your Honor.

There's important context, again, in the chronology here.  So I think when your Honor articulated where you saw the

United States District Court
Newark, New Jersey

beginning of the chronology, the relevant chronology, you started in the middle of 2019, and that's part of it. But actually our brief, and we lay this out, goes back earlier. The FDA and Outlook had an end of phase 2 meeting in 2018 which Outlook disclosed at the time and described as successful, and they said at that point that the FDA had reviewed -- in that meeting and thereafter, they disclosed the FDA reviewed and accepted the study design for NORSE 1 and 2 and confirmed that each of them is acceptable and may support a BLA.

So Outlook says that in 2000 -- after this end of phase 2 meeting in 2018, and they reiterated similar concepts in 2019. So anybody who hears statements after that is hearing them in that context and understanding that that's what the FDA did. The FDA reviewed and accepted the study design for these two studies and confirmed that they could -- didn't promise, and Outlook was very clear in its statements that the FDA said they may support a BLA.

So what this statement here -- now, plaintiffs don't challenge the Outlook statements in 2018, 2019, or 2020, although Outlook made statements, about this meeting that it had with the FDA in 2018, plaintiffs chose to start a class period on August 3rd, 2021.

Your Honor, I cannot tell you why because except that possibly they like the stock drop period, but in any event, this statement is harkening back to those earlier statements

which plaintiffs don't challenge.  So all that is being said in this statement is that we have -- now that we have completed NORSE 2, which was the second of the two trials that the FDA had said may support a BLA, we have done what we need to do to be in position to file the BLA.

THE COURT:  Can I stop you for a minute?  Wasn't the NORSE 2 data, didn't that come in in August of '21?

MS. LIGHTDALE:  Yes, and that's when the statement is made.

THE COURT:  Right.  But the meeting you're referring with the FDA from the NORSE 1 data was in '18.  So this is made in 2021 and it's around the time that the NORSE 2 data was reported.  So why would I read that as referring back to -- it says:  "In meeting both the primary and key secondary end points in NORSE 2", which was August of 2021 and this statement was made in August of -- well, August 3rd of '21, this is the day the NORSE 2 data was disclosed, "we achieved the requirements agreed upon with the FDA."

How could that be referring back to what happened in '18?

MS. LIGHTDALE:  Your Honor, in order to submit a BLA, you need -- what Outlook did was it spoke to the FDA about the trials that it intended to run.  They needed to have, and the plaintiffs -- you know, this is separate and apart from the guidance, which we'll get to in a little bit, which comes out

after the BLA is submitted, but even at this time, you needed to have two adequate and well-controlled trials in order to submit a BLA.

So the question with the FDA at the end of phase 2 was what will you consider to be adequate and well-controlled, and the FDA said, and Outlook disclosed in 2018, 2019, 2020, if you -- we agree that NORSE 1 and NORSE 2 -- these are the studies that the plaintiffs are saying were so grossly small that anybody must have known, but Outlook disclosed we talked to the FDA about them, the FDA said that the design of those is acceptable to us, and if you get data that you like out of those trials, go ahead and submit a BLA.  That data comes out, it finishes coming out in 2021 when they start the class period.

So Outlook is saying in 2021 we talked about the trial design with the FDA.  We ran the -- we then went on and ran the trials, and now that we know the data that came out of the trials that the FDA told us had an okay design, we're going to go ahead and file this application.  What the plaintiffs want you to take away from this statement is that in 2021, the market heard from Outlook we've got an approved drug.

Your Honor, no reasonable biotech investor who knows this process, who knows how -- which biotech investors do, who understands how hard it is to get a biologics, much less one that gets injected in peoples' eyes, approved by the FDA is

hearing that in 2021.  They're hearing, oh, these guys are going to go ahead and make their filing.

A reasonable investor also knows that it takes 60 days after you send your BLA package to the FDA before the FDA even accepts it, decides that they will accept it for filing. So they don't even tell you you've given us what we need to substantively consider it, for 60 days after you file it.  And, actually, that's what happened here.  Outlook submitted it to BLA and the FDA said, actually, we think you need some more stuff and Outlook voluntarily withdrew it and resubmitted it. That happens in the middle of the class period.  Plaintiff's actually allege it's when the truth was revealed, although I don't know what they actually think was revealed at that point.

So investigators know in 2021, your Honor, this is a long, long road.  We are not close to done with it. Plaintiff's, you know, sort of portrayal of this statement as a promise that we're done cannot be squared with what was actually said or how a reasonable investor could read it.

If any reasonable investor had heard it that way at the time, your Honor, you would think in the two years of analyst transcripts and whatever after that that the plaintiffs scoured during the class period, somebody would have asked about it.  Wait a minute, didn't you tell me in 2021 we were done here?

There's none of that, your Honor, because analysts

didn't hear it that way, the market didn't hear it that way. The plaintiffs are misreading it out of context in which it must be placed.

THE COURT:  So let me ask the plaintiff's counsel, you argue that that part of the statement that Outlook had achieved the requirements agreed upon with the FDA, how is that false?  They're saying it's not false; that three years ago or '18 they agreed on the structure of the clinical trials. You're saying that that statement is false.  Why is it false?

Is it false that you have reasonably -- the FDA never agreed to the structure of NORSE 2?  Is that what makes it false?  Because we're talking about NORSE 2 here.

What's the falsity?

MR. ARIFI:  First off, your Honor, the falsity is that there wasn't an agreement with the FDA as to these --

THE COURT:  There was or there wasn't?

MR. ARIFI:  There wasn't.

THE COURT:  What do you base that on?

Let me stop you for a minute.  You just heard your adversary Ms. Lightdale say that there was an agreement.  The FDA agreed with the structure of NORSE 1 and 2 and that's all he was referring to, nothing else.  And so you're saying it was false.  What about it is false?

MR. ARIFI:  Your Honor, what I heard was more of a summary judgment type of argument.

THE COURT:  No.  I'm asking you a question.  Are you saying the FDA never agreed -- ultimately when that guidance came out and the CLR issued, the trial samples were too small.  That was one of the problems.

So what you're suggesting to me in these allegations is that they misrepresented that the FDA thought that the trial size was fine.  I forget what the amount numbers were of NORSE 1, NORSE 2, they went up.  There was a smaller sample and then NORSE 2 was a much bigger sample but not as big as other samples out there in the cat sample.

But they're saying that they looked at the structure of the clinical trials back before they even started them and they had given -- they did not -- they agreed for them to move forward with the structure.

So are you saying that that's false?  What's false about it?  That the FDA never agreed to a trial that small?

MR. ARIFI:  That's --

THE COURT:  What do you base it on?  You can't just say it.  You have to say that's a lie because the FDA never ever told them that their trial -- are you questioning the trial sample, that it was too small based on the guidance that issued a year later?

MR. ARIFI:  Well, your Honor, it's also small based on the guidance that was in effect at that time.  The FDA came out with the wet AMD specific guidance but the industry

United States District Court
Newark, New Jersey

36

guidance still mandated substantial etiquette well-controlled trials.

THE COURT:  But they never had numbers, right?  Let's get to the nitty-gritty.  They didn't have the numbers.

MR. ARIFI:  Well, in paragraph 48, we do allege that the FDA has long advised the industry that with regard to quantity of pivotal clinical trials, that the FDA's position has been that Congress intended to require at least two.

THE COURT:  Two what?

MR. ARIFI:  Two adequate and well-controlled pivotal phase 3 trials.

THE COURT:  But that is different.  What they're saying in this paragraph is we did, we had NORSE 1, NORSE 2 and NORSE 3.  We had three.  The second one was a lot bigger than the first one.  I don't know what the numbers are.  I have them somewhere in my outlines, but they went from, I think it was like a smaller number and then it went into a three-figure number and this is NORSE 2.

So in other words, there's no guidance that says you have to have at least 300 people.  That guidance that gave frameworks came out a year later.  What they're saying is that the FDA approved -- I'm looking at the statement in paragraph 98 that you're pointing to:  "We have achieved requirements agreed upon with the FDA, and when combined with our previously reported trial results" -- they did have good trial results, no

one is disputing that -- "this completes the clinical packet

necessary for the submission of the FDA."

What's false about it?  The only thing that would

make it false is -- the inference you're asking me to draw here

from the statement is that they hadn't agreed that they had

not -- the FDA and Outlook had not reached an agreement about

the requirements for the clinical trials, but defense counsel

said they had.  It's undisputed in '18 they reached an

agreement.

So I'm still not hearing why it's false?  Is it false

because --

MR. ARIFI:  Because of the size, your Honor.

THE COURT:  -- they had it?

But what about the size?  They're saying that the FDA

agreed to the parameters of the first two trials which were

small.  So what is false?

MR. ARIFI:  It's false that the FDA would agree to

that when it would go against the guidance in the industry and

the practice at that time, your Honor.

THE COURT:  That's all guesswork.  There's absolutely

no guidance in effect at the time that said you need to have at

least 100 people or 104 people or 300 people.  There is no

guidance.  The bigger the better, of course.  But there's no

minimum standard or maximum standard.  That didn't come out

until -- the guidance didn't come out until February 2023 which

suggested a greater pool.  Right.

So how is that false?  You have to say that that is false, that the FDA did not preliminarily agree on their size of their two studies, and you haven't done it.  You just say it.

Let me ask Ms. Lightdale, does the complaint mention what happened in '18 when you went to the FDA and they approved your two clinical trials and numbers or the structure of them?

MS. LIGHTDALE:  Your Honor, I believe that there are pre-class period allegations in the complaint, and if you give -- actually, the complaint starts with a story in 2004 because think it's not Outlook specific, but that's when -- this is not a new drug.  What we were doing here was trying it for a new indication that previously only had been done off label.  And so the complaint starts much earlier than the class period in terms of what it's saying is relevant.

As to whether it specifically takes note of our statements in 2018, I think it does because it starts the -- it starts describing statements.  If you look at paragraph 80 --

THE COURT:  I'm at it right now.

MS. LIGHTDALE:  -- when they're laying out sort of the history of Outlook, they're referencing and quoting from our statements in 2018 and 2019 and they're doing that and 2020, and they're doing that because -- I think it's largely because they're trying to -- I don't know actually, but I don't

want -- I don't want to do too much theorizing about my adversary's strategic decisions, but this period is absolutely in play.  As the complaint is alleged, they're putting it forward to you as a period that is relevant to consideration of whatever fraud allegations there are here.

Now, we in our brief gave you SEC filings and actual quotes from that time period.  So I think we spelled out more of what happened and certainly I think more clearly than the complaint does, but there's no question that the plaintiffs themselves have recognized that this period, this pre-class period time is relevant to assessing their allegations.

I have one other point to address, your Honor, but I still feel like you're digesting this one.

THE COURT:  You can go.  I can handle it.

MS. LIGHTDALE:  Great.

The complaint response letter that was issued at the end of the class period, there is no allegation that it had anything to do -- the FDA's concerns actually had anything to do with trial size.  Now, the complete response letter is not in the record, in the public record and I'm not going to, you know, cause us any sort of selective disclosure issues here today.  But your Honor, I would just note that there are no specific allegations as to what the FDA's concerns were and there's no basis for the Court to infer, from the complaint or from anything else that I'm aware of, that trial size was

ultimately raised in the complete response letter or that it was -- it was the impetus for the denial of the BLA at time.

THE COURT:  Can you represent what was contained in that letter?

MS. LIGHTDALE:  Your Honor, as I alluded to, I feel I can't because I heard from my adversary --

THE COURT:  Fair enough.

MS. LIGHTDALE:  -- reference to summary judgment.

I can tell you that if this case moves forward into discovery and it is the exact type of case that the PSLRA is there to protect companies like Outlook from having to spend their time defending, I believe we will have an excellent summary judgment motion, which we can get done very efficiently.  But, your Honor, I don't think this case has cleared anywhere near the extraordinarily high bar that the plaintiffs have to clear as you actually move forward into discovery and have all of the costs and expense and headache and danger that that puts on a little company like Outlook.

You said it to my adversary:  You're not giving me facts.  You're just saying it.

That's the entire complaint, your Honor, and that's foreclosed under the PSLRA.

THE COURT:  Okay.  Let's move ahead, there's 98. Let's move ahead to 106.  It's the same issue, right?

MS. LIGHTDALE:  It is the same issue.

THE COURT:  "This company is engaged in three very important clinical trials in order to gain FDA approval.  This was a plan that was put together between the company and the FDA, and you know, Doug, the first study and third study are the so-called NORSE 1 and 3 have already been completed, showed good safety and efficacy.  One was a really nice trial that gave them a window into both safety and efficacy and the study, one was an open label safety study."

So I guess, Ms. Lightdale, I'm going -- I'll let you respond.  I want to hear from plaintiff's counsel.

So what is it that's false?  So we know there was NORSE 1, NORSE 2, NORSE 3.  Plaintiff is saying that the FDA, they didn't just do them in a vacuum.  FDA was, you know, gave them the green light to move forward with that size trials.  I think NORSE 2 was 180, NORSE 1 was less than a hundred, NORSE 3 wasn't an injectable -- was it a trial with injectables or was it some other just data drip and trial?  I'm not sure.

MR. ARIFI:  I'm not sure.

THE COURT:  Okay.  So there's three trials, right?  So all they're saying here is "the company is engaged in three very important clinical trials in order to gain FDA approval."

"Accordingly, all three of these clinical trials required for our planned BLA submission for wet AMD have been completed.  This was a plan that was put together between the company and the FDA."

Again, what is the falsity?

MR. ARIFI:  Well, the statement is false because there was no agreement as to the three program trial here, your Honor.  And we can't look at this in a vacuum, because if we even take into account what defense counsel is saying about the end of 2018 meeting with the FDA, that only touched on NORSE 1.  And now all of a sudden we have defendant Trenary making new statements regarding an agreement.  That's clearly -- it's not referencing the 2018 meeting with the FDA, and of course, you can't have investors left to guess which agreement defendants are referencing here.  And we know that after --

THE COURT:  What are you claiming that's false?  Are you claiming generally when they say this is a plan that was put together with the FDA, there was no plan with the FDA?  They just did it on their own?

MR. ARIFI:  That's correct.

THE COURT:  What about the plan?

You don't just start a trial without having FDA know what you're doing.  Is that fair to say?

MR. ARIFI:  Well, I'm not sure, your Honor.

THE COURT:  So at this point -- let's put it in context with the facts.  This is in August of '21.  They've already accepted an IND and that is it's a very early stage of an investigative new drug application.  You say in your complaint at paragraph 80 and 81, it announced that it was

NORSE 1 and NORSE 2 was a small study.  You say they did not reach an agreement with FDA.  The company issued a press release announcing they're formally changing its name.  March of '19, you know, they're talking about the -- about the second trials.  240 would be the total of NORSE 1 and 2.  FDA had accepted the IND application in April of '19.  So this is also after the FDA has accepted it.

I'm trying to understand what you're saying is false. Is it falsity the fact that they said -- "this is a plan that was put together between the company and the FDA"?

MR. ARIFI:  That's correct, your Honor.

THE COURT:  What was it that the FDA had no involvement -- a plan is kind of a vague word.  So is it that it gives -- what does it give a false impression in your mind of?

MR. ARIFI:  It gives the investors the false impression that they had the FDA's blessing on these NORSE trials and that they were adequate in every way.  The number of pivotal trials and the number of patients required for each, and it's more plausible -- it's not plausible that the FDA would provide an agreement to defendants on such a small underpowered study when the other FDA-approved treatments all had patients over 1,000.  Even the cat seminal study was over 700 patients, your Honor.  So it's not plausible that the FDA would all of a sudden --

THE COURT:  Here's what you're really saying.  What you're really saying is the FDA would never approve even to move forward with any trial that was under 3 or 400 people.  You don't plead that.  The FDA accepted their investigative new drug application, although it's a like standard, that arguably had referenced NORSE 1 and 2 and 3 in it.  NORSE 2 had 100 and 1 -- 1 and 2 together had close to 200 participants.  These were all injections in the arm, not in the eye yet.

So in other words, no one is saying that the FDA -- if they said the FDA absolutely approved and endorsed our clinical trial size, maybe you get closer to saying that's a false statement, but they're just saying that they put a plan together.  It's not just about size of the class.  It's about efficacy.  It's about a million other touch points about how -- how to evaluate a drug, and they put together a plan with the FDA to move forward in a -- towards a submission of a BLA, which they in fact did do, which in fact the FDA accepted.

So I don't understand -- I mean, you have to have more here than just it's false that they said that there was a plan with the FDA, because they were already engaged with the FDA in their submission of an IND working towards a BLA.

So what is the plan?  Is it that it was false because the FDA -- you know that they submitted things to the FDA at that point and you know that they were working with the FDA.  So what was it that was false about what they said?  I don't

know.  Plan?

I don't know if it has the clarity that is needed to become a false statement.

MR. ARIFI:  I hear you, your Honor.  If that's something that the Court has reservations about, we'd be glad to go back and provide more clarity as to that.

THE COURT:  Let me look at paragraph 129.  Same thing, and what the company did -- again, these are 2021. These were all around the same time, right?  This is all -- I'm not sure.  I'm looking at paragraph 129.  I think it's all in 2021.

MS. LIGHTDALE:  129 is January 10, 2022, your Honor. So very close.

THE COURT:  '22.  Okay.  So here is what Trenary said.  "So the filing of the BLA is really soon."

True.  The BLA was filed in March of '22 and this is January.

"We're going to be doing it this quarter.  And what the company did was, in consultation with the FDA and in communication with the FDA, designed a three-study program in order to get approval....and as expected, they also were very similar."

So no one is questioning that the results were good, right?  They didn't fail it.  They did well.  You're challenging the -- the preliminary data that they shared was

not false.  They didn't doctor up data.  It's all about the clinical trial size.

Again, it's the same deficiency.  They consulted.  Why is that false?  They said they're not -- they're not misleading investors.  They're saying, look, we got an IND which is really easy to get, I guess, and now we're going to submit the BLA.  There was a problem, we fixed it, and they ultimately accepted it back in October, I guess nine, ten months later.  And they're just saying in consultation with the FDA, same issue that I'm struggling with.

And finally let's look at 133.  There was again -- the whole thing, there was an agreement.  This is even a little -- let me ask counsel.

Ms. Lightdale, explain 133.  What's going on here with the agreement control arm to use?

MS. LIGHTDALE:  Yeah, I think, your Honor, this goes directly to study design because in order to submit a BLA at this time, one of the few things that we -- and Genc, I think, does agree on -- is that the requirement was that you have two adequate and well-controlled trials.  And so that was the discussion, when you were having a discussion with the FDA around wheels of design of NORSE 1 and 2 give us what we need to move forward with the filing of a BLA.

The well-controlled is a piece of that, right?  And so I think that's what he's saying here is, yeah, we discussed

with the FDA the control aspect of our trial design.  And the control aspect of our trial design is not something that plaintiffs complain in its current form, and I really don't believe your Honor should give them any sort of vast leeway to amend the way that it was just articulated to think about things that we've very clearly laid out in our motion to dismiss.  But in any event, it was very clearly articulated that we thought that control was an issue that would have had to have been discussed with the FDA in connection with trial design.

THE COURT:  Would you like to respond, counsel?

MR. ARIFI:  Your Honor, I just keep going back to the fact that we're talking about a plan with the FDA that it's supposedly in place, yet at the end of the day, the FDA goes back and doesn't accept that study design.

So that's the part where it doesn't make sense and that's why this plan, whatever it was, it was false. Obviously, we don't have the CRL in front of us, but what we do have is the defendant's remarks that touched on it and one of that was the substantial -- the missing of substantial evidence.  Substantial.  And we plead that substantial means that there was adequate and well-controlled investigations and like I was saying earlier, that would be his position on well-controlled investigations, especially as it relates to phase 3 studies that there would need to be two.

THE COURT:  Here's the problem.  If they said the FDA is with us, they are excited about our proposal, they have given us indications that this will sale through, they just said they designed a study in consultation with the FDA.  They carefully said that.  They didn't say FDA has given us, like, an informal wink and a nod, they're really excited about our results.  They didn't say that.  Of course they're consulting --

MR. ARIFI:  No, but --

THE COURT:  Let me finish.  They're consulting with the FDA.  That's what they said.  They said it repeatedly in 98, 106 and 129.  We just went through them.  And I'm not sure that that's a false statement.  You haven't convinced me it's a false statement.  And what about it is false?

If your position is that they went to the FDA and told them that NORSE 1 and 2 were 180 participants, and the FDA never would have approved that because that's sort of what you've been arguing, the study size is way too small for them ever to have given any kind of approval, go ahead, as you're going through the regulatory process, that would have been a deal breaker.  You have to plead that.  That's false.

When they said we're working with the FDA on NORSE 1 and 2, that this was a plan put together with us and the FDA, that was false because the FDA never told them that -- or to state it differently, the FDA said, no, your trial is too

small.

It defies logic because if you're -- to believe you, not only are they lying -- which happens, I don't know, I don't know these people, but they would spend all this money and research and move forward with this regulatory process knowing that their trials were too small. So you have to say either that they didn't discuss the trials and therefore it was misleading, and that's going to be hard for you to prove under the standard, or that the FDA told them this trial is -- your trial is too small and they nonetheless worked together with the FDA.

You're going to have to articulate it. What is it about these statements -- there was a plan between us, there was no plan, it was just -- everyone knows they're not at the point of -- they're steps and steps away from approval. This is early on. This is in 2021. There was a plan.

What about that plan made it false and misleading and intentional? You have to explain to me how that language was false and you haven't convinced me. I'm going to give you a chance to replead because this is your first time, but you have an uphill battle convincing me now that I understand the context a little bit.

On the other hand, we're not going to be relying on things outside of the pleadings, although you know there is a heightened pleading standard here. So you're going to have to

explain to me how these plan standards.

A couple of other things:  The first drug company to gain -- what we hope to be will be the first drug -- they're not actionable.

Certain drugs are being in the final step, we're getting close, that's not actionable.  Investors know what the steps are to get FDA time approval.

Statements about success and efficacy of trials, I'm not convinced that those statements are false.

Statements about, you know, how first class manufacturing partners, not moving it for me.  I'm not satisfied that that is enough to state a claim.

I am concerned about -- the one that seems stronger to me -- now, of course, these were made right before the CLR issued, paragraph 175 and 177.  I am going to let those go forward but I'm also going to let defendants move to dismiss them again.  If there's other arguments, they have case law they want me to focus on in light of our conversations today about 175 and 177.  I'm going to let defendants replead this whole thing about FDA planning statements.  I want crisp explanations and I want some case law cited because that to me is a bigger hurdle.

So the motion to dismiss is granted in part -- well, I'm going to grant it with leave to amend.  I think it's cleaner that way.  I want plaintiff to file a new complaint,

but when we have this new complaint, I don't want the same arguments raised again about the things I've already said are not actionable.  You can keep them in the complaint for context but I don't want to hear argument about the puffery, the optimism statements again.

I'm going to focus on 175, 177 and I want you to flush out what's false about these statements about FDA approval and working together with the FDA.  Okay?  I'm going to leave it to counsel --

MS. LIGHTDALE:  Your Honor, may I?

THE COURT:  Yes.

MS. LIGHTDALE:  We haven't addressed the scienter today.  In our view as set out in our briefing, scienter and loss causation, frankly, but I'll focus on scienter since you just said the word "lying" are independent bases for dismissal of the entire complaint.

THE COURT:  I understand that and I'll look at that more briefly.

MS. LIGHTDALE:  I'll brief it.

THE COURT:  You can rebrief that briefly.  You know my views on scienter.  I'm very concerned about 175 and 177, and you know that.  They can sharply address the scienter in that context with *Omnicare* if you want to.  Now you know what I'm concerned about.

As to all these other statements, you're right,

scienter has to be about the planning with the FDA.  That's an issue you can raise again and they can also address when they see your arguments.

So they're going to file an amended complaint and you're going to move to dismiss and we'll have a regular briefing schedule.  You can work out -- whatever you guys need is fine with me as long as it's not crazy.  Just agree to a briefing schedule and I'll try to get -- I'd like to get it done, I'd like to have the briefing done and argument by the summer.  I know it's already February but I'd like to move the case a little bit and I want to do it while we're still in -- while it's still fresher in my mind.

How long do you think plaintiff will need to file an amended complaint?

MR. ARIFI:  Your Honor, as I stand here right now, no more than 45 days.

THE COURT:  Let's make it 30.

MR. ARIFI:  Okay.

THE COURT:  And that's going to put you in the beginning of March, April, a month each to write a brief and then two weeks for a reply.  Let's try to get oral argument on the calendar.  I'm going to put it now for July.  I know it's far out.  If there's a problem, I'll get to you before then, but I want everything briefed by -- if you can get your amended complaint in by early March, let's see, by March 7th, and then

we can have April 4 is the motion to dismiss; May 2nd; May 23rd for reply, and let's schedule argument sometime in July.  I'll check with Amy and we'll send out a notice.

If you need a couple of extra weeks it's fine, not a big deal, we can move things around, but I really want to get it done in July before my new law clerks come in and it's all fresher in my mind.  Is that a plan?

Guys, you did a great job in oral argument.  Thank you for your great briefs, and thank you for everything.

MR. ARIFI:  Thank you, your Honor.

MS. LIGHTDALE:  You're honor, may I ask for clarification?

THE COURT:  Sure.

MS. LIGHTDALE:  And I hear you on 175 and 177 where you are on whether those are actionable misstatements, we'll fully address that.  If they were, whether they were made with scienter is a separate issue.

THE COURT:  Yes.

MS. LIGHTDALE:  We dispute that and we will lay that out in our briefing as well.

THE COURT:  Excellent.  That's exactly what I need.

MS. LIGHTDALE:  Thank you, your Honor.

THE COURT:  Thank you.  Have a great day.  See you soon.  Bye-bye.

(Time noted: 3:19 p.m.)

United States District Court
Newark, New Jersey

--------------------------------------------------

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/S/Diane DiTizii, CCR, CRR, RMR, RDR          02/11/2025

Federal Official Court Reporter                    Date