UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE OUTLOOK THERAPEUTICS, INC. SECURITIES LITIGATION | Case No. 2:23-cv-21862-MCA-CLW |
| THIS DOCUMENT RELATES TO: ALL FILINGS | **CLASS ACTION**<br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Jason Solomon and Additional Plaintiffs Ramzy Alsaidi, Michael Lucas, and Mariam Silverman, Trustee for the Mariam Silverman Trust UA Mar. 15, 1969 (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Outlook Therapeutics, Inc. f/k/a Oncobiologics, Inc. ("Outlook" or the "Company"), analysts' reports and advisories about the Company, interviews with knowledgeable individuals, and information readily obtainable on the Internet. Plaintiffs believe that substantial,

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION[1]

1. This is a federal securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Outlook securities between August 3, 2021 and August 29, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Excluded from the class are Defendants, current and former officers and directors, and the immediate families of any of the above.

2. Outlook is a small, clinical-stage biopharmaceutical company that focuses on developing monoclonal antibodies for ophthalmic indications. According to the Company's Form 10-K filed on December 22, 2023, the Company maintained only twenty-four full-time employees. The Company's lead product candidate is ONS-5010, an ophthalmic formulation of the monoclonal antibody bevacizumab for treating wet age-related macular degeneration ("wet AMD") and other retina diseases.

[1] Unless otherwise noted, all emphasis is supplied.

3. Outlook began as a company focusing on creating treatments in the fields of immunology and oncology; however, the Company soon discovered that ONS-5010 could become a lucrative treatment for wet AMD. Beginning in early 2018, the Company began to quickly shift its complete focus to the development of ONS-5010 as a treatment for wet AMD, abandoning the development of two other drug candidates, ONS-3010 and ONS-1045. Additionally, the Company changed its name to Outlook to reflect its new endeavor into the ophthalmology field and hired veterans in the field, including Defendant Trenary as CEO, to lead the development and commercialization of ONS-5010, its only clinical-stage drug candidate. At all relevant times, ONS-5010 has been Outlook's flagship drug candidate, and Outlook admitted that its ability to generate revenue and achieve profitability completely depended on its ability to gain regulatory and marketing approval for ONS-5010.

4. ONS-5010 is an ophthalmic formulation of bevacizumab, a drug that another sponsor developed and obtained approval for use as a nonophthalmic intravenous treatment for certain cancers. Bevacizumab works by inhibiting vascular endothelial growth factor-A and, like other anti-VEGF drugs, slows the growth of blood vessels to limit the progression of tumors and other conditions. Bevacizumab has been considered a potential treatment for wet AMD since at least

2008. Besides Outlook, several other manufacturers were also racing to develop new anti-VEGF treatments for wet AMD.

5. This case arises from misrepresentations and omissions that Defendants made to investors throughout the Class Period on three subjects: (1) known failures of the contract manufacturers the Company selected to comply with the United States Food and Drug Administration's ("FDA" or the "Agency") Current Good Manufacturing Practices regulations ("cGMP"); (2) regulatory communications between Outlook and the FDA that Defendants claimed purported to show FDA agreement that the Company's two undersized closed-label clinical trials would be sufficient to prove the drug's efficacy; and (3) whether the Company's NORSE 1 and NORSE 2 trials were or were not comparable to other clinical trials accepted as adequate and well-controlled for treatments of wet AMD.

6. To obtain marketing approval for a drug like ONS-5010, derived from a monoclonal antibody, the drug company sponsor must submit to the FDA a Biologics License Application ("BLA"), together with supporting data establishing evidence of the drug's efficacy and safety and the ability of manufacturing facilities to mass produce the drug in accordance with cGMP. Throughout the Class Period, Defendants assured investors that their two contract manufacturers were cGMP compliant and that each could "provide product manufacturing in current Good Manufacturing Practices." However, they concealed the most important part: both

contract manufacturers Outlook selected had repeatedly been censured by the FDA for failing to comply with cGMP in the very facilities in which ONS-5010 was to be produced.

7. Defendants were also untruthful about regulatory communications pertaining to Outlook's pivotal clinical trials. Pivotal clinical trials are advanced-stage (Phase II/III or Phase III) trials proffered in a BLA as proof of efficacy. The FDA has long held that two adequate, well-controlled pivotal trials are generally necessary to prove efficacy.

8. If the BLA fails to establish one or more of these criteria, then the FDA issues a Complete Response Letter ("CRL"). Pursuant to federal regulations, a CRL states that the FDA will not approve the application in its present form, denotes all the specific deficiencies the FDA has identified in the application, and generally recommends corrective actions that a sponsor can take to rectify its mistakes.

9. Outlook first submitted its BLA for ONS-5010 on March 31, 2022, purportedly supported by data from pivotal trials known as NORSE 1 and NORSE 2. Both were significantly smaller in size than the clinical trials supporting approval of approved wet AMD treatments or the seminal study of bevacizumab for wet AMD. Prior to the Class Period at a September 21, 2020 healthcare conference with analysts, Defendant Lawrence Kenyon stated that the intent was "to submit a very streamlined clinical program that allows us to very efficiently and quickly

move ONS-5010 through the regulatory process," avoiding the substantial expense and time of full-scale clinical trials.

10. To assuage investor fears that the undersizing of NORSE 1 and NORSE 2 would risk non-approval, Defendants, both before and during the Class Period, falsely represented that the FDA had agreed to the trial design, including the small sizing. This was not true. Defendants also misrepresented that the NORSE 1 and 2 studies were comparable to rigorous studies underpinning other wet AMD approvals, when they were not.

11. The FDA notified Defendants as early as May 2022 requesting additional information due to concerns about the contract drug manufacturing facilities Outlook had indicated were to be used to manufacture ONS-5010. For this reason, on May 31, 2022, the Company issued a press release announcing that it was voluntarily withdrawing its ONS-5010 BLA submission and planned to resubmit after providing information to the FDA about its concerns.

12. As a result of this partial disclosure and materialization of concealed risks, the Company's stock price declined by nearly 6.96% from its previous day closing price of $1.15 on May 31, 2022 to close at $1.07 on June 1, 2022, on heavy trading volume.[2] On August 30, 2022, Outlook resubmitted the BLA, assuring

[2] On March 14, 2024, Outlook underwent a one-for twenty reverse stock split of its common stock in order to meet the NASDAQ's stock price listing requirement. All

investors with the promise that it had provided the "additional required information that was not included in our March 2022 BLA submission."

13. About a year later, investors learned that the BLA had been denied for reasons including the same "open observations" regarding manufacturing that were never resolved. On August 30, 2023, Outlook admitted that the FDA had issued a CRL declining Outlook's ONS-5010 BLA. The Company revealed that, "the Agency concluded it could not approve the BLA during this review cycle due to several CMC issues, open observations from pre-approval manufacturing inspections, and a lack of substantial evidence." When pressed by an analyst, Defendant Russell Trenary admitted the CRL addressed multiple "old items" as well as some newer items.

14. On this news, Outlook's stock price fell $1.141 per share, or 80.92%, to close at $0.269 per share on August 30, 2023.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

---

references to Outlook stock prices are without adjustment for this post-Class Period reverse stock split.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Outlook is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

19. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20. Lead Plaintiff Jason Solomon acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 24-3)

21. Additional Plaintiff Ramzy Alsaidi acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 1 at pp 31-33)

22. Additional Plaintiff Michael Lucas acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 23-3)

23. Additional Plaintiff Mariam Silverman, Trustee for the Mariam Silverman Trust UA Mar. 15, 1969, acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. (ECF No. 23-3)

24. Defendant Outlook is a Delaware corporation with principal executive offices located at 485 Route 1 South, Building F, Suite 320, Iselin, New Jersey 08830. Outlook's common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "OTLK".

25. Defendant C. Russell Trenary III ("Trenary") served as Outlook's Chief Executive Officer ("CEO") from July 2021 to December 3, 2024.

26. Defendant Lawrence A. Kenyon ("Kenyon") has served as Outlook's Chief Financial Officer ("CFO") at all relevant times. Defendant Kenyon served as the Company's CEO, CFO and President from August 2018 to July 2021, when he

led Outlook's shift in business strategy from oncobiology to focus solely on ophthalmology. Defendant Kenyon currently serves as the Company's interim CEO.

27. Defendants Trenary and Kenyon are referred to herein collectively as the "Individual Defendants."

28. The Individual Defendants possessed the power and authority to control the contents of Outlook's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Outlook's SEC filings, press releases, and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Outlook, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

29. Outlook and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Age-Related Macular Degeneration Background

30. Age-related macular degeneration ("AMD") is an eye disease that can blur your central vision. AMD occurs when aging causes damage to the macula — the part of the eye that controls sharp, straight-ahead vision. The macula is part of the retina — the light-sensitive tissue at the back of the eye.

31. AMD is a common condition, and it is a leading cause of vision loss for older adults. AMD does not cause complete blindness, but losing the central vision can make it more difficult to see faces, read, drive, or do close-up work like cooking or fixing things around the house.

32. Most people with AMD have dry AMD (also called atrophic AMD). This is when the macula gets thinner with age. Dry AMD happens in 3 stages: early, intermediate, and late. It usually progresses slowly over several years. There is no treatment for late dry AMD.

33. Wet AMD (also called advanced neovascular AMD) is a less common type of late AMD that usually causes faster vision loss. Any stage of dry AMD can turn into wet AMD, but wet AMD is always late stage. It occurs when a protein called vascular endothelial growth factor ("VEGF") makes abnormal blood vessels grow in the wrong place in the back of the eye.

34. Two treatment options can slow down or stop vision loss from wet AMD: Anti-VEGF injections and photodynamic therapy.

35. Anti-VEGF injections are the most common treatment doctors prescribe and administer to slow vision loss from wet AMD. These medicines help stop bleeding and leaking from blood vessels in the back of the eye. Most patients with wet AMD are prescribed anti-VEGF injections as their only treatment. An individual anti-VEGF injection is usually effective in treating wet AMD for only a short period of time, so most patients treated with anti-VEGF injections require reoccurring injections to treat their symptoms.

36. Anti-VEGF injection therapies are also FDA and European Medicines Agency-approved for the treatment of many forms of cancer. These medications are frequently prescribed and administered for targeted cancer therapy and are typically combined with other medications.

37. In 2004, the FDA approved Genentech, Inc.'s ("Genentech") Avastin (bevacizumab), for the treatment of metastatic colorectal cancer. The approval was based on two pivotal Phase III clinical trials, including a total of 1385 patients. Because Avastin targeted VEGF growth, it was flagged as a potential treatment for wet AMD. However, the FDA has never approved any formulation of bevacizumab for ophthalmic use.

38. In June 2006, the FDA approved Genentech's Lucentis (ranibizumab) for treating wet AMD. The approval was based on two pivotal, Phase III clinical trials, including a total of 1139 patients.

39. In October 2006, the National Eye Institute of the National Institutes of Health announced that it would fund a comparative study trial of ranibizumab and bevacizumab to assess the relative efficacy and ocular adversity in treating wet AMD. In 2008, this study, called the Comparison of Age-Related Macular Degeneration Treatment Trials ("CATT Study"), enrolled approximately 1,200 patients with newly diagnosed wet AMD. The patients were assigned randomly to different treatment groups, and the data was collected from 2008 to 2009. The overall conclusions demonstrated no statistical difference between the treatment groups' outcomes after eight years. The CATT Study also provided guidance to the ophthalmology industry regarding the appropriate size of the clinical trial.

40. Due in part to the positive results of the CATT Study, bevacizumab became a popular off-label option for treating wet AMD. Bevacizumab's use in ophthalmology is "off-label" because it has not been through the rigorous FDA process required for approval to market bevacizumab with an indication to treat ophthalmic pathology.

41. Genentech does not produce bevacizumab in doses suitable for intravitreal injections necessary for treating wet AMD. Doctors must rely on

compounding pharmacies to create single-use vials of the appropriate doses for such treatments.

42. Compounded drugs are not FDA-approved and are generally exempt from pre-market drug approval cGMP. FDA does not verify the safety or effectiveness of compounded drugs. Compounded drugs, while at higher risk, fill an important role for patients whose medical needs cannot be met by an FDA-approved drug product.

43. However, if bevacizumab were to be approved by the FDA for treatment of wet AMD and other ophthalmologic indications, then Sections 503A and 503B of the Federal Food, Drug and Cosmetic Act (the "FDCA") would generally prohibit compounding manufacturers from manufacturing single-use vials and syringes of bevacizumab. In that case, Outlook, as the drug sponsor, would then be the only entity authorized to market bevacizumab for those indications in the United States. Accordingly, approval had enormous benefits because (a) Outlook would be the only company authorized to sell the drug for the treatment of wet AMD, (b) approval would restrain competition from compounding pharmacies, and (c) Outlook would finally have a drug candidate that would generate revenue.

**The FDA Approval Process**

44. In the United States, pharmaceutical development and marketing is regulated by the FDA, an agency of the U.S. Department of Health and Human

Services. The modern regulatory regime was enacted in 1962, after Thalidomide, a sleeping pill, caused congenital disabilities in thousands of babies. In reaction to this tragedy, Congress passed the Kefauver-Harris Amendments to the FDCA, requiring that any company that wanted to market a pharmaceutical product in the United States (in industry parlance, a "sponsor") had to obtain prior approval from the FDA, and that the approval had to be based upon substantial scientific evidence demonstrating that the product was safe and effective for its intended use in humans.

45. The FDA divides therapeutics into different categories. Bevacizumab falls into a category known as "biologics," or large molecule drugs, because it is a monoclonal antibody. Biologics can only be marketed in the United States when the FDA has approved a BLA.

46. Biologics like bevacizumab are considered "drugs" under the FDCA; thus, they are subject to the requirements of the FDCA. *See* https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequentlyasked-questions-about-therapeutic-biological-products. As amended, that statute requires the Secretary of the FDA to refuse any drug application if:

> (a) "he has insufficient information to determine whether such drug is safe for use under such conditions;"
>
> (b) "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof;" or

> (c) "the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity."

21 U.S.C. § 355(d)(3)-(5).

47. Biologics are also subject to the provisions of the Public Health Services Act (the "PHSA"). 42 U.S.C. § 262. Because of the complexity of manufacturing and characterizing a biologic, the PHSA emphasizes the importance of appropriate manufacturing control for products. The PHSA provides for a system of controls over all aspects of the manufacturing process. In some cases, manufacturing changes could result in changes to the biological molecule that might not be detected by standard chemical and molecular biology characterization techniques yet could profoundly alter the safety or efficacy profile. Therefore, changes in the manufacturing process, equipment or facilities may require additional clinical studies to demonstrate the product's continued safety, identity, purity and potency.

48. The PHSA requires that a BLA be approved only "on the basis of a demonstration that – (I) "the biological product that is the subject of the application is safe, pure, and potent; and (II) the facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C).

49. The PHSA clarifies that its requirements are in addition to those enumerated by FDCA and other regulations. 42 U.S.C. § 262(j).

50. Prior to conducting any clinical research in humans, a sponsor must screen the proposed biologic for toxicity with animal studies, and file an Investigational New Drug ("IND") application with the FDA. An IND application includes the following information:

> (a) Animal pharmacology and toxicology studies sufficient to permit an assessment as to whether the product is reasonably safe for initial testing in humans. Any previous experience with the drug in humans (such as use in foreign countries) also must be included.
>
> (b) Manufacturing information describing the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product. This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.
>
> (c) Clinical protocols and investigator information including sufficient detail regarding the proposed protocols for clinical studies to assess whether the initial-phase trials will expose human subjects to unnecessary risks.

21 C.F.R. § 312.23. After filing an IND, the sponsor must wait 30 days before commencing human clinical trials.

51. The sponsor, not the FDA, is responsible for determining the design of clinical trials and the protocols for each trial. If a sponsor wants the FDA to agree to the sufficiency of a particular protocol, the sponsor may request a Special Protocol Assessment ("SPA") pursuant to 21 U.S.C. § 355(b)(5)(C). Under this provision,

the FDA and sponsor meet to discuss the sponsor's proposed protocols and reduce any agreements to writings that become part of the administrative record. Such agreements may not be changed except by mutual consent or under exceptional medical or scientific circumstances. *Id.* Outlook did not apply for and did not receive any SPA's in connection with the NORSE 1, NORSE 2, or NORSE 3 clinical trials that would confirm the FDA agreed to accept undersized trials as proof of efficacy for ONS-5010.

52. A sponsor generally conducts clinical trials in three phases. These phases, which are codified in FDA regulations, are as follows:

> (a) Phase I. Phase I studies "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness. ***The total number of subjects and patients included in Phase 1 studies varies with the drug, but is generally in the range of 20 to 80."***
>
> (b) Phase II. Phase II studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug." ***Phase II studies are "conducted in a relatively small number of patients, usually involving no more than several hundred subjects."***
>
> (c) Phase III. Phase III studies are expanded studies "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. ***Phase 3 studies usually include from several hundred to several thousand subjects."***

21 C.F.R. § 312.21. Phase III clinical trials are also sometimes called "pivotal" clinical trials, referring to their importance to a marketing application. Such trials are "conducted in a larger and often more diverse target population in order to demonstrate and/or confirm efficacy and to identify and estimate the incidence of common adverse reactions." *See* Umsched, *et al.*, "*Key Concepts of Clinical Trials: A Narrative Review*," available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3272827/.

53. For a Phase III clinical trial to be sufficiently powered, it generally needs to include "300 to 3000 subjects; they consequently have the statistical power to establish an adverse event rate of no less than 1 in 100 persons." *Id.*

54. When a sponsor believes it has conducted sufficient well-controlled clinical trials and believes that those trials demonstrate substantial evidence of efficacy and safety consistent with the FDCA, the sponsor may prepare and file a BLA with the FDA seeking approval to market the subject drug in a specific dose for the treatment of a specific condition or indication. The BLA must also specify how the drug will be manufactured, packaged and labeled. The FDA can only grant approval when presented with scientific evidence meeting the requisite statutory criteria.

55. Within sixty (60) days of receiving a BLA, the FDA will accept the BLA for filing if it believes the BLA is sufficiently complete to permit a substantive

review of the information contained within the BLA. The acceptance of a BLA for filing is not a determination of the substantive merits of the BLA, but rather a threshold determination of whether there is enough data to conduct a substantive examination. If the BLA determines a facial problem preventing a meaningful substantive examination – for example, if the BLA is missing paperwork, fails to include data in the proper format, or suffers from other facial errors that make review impossible – the FDA may refuse to file the BLA. Otherwise, substantive determinations are reserved for the full application review.

56. For example, the drug sponsor for Vabysmo, an FDA-approved wet AMD treatment, as part of its Type B meeting, asked the FDA whether it would agree "that efficacy and safety results from the outlined studies support the submission" of the BLA to which the FDA responded that the studies were "adequate to support the filing of a BLA" but warned that "the adequacy of the study results to support approval is a review issue." U.S. Food & Drug Admin. Type B Meeting Preliminary Meeting Comments (March 29, 2021) at 1-2, Type B Preliminary, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/761235Orig1s000AdminCorres.pdf.

57. The filing of a BLA triggers review deadlines specified in the Prescription Drug User Fee Act ("PDUFA"), enacted in 1992 and reauthorized by amendment every five years thereafter. Under the PDUFA, the FDA is generally

required to respond to the BLA within six months. The date by which the FDA must issue its response is frequently referred to as a drug candidate's "PDUFA date."

58. A BLA accepted for filing is reviewed for substance by the FDA's Center for Drug Evaluation & Research ("CDER") when a biologic drug candidate consists of monoclonal antibodies, such as bevacizumab.

59. A sponsor such as Outlook is required to identify on the form for submitting a BLA (FDA Form 356h) each manufacturing facility to be used, so that the FDA can review and inspect those facilities. The FDA also specifies that those facilities should be identified in a table within module 3 (CMC) of the BLA, along with the address, contact person, and FDA Establishment Identifier (FEI) for each facility. *See, generally,* FDA, Guidance for Industry: Identification of Manufacturing Establishments in Applications Submitted to CDER and CBER, Questions and Answers (October 2019), available at: https://www.fda.gov/media/131911/download. The FEI and other identifying information allow the FDA to readily pull up historical inspection information for a given facility.

60. Because biologics manufacturing is often substantially more difficult and inconsistent than traditional pharmaceuticals, FDA regulations impose strict requirements that proper manufacturing practices be proved before approval. Specifically, 21 C.F.R. § 601.2(d) provides that BLA approvals require "a

determination that the establishment(s) and the product meet applicable requirements to ensure the continued safety, purity, and potency of such products. Applicable requirements for the maintenance of establishments for the manufacture of a product subject to this section shall include but not be limited to the good manufacturing practice requirements." *Id.*

61. The requirement to show good manufacturing practices is well known and repeated throughout FDA regulations governing biologics. For example, FDA regulations clarify that: "A biologics license application shall be approved only upon examination of the product and upon a determination that the product complies with the standards established in the biologics license application and the requirements prescribed in the regulations in this chapter including but not limited to the good manufacturing practice requirements set forth in parts 210, 211, 600, 606, and 820 of this chapter." 21 C.F.R. § 601.20(a). Defendants acknowledged the same. *See* ¶¶128, 131, 132.

62. FDA regulations also require that the biologic be "available for inspection during all phases of manufacture," 21 C.F.R. § 601.20(b)(2) and that "[n]o product shall be licensed if any part of the process of or relating to the manufacture of such product…would impair the assurances of continued safety, purity, and potency as provided by the regulations contained in this chapter," 21 C.F.R. § 601.20(c).

63. Defendants made numerous statements acknowledging the FDA's cGMP requirements regarding the manufacturing of ONS-5010 and specifically that the "manufacturing facilities are subject to continual review and inspections." *See* ¶132.

64. The FDA ensures the quality of drug products by carefully monitoring drug manufacturers' compliance with cGMP regulations. The cGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used to manufacture, process, and pack a drug product. The regulations ensure that a product is safe for use and has the ingredients and potency it claims to have.

65. The approval process for new and generic drug marketing applications includes a review of the manufacturer's compliance with the cGMP. FDA assessors and investigators determine whether the firm has the necessary facilities, equipment, and ability to manufacture the drug it intends to market.

66. When the FDA inspects a drug manufacturing facility and finds violations in cGMP, the FDA notifies the facility of each observed violation via Form 483. A Form 483 is used to document violations observed in a specific facility, identified using the FEI number. A Form 483 is not intended to comprehensively list every minor violation, but rather those that are "significant" and, in the investigator's view, could cause the manufactured drugs to become "adulterated or

rendered injurious to health."[3] At the conclusion of the inspection, the Form 483 is presented to and discussed with the facility's senior management. *Id.* Form 483's are relatively rare. As the FDA notes, "more than 90% of inspections found facilities to have acceptable cGMP compliance."[4] Form 483s are not published or readily available to investors but can usually be obtained through the FOIA process or private third-party services that have obtained them through the FOIA process.

67. If the FDA approves the biologic drug candidate, it will issue an approval letter in writing to the sponsor. If the FDA finds that the BLA fails to provide the substantial evidence of efficacy and safety required by statute, or has other material shortcomings preventing approval, the FDA will send the sponsor a CRL identifying the reasons why the application was not approved. A CRL may, but need not always, suggest that the sponsor conduct additional clinical trials.

68. CRLs are never made public by the FDA when issued and are shielded by regulation thereafter as long as the sponsor is continuing to pursue the subject drug application.[5] Accordingly, investors must rely on the sponsor companies to provide accurate information regarding CRLs.

---

[3]Available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions
[4]Available at https://www.fda.gov/drugs/guidance-compliance-regulatory-information/pharmaceutical-inspections-and-compliance
[5] The FDA sometimes releases CRLs in redacted form years later, after the drug candidate is approved or officially abandoned.

69. A sponsor may continue to pursue approval of a drug candidate after receiving a CRL by resubmitting its BLA within a year, or longer if extended. A BLA resubmission is also called the sponsor's "complete response" to the CRL because it is supposed to respond to all the deficiencies identified in the CRL and the sponsor is supposed to indicate on the cover page of the resubmission that it does so.

**FDA's Wet AMD Approval History and Guidance**

70. The FDA will, from time to time, release guidance prepared for FDA staff, the regulated industry, and/or the public that describes the FDA's interpretation of, or policy on, a regulatory issue.

71. FDA's Good Guidance Practices regulation (21 C.F.R. § 10.115) governs the development and issuance of guidance documents, and it gives interested persons a number of opportunities to provide input into the guidance development process.

72. Generally, the FDA solicits public input on guidance prior to implementation. The Agency posts draft guidance documents on its website and publicizes them by issuing a Notice of Availability ("NOA") of the draft guidance in the *Federal Register*.

73. Generally, the public has 60 days to provide comments to the FDA on draft guidance. In some instances, FDA may also hold public meetings or

workshops on draft guidance to solicit additional comments or present the draft guidance to an advisory committee for review. Once the comment period has closed, the Agency reviews and considers the comments it has received, as it prepares the final guidance.

74. On December 20, 2019, the FDA published a guidance titled Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products Guidance for Industry (the "2019 Guidance").[6] On the same day, the FDA published an NOA in the *Federal Register*.

75. The 2019 Guidance states that the "substantial evidence of effectiveness standard in the statute refers to both [to] the quality and the quantity of the evidence." Substantial evidence of effectiveness means:

> evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C.A. § 355.

76. The 2019 Guidance reiterates that the "standard approach" to generating substantial evidence of effectiveness is by performing two adequate and

[6] Available at https://www.fda.gov/media/133660/download

well-controlled trials. 2019 Guidance at 15. In general, the "FDA requires two adequate and well-controlled trials to establish effectiveness," which "reflects the need for substantiation of experimental results." Adequate and well-controlled, as defined in 21 C.F.R. § 314.126, describes characteristics of an adequate and well-controlled clinical investigation, including choice of control, method of patient assignment to treatment (*e.g*., randomization), adequate measures to minimize bias (*e.g*., blinding), well-defined and reliable assessment of individuals' response (*i.e*., efficacy endpoint), and adequate analysis of the clinical investigation's results to assess the effects of the drug (*i.e*., statistical methods).

77. It also explains that "[a] second adequate and well-controlled investigation or confirmatory evidence provides substantiation of experimental results, which is a widely accepted scientific principle. This approach is intended to minimize the possibility that other influences such as bias and chance findings could result in a false conclusion that a drug is effective when in fact it is not (false positive)." 2019 Guidance at 4-5.

78. The 2019 Guidance explains that statistical considerations support conducting two trials, which must be of sufficient size. "The strength of evidence in each trial contributing to meeting the substantial evidence standard should be assessed by appropriate statistical methods." 2019 Guidance at 8. Two large trials allow "[t]he uncertainty about the findings from each trial should be sufficiently

small and the findings [to] be unlikely to result from chance alone, as demonstrated by a statistically significant result or a high posterior probability of effectiveness." *Id*. While there have been exceptions that allowed for drug approval involving only one well-controlled trial, such a trial requires a lower p-value, demonstrating stronger statistical significance than an application with two adequate and well-controlled trials. 2019 Guidance at 16.

79. The 2019 Guidance explains the circumstances in which a single trial could be warranted: "[r]eliance on a single large multicenter trial to establish effectiveness should generally be limited to situations in which the trial has demonstrated a clinically meaningful and statistically very persuasive effect on mortality, severe or irreversible morbidity, or prevention of a disease with potentially serious outcome, … ***and*** confirmation of the result in a second trial would be impracticable or unethical." 2019 Guidance at 9. "Repetition of positive trials showing only symptomatic benefit would generally not present the same ethical concerns." *Id*. Here, there were no impractical or ethical concerns preventing two adequately sized trials, as demonstrated by the numerous approvals based on two large Phase III studies that preceded Outlook's NORSE 1 and NORSE 2.

80. On February 6, 2023, the FDA published a guidance regarding the eligibility criteria, trial design considerations and efficacy endpoints of clinical trials for drug candidates aimed at treating wet AMD, titled *Neovascular Age-Related*

*Macular Degeneration: Developing Drugs for Treatments Guidance for Industry* (the "Wet AMD Guidance").[7] On the same day, the FDA published an NOA in the *Federal Register*.

81. With regards to efficacy considerations, the Wet AMD Guidance affirmed the 2019 Guidance, recommending that "***safety and efficacy should be demonstrated in at least two adequate and well-controlled, multicenter trials*** utilizing different investigative sites," and that a "decrease in the number of administrations of available effective therapies alone is not sufficient for the demonstration of efficacy." Wet AMD Guidance at 3.

82. In order to satisfy the safety requirement, the Wet AMD Guidance recommends:

> (a) ***That approximately 400 or more patients using the investigational drug complete treatment*** with a concentration of the investigational drug at least as high as proposed for marketing and with a dosing frequency at least as frequent as proposed for marketing.
>
> (b) Before submission of a marketing application, ***the sponsor should ensure that at least 300 patients have completed at least 9 months of follow-up after the initiation of treatment***.
>
> (c) FDA recommends that at least one concurrently controlled safety trial be conducted for at least 2 years' duration.

Wet AMD Guidance at 4.

[7] Available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/neovascular-age-related-macular-degeneration-developing-drugs-treatment

83. Even before the Wet AMD Guidance was issued, it was well-known throughout the ophthalmic drug industry that the FDA required significant patient populations and at least two adequately sized Phase III trials to establish efficacy for a wet AMD treatment. Indeed, ***every*** wet AMD approval involving eye injections has involved at least two Phase III trials consisting of more than 500 patients:

| **Wet AMD Treatment** | **Year of FDA Approval** | **Number of Patients Enrolled** |
|---|---|---|
| Macugen | 2004 | 1190 patients across two pivotal Phase III trials |
| Lucentis | 2006 | 1139 patients across two pivotal Phase III trials |
| Eylea | 2011 | 2457 patients across two pivotal Phase III pivotal trials |
| Beovu | 2019 | 1817 patients across two pivotal Phase III trials |
| Vabysmo | 2022 | 1329 patients across two pivotal Phase III trials |

84. Each of the above, previously FDA-approved FDA wet AMD approvals, which were referenced by and understood by Defendants, was based on the submission of data from at least two large, well-controlled clinical studies as prescribed in the FDA regulations describing Phase III trials, and reiterated in the FDA's 2019 Guidance and the Wet AMD Guidance.

85. What constitutes a large clinical study has remained unchanged since the first wet AMD treatment, Macugen, was approved. During the FDA's Dermatology and Ophthalmology Advisory Committee Meeting on August 27, 2004, where Deputy Director of the Division of Anti-Inflammatory, Analgesic and

Ophthalmologic Drug Products, Dr. Wiley A. Chambers specifically noted that the FDA required at least 300 patients to complete the study and recommended 500 patients in each Phase III trial:

> "That means you need at least 300 patients studied fully through that to be able to determine that. We generally recommend at least 500 patients so that we are not dealing with, "well, I've got 299" or "I've got 298" or "I've got 301." We know in this population, because of the natural age and normal life span, people are not going to necessarily survive through the trial--just not related to the drug but related to other reasons. So, we start out asking for people to do trials of 500 patients or more."

Dermatologic and Ophthalmic Drugs Advisory Committee, Transcript of Review of NDA21-756 (Macugen) (August 27, 2004), at 14-15, https://web.archive.org/web/20170404064152/https://www.fda.gov/ohrms/dockets/ac/04/transcripts/2004-4053T1.htm.

86. In the accompanying presentation, the FDA laid out the requirements in plain terms[8]:







[8] Available at https://web.archive.org/web/20170404064150/https://www.fda.gov/ohrms/dockets/ac/04/slides/2004-4053S104FDA-Chambers.ppt

87. Accordingly, it was known within the ophthalmologic drug industry no later than 2004 that Phase III studies should be sized appropriately with 500 or more subjects, especially where the studied population involves elderly persons who are likely to have adverse health events as a result of age as well as from reactions to a drug or placebo.

88. The FDA has likewise emphasized the importance of study size in its review of other wet AMD treatments. For example, in its review of the BEOVU BLA, the FDA reiterated the requirement of an adequate patient population and specifically stated that the two Phase III studies with more than 1,800 patients were "adequate and well controlled studies contained in this submission establish the efficacy of BEOVU." U.S. Food and Drug Admin., Summary Review, BLA 761125, at 3 (Sep. 25, 2019), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2019/761125Orig1s000SumR.pdf.

**Outlook and Bevacizumab**

89. Outlook is a late clinical-stage biopharmaceutical company focusing on developing and commercializing monoclonal antibodies for various ophthalmic indications. The Company's lead product candidate is ONS-5010, an ophthalmic formulation of the antibody bevacizumab for treating wet AMD and other retina diseases.

90. Prior to focusing on the ophthalmology market, Outlook was known as Oncobiologics, Inc., and described itself as a clinical-stage biopharmaceutical company focused on identifying, developing, manufacturing, and commercializing complex biosimilar therapeutics to monoclonal antibodies, or mAbs, in the disease areas of immunology and oncology.

91. On August 2, 2018, Outlook signaled that it would shift away from oncology and focus solely on ophthalmology. On the same day, the Company announced in a press release that Defendant Kenyon was appointed CEO and President and that he would be an "ideal fit" as the Company moved ONS-5010 "into the clinic."

92. On November 6, 2018, the Company announced that it had commenced its first clinical study for ONS-5010 outside of the United States, later termed "NORSE 1." NORSE 1 enrolled only 61 patients in nine sites around Australia. At no time did the Company reach agreement with the FDA through a SPA or otherwise that such a small, underpowered study would provide proof of efficacy sufficient to support approval.

93. On December 3, 2018, the Company issued a press release announcing that it formally changed its name to Outlook Therapeutics, Inc. Defendant Kenyon explained that "the timing of this corporate rebranding effectively signals the

significance of the recent strategic shift in the business and the high value opportunity we are pursuing in the anti-VEGF ophthalmic market."

94. According to CW1, the Vice President of Manufacturing at Outlook from January 2018 to May 2019, the Company attempted to prepare its manufacturing facility in Cranbury, New Jersey for commercial production of ONS-5010 and a pre-approval inspection. The Company hired CW1 to revive its manufacturing facilities as they were run down with old equipment and a stripped-down staff. Over the next year, CW1 hired new manufacturing managers and employees and recommissioned the equipment.

95. The results were unsatisfactory. Accordingly, in 2019, the Company shut down its in-house manufacturing and partnered with a contract development and manufacturing organization to produce ONS-5010. The Company utilized contract manufacturers to manufacture ONS-5010 for its clinical trials.

96. On June 3, 2019, the Company announced that it had signed a master services agreement with FUJIFILM Diosynth Biotechnologies ("FujiFilm") for the production of ONS-5010. Defendant Trenary and Outlook claimed to be familiar with FujiFilm's status, capabilities and history. Defendant Trenary stated:

> "Our master services agreement with [FujiFilm] secures a world class manufacturing facility for the potential commercial launch of ONS-5010. Most importantly, [FujiFilm] has the ability to rapidly scale manufacturing of ONS-5010 while maintaining the quality controls that meet or exceed regulatory requirements. Identifying a highly-regarded manufacturing partner for ONS-5010 is an important part of our

> commercialization strategy and is a required part of the Biologics License Application, or BLA, submission in wet AMD."

97. The same press release touted FujiFilm's manufacturing history:

> [FujiFilm] is focused on combining technical leadership in cell culture, microbial fermentation and viral vectors with world class GMP manufacturing facilities to advance tomorrow's medicines. For over 25 years they have been supporting customers with the development and manufacture of recombinant proteins, viral vaccines and gene therapies.

98. On August 14, 2019, the Company issued a press release announcing its financial and operational results for the third quarter ended June 30, 2019. In that press release, the Company formally announced renaming its two Phase III clinical trials to NORSE 1 and NORSE 2 from ONS-5010-001 and ONS-5010-002, respectively. That release also described NORSE 1 and 2 as the Company's Phase III clinical trials.

99. In the same press release, Defendant Kenyon endorsed FujiFilm's manufacturing capacity:

> "I am confident that our engagement of FUJIFILM Diosynth Biotechnologies as the global producer of ONS-5010 puts us in a stronger position for commercialization as we look past the clinical development program and towards seeking regulatory approvals."

100. On August 20, 2019, the Company issued a press release and once again misled investors that "[t]he NORSE 1 study design was confirmed in our April 2018 FDA meeting to be one of our two adequate and well controlled clinical trials ***required to support approval*** of ONS-5010 to treat wet AMD." This was not true.

The FDA had not "confirmed" in an April 2018 meeting or at any time that the NORSE 1 study was sufficiently sized to support approval as "one of … two" pivotal trials for ONS-5010, as was made clear by the fact that although NORSE 1 and 2 both met their endpoints, the FDA determined that evidence of efficacy was lacking, and by the fact that the Company's response was to implement a full-scale trial, just as had been used in every approved application for a wet AMD treatment. *See* ¶¶158, 178-80. Plaintiffs also base their belief on the fact (a) that the FDA's standard response in situations where asked in the absence of a SPA whether a not-yet-conducted trial supported approval is that the issue will be determined when the application is reviewed, *see* ¶56, and (b) on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶74-82. To ensure that investors did not learn the truth, Outlook has declined to disclose to investors its actual regulatory communications with the FDA, including the correspondence related to this 2018 meeting.

101. On June 17, 2020, the Company again misrepresented that the FDA had accepted the size of the NORSE 1 and NORSE 2 trials at the April 2018 End-of-Phase 2 meeting:

> Outlook Therapeutics is currently conducting two registration clinical trials for ONS-5010. At an End-of-Phase 2 meeting in April 2018, the ***U.S. Food and Drug Administration (FDA) accepted the study design / size for the NORSE 1 and NORSE 2 trials and confirmed that each of them is acceptable*** and may support a new biologics license application (BLA) under the 351(a) regulatory pathway toward approval for the treatment of wet age-related macular degeneration (wet AMD).

102. However, as explained in Paragraph 101 above, the FDA had not actually agreed that the "study design / size for the NORSE 1 and NORSE 2 trials was "acceptable" to support approval of a BLA, without additional clinical trials of a scale required by FDA guidance and implemented by every other sponsor that had received approval for a wet AMD treatment, but which Outlook had not conducted.

103. On September 30, 2020, the Company announced its partnership with Ajinomoto bio-Pharma Services ("Ajinomoto") "to provide product manufacturing in the best-in-class cGMP global manufacturing facilities." The Company further added that it had "completed technology transfer and scale-up consistent with global cGMP standards with both Fuji and [Ajinomoto]."

104. Due to clear regulations and extensive guidance from the FDA, Defendants understood that to obtain approval for the ONS-5010 BLA, Outlook would have to (1) submit substantial evidence from two well-controlled Phase III pivotal trials, each with an adequate number of patients, and (2) prove that its manufacturers, FujiFilm and Ajinomoto, comply with cGMP regulations.

105. On June 10, 2021, while under contract with Outlook, Ajinomoto received a Form 483 from the FDA, after inspections of its San Diego, California facility from May 5, 2021 to May 25, 2021. A true and correct copy of this Form 483, which was made available to Defendants, is attached hereto as **Exhibit 1**. The Form 483 identified three observations of cGMP violations:

(a) The separate or defined areas and control systems necessary to prevent contamination or mix-ups were deficient.

(b) Equipment and utensils were not cleaned and sanitized at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality, or purity of the drug product.

(c) Written specifications for laboratory controls did not include a description of the testing procedures used.

106. On August 31, 2021, while under contract with Outlook, FujiFilm received a Form 483 from the FDA, after inspections of its College Station, Texas facility from August 23, 2021 to August 31, 2021. A true and correct copy of this Form 483, which was made available to Defendants, is attached hereto as **Exhibit 2**. The Form 483 identified nine observations of cGMP violations:

(a) There were not adequate controls to prevent cross-contamination of other products in its multiproduct facility.

(b) Failed to adequately investigate batch contamination.

(c) No quantitative or specific measurements had been taken to determine the equipment used in bulk drug substance manufacturing.

(d) The facility was not following its contamination control strategy for its products.

(e) Inadequate data integrity corrective measures.

(f) No procedures/policies required identity testing of cell banks that have been received from outside sources.

(g) Inadequate handling of inventory and misuse of facilities.

(h) Failed to perform routine corrective maintenance to assess whether PM plans need to be changes or determining the need for re-qualification of equipment, utilities, or facilities.

(i) Missing training records and inadequate training for employees that manufacture bulk substance.

107. On January 16, 2023, while under contract with Outlook, Ajinomoto received another Form 483 from the FDA after inspection of its San Diego, California facility from January 11-13, and January 16, 2023. A true and correct copy of the Form 483, which was made available to Defendants, is attached hereto as **Exhibit 3**. The Form 483 identified two observations of cGMP violations:

(a) The building filling line capping and [redacted] machine was validated using only one batch run and not three. The quality control microbiology laboratory's cGMP material ambient storage room was not qualified for 20-25 degrees Celsius.

(b) Facility and equipment maintenance were deficient in their ability to support cGMP production activities.

(c) Written specifications regarding the responsibilities and procedures applicable to the quality control unit were not fully followed.

108. On June 7, 2023, while under contract with Outlook, FujiFilm received another Form 483 from the FDA after inspections of its College Station, Texas facility from May 31, 2023 to June 7, 2023. A true and correct copy of the Form 483, which was made available to Defendants, is attached hereto as **Exhibit 4**. The Form 483 identified eight observations of cGMP violations:

(a) The responsibilities and procedures applicable to the quality control unit were not fully followed, specifically that the quality systems in place were inadequate to prevent the use of critical quality analytical test methods and protocols that had not been appropriately validated or released for use in testing to ensure product quality, potency, identity, and quality.

(b) Control procedures which validate the performance of those manufacturing processes that may be responsible for causing variability of drug substances were inadequate.

(c) Laboratory controls did not include the establishment of scientifically sound and appropriate standards designed to assure that drug substances conformed to appropriate standards of identity, strength, quality, and purity.

(d) Failed to thoroughly review and document unexplained discrepancies.

(e) Manufacturing process areas were deficient regarding the system for monitoring environmental conditions.

(f) The control systems necessary to prevent contamination or mix-ups were deficient.

(g) Failed to establish adequate written procedures.

(h) Failed to exercise appropriate controls over computer or related systems to ensure data generated cannot be deleted.

109. Despite Defendants' repeated boasting about the strength of their manufacturing partners and framing lack of compliance as a mere hypothetical, both Fujifilm and Ajinomoto were cited for the same recurring, un-remediated violations in the 2023 Form 483s as they were in 2021.

110. For example, both in 2021 and 2023, the Ajinomoto was cited for not cleaning "at appropriate intervals to prevent contamination." Ex. 1 at Observation 2; compare with Ex. 3 at Observation 2 ("Cleaning and Sanitization for Building []Line~ Area, directs cleaning to be a [redacted] contact time using disinfectants for the facility cleaning procedures. This contact time is not validated by the efficacy studies."). Further, Ajinomoto's 2023 Form 483 notes that certain equipment was due for maintenance on December 16, 2020, meaning it was an issue that had not been remediated since that time. Ex. 3 at Observation 2(c).

111. Similar repeat violations or "old issues" were among those cited in the 2023 Form 483 at the Fujifilm facility. For example, in both 2021 and 2023, Fujifilm was cited for not having adequate controls to prevent cross-contamination and failure to have written procedures. *Compare* Exhibit 2 at Observations 1 and 2 *with* Exhibit 4 at Observation 6. Fujifilm was further cited both times for not having proper policies to identity testing of cell banks that had been received by outside sources. *See* Exhibit 2 at Observation 6; Exhibit 4 at Observation 6.

112. CW2 began working at Ajinomoto's San Diego facility in November 2016 as a Compliance Associate and rose to Senior Compliance Associate II by the time CW2 left in September 2020. CW2 reported to the San Diego facility's compliance manager, Ryan Koed.

113. CW2 was involved with audits and inspections of the San Diego facility, including those led by the FDA and drug sponsors. CW2 confirmed that drug sponsors routinely audited the San Diego facility, and that the facility was subject to 50 to 60 drug sponsor audits per year.

114. With respect to FDA inspections, CW2 stated that a representative of the drug sponsor, such as Outlook, was on-site during the FDA's multi-day inspection. At the end of each day, Ajinomoto communicated the summary of that day's activities to the drug sponsor. If the drug sponsor was not on-site, these details were provided via a telephone call. Ajinomoto also provided the drug sponsor with a summary at the end of the FDA inspection.

115. CW2 also confirmed that Ajinomoto provided drug sponsors with notice of the Form 483 issued by the FDA and any response to the Form 483 by Ajinomoto.

116. CW3 worked at Ajinomoto's San Diego facility as a Quality Control Operations Manager from February 2006 to June 2023. CW3 interfaced with FDA inspectors regarding quality control processes and with drug sponsors regarding FDA inspections and potential remediations. According to CW3, the FDA had inspected Ajinomoto's San Diego facility numerous times during her tenure.

117. CW3 confirmed CW2's account that Ajinomoto provided end-of-day and end-of-inspection updates to the drug sponsor regarding what had occurred with

the FDA inspection. CW3 further confirmed CW2's account that Form 483's and Ajinomoto's response to Form 483's were provided to drug sponsors.

118. CW4 worked at FujiFilm's College Station, Texas facility as a Quality Control Chemist from September 2020 to July 2022 and reported to QC Chemistry Supervisor Marianela Rodriguez.

119. CW4's responsibilities included running diverse types of chemistry tests to ensure the drug product was meeting specifications, including tests for purity, concentration, stability, PH levels, and characterization, such as weight and size of the molecule.

120. CW4 confirmed that project managers at FujiFilm informed the drug sponsor of any quality issues and any identified CMC issues with the product, including those from FDA inspections.

121. CW5 worked at Outlook from February 2018 to September 2019, first as an Upstream Supervisor and was then promoted to Associate Director. CW5 initially reported to CW1, but after Outlook shuttered its in-house manufacturing facility, CW5 reported to Chris Yonan, Vice President of Technical Operations. CW5 assisted in the tech transfer of instructions to FujiFilm regarding the manufacture of ONS-5010.

122. CW5 reported that FujiFilm communicated manufacturing problems directly to Outlook at its highest levels. Specifically, CW5 said that deficiencies

were reported directly to Outlook's Chief Operating Officer. CW5 recalled that FujiFilm had a failed batch while manufacturing Outlook's drug candidate, ONS-5010, and had to run experimental batches to attempt to resolve the process.

123. Despite having knowledge of the multiple cGMP violations cited in Form 483s at both of its manufacturing facilities, and the existence of planned or pending BLA submissions, at no point during the Class Period did Defendants disclose these violations or the existence of the Form 483s to investors.

**Materially False and Misleading Statements Issued During the Class Period**

124. The Class Period begins on August 3, 2021, when the Company issued a press release highlighting the outcome of its NORSE 2 trial. In that press release, Trenary stated:

> "In meeting both the primary and key secondary endpoints in NORSE TWO with highly significant clinically relevant results, ***we have achieved the requirements agreed upon with the FDA,*** and when combined with our previously reported clinical trial results, this completes the clinical package necessary for the submission of our BLA."

125. The statements identified in Paragraph 124 above were materially false and/or misleading when made because the FDA had never "agreed" that the successful completion of the undersized NORSE 1 and NORSE 2 would be sufficient to support approval of ONS-5010, as confirmed by the fact that although NORSE 1 and 2 both met their endpoints, the FDA determined that evidence of efficacy was lacking, and by the fact that the Company's response was to implement

a full-scale trial, just as had been used in every approved application for a wet AMD treatment. *See* ¶¶158, 178-80. Plaintiffs also base this belief on the fact that (a) the FDA's standard response in the absence of an SPA is to indicate that the BLA may be filed but that the sufficiency of the trial will be determined when the application is reviewed, *see* ¶56, (b) on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶52, 74-82; and (c) the statements omitted that the FDA required Outlook to prove that its selected contract manufacturers complied with cGMP, which it had not done.

126. On September 13, 2021, Defendant Trenary attended the HC Wainwright 23rd Annual Global Investment Conference and was questioned about the data from the NORSE 2 trial, to which Trenary responded:

> "Yeah, ***so this was, the company is engaged in three very important clinical trials in order to gain FDA approval. This was a plan that was put together between the company and the FDA*** and, as you know, Doug, the first study and the third study or the so-called NORSE 1 and NORSE 3 had already been completed, showed good safety and efficacy.

127. The statements identified in Paragraph 126 above were materially false and/or misleading when made because: (a) using the undersized NORSE 1 and 2 trials, together with the open-label (uncontrolled) NORSE 3 trial, was not "a plan put together with the company and the FDA"; and (b) the FDA had never agreed that the successful completion of those trials would be sufficient to support approval of ONS-5010, as confirmed by the fact that although all referenced trials were

successful, the FDA determined that evidence of efficacy was lacking, and by the fact that the Company's response was to implement a full-scale trial, just as had been used in every approved application for a wet AMD treatment. *See* ¶¶158, 178-80. Plaintiffs also base this belief on the fact that (a) the FDA's standard response in the absence of an SPA is to indicate that the BLA may be filed but that the sufficiency of the trial will be determined when the application is reviewed, *see* ¶56, (b) on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶52, 74-82; and (c) the statements omitted that the FDA required Outlook to prove that its selected contract manufacturers complied with cGMP, which it had not done.

128. On September 13, 2021, Defendant Trenary attended the HC Wainwright 23rd Annual Global Investment Conference. During the presentation, Trenary held himself out as familiar with the importance of maintaining manufacturing partners with facilities that satisfy the FDA's cGMP for ophthalmology substances. He stated that in order "to get FDA approval in ophthalmology for a drug that's going to be injected in someone's eye, there are standards that have to be met. These standards relate to sterility, to PH, to osmolarity, potency, and all of these requirements are things that we just have to meet all of those in order to get an FDA approval in ophthalmology for these conditions."

129. As confirmed by CW2, CW3 and CW4, Ajinomoto and FujiFilm are subjected to audits and inspections of their facilities by the Company since the beginning of their respective partnerships with the Company. *See* ¶¶112-20. CW5 confirmed that FujiFilm began reporting manufacturing issues directly to Outlook's Chief Operating Officer by 2019. *See* ¶¶121-22. Defendant Trenary also confirmed that the Company did, in fact, audit and inspect each facility at least three times. *See* ¶156. Thus, Defendants had actual knowledge of whether Ajinomoto and FujiFilm complied with cGMP.

130. On September 28, 2021, Cantor Fitzgerald hosted Defendant Trenary at a fireside chat. Trenary touted his experience and expertise in the ophthalmology field, and specifically:

> "Yeah, so I've been involved in what at the time were four of the ten largest launches in the history of medical devices in ophthalmology. And they ranged from intraocular lens implants to lasers to phacoemulsification equipment. So it's really, my experience has kind of run the gamut."

131. Trenary also specifically admitted understanding the importance of cGMP in the approval of ophthalmology treatments: "[t]he requirements around osmolarity and drug concentration and pH and all the cGMP standards that we have to live to in ophthalmology, even the ophthalmologist, they know there's a difference."

132. On December 23, 2021, the Company filed with the SEC a form 10-K Annual Report, signed by Defendants Trenary and Kenyon. In that filing, the Company made numerous statements acknowledging the FDA's cGMP requirements regarding the manufacturing of ONS-5010 and specifically that the "manufacturing facilities are subject to continual review and inspections":

> Manufacturers and manufacturing facilities are required to comply with extensive FDA, and comparable foreign regulatory authority, requirements, including ensuring that quality control and manufacturing procedures conform to current Good Manufacturing Practices, or cGMP, regulations. As such, our current and future manufacturing partners will be subject to continual review and inspections to assess compliance with cGMP and adherence to commitments made in any non-disclosure agreement, BLA or marketing authorization application.

133. In that same 10-K Annual Report, the Company discussed compliance with the FDA's cGMP requirements at FujiFilm's and Ajinomoto's manufacturing facilities:

> **Manufacturing**
>
> ***We are working with FujiFilm Diosynth Biotechnologies, or Fuji, and Ajinomoto Bio-pharma Services, or AjiBio, to provide product manufacturing in current Good Manufacturing Practices, or cGMP, manufacturing facilities***…

134. The statements identified in Paragraph 133 above were materially false and/or misleading when made because they (a) omitted that the Company lacked evidence that the two contract manufacturers it had engaged to manufacture ONS-5010, FujiFilm and Ajinomoto, complied with cGMP; (b) the statements omitted

that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-22, 156.

135. On January 10, 2022, Defendant Trenary attended a presentation organized by HC Wainwright and, in response to a pointed question about the NORSE trials, assured that the Company had consulted and complied with the FDA's requirements regarding the NORSE trials:

> **Q – Doug Tsao**: So why don't we talk about the approval process for Lytenava or your Bevacizumab. You've obviously now reported strong results from your pivotal study. So how does that position you and where are you in terms of preparation for filing your BLA?
>
> **A – Russ Trenary**: Yeah, so the filing of the BLA is really soon. We're going to be doing that this quarter. ***And what the company did was, in consultation with FDA and in communication with FDA, designed a three-study program in order to get approval for our version of bevacizumab***. There was a clinical experience trial that was performed initially that really informed the company of how our product would perform. ***And as expected, the results of it were very similar to what you would see in the literature over the last 14, 15 years pertaining to bevacizumab results***.

136. The statements identified in Paragraph 135 above were materially or misleading when made because they omitted that: (a) although Outlook had met with the FDA, the FDA had not provided Outlook any assurance that the "three-study program" featuring the undersized NORSE 1 and NORSE 2 as pivotal clinical trials was sufficient "to get approval for [their] version of bevacizumab," as demonstrated by the fact that the FDA refused to approve the BLA on the basis of those studies even though they met specified endpoints; and (b) the trials were not remotely similar to the trials "you would see in the literature over the last 14, 15 years pertaining to bevacizumab" in that those trials were appropriately sized and consistent with FDA regulations and guidance, and Outlook's trials were intentionally undersized to reduce time and cost. Plaintiffs also base their belief on (a) the fact that the FDA's standard response in situations where asked in the absence of an SPA whether a not-yet-conducted trial supported approval is that the issue will be determined when the application is reviewed, *see* ¶56, and on (b) the FDA's regulations and guidance regarding trial sizing, *see* ¶¶52, 74-82. To ensure that investors did not learn the truth, Outlook has declined to disclose to investors its actual regulatory communications with the FDA, including the correspondence related to this 2018 meeting, Outlook's voluntary withdrawal of the ONS-5010 BLA, and the CRL identifying Outlook's lack of "substantial evidence."

137. At the same event, analyst Doug Tsao asked Defendant Trenary regarding the comparison between the NORSE trials and the CATT Study:

> **Q – Doug Tsao**: And when you look at this data and the strength of it, what do you think, sort of... And clearly I think the results were even better than you sort of might've assumed. And really the study I think was sort of designed around the effect that you had typically seen from your previous studies with CATT and so forth. And what do you think might've helped get somewhat incrementally better results versus prior studies that were relying on compounded Avastin?
>
> **A – Russ Trenary:** Yeah. So I think there's probably a couple of things. ***I mean, in all fairness, part of this would be associated with trial design, right?*** So when we performed the study, the bevacizumab arm, we did monthly injections of bevacizumab, ***which is comparable to what all the other companies did in order to gain FDA approval for their drug.*** So we needed to do that. Having said that, getting almost 43% of the patients with three-line gainers was, by any measure, fantastic.

138. The statements identified in Paragraph 137 above were materially false and/or misleading when made because the NORSE 1-3 trials were not "comparable to what all the other companies did in order to gain FDA approval for their drug" or to the CATT study referenced in the analyst question.

139. Furthermore, at the January 25, 2022 Virtual Investor Conference, Defendant Trenary touted FujiFilm's and Ajinomoto's ability to meet the FDA's cGMP requirements:

> FDA will be reviewing our stability that supports our shelf life. They'll be looking at the particulate amount in our drug solution. They'll be looking at our pH levels, the drug potency, our osmolarity specifications, our endotox levels, and all the other things that go into being a cGMP approved ... Having those cGMP approved facilities, processes, and products.

Everything in green, we have to check those boxes. ***We did check those boxes in order to use the drug solution that was injected during the clinical trials. We think we bring a level, of pristine level, of safety and efficacy partially associated to meeting the requirements that FDA makes you meet in ophthalmology***.

140. In connection with Outlook's presentation at this investor conference, Defendant Trenary used a slide portraying differences between compounded bevacizumab and (in green) the CMC items for which Outlook "check[ed] those boxes" in order to obtain FDA approval for ONS-5010, including cGMP:

| Ophthalmic Solution Requirement | Off-Label Compounded Repackaged IV Solution | FDA Approved Ophthalmic Solution for Intravitreal Injection |
|---|---|---|
| Sterile USP <71>[1] | ? | Yes |
| FDA approved ophthalmic package consistent with USP <771>[1] | No | Yes |
| FDA reviewed stability data supporting shelf life[2,3] | No | Yes |
| Particulates per USP <789> for ophthalmic solutions[1] | ? | Yes |
| pH FDA approved and consistent with USP <771>[1,2,3] | No | Yes |
| Potency FDA approved specifications for shelf life[2,3] | No | Yes |
| Osmolarity specification for ophthalmic solution[2,3] | No | Yes |
| Bacterial endotoxins USP <85>[1] | ? | Yes |
| GMP[2,3] | ? | Yes |

141. The statements identified in Paragraphs 139 and 140 above were materially false and/or misleading when made because: (a) the Company had not met cGMP requirements "in order to use the drug solution that was injected during the clinical trials"; (b) the statements omitted that the Company lacked evidence that its selected manufacturers complied with cGMP; and (c) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP

violations at the very facilities designated for manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-22, 156.

142. On May 31, 2022, the Company issued a press release announcing that the FDA requested additional information regarding the Company's ONS-5010 BLA submission:

> Outlook Therapeutics, Inc. (Nasdaq: OTLK), a pre-commercial biopharmaceutical company working to develop and launch the first FDA-approved ophthalmic formulation of bevacizumab for use in retinal indications, today announced that the U.S. Food and Drug Administration (FDA) has requested additional information in order to complete the filing of the Company's Biologics License Application (BLA) for ONS-5010/ LYTENAVA™ (bevacizumab-vikg) for the treatment of wet age-related macular degeneration (wet AMD). Outlook Therapeutics has voluntarily withdrawn its BLA for ONS-5010 and is actively working to respond to the FDA's request. The Company plans to re-submit a revised BLA by September 2022.

143. On June 14, 2022, the Company issued a press release announcing:

> As previously announced, Outlook Therapeutics submitted its BLA for ONS-5010 to the FDA in March 2022 and subsequently voluntarily withdrew its submission in May 2022 to provide additional information requested by the FDA. Following receipt of further correspondence from the FDA, Outlook Therapeutics has confirmed the additional information necessary to re-submit the BLA for ONS-5010.

144. On August 30, 2022, the Company issued a press release reporting that it had resubmitted its ONS-5010 BLA to the FDA. In that press release, Defendant Trenary stated:

> Over the past three months, ***we have worked diligently to provide the additional required information that was not included in our March 2022 BLA submission, to address requests from the Agency to ensure our BLA is complete for acceptance and review. We believe that this re-submission addresses each of the comments and recommendations from the Agency, and we are confident in the revised BLA application."***

145. The statements identified in Paragraph 144 above were materially false and/or misleading when made because: (a) the re-submission did not address "each of the comments and recommendations from the Agency;" (b) the statements omitted that the Company lacked evidence that its selected manufacturers complied with cGMP; and (c) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-22, 156.

146. On October 28, 2022, the Company issued another press release and touted its BLA re-submission:

> "We are pleased the FDA has begun its review of our application. ***ONS-5010 is designed and manufactured to be fully compliant with the FDA's criteria for ophthalmic intravitreal biologics*** and we are excited about the prospect of filling the public health need for an FDA-approved ophthalmic formulation of bevacizumab."

147. The statements identified in Paragraph 146 above were materially false and/or misleading when made because: (a) ONS-5010 was not "manufactured to be fully compliant with the FDA's criteria for ophthalmic intravitreal biologics" because the selected manufacturing facilities were not cGMP compliant; (b) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010; (c) ONS-5010 was not "designed [ ] to be fully compliant with the FDA's criteria for ophthalmic intravitreal biologics" because the FDA never agreed that NORSE 1 and NORSE 2 were each adequate, well-controlled Phase III trials; and (d) the statements omitted that Outlook had not obtained either evidence of efficacy consistent with FDA regulations and trial size guidelines or evidence of cGMP compliance, both of which were necessary for FDA approval.

148. On December 29, 2022, the Company filed a Form 10-K Annual Report with the SEC, signed by Defendants Trenary and Kenyon. In that filing, the

Company made numerous statements acknowledging their knowledge of the other FDA-approved treatments:

> The current FDA approved market leaders for the treatment of wet AMD are VEGF inhibitors, including EYLEA, BEOVU, LUCENTIS, SUSVIMO and VABYSMO. Recently, BYOOVIZ was approved and launched which will be followed by CIMERLI, both ranibizumab biosimilars.
>
> ***
>
> The initial recently approved biosimilar versions of LUCENTIS are also expensive, although they are available at a discount to the reference drug. Bevacizumab, BYOOVIZ, CIMERLI, EYLEA, BEOVU, LUCENTIS and VABYSMO are all administered via intravitreal injections directly into the eye. SUSVIMO is an implantable refillable port delivery system that delivers anti-VEGF for 4-6 months, upon which the device is refilled.

149. The FDA's public database maintains all documents, correspondence, minutes, and review materials in connection with the BLAs/NDAs submitted for FDA-approved wet AMD drug products Byooviz, Cimerli, Eylea, Beovu, Lucentis and Vabysmo. These documents detail the study design of each drug product, including the number of Phase III clinical trials and the number of patients in each Phase III trial, and include the FDA's feedback on each respective study design. Defendants had access to these documents and information within at all relevant times, and held themselves out to investors as having an understanding of the FDA's approach to ophthalmic treatments.

150. The Company further assured that its manufacturing partners, FujiFilm and Ajinomoto, could provide cGMP-compliant manufacturing:

> **Manufacturing**
>
> We are working with FujiFilm Diosynth Biotechnologies, or Fuji, and Ajinomoto Bio-pharma Services, or AjiBio, to provide product manufacturing in current Good Manufacturing Practices, or cGMP, manufacturing facilities.

151. The statements identified in Paragraph 150 above were materially false and/or misleading when made because the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-22, 154.

152. In the same filing, the Company included language purportedly disclosing risks regarding its manufacturing partners:

> We rely on third parties to manufacture and test ONS-5010, conduct our preclinical and clinical trials and perform other tasks for us. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or comply with regulatory requirements, we may

> not be able to obtain regulatory approval for or commercialize our product candidates and our business could be harmed.

153. The statements identified in Paragraph 152 above were materially false and/or misleading when made because: (a) the risk that FujiFilm or Ajinomoto would violate the FDA's cGMP regulations was not hypothetical but had already materialized; and (b) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-20, 156.

154. On July 28, 2023, Defendant Trenary attended an event on age-related macular degeneration hosted by Chardan Capital Markets LLC. Defendant Trenary affirmatively stated, "[a]s far as we know ***we've provided all necessary information in both clinical as well as CMC in order to earn approval***."

155. The statements identified in Paragraph 154 above were materially false and/or misleading when made because: (a) the Company had not "provided all necessary information in both clinical as well as CMC in order to earn approval";

(b) the statements omitted that the Company had not provided evidence of efficacy consistent with the clinical trials used to support approved wet AMD treatments and FDA guidance on trial sizes, and had not obtained FDA agreement that unusually undersized pivotal trials would be sufficient to support approval of ONS-5010; (c) the statements omitted that the Company had not provided evidence that its contract manufacturers could consistently manufacture in compliance with cGMP; and (d) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with multiple and repeated Form 483's documenting that each had serious cGMP violations at the very facilities designated for manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-22, 156.

156. In response to a pointed question about the Company's manufacturing partners, Defendant Trenary assured that the Company had worked directly with FujiFilm and Ajinomoto to ensure their respective compliance with FDA cGMP regulations, including analyzing their CMC capabilities and executing mock FDA inspections:

> **Q – Host**: So in terms of manufacturing, so you're utilizing manufacturing partners to make Letenova can you comment whether all the necessary FDA inspections have been completed, any other outstanding CMC issues?
>
> **A – Trenary**: Yes, so we have not been given the marketplace blow by blow on when FDA's gone in for factory inspections or clinical site inspections or things like that. ***But I will say that we think we've got two great factory partners in FujiFilm Diosynth in their location in College Station, Texas and in Ajinomoto Biopharma with their location in San Diego. Both are experienced companies in this whole area. We have found their CMC capabilities to be outstanding. We did a lot of work with them on mock inspections. We went through both of their factories several times with our mock inspection teams that we hired and just felt all along like both of those companies had great capability to not only run a clean shop but be in a position to do what needs to be done to get through FDA inspections in really good shape. So we're confident in those folks and believe that they've got all the capabilities required to get us to the finish line.***

157. The statements identified in Paragraph 156 above were materially false and/or misleading when made because: (a) the statements omitted that the Company had not provided in its BLA resubmission evidence that its selected manufacturers complied with cGMP; and (b) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with multiple and repeated Form 483s documenting that each had serious and continuing cGMP violations at the very facilities designated for manufacture of ONS-5010. As confirmed by CW2, CW3, and CW4, it was the standard practice of the contract manufacturers to inform sponsors of such Form 483s, CW5 confirmed that FujiFilm reported manufacturing issues directly to Outlook's Chief Operating

Officer, and Outlook and Defendant Trenary had to have assessed the Form 483s if they actually conducted the multiple mock inspections described to investors. *See* ¶¶112-22, 156.

## The Truth Emerges

158. On May 31, 2022, the Company issued a press release announcing that the FDA requested additional information regarding the Company's ONS-5010 BLA submission.

159. As a result of this partial disclosure and/or the materialization of concealed risks, the Company's stock price declined by nearly 6.96% from its previous day closing price of $1.15 on May 31, 2022, to close at $1.07 on June 1, 2022, on heavy trading volume.

160. On August 30, 2023, during pre-market hours, Outlook issued a press release announcing that the FDA had issued a CRL to the ONS-5010 BLA and could not approve the ONS-5010 BLA during the present review cycle because of unresolved CMC and manufacturing site inspection issues, as well as "a lack of substantial evidence". Specifically, that press release stated, in relevant part:

> [T]he U.S. [FDA] has issued a CRL to the Company's BLA for ONS-5010, an investigational ophthalmic formulation of bevacizumab under development to treat wet AMD. While the FDA acknowledged the NORSE TWO pivotal trial met its safety and efficacy endpoints, ***the Agency concluded it could not approve the BLA during this review cycle due to several CMC issues, open observations from pre-approval manufacturing inspections, and a lack of substantial evidence***.

> "We continue to believe in the public health need to provide the retina community with an FDA-approved bevacizumab treatment option for wet AMD. We will request a formal meeting as soon as possible with the FDA to further understand the BLA deficiencies and how best to resolve them. Following this meeting with the FDA, the Company will be able to discuss next steps and the expected timing for resolution," said Russell Trenary, President and CEO of Outlook Therapeutics.

161. On this news, Outlook's stock price fell $1.141 per share, or 80.92%, to close at $0.269 per share on August 30, 2023.

162. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant damages.

## ADDITIONAL ALLEGATIONS OF SCIENTER

163. Several facts demonstrate that Defendants knowingly made false statements or, at a minimum, acted with reckless disregard for the truth or falsity of their Class Period representations to investors.

164. The temporal proximity between the Form 483 violations in 2023, Trenary's July 28, 2023 statements regarding mock inspections, and the August CRL further corroborates the fraud. Barely a month before the truth was revealed, and after the 2023 Form 483 violations had occurred, Trenary said that Outlook had "***went through both of their factories several times with our mock inspection teams***" and that "***both of those companies had great capability to not only run a clean shop [but were] in a position to do what needs to be done to get through FDA***

***inspections in really good shape***." That Defendant Trenary made these statements after the manufacturing facilities were cited for the violations but just before the FDA denied Outlook's application further enhances the inference of fraud.

165. CW6 served as Executive Director of Payer Market Access at Outlook from February 2023 to December 2023. CW6 reported to Alicia Tozier, Outlook's Senior Vice President and Overseer of Market Access. CW6 interacted regularly with Defendant Trenary. According to CW6, Defendant Trenary was a very hands-on CEO who regularly interacted with other employees of the Company regarding every facet of the Company.

166. Defendants' own statements to investors also show that they had access to information about the deficient size of the NORSE 1-3 trials and the cGMP issues with FujiFilm and Ajinomoto. For example, as alleged in Paragraph 156, Defendant Trenary stated that the Company had worked directly with FujiFilm and Ajinomoto to ensure their respective compliance with FDA cGMP regulations, including analyzing their CMC capabilities and executing mock FDA inspections to gauge each facility's readiness for an FDA inspection. During the purported inspections, the Defendants would no doubt have inquired about any Form 483 FujiFilm and Ajinomoto had received.

167. CW2 confirmed Defendant Trenary's statement in Paragraph 156 because drug sponsors like Outlook conducted audits of Ajinomoto's facility

throughout their contractual relationship. CW2 and CW3 further confirmed that drug sponsors were present for FDA inspections, and Ajinomoto provided daily and end-of-inspection summaries regarding FDA inspections to the drug sponsor. CW4 confirmed that FujiFilm also provided updates to drug sponsors regarding any issues that impacted the drug sponsor's product. CW5 confirmed that FujiFilm encountered manufacturing issues and reported them directly to Outlook's highest levels, its Chief Operating Officer, beginning in 2019.

168. Thus, Defendants had access to information about FujiFilm's and Ajinomoto's manufacturing facilities and their respective abilities to comply with cGMP. If Defendants did not inquire about FujiFilm's and Ajinomoto's cGMP compliance, then Defendants acted with reckless disregard when they disseminated false representations regarding each manufacturer's ability to comply with cGMP.

169. Defendants held themselves out as knowledgeable regarding the specific cGMP requirements. *See* ¶128 ("to get FDA approval in ophthalmology for a drug that's going to be injected in someone's eye, there are standards that have to be met … and all of these requirements are things that we just have to meet all of those in order to get an FDA approval); ¶131 ("[t]he requirements around osmolarity and drug concentration and pH and all the cGMP standards that we have to live to in ophthalmology").

170. Defendants also had access to information and held themselves out as knowledgeable regarding the number, design, and size of trials required to satisfy the FDA's requirements. *See* ¶130 (Defendant Trenary touting experience in ophthalmology field); ¶100 ("NORSE 1 study design was confirmed in our April 2018 FDA meeting to be one of our two adequate and well-controlled clinical trials"); ¶135 ("And what the company did was, in consultation with FDA and in communication with FDA… very similar to what you would see in the literature over the last 14, 15 years"); ¶137 ("which is comparable to what all the other companies did in order to gain FDA approval for their drug").

171. In SEC filings signed by Individual Defendants, the Company repeatedly demonstrated actual knowledge (a) that its manufacturing contractors were required to adhere to cGMP requirements at all times, ¶132, and (b) the existence of other FDA-approved wet AMD treatments and the size of their two Phase III trials, ¶¶148-49.

172. Obtaining approval for ONS-5010 was a core operation and the predominant function of Outlook during the Class Period, as it was a small company without any other late-stage drug candidates. Additionally, Defendants were active in all aspects of the business. For these reasons, it would be absurd to assume that Defendants were unaware of the enormous actual problems with cGMP and trial sizing that were misrepresented to investors.

**Post-Class Period Admissions and Developments Supporting Scienter**

173. The above is further supported by Defendant Trenary's post-Class Period admission that Defendants were aware of the deficiencies in ONS-BLA submission. On August 30, 2023, Defendant Trenary was asked about the contents of the CRL:

> **Q – Kristen Kluska**: Hi. Good morning, everybody. Also sorry to hear about to this news. Just wanted to ask on some of these items. ***I know that you've had frequent dialogue with them in the past and also withdrew your initial filing to address questions that they have now. First, can you comment if some of the items that were brought up were essentially new, relative to those previous discussions?***
>
> **A – Russ Trenary**: Yes. Thank you, Kristen. I think as we read through that, ***it looked like there were a couple of new things but a couple of clarifications that the FDA was looking for on old items***. And so, I think they're – I think for us, ***the good news was it appeared that everything that they had in there required either a clarification, or some additional information from us***, or some new information from us, because it was a question that had never been received before. So a little bit of a mix there. But I think the – our read as we went through the CMC section was we can handle this.

Thus, the Defendants had knowledge of the BLA's deficiencies from at least May 31, 2022, but omitted to disclose them.

174. Defendant Trenary's admission starkly contrasts his statements regarding confirmations from the FDA that the NORSE 1-3 trials were sufficient to support approval of the ONS-5010 BLA as set forth in Paragraphs 126, 135, 137, 144, and 154.

175. According to CW6, in rejecting the ONS 5010 BLA, the FDA told the Company that the FDA's guidelines require two pivotal trials and the Company had only one adequate, well-controlled pivotal trial.

176. On September 20, 2023, Ajinomoto received a ***third*** Form 483 from the FDA, which was available to Defendants, after inspections of its San Diego, California facility from September 12, 2023 to September 20, 2023. A true and correct copy of this Form 483 is attached hereto as **Exhibit 5**. The Form 483 confirmed the CMC issues listed in the CRL and confirmed that many remained ongoing and unremediated, just as they had throughout the Class Period.

177. This Form 483 specifically highlighted how between "2021 to 2023," [Ajinomoto] received 6 complaints related to particulates observed in your finished commercial products." Ex. 5 at 2. The Form 483 further admonished Ajinomoto that its "investigation of the complaints was inadequate" concluding that "there was a lack of risk assessment of products with potentially undetected particulates" and "***there is a lack of scientific justification for this large variations of particulates observed from batch to batch in the same or different products in order to minimize the risk of particulates in finished drug products***." *Id.*

178. Accordingly, from 2021 to 2023, Ajinomoto lacked the capability to produce ONS-5010 in accordance with cGMP, especially as it relates to the requirement for sterility as Defendant Trenary admitted was required, *see* ¶128, but

as Trenary assured investors that cGMP requirements were met by Outlook's manufacturing partners. *See* ¶¶133, 137, 139, 140, 146, 152, and 154.

179. On November 7, 2023, FujiFilm ***also*** received a ***third*** Form 483 from the FDA, which was available to Defendants, after inspections of its College Station, Texas facility from October 30, 2023 to November 7, 2023. A true and correct copy of this Form 483 is attached hereto as **Exhibit 6**. The Form 483 confirmed the CMC issues listed in the CRL and confirmed that many remained ongoing and unremediated, just as they had throughout the Class Period.

180. On November 27, 2023, the Company issued a press release announcing receipt of the October 2023 FDA Type A meeting minutes. In that press release, the Company confirmed the requirement for a second, adequate and well-controlled pivotal trial:

> As previously reported, ***the FDA requires an additional adequate and well-controlled study to support the ONS-5010 BLA***. The FDA has informed Outlook Therapeutics that it can conduct a non-inferiority study evaluating ONS-5010 versus ranibizumab in a 3-month study of treatment naïve patients with a primary endpoint at 2 months. As recommended by the FDA at the Type A meeting, Outlook Therapeutics has been working with the Division of Ophthalmology to design an appropriate study to satisfy the FDA's requirements. The FDA and Outlook Therapeutics have also identified the approaches needed to resolve the CMC comments in the CRL.

181. On December 22, 2023, the Company filed a Form 10-K with the SEC. In that filing, the Company conceded that the FDA requirement for a second

adequate and well-controlled pivotal trial was only then being addressed (*i.e.*, it was not satisfied by the prior BLA):

> ***We agreed to conduct an additional adequate, and well-controlled clinical trial following discussions with the FDA in support of our BLA for ONS-5010***. In December 2023, we submitted a Special Protocol Assessment, or SPA, to the FDA for this study (NORSE EIGHT) seeking confirmation that, if successful, ***it will address the FDA's requirement for a second adequate and well-controlled clinical trial to support our planned resubmission of the ONS-5010 BLA***. The FDA is expected to respond to the SPA in early February 2024.

182. On January 23, 2024, the Company issued a press release announcing that it had received a SPA for NORSE 8. In that press release, the Company confirmed that NORSE 8 would comply with the parameters set out in FDA regulations, the 2019 Guidance, Wet AMD Guidance, and other FDA-approved wet AMD treatments:

> NORSE EIGHT will be a randomized, controlled, parallel-group, masked, non-inferiority study of ***approximately 400 newly diagnosed, wet AMD subjects*** randomized in a 1:1 ratio to receive 1.25 mg ONS-5010 or 0.5 mg ranibizumab intravitreal injections. Subjects will receive injections at Day 0 (randomization), Week 4, and Week 8 visits. The primary endpoint will be mean change in BCVA from baseline to week 8. Outlook Therapeutics expects NORSE EIGHT topline results and resubmission of the ONS-5010 BLA by the end of calendar year 2024.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

183. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

purchased or otherwise acquired Outlook securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

184. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Outlook securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. According to the Company's 2022 Form 10-K, "there were approximately 96 stockholders of record," but the "actual number of stockholders is greater than this number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers and other nominees." Record owners and other members of the Class may be identified from records maintained by Outlook or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

185. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

186. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class, and have retained experienced counsel for the benefit of the Class.

187. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants misrepresented their regulatory communications with the FDA;

  whether Defendants misrepresented the evidence of efficacy submitted to the FDA;

- whether Defendants concealed cGMP violations at their selected manufacturing partners, FujiFilm and Ajinomoto;

- whether Defendants' misrepresentations violated the Securities Exchange Act of 1934;

- whether Defendants acted knowingly or recklessly in making these misrepresentations to investors;

- whether the prices of Outlook securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether Plaintiffs and other members of the Class have sustained damages and, if so, what is the proper measure of damages.

188. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

189. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Outlook securities are traded in an efficient market;
- the Company's shares were liquid and traded actively during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Outlook securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

190. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

191. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

192. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

193. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

194. During the Class Period, Defendants made as detailed above untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including

Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Outlook securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Outlook securities and options at artificially inflated prices.

195. By virtue of their access to the actual facts, interactions and positions detailed above, review of other approved drugs, claims to investors that they were knowledgeable about the regulatory process and competitive landscape, participation in and knowledge of confidential regulatory communications with the Company, and inspections of and discussions with their manufacturing partners, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

196. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As

the senior executives of Outlook directly involved in describing the Company's regulatory progress, clinical progress, and manufacturing partners to investors, the Individual Defendants had knowledge of the actual facts that were omitted and/or misrepresented.

197. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Outlook. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Outlook's key drug candidate, ONS-5010. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Outlook securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Outlook which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Outlook securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

198. During the Class Period, Outlook securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Outlook securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Outlook securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Outlook securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

199. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

200. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201. During the Class Period, the Individual Defendants participated in the operation and management of Outlook, a company with only twenty-four full-time employees, and conducted and participated, directly and indirectly, in the conduct of Outlook's business affairs. Because of their senior positions and day-to-day control, they knew the adverse non-public information about Outlook's misstatement of its ONS-5010 BLA submission, the Company's communications with the FDA regarding the ONS-5010 BLA, and the status of the Company's manufacturing partners' facilities.

202. As CEO and CFO of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to every aspect of Outlook's ONS-5010 BLA submission, and to correct promptly any public statements issued by Outlook which had become materially false or misleading.

203. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, investor conferences, press releases and public filings that Outlook disseminated in the marketplace during the Class Period concerning Outlook's ONS-5010 BLA submission. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Outlook to engage in the wrongful acts complained of herein.

204. Each of the Individual Defendants, therefore, acted as a controlling person of Outlook. By reason of their senior management positions and/or being directors of Outlook, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Outlook to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Outlook and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

205. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Outlook.

206. Defendant Kenyon reported to Defendant Trenary, either directly or indirectly. As CEO, he had the ability to control Defendant Kenyon's day-to-day conduct. As a result, Defendant Trenary is also liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Kenyon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: March 14, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Thomas H. Przybylowski*

Joshua B. Silverman (*pro hac vice*)
Brian O'Connell (*pro hac vice*)
Genc Arifi (*pro hac vice*)
POMERANTZ LLLP
10 S La Salle Street, Suite 3505
Chicago, IL 60603-1049
Tel: (312)-881-4859
Fax: (312)-377-1184
Email: jbsilverman@pomlaw.com
boconnell@pomlaw.com
garifi@pomlaw.com

and

Jeremy A. Lieberman (*pro hac vice*)
Thomas H. Przybylowski

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
tprzybylowski@pomlaw.com

*Lead Counsel for the Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
Alex Heller
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net
aheller@bm.net

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*