Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Genc Arifi (*pro hac vice*)
POMERANTZ LLLP
10 S La Salle Street, Suite 3505
Chicago, IL 60603-1049
Tel: (312)-881-4859
Fax: (312)-377-1184
Email: jbsilverman@pomlaw.com
        boconnell@pomlaw.com
        garifi@pomlaw.com


*Lead Counsel for the Lead Plaintiff,*
*Additional Plaintiffs, and the Proposed Class*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE OUTLOOK THERAPEUTICS, INC. SECURITIES LITIGATION <br><br> THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 2:23-cv-21862-MCA-CLW <br><br> **CLASS ACTION** <br><br> Hon. Madeline Cox Arleo |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT .....................................................................................................1

STATEMENT OF RELEVANT FACTS ........................................................................................3

      A.  Outlook's Core Focus on ONS-5010............................................................................3

      B.  The Biologic License Application Process ...................................................................3

      C.  Defendants Concealed that their Manufacturing Facilities Received Multiple Forms 483 Noting Violations of the FDA's cGMP ...................................................................3

      D.  The FDA did not Jointly Plan the NORSE trials with Outlook or Agree that the NORSE 1 and 2 Trials Would be Sufficient to Support Approval ...............................5

      E.  Investors Learn the Truth through Two Partial Disclosures .........................................7

ARGUMENT....................................................................................................................................8

  I.  Legal Standards Do Not Favor Dismissal.........................................................................8

  II.  Extraneous Documents Are Not Appropriately Considered..............................................10

  III. The SAC Adequately Alleges Violations of Section 10(b) ...............................................11

      A.  Material Misrepresentations and Omissions Regarding cGMP Compliance ..............11

      B.  Material Misrepresentations and Omissions Regarding the Defendants' Regulatory Communications with the FDA ..................................................................................17

      C.  Misrepresentations Regarding Comparability and FDA Guidance ............................20

      D.  Plaintiffs Raise a Strong Inference of Scienter .........................................................21

          i.     Defendants' actual knowledge and access to information contradicting public statements supports a strong inference of scienter...............................................21

          ii.    That Defendants held themselves out as knowledgeable about the misrepresented subjects supports a strong inference of scienter .......................24

iii.    The newly-added CW accounts enhance the inference of scienter.....................25

iv.    Core operations support a strong inference of scienter.......................................26

v.    Trenary's "hands-on" role supports a strong inference of his scienter...............27

vi.    Temporal proximity supports a strong inference of scienter .............................27

vii.    Evasive answers to questions bolster the strong inference of scienter ...............28

E.  The SAC Adequately Alleges Loss Causation ............................................................29

IV. The SAC Adequately Alleges Control Person Liability Under Section 20(a) of the
Exchange Act ........................................................................................................................30

CONCLUSION ...............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)......................................................................................21

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ......................................................................27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................8

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ...................................................24, 27

*Carmack v. Amaya Inc.*,
258 F. Supp. 3d 454 (D.N.J. 2017) .............................................................................9

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019)...............................................................26

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)........................................................23

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ................................................................11, 16, 20, 27

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) .................................................................16

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018)..............................................................14

*Dodge v. Cambrex Corp.*,
2007 WL 608365 (D.N.J. Feb. 23, 2007) ................................................................17

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................29, 30

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000)......................................................................................29

*Fleisher v. Standard Ins. Co.*,
679 F.3d 116 (3d Cir. 2012)....................................................................................8, 9

*Frater v. Hemispherx Biopharma, Inc.*,
    996 F. Supp. 2d 335 (E.D. Pa. 2014) .........................................................................17, 18, 21

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
    2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) ....................................................................23

*Hills v. BioXcel Therapeutics, Inc.*,
    2024 WL 3374145 (D. Conn. July 11, 2024) ..............................................................11, 12, 14

*Hoey v. Insmed Inc.*,
    2018 WL 902266 (D.N.J. Feb. 15, 2018) .............................................................................28

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022) ....................................................................................18

*In re Able Lab'ys Sec. Litig.*,
    2008 WL 1967509 (D.N.J. Mar. 24, 2008)..............................................................12, 22, 23

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)................................................................................................21

*In re Allergan Generic Drug Pricing Sec. Litig.*,
    2019 WL 3562134 (D.N.J. Aug. 6, 2019) ............................................................................27

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)...........................................................................................9, 10

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001). ...............................................................................21, 22

*In re Discovery Lab'ys Sec. Litig.*,
    2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ........................................................................12

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
    2019 WL 1299673 (D.N.J. Mar. 21, 2019)....................................................................15, 22

*In re: Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015)....................................................................17, 19

*In re Genzyme Corp.*,
    754 F.3d 31 (1st Cir. 2014)............................................................................................12, 14

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)................................................................19, 22

iv

*In re MannKind Sec. Litig.,*
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ........................................................18, 20, 23

*In re Merck & Co. Sec. Litig.,*
  432 F.3d 261 (3d Cir. 2005)..................................................................................28

*In re Mylan N.V. Sec. Litig.,*
  2023 WL 3539371 (W.D. Pa. May 18, 2023)................................................16, 25, 26

*In re Ocugen, Inc. Sec. Litig.,*
  2024 WL 1209513 (3d Cir. Mar. 21, 2024) ..........................................................20

*In re PTC Therapeutics, Inc., Sec. Litig.,*
  2017 WL 3705801 (D.N.J. Aug. 28, 2017) ........................................9, 11, 24, 25, 30

*In re RenovaCare, Inc. Sec. Litig.,*
  2024 WL 2815034 (D.N.J. June 3, 2024) .............................................................11

*In re Sanofi-Aventis Sec. Litig.,*
  774 F. Supp. 2d 549 (S.D.N.Y. 2011)....................................................................29

*In re Suprema Specialties, Inc. Sec. Litig.,*
  438 F.3d 256 (3d Cir. 2006).............................................................................10, 27

*In re Urban Outfitters, Inc. Sec. Litig.,*
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ...............................................................25, 26

*In re Viropharma, Inc. Sec. Litig.,*
  2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ...........................................................24

*In re Viropharma Sec. Litig.,*
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ................................................................17, 21

*In re Westinghouse Sec. Litig.,*
  90 F.3d 696 (3d Cir. 1996).................................................................................17

*In re Wilmington Tr. Sec. Litig.,*
  29 F. Supp. 3d 432 (D. Del. 2014)......................................................................29

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.,*
  2024 WL 451691 (S.D.N.Y. Feb. 5, 2024) ...........................................................18

*Institutional Invs. Grp. v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009)...........................................................9, 21, 24, 26, 27

v

*Kickflip, Inc. v. Facebook, Inc.*,
  999 F. Supp. 2d 677 (D. Del. 2013)..................................................................10

*Lewakowski v. Aquestive Therapeutics, Inc.*,
  2023 WL 2496504 (D.N.J. Mar. 14, 2023)........................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).................................................................................8, 9, 10, 19

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007)...........................................................................29, 30

*McGuire v. Dendreon Corp.*,
  688 F.Supp.2d 1239 (W.D. Wash. 2009).............................................................12

*Medtronic Ave, Inc. v. Bos. Sci. Corp.*,
  2001 WL 652016 (D. Del. Mar. 30, 2001) ............................................................9

*Odeh v. Immunomedics, Inc.*,
  2020 WL 4381924 (D.N.J. July 31, 2020)...........................................................14

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ...............................................................................26

*Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
  2020 WL 3268531 (S.D.N.Y. June 17, 2020) .....................................................12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................................15, 16

*Paice v. Aldeyra Therapeutics, Inc.*,
  2025 WL 815065 (D. Mass. Mar. 14, 2025) .......................................................19

*Paxton v. ProventionBio, Inc.*,
  2022 WL 3098236 (D.N.J. Aug. 4, 2022) ...........................................................28

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
  679 F.3d 972 (8th Cir. 2012) ..............................................................................12

*Reid v. Hemispherx Biopharma, Inc.*,
  2010 WL 11710594 (E.D. Pa. Apr. 20, 2010) ....................................................27

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .....................................................26

vi

*Salzman v. ImmunityBio, Inc.*,
    753 F. Supp. 3d 1050 (S.D. Cal. 2024).......................................................................13, 16, 17

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ....................................................................................27

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................................................................21

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) .......................................................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................9, 21

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .......................................................................23

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*,
    659 F.3d 295 (3d Cir. 2011)....................................................................................................8

*Washtenaw Cnty. Emps. Ret. Sys. v. Cetera Corp.*,
    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) .......................................................................26

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .................................................................................................28

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
    2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ...............................................................12, 15

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).....................................................................................................16

*Wu v. GSX Techedu Inc.*,
    738 F. Supp 3d 527 (D.N.J. 2024) .........................................................................................29

*Yanek v. Staar Surgical Co.*,
    388 F.Supp.2d 1110 (C.D. Cal. 2005) ...................................................................................12

## Statutes

15 U.S.C. §78u-4(b)(2) ...................................................................................................................9

15 U.S.C. §78j(b) ......................................................................................................................9, 10

Lead plaintiff Jason Solomon and additional plaintiffs Ramzy Alsaidi, Michael Lucas, and Mariam Silverman, trustee for the Mariam Silverman Trust UA Mar. 15, 1969 (collectively, "Plaintiffs"), hereby oppose the motion to dismiss filed by Defendants Outlook Therapeutics, Inc. ("Outlook"), C. Russell Trenary III ("Trenary"), and Lawrence A. Kenyon ("Kenyon," and collectively with Outlook and Trenary, the "Defendants").

## PRELIMINARY STATEMENT[1]

Plaintiffs' SAC cures the gaps identified by the Court in the prior hearing and easily pleads that Defendants: (1) misrepresented compliance with the United States Food and Drug Administration's ("FDA") Current Good Manufacturing Practices regulations ("cGMP"), both through affirmative misstatements and by concealing known problems identified and documented by the FDA in multiple Form 483 reports; (2) misrepresented regulatory communications between Outlook and the FDA, falsely claiming that the FDA expressly agreed to the sufficiency of undersized clinical trials; and (3) misrepresented that the deficient NORSE 1 and NORSE 2 trials were comparable to trials in successful wet AMD drug applications when they were much smaller and underpowered.

After considering the Court's guidance, Plaintiffs bolstered the SAC by:

- Adding six new Confidential Witness ("CW") accounts, including CWs demonstrating that the Forms 483 were provided to senior management and a CW account showing that senior management was informed of a specific problem manufacturing ONS-5010 even before the Class Period, ¶¶94, 112-22, 165, 175;

- Adding two additional Forms 483, showing that both facilities used to manufacture ONS-5010 chronically violated cGMP and that those violations persisted not only during the pre-Class Period and early Class Period, but also remained throughout the Class Period and

---

[1] Paragraph citations ("¶" or "¶¶") refer to the numbered paragraphs of Consolidated Second Amended Class Action Complaint ("SAC") (ECF No. 60). "MTD" refers to the pages of Defendants' Memorandum of Law in Support of their Motion to Dismiss the SAC (ECF No. 61-1) (hereinafter "MTD"). Unless otherwise noted, internal citations are omitted, and all emphasis is added.

thereafter. ¶¶105-11, 176-79; Exs. 1-6. The additional Forms 483 also demonstrate the deficiencies that were apparent when the Company conducted the mock facility inspections Trenary discussed with investors, ¶156;

- Streamlining allegations regarding misrepresentations about trial design to focus narrowly on Defendants' affirmative misrepresentations that the FDA jointly designed and affirmatively agreed to the sufficiency of pivotal trials that were much smaller than in successful wet AMD drug applications and smaller than specified in FDA guidance, ¶¶124, 126, 135, 137, 140, 144, 154;

- Adding the account of CW6, an executive director at the Company who regularly worked directly with Trenary, who confirmed that the FDA told Defendants in their rejection of the ONS-5010 application that their clinical trials were insufficient, ¶¶165, 175;

- Adding allegations about other successful wet AMD drug applications, FDA guidance, and FDA committee proceedings showing industry knowledge that large trial sizes were necessary, ¶¶53, 56, 74-79, 84-88; and

- Bolstering allegations about the Form 483 process, including facts establishing that the Form 483 applies to the facility in question, not a specific product, as defense counsel mistakenly asserted at the hearing, *see* ¶¶59, 63, 66; MTD Ex. 19 at 16:16-22.

Instead of squarely addressing the SAC's well-pleaded allegations, Defendants attempt to recharacterize their misleading statements of fact alternately as opinions, conjecture, or mere scientific disagreements and argue that they were free to hide the truth because they offered a few boilerplate warnings. However, the identified misrepresentations and omissions were concrete and grounded in then-present facts about manufacturing conditions that existed at the time and a purported regulatory agreement regarding trial size. None were forward-looking, and none were accompanied by meaningful cautionary language. The boilerplate language Defendants reference said nothing about the specific risks they concealed and misrepresented: prior cGMP violations left unremediated, and the fact that the FDA had not actually agreed to the sufficiency of the trial design for NORSE 1 and 2, as Defendants falsely claimed to investors.

Nor do Defendants provide any credible challenge to scienter or loss causation. The SAC easily pleads Defendants' knowledge of and access to information contradicting their misleading public statements, all of which involved Outlook's core operation of commercializing ONS-5010.

2

The six new CW accounts bolster the already strong inference of scienter, as does Defendants' portrayal to investors that they were knowledgeable about the concealed subjects. For loss causation, Plaintiffs demonstrate a massive stock drop following the receipt of a Complete Response Letter ("CRL"), revealing to the market what Defendants concealed with their Class Period misrepresentations.

Because Defendants identify no pleading deficiency and the SAC's allegations easily satisfy applicable pleading standards, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF RELEVANT FACTS

### A.    Outlook's Core Focus on ONS-5010

Outlook was a small company during the Class Period with only one advanced drug candidate: ONS-5010. ¶89. ONS-5010 is an ophthalmic formulation of bevacizumab designed to treat wet AMD. ¶30.

### B.    The Biologic License Application Process

The FDA regulates pharmaceutical development. ¶44. The FDA divides therapeutics into various categories, and bevacizumab is classified as a biologic, which Outlook could only market and sell in the United States after the FDA approved Outlook's Biologics License Application ("BLA"). ¶45. The BLA package consists of (i) clinical testing data, including from two adequate, well-controlled trials ("Phase III trials") demonstrating ONS-5010's efficacy and safety, and (ii) inspection data confirming that the facilities manufacturing ONS-5010 complied with the cGMP. ¶¶5-6, 48, 60. Outlook's BLA submission failed both requirements, and the FDA issued a CRL noting a lack of substantial evidence and cGMP deficiencies. ¶¶13, 160.

### C.    Defendants Concealed that their Manufacturing Facilities Received Multiple Forms 483 Noting Violations of the FDA's cGMP

3

After failing to establish an in-house manufacturing facility successfully, Outlook contracted with two third-party manufacturers. ¶94; *see* **Exhibit A** attached to Thomas H. Przybylowski Declaration. On June 3, 2019, Outlook announced it contracted to have ONS-5010 manufactured in FUJIFILM Diosynth Biotechnologies' College Station, Texas facility ("FujiFilm"). ¶¶96, 156. On September 30, 2020, Outlook announced it signed Ajinomoto bio-Pharma Services' San Diego, California facility as an additional manufacturing site ("Ajinomoto", and collectively with FujiFilm, the "Manufacturing Facilities"). ¶¶103, 156. Trenary touted FujiFilm as having "world class GMP manufacturing facilities." ¶97. Similarly, Outlook touted Ajinomoto as having "best-in-class cGMP global manufacturing facilities." ¶103. However, both Manufacturing Facilities received multiple Forms 483 citing numerous serious cGMP violations, which were *then* under contract with Outlook to manufacture ONS-5010, before, during, and shortly after the Class Period. ¶¶105-11, 176-79, Exs. 1-6. Critically, the cGMP violations at each Manufacturing Facility remained unremediated from as early as 2021. *Id*.

Defendants were informed about the Forms 483 and the details of the violations, including the non-compliance of the Manufacturing Facilities with cGMP, through Defendants' own inspections and because each Manufacturing Facility shared the FDA's findings with Defendants as part of their standard procedures. ¶¶113-23. Trenary admitted he and his team were personally involved in gearing up for FDA inspections: "*We did a lot of work with them on mock inspections. We went through both of their factories several times with our mock inspection teams that we hired…*" ¶156.

Additionally, CWs who worked at the Manufacturing Facilities confirmed that violations noted in Form 483 were shared with drug sponsors like Outlook. ¶113-20. CW2 stated that Ajinomoto routinely notified drug sponsors about Form 483 and the cited violations. ¶115. CW3

confirmed that the FDA inspected Ajinomoto's San Diego facility multiple times, and provided drug sponsors with end-of-day and end-of-inspection updates, including sharing the Forms 483 directly with them. ¶¶116-17. CW4 confirmed that FujiFilm notified drug sponsors about quality issues and any identified chemical manufacturing and control ("CMC") issues. ¶¶118-20. Critically, CW5, a former Outlook Associate Director involved with the FujiFilm partnership, confirmed that FujiFilm directly communicated manufacturing issues to Outlook's senior leadership, including its Chief Operating Officer (who reported to Trenary), starting in 2019. ¶¶121-22, 129. Consequently, Defendants had actual knowledge of cGMP violations at each Manufacturing Facility before, during and after the Class Period. ¶129.

Despite knowing that its Manufacturing Facilities were cited for numerous cGMP violations left unremediated, Defendants continually concealed the multiple Forms 483 and the violations they documented. ¶¶105-11, 123. Instead, Defendants affirmatively misrepresented the Manufacturing Facilities as being cGMP-compliant. *See* ¶¶133, 139, 140, 146, 150, 152, 154, 156.

**D.      The FDA did not Jointly Plan the NORSE Trials with Outlook or Agree that the NORSE 1 and 2 Trials Would be Sufficient to Support Approval**

A drug sponsor, not the FDA, designs clinical trials and protocols for the trials to be submitted in support of a BLA. ¶51. A sponsor generally conducts clinical trials in three phases, with the Phase III trials referred to as "pivotal" clinical trials due to their importance and the fact that such trials are supposed to be large and well-controlled. ¶52. Phase III trials are conducted on a larger population to demonstrate efficacy, and as such, for Phase III trials to be sufficiently powered, each must include "300 to 3000 subjects" so that the Phase III trials have a statistical power to "establish an adverse event rate of no less than 1 in 100 persons." ¶¶52-53. If a drug sponsor wants the FDA to agree to the sufficiency of another or a particular Phase III trial design, the sponsor must request a Special Protocol Assessment ("SPA"). ¶51. Outlook did not obtain an

SPA confirming that the FDA agreed that undersized NORSE 1 and 2 trials could establish efficacy for ONS-5010. *Id.*[2]

Instead, the FDA merely agreed ***to review the sufficiency of the filing*** at that stage, as it typically does when accepting a BLA filing. ¶¶55-56. Defendants knew those chances were poor, absent express FDA agreement to accept undersized trials. In accordance with FDA guidelines, every FDA-approved wet AMD intravenous treatment, including Lucentis, Eylea, Beovu, and Vabysmo, submitted evidence from multiple Phase III trials with more than 1100 patients dosed in their respective trials. ¶83. The size requirement has been common knowledge among wet AMD companies since at least 2004. ¶¶85-86. At the public advisory committee hearing for the first wet AMD treatment, Macugen, the FDA emphasized that "safety and efficacy should be supported by at least two independent [Phase III] trials" each consisting of "500 or more subjects." ¶¶85-87. Likewise, in September 2019, the FDA noted in its review of the Beovu BLA that the two Phase III studies with more than 1,800 patients were "adequate and well controlled studies contained in this submission establish the efficacy of BEOVU." ¶88.

On December 20, 2019, the FDA published a guidance interpreting the efficacy standard (the "2019 Guidance"), noting two adequately-sized Phase III trials were generally required. ¶74; *see also* ¶¶80-82 (describing Wet AMD Guidance, confirming that "two adequate" Phase III trials should support a BLA, each containing "400 or more patients.")

Contrary to well-accepted standards, Outlook included in its BLA only undersized trials as evidence of efficacy: NORSE 1, which enrolled only 61 patients across both the therapeutic and placebo arms, and NORSE 2, which enrolled only 228 patients in total, ¶92.

---

[2] The third NORSE trial submitted in the BLA, NORSE 3, was open label and not placebo controlled, and was submitted as a supplemental safety trial rather than as evidence of efficacy. ¶¶126-27.

Defendant Kenyon indicated that the "streamlined" trials would allow Outlook "to very efficiently and quickly move ONS-5010 through the regulatory process." ¶9. To offset natural concern by investors and analysts that such small, underpowered studies would be sufficient, Defendants falsely told investors that the FDA had signed off on the sufficiency of the tiny trial sizes, and helped design each trial. *See, e.g.,* ¶¶10, 101, 124, 135. Specifically, Defendants claimed that: (a) the trials were designed "*in consultation with FDA* and in communication with FDA," ¶135, that the FDA "*accepted the study design / size* for the NORSE 1 and NORSE 2 trials and *confirmed that each of them is acceptable*," ¶101, and that by meeting the endpoints in those trials, "we have achieved the requirements *agreed upon with the FDA*," ¶124. These were sheer fabrications, as the CRL confirmed by finding that the trials *did not* provide substantial evidence of efficacy. ¶160. And, after the Class Period, Outlook acknowledged that the FDA in fact required it to conduct an additional Phase III trial containing at least 400 patients, confirming that there was no agreement to accept as sufficient the undersized NORSE 1 and 2 trials. ¶182.

### E.    Investors Learn the Truth through Two Partial Disclosures

On May 31, 2022, Outlook admitted that the FDA requested additional information regarding CMC issues related to Outlook's ONS-5010 BLA submission, partially revealing to investors the cGMP deficiencies Defendants sought to conceal. ¶158. As a result, Outlook's stock price declined by nearly 6.96%. ¶159. Then, before market open on August 30, 2023, Outlook disclosed that the FDA had issued a CRL rejecting the ONS-5010 BLA because of unresolved CMC issues, including lack of cGMP compliance, as well as "a lack of substantial evidence" of efficacy. ¶160. On this news, Outlook's stock price fell $1.141 per share, or 80.92%. ¶161.

After the Class Period, Defendants admitted to many of the facts that had been previously concealed. On August 30, 2023, Trenary conceded that the problems identified in the CRL

7

consisted in large part of "*old items*" concerning CMC that had not been remedied. ¶173. On September 20, 2023, the FDA issued a third Form 483 confirming ongoing, unremediated issues at Ajinomoto's San Diego facility, including issues Trenary had previously touted, such as sterility. ¶¶128, 176-78. On November 7, 2023, the FDA issued a third Form 483, likewise confirming persistent cGMP deficiencies at FujiFilm's College Station facility. ¶179. On November 27, 2023, the Company disclosed that the FDA had informed it that it required a second well-controlled study to support the ONS-5010 BLA. ¶180. On December 22, 2023, Outlook filed a Form 10-K admitting that the FDA had required it to conduct an additional, appropriately sized and well-controlled pivotal trial. ¶181. Then, on January 23, 2024, Outlook issued a press release announcing that it had entered into an SPA with the FDA on trial design for the newly-sized NORSE 8 clinical trial, confirming that it understood such SPAs were how a sponsor achieves actual agreement with the FDA on the sufficiency of a clinical trial design to support approval. ¶182.

## ARGUMENT

### I.   Legal Standards Do Not Favor Dismissal

To withstand a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The question is not whether the plaintiff "will ultimately prevail but whether they are entitled to offer evidence to support the claims." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). On a Rule 12(b)(6) motion to dismiss, courts will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint,

8

the plaintiff may be entitled to relief." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

For §10(b) claims, the PSLRA and Rule 9(b) impose two additional pleading standards. First, misrepresentations must be alleged with particularity. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009). This does not call for an "exhaustive cataloging of facts," but only allegations sufficient to "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Bos. Sci. Corp.*, 2001 WL 652016, at *2 (D. Del. Mar. 30, 2001). The Third Circuit instructs that particularity requirements are relaxed where, as here, the factual information is peculiarly within defendants' knowledge or control. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Second, the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter. *See* 15 U.S.C. §78u-4(b)(2). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Instead, a complaint alleges a strong inference of scienter so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. Scienter may be established by showing that defendants acted either consciously or recklessly. *In re PTC Therapeutics, Inc., Sec. Litig.*, 2017 WL 3705801, at *15 (D.N.J. Aug. 28, 2017). Scienter of executives acting within the scope of employment is imputed to the corporation. *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 468 (D.N.J. 2017).

To plead a claim under §10(b), 15 U.S.C. §78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37-38; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The SAC satisfies each of these elements.

## II.     Extraneous Documents Are Not Appropriately Considered

Defendants submit the Declaration of Caroline Pignatelli ("Pignatelli Decl.") (ECF No. 61-3) and Exhibits 1-22 thereto (ECF Nos. 61-4 to 61-25) to inject extraneous facts that seek to transform this into a mini-trial on facts outside the pleadings.[3] "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *Burlington*, 114 F.3d at 1426. Third Circuit precedent prohibits consideration of matters outside the pleadings in resolving a motion to dismiss unless the Court first converts the motion into one for summary judgment. *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 682 (D. Del. 2013). "However, an exception to the general rule is that a 'document ***integral to or explicitly relied upon*** in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Burlington Coat Factory*, 114 F.3d at 1426.

Plaintiffs take no position on Defendants' submission of documents relied upon as part of the allegations of the SAC, except to note that the SAC disputes the factual accuracy of such documents, and such documents should only be noticed, if at all, to reflect that they were issued,

---

[3] For example, Defendants improperly attach documents regarding European Union acceptance of ONS-5010 almost a year after the Class Period (Exs. 17-18), which is not alleged at all in the SAC and is wholly irrelevant to this Rule 12(b)(6) motion. Similarly, ¶¶24-25 of the Pignatelli Decl. purport to set forth the conclusions of a survey by counsel regarding other SEC filings mentioning FujiFilm and Ajinomoto. Such other filings are not mentioned in or relevant to the SAC. ECF 61-4 at ¶¶24-25. To the extent that Defendants believe that a survey can manufacture evidence of a counter-narrative for trial, and can support it in an admissible manner, they should raise it at that stage.

not for the truth of statements contained therein. Exs. 1, 3-7, 9-16, 21. The Court should not consider the remaining extraneous documents and information, *i.e*., Pignatelli Decl. Exs. 2, 8, 17, 18, 20, 22, and paragraphs 24-25.

### III.    The SAC Adequately Alleges Violations of Section 10(b)

#### A.    Material Misrepresentations and Omissions Regarding cGMP Compliance

The SAC easily satisfies the standard in this Circuit for pleading falsity of the manufacturing compliance statements. As the Circuit emphasizes, "Rule 9(b) and the PSLRA do not insist upon irrefutable evidence of a statement's falsity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023). Rather, a complaint need only "contain particularized factual allegations that ***plausibly allege*** that a statement was misleading." *Id.* The SAC here, bolstered by additional allegations and six new CW accounts, plausibly alleges that both Manufacturing Facilities were not cGMP compliant and had a pervasive concealed history of serious violations at the time that Defendants falsely assured investors they were cGMP compliant and well-prepared for FDA inspection.

Once Defendants chose to speak to investors about cGMP compliance, they put the issue "in play" and undertook a duty to be truthful, accurate and complete. ¶¶133, 139, 140, 144, 146, 150, 152, 156. The law is clear: "once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading." *PTC Therapeutics*, 2017 WL 3705801, at \*14; *see also In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at \*21 (D.N.J. June 3, 2024) (once defendant "opened the door and began to make disclosures … he was required to 'tell the whole truth'"). By discussing cGMP and other manufacturing issues "relating to the Form 483, they had an obligation

11

to provide complete information in a manner that was not misleading." *Hills v. BioXcel Therapeutics, Inc.*, 2024 WL 3374145, at \*12 (D. Conn. July 11, 2024).[4]

For pleading purposes, "the issuance of Form 483s may render a defendant's statement about its compliance with FDA regulations or cGMP false, or at least misleading." *Pub. Pension Fund Grp. v. KV Pharm. Co*., 679 F.3d 972, 982-83 (8th Cir. 2012). Courts have not hesitated to sustain securities fraud complaints where, as here, defendants misrepresent cGMP compliance or manufacturing capabilities after Forms 483 have been issued. *See, e.g., In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at \*16, 30 (D.N.J. Mar. 24, 2008); *McGuire v. Dendreon Corp*., 688 F.Supp. 2d 1239, 1241, 1244–45 (W.D. Wash. 2009); *Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc*., 2020 WL 3268531, at \*14 (S.D.N.Y. June 17, 2020); *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1129 (C.D. Cal. 2005). In particular, it is false to represent that a facility is "substantially cGMP compliant" after the FDA issued a Form 483 identifying cGMP violations. *Wilkof v. Caraco Pharm. Lab'ys*, Ltd., 2010 WL 4184465, at \*6 (E.D. Mich. Oct. 21, 2010).

Here, the Forms 483 issued to both Manufacturing Facilities refuted Defendants' repeated (but false) assurances of cGMP compliance. ¶¶105-111, 176-79, Exs. 1-6. Multiple Forms 483 issued for Ajinomoto's facility explicitly stated that "***facility and equipment maintenance were deficient in their ability to support cGMP production activities***" and the "control systems

---

[4] Defendants' cases do not hold otherwise, and involve vastly different facts. For example, *In re Discovery Lab'ys Sec. Litig*. involved a Form 483 issued **two years** before the defendant even contracted with the manufacturing facility. 2006 WL 3227767, at \*2 (E.D. Pa. Nov. 1, 2006). Here, **all six** Forms 483 were issued **after** Outlook had contracted with FujiFilm and Ajinomoto. *In re Genzyme Corp.* was a pure omission that, if anything, supports Plaintiffs by demonstrating how deceitful Defendants were here. 754 F.3d 31, 42 (1st Cir. 2014). Genzyme made no statements about cGMP compliance, and disclosed each Form 483 within months. *Id*. at 39, 41. Here, by contrast, Defendants repeatedly boasted of cGMP compliance and concealed throughout the Class Period the multiple Forms 483 citing serious cGMP violations. ¶¶133, 139, 144, 146, 150, 152, 154, 156.

necessary to prevent contamination or mix-ups were deficient." ¶¶105(a), 107(a); Exs. 1 at 1, 3 at 1. The Forms 483 for FujiFilm's facility each indicated at least eight separate violations, including a clear conclusion that the "***manufacturing process areas were deficient***" and that FujiFilm had "failed to adequately investigate batch contamination." ¶¶106(b), 108(a)-(h); Exs. 2, 4. Moreover, Outlook had actual knowledge before the Class Period that FujiFilm had manufacturing problems ***directly related to the manufacture of ONS-5010***. ¶122. CW5, an Outlook associate director, confirmed that FujiFilm told Outlook that FujiFilm failed a batch of ONS-5010 in 2019. Thus, Defendants knew FujiFilm's manufacturing problems extended beyond those noted in Forms 483.

*Salzman v. ImmunityBio, Inc.*, 753 F. Supp. 3d 1050 (S.D. Cal. 2024) is on point. There, as here, the company contracted with a third-party manufacturing facility to produce the active ingredient in its lead drug candidate. *Id*. at 1056. Like here, the FDA issued Forms 483 for violations both before and after the BLA was filed. *Id*. at 1056-57; *see also* Ex. A. Like here, the defendants in *ImmunityBio* touted cGMP compliance. *Compare* ¶¶133, 139, 140, 144, 146, 150, 152, 156 *with* 753 F. Supp. 3d at 1058 (company "had established [] GMP" and contracted facilities were "cGMP-compliant"). The *ImmunityBio* court found these statements actionable because "the statements plausibly create the impression that [manufacturing facility] was not experiencing cGMP difficulties." *Id*. at 1062. The court further found that, having chosen to speak about cGMP compliance, the defendants undertook a duty to disclose the known cGMP issues cited in the Forms 483 and sustained the complaint because there, as here, defendants "did not disclose any of their [c]GMP issue, much less the receipt of the several Forms 483." *Id*. at 1063-64. The same outcome should follow here.

Defendants offer no reason why omitting such devastating information about the Manufacturing Facilities contracted to manufacture their only advanced drug candidate would not

13

mislead investors. As the *Hills* court explained, when companies speak to investors about drug manufacturing, a reasonable investor would find the omission of a Form 483 to "significant[ly] alter[] the total mix of information available regarding compliance issues." 2024 WL 3374145, at *12. Indeed, even Defendants' primary case, *Genzyme*, acknowledges that an omission of a Form 483 may very well be material depending on the facts of the case. 754 F.3d 31, 42 n.4; *see also Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *7 (D.N.J. July 31, 2020) ("a reasonable shareholder could consider the omitted information about … the Form 483 to be important when making an investment decision").

Defendants' factual disputes are similarly without force. Defendants attempt to contradict well-pleaded SAC allegations by speculating that the Forms 483 might not have involved any of the equipment relevant to manufacturing ONS-5010, or that the Manufacturing Facilities might have been cGMP compliant at times they were not inspected even if the FDA confirmed they violated cGMP during the three inspections made just after they were contracted, during the Class Period, and shortly after the Class Period. *See* MTD at 19-21; ¶¶105-11, 176-79. Defendants' assertions are factually wrong and will be disproved at trial. For example, many of the Forms 483 violations cited applied to defects endemic to the Manufacturing Facilities as a whole, and the persistence of cGMP violations suggests they were never remediated. ¶¶105-11, 176-79, Exs. 1-6; Ex. A. Regardless, such factual disputes are "the exact type of fact finding that is inappropriate at the motion to dismiss stage." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *28-29 (D.N.J. Dec. 31, 2018).

Nor can Defendants escape liability by recasting affirmative statements boasting of cGMP compliance as opinion. First, cGMP compliance involves adhering to objective, verifiable standards, not subjective beliefs. *See, e.g.,* ¶¶64-65. Second, the SAC alleges the falsity of these

14

statements consistent with Supreme Court precedent, whether characterized as opinion or fact. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). A statement of opinion can be actionable if: (1) it is not subjectively believed; (2) it contains embedded statements of facts which are not true; *or* (3) it omits material facts which undermine the opinion expressed. *Id.*

The Company's description of the Manufacturing Facilities as "world class GMP" or "best-in-class cGMP" facilities, and its statement that Outlook had scaled-up manufacturing at the facilities "consistent with global cGMP standards" are actionable under all three *Omnicare* prongs. ¶¶96-97, 103. So are Trenary's statements that the Manufacturing Facilities' "CMC capabilities [were] outstanding" and that "both of those companies had great capability to not only run a clean shop but to be in a position to do what needs to be done to get through FDA inspections in really good shape." ¶156. A reasonable jury could find these characterizations—even if opinions—were not genuinely believed in light of the repeated Forms 483 issued since Outlook contracted with the Manufacturing Facilities, and the known ONS-5010 manufacturing failure at FujiFilm. ¶¶105-11, 122-23,176-79; *see* Ex. A setting out of the timing of the Forms 483.

All these statements also embedded a false statement of fact—adherence to an objective, verifiable set of standards, to which the Manufacturing Facilities did not actually adhere. ¶¶96-97, 103, 156; *see also Wilkof*, 2010 WL 4184465 at *4 ("whether [the defendant] was compliant with cGMP regulations is an issue subject to objective verification."); *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *17 (D.N.J. Mar. 21, 2019) (same); *see also* MTD Ex. 19 at 22:19-23 (Trenary's statement was "not just an opinion. It's an opinion that captures facts."). Moreover, the SAC alleges that the omission of the Forms 483 and the prior manufacturing failure for ONS-5010 at FujiFilm undermined and rendered misleading positive characterizations about the

15

Manufacturing Facilities. ¶¶123, 134, 141, 147, 151, 153, 155, 157. Thus, the statements are actionable under *Omnicare*, whether considered fact or opinion. *Omnicare*, 575 U.S. at 183; *Curran v. Freshpet, Inc*., 2018 WL 394878, at *4-5 (D.N.J. Jan. 12, 2018); *Prudential Fin., Inc*., 70 F.4th at 685.[5]

Finally, Defendants' boilerplate cautionary statements provide no cover for their fraud because the misrepresentations and omissions in question are not forward-looking, the so-called cautionary language says nothing whatsoever about the specific risks concealed, and because the risks had already materialized. *See, e.g*., ¶152. The cGMP violations documented in the Forms 483 (later referenced by Trenary as "old items," ¶173) involved then-present and historical conditions.

Still, these risk disclosures are themselves misleading and cannot inoculate Defendants because the risks described as contingent had already materialized. *See Williams v. Globus Med., Inc*., 869 F.3d 235, 241-42 (3d Cir. 2017) ("[A] company may be liable under Section 10b [sic] for misleading investors when it describes as hypothetical a risk that has already come to fruition.").[6] For example, Defendants said they might be harmed *if* the contract manufacturers do not "comply with regulatory requirements," when they already possessed written confirmation that the same manufacturers, in the same facilities, had not complied with regulatory requirements. ¶¶152, 168. Such language is "plausibly materially misleading because Defendants

---

[5] Defendants' citation to *In re Mylan* is misplaced. The statements there did not mention the cGMP capabilities of the facilities so the omission of cGMP problems didn't "relate to the content of the statement at issue." *In re Mylan N.V. Sec. Litig*., 2023 WL 3539371 at *13 (W.D. Pa. May 18, 2023). By contrast, Trenary's statements directly addressed cGMP compliance and therefore were misleading by omitting "the FDA's observations and warnings" set out in the Forms 483. *Id*.; ¶¶156-57. That is actionable under *Omnicare*.

[6] There, the risk disclosures were found effective because, unlike here, the risk had not already materialized—the distributor was then still distributing the company's products. *Williams*, 869 F.3d at 242-43. In this case it had. When Outlook filed its Form 10-K for fiscal year 2022 containing the so-called cautionary language, the Manufacturing Facilities had *already* received Forms 483 noting the violations of cGMP. ¶¶105-06, 153.

16

presented…cGMP deficiencies as purely hypothetical when they had already occurred." *ImmunityBio*, 753 F. Supp. 3d at 1066. "[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Westinghouse Sec. Litig*., 90 F.3d 696, 710 (3d Cir. 1996); *see also In re: Enzymotec Sec. Litig*., 2015 WL 8784065, at *15 (D.N.J. Dec. 15, 2015); *In re Viropharma Sec. Litig*., 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014).

Moreover, there is no safe harbor for statements like the ones alleged here that are made with actual knowledge of falsity. *See, e.g., Dodge v. Cambrex Corp.*, 2007 WL 608365, at *2-3 (D.N.J. Feb. 23, 2007). As the SAC alleges, before Defendants told investors the Manufacturing Facilities were cGMP compliant, they learned from Forms 483 that the FDA had determined the exact opposite. ¶¶123, 167-69, 173. Where, as here, an alleged misrepresentation addressed already-known issues, "it cannot be that the mere inclusion of 'words of futurity or belief' brings otherwise non-forward-looking statements within the PSLRA safe harbor." *Frater v. Hemispherx Biopharma, Inc*., 996 F. Supp. 2d 335, 348-49 (E.D. Pa. 2014).

### B. Material Misrepresentations and Omissions Regarding the Defendants' Regulatory Communications with the FDA

The SAC details false statements by Defendants asserting that the Company had an agreement with the FDA that the Company's two undersized clinical trials, NORSE 1 and 2, would be sufficient for approval. Defendants falsely told investors that NORSE 1 and 2 were designed "*in consultation with FDA* and in communication with FDA," ¶135, that the FDA "*accepted the study design / size* for the NORSE 1 and NORSE 2 trials and *confirmed that each of them is acceptable*," ¶101, that by meeting the endpoints in those trials, Outlook "achieved the requirements *agreed upon with the FDA*," ¶124, and that the clinical trial plan "*was put together between the company and the FDA*," ¶126. These statements were absolutely false when made,

17

as the CRL confirmed that the trials, although meeting endpoints, failed to provide the required evidence of efficacy. ¶160.

Courts consistently uphold statements in similar cases where defendants misrepresent regulatory communications and agreements. *See, e.g., Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co*., 620 F. Supp. 3d 167, 187-88 (D.N.J. 2022) (finding statements misrepresenting communications with FDA to be actionable); *In re Y-mAbs Therapeutics, Inc. Sec. Litig.,* 2024 WL 451691, at *11 (S.D.N.Y. Feb. 5, 2024) (finding statements such as "FDA had provided a clear regulatory path forward" were misleading because "FDA continued to voice concerns with the available data, including stating that there was insufficient information to provide agreement on the efficacy package to support the BLA"); *Frater*, 996 F. Supp. 2d at 348-49 (defendants "systemically misled investors about the key components of the Ampligen NDA and the nature of FDA feedback while presenting predictions about FDA approval of Ampligen that it should have known were unreasonable under the circumstances."); *In re MannKind Sec. Litig*., 835 F. Supp. 2d 797, 810 (C.D. Cal. 2011) ("Defendants made a series of statements in which they described the FDA's 'vetting' of, 'blessing' of, 'approval' of, and 'agreement' with their bioequivalency studies. Based on the FDA's subsequent ordering of further studies, the Court finds that the most plausible inference to draw is that Defendants' showing of bioequivalence had failed, and that no 'agreement' or 'blessing' had ever been secured.").

Defendants' attempt to recast this as a scientific disagreement misses the point: Defendants told investors there was an agreement when there was not. *See*, *e.g*., ¶¶126; 135. Whether there was a pre-existing agreement is a question of fact that has no bearing on different approaches to analyzing trial data. Regardless, as the Supreme Court made clear, when a corporation receives plausible material adverse information, it cannot make misleading statements even if it disagrees

18

with the information or there is some scientific uncertainty. *Matrixx,* 563 U.S. at 45 (plaintiff adequately alleged misrepresentations about anosmia even though Matrixx disagreed its drug caused the symptom). *Lewakowski v. Aquestive Therapeutics, Inc*., 2023 WL 2496504, at *6 (D.N.J. Mar. 14, 2023) and *Paice v. Aldeyra Therapeutics, Inc*., 2025 WL 815065, at *8 (D. Mass. Mar. 14, 2025) do not suggest otherwise. The defendants in *Lewakowski* and *Paice* did not claim that an agreement was put together with the FDA when, in fact, none existed. In *Lewakowski*, the plaintiffs did not plead any facts suggesting that the company's characterization of "topline results were not honestly believed and lacked a reasonable basis." 2023 WL 2496504, at *8; *see also Paice*, 2025 WL 815065, at *8 (similar). Here, Plaintiffs plead (and Defendants admit that the CRL acknowledged) that efficacy was not established by NORSE 1 and 2, even though endpoints were met, indicating there was no agreement to bypass traditional standards, and Defendants ultimately acknowledged that they needed to conduct another trial consistent with those standards. ¶¶175, 180-82.[7]

Defendants' attempt to diminish the regulatory guidance as "non-binding" or a "draft" as something that would not put them on notice of the falsity of their statements is not persuasive, and counter to the caselaw. *See In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig*., 2020 WL 1479128, at *11 (E.D. Pa. Mar. 25, 2020) (considering non-binding guidance in scienter analysis).

---

[7] Defendants' footnote 11 claims that they "never stated that NORSE 1 met its endpoints," (MTD at 14 n.11), but they attach Exhibits 4 and 8 that confirm that the NORSE 1 "endpoint was a mean change in visual acuity" and that "NORSE 1, ONS-5010 provided us with positive trends in efficacy in three-line visual acuity gains and was shown to be safe and well tolerated" and that "[t]he results from NORSE 1 met our proof-of-concept expectations and, importantly, validate our confidence in the design of our ongoing NORSE 2 trial and the potential data we may see from that study." MTD Exs. 4 at 1; Ex. 8 at 1. This is an improper challenge to Plaintiffs' well-pled allegations, ignoring that Plaintiffs' allegations are to be taken as true at this stage. *Enzymotec*, 2015 WL 8784065, at *16. To the extent Defendants are contending that their documents do not mean what they say, that is an argument for a later stage in this litigation.

19

As alleged in the SAC, FDA guidance describes the FDA's interpretation of, or policy on, a regulatory issue. ¶70. Both the 2019 Guidance and Wet AMD Guidance provided notice to Defendants regarding the FDA's then-current thinking regarding the trial design requirements for clinical trials, and were intended to guide the industry on these types of treatment, and each had an NOA published in the Federal Register. ¶¶74, 80.

Moreover, that the fraud was *revealed* by the CRL does not render Defendants' false-when-made statements "fraud by hindsight." The Third Circuit has soundly rejected that circular argument, instructing that although "later developments may allow a reasonable inference that prior statements were untrue or misleading when made," such pleading does not constitute "fraud by hindsight." *Prudential Fin., Inc.*, 70 F.4th at 693 (3d Cir. 2023). Defendants' precise argument was rejected in *MannKind,* 835 F. Supp. 2d at 809-10: "Defendants lay heavy emphasis on the fact that in demonstrating falsity, Plaintiffs rely in part upon the FDA's 2011 CRL to demonstrate that no such 'agreement' or 'blessing' existed, calling this classic fraud-by-hindsight…. Defendants' argument misses the mark. Fraud is almost always detected after the fact."

### C.      Misrepresentations Regarding Comparability and FDA Guidance

The SAC also adequately alleges that Defendants misrepresented that the NORSE 1 and 2 trials were comparable to trials in FDA-approved wet AMD intravenous treatments and consistent with FDA guidance. ¶¶135, 137. They were not. Unlike NORSE 1 and 2, each of the referenced treatments was approved on submission of at least two well-controlled Phase III trials, including over 1100 patients each. ¶83. This requirement was well-known in the industry and confirmed in FDA guidances. ¶¶74-82, 84-88.[8]

---

[8] Defendants' citation to *In re Ocugen, Inc. Sec. Litig.*, 2024 WL 1209513, at *3 (3d Cir. Mar. 21, 2024) is misplaced. MTD at 12. Unlike Outlook, Ocugen disclosed a "great deal of information about *its departures from FDA guidance*." *Id*. at *4. Here, Defendants never even acknowledged

**D.    Plaintiffs Raise a Strong Inference of Scienter**

Plaintiffs' detailed scienter allegations strongly suggest that Defendants were either reckless or intentionally misleading to investors when making the misrepresentations and omissions at issue. Either will suffice. *See In re Advanta Corp. Sec. Litig*., 180 F.3d 525, 534-35 (3d Cir. 1999). "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 267-68. In making this assessment, courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Neither motive nor "smoking-gun" evidence is required, and a plaintiff need only allege an inference at least as compelling as any nonculpable inference that can be drawn from complaint allegations. *Tellabs,* 551 U.S. at 324.[9]

        **i.    Defendants' actual knowledge and access to information contradicting public statements supports a strong inference of scienter**

A defendant's contemporaneous access to information contradicting their statements to investors is classic evidence of scienter. *See In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 599 (D.N.J. 2001); *see also ViroPharma*, 21 F. Supp. 3d at 473; *Frater,* 996 F. Supp. 2d at 348-49; *Aldridge v. A.T. Cross Corp*., 284 F.3d 72, 83 (1st Cir. 2002) (same). The SAC alleges that Defendants had actual knowledge of or access to information: (1) contradicting their public

---

that they were departing from FDA guidance, and doubled down by asserting that they were comparable to the trials in approved wet AMD treatments that ***did comply*** with FDA guidance.

[9] Defendants misrepresent controlling authority by arguing that "emails, phone calls, documents" etc. are required to establish scienter. *See* MTD at 23. The Supreme Court held the opposite, emphasizing that no such "smoking-gun" is required. *Tellabs*, 551 U.S. at 324. Nevertheless, Plaintiffs have attached the Forms 483 as exhibits and set forth Defendants' statements evidencing that the information known by and available to Defendants when they made their misleading representations to investors.

statements about their Manufacturing Facilities' compliance with cGMP (¶¶133, 139, 140, 144, 146, 150, 152, 156); (2) contradicting Defendants' statements about a fictitious agreement with the FDA to accept the Company's two undersized closed-label clinical trials as sufficient evidence of efficacy (¶¶124, 126, 135, 144, 154); and (3) contradicting Defendants' statements that the Company's NORSE 1 and NORSE 2 trials were comparable to other clinical trials accepted as adequate and well-controlled for treatments of wet AMD. ¶¶135, 137.[10]

Trenary admitted that Outlook worked directly with its manufacturers to analyze their cGMP capabilities, including that Outlook had held mock inspections "several times" and audits of the Manufacturing Facilities, which alone suggests that Trenary and Outlook were aware of the endemic cGMP violations consistently documented by the FDA. ¶¶156-57. Moreover, Outlook and its senior executives were informed of the several Forms 483 that the Manufacturing Facilities received while under contract with Outlook detailing their respective cGMP violations. ¶¶105-111, 176-79, Exs. 1-6. There is no non-culpable basis to tell investors that the facilities were cGMP compliant without informing them that the FDA had determined otherwise. ¶¶114-17, 167.

Here, as in *Dr. Reddy's Lab'y*, the "striking contrast between the true state of affairs at Defendants' manufacturing facilities" and Defendants' statements to investors creates "a strong inference of scienter." 2019 WL 1299673, at *15. Defendants either reviewed the Form 483 documentation establishing that FujiFilm and Ajinomoto failed to comply with cGMP, or were reckless in deciding to speak about cGMP compliance without reviewing the available contradictory information. *Able Lab'ys*, 2008 WL 1967509, at *16 (Form 483 "provided notice to

---

[10] Defendants' speculation (MTD at 23-24) that they were unaware of chronic cGMP non-compliance, or its insufficiently sized trial design is unavailing: a plaintiff can raise a strong inference of scienter based on a defendant's "***mere access*** to information in contradiction to their public statements." *Innocoll*, 2020 WL 1479128, at *12 (internal quotation omitted); *Campbell Soup Co.*, 145 F. Supp. 2d at 599.

the defendants that serious problems existed in the manufacturing process"); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at \*5 (N.D. Ohio Aug. 18, 2014) (inference of recklessness where defendants received five Forms 483 that "presented the near certainty that the FDA would take corrective action"). It is "absurd to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, noncompliant conditions because FDA warnings and failed inspections are crucial to a pharmaceutical company." *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 527 (D. Md. 2022) (internal quotations omitted). Moreover, as explained in *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*12 (C.D. Cal. Apr. 12, 2016), actual receipt of Forms 483 as alleged here is not even required where Defendants, like Trenary and Kenyon, hold themselves out as well-versed in FDA procedures. *See* ¶¶128-32.

Defendants' knowledge that they did not have an agreement with the FDA, which they told investors would smooth approval, is also strongly alleged. Defendants are charged with knowledge "of the terms of any agreement with the FDA and the alleged shortcomings with the design and result[]." *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at \*12 (S.D. Cal. Sept. 27, 2022); *see also MannKind*, 835 F. Supp. 2d at 811 (easily finding scienter for statements falsely asserting that the FDA reached agreement on trial design in private meetings where, as here, the plaintiff alleged access that defendants themselves had access to the true facts of the meetings, which involved the corporate defendant). Defendants likewise were at least reckless in describing the deficient clinical program as "a plan that was put together between the company and the FDA…," when it had not procured an SPA and Outlook, not the FDA, determined the size of the trials. ¶¶51, 126.

23

Defendants knew that every successful wet AMD injection treatment was approved upon submission of at least two, Phase III clinical trials of more than 1100 patients. *See* ¶¶83-87. Indeed, Defendants' 10-K filed on December 29, 2022, which both Trenary and Kenyon signed, acknowledged their awareness of the other FDA-approved Wet AMD treatments, including the Byooviz, Cimerli, Eylea, Beovu, Lucentis and Vabysmo studies. ¶148. Defendants were likewise aware of the 2019 Guidance's explanation that two trials are necessary to control for statistical uncertainties. ¶¶76-78. Yet, they told investors their clinical trials were comparable to those submitted for approved treatments and checked off FDA requirements, knowing neither was true. *Compare with Busic v. Orphazyme A/S*, 2022 WL 3299843, at *23 (N.D. Ill. Aug. 11, 2022) (finding an inference of scienter where defendants "made a deliberate choice ... to submit to the FDA weak and contradictory clinical data that they knew lacked statistical evidence"); *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (defendants aware of need for additional testing data to satisfy FDA requirements).

### ii.    That Defendants held themselves out as knowledgeable about the misrepresented subjects supports a strong inference of scienter

Defendants repeatedly spoke to investors and analysts about the cGMP compliance of the facilities they selected for ONS-5010 manufacturing and Outlook's regulatory communications with the FDA. Defendants "implied that they had first-hand knowledge" of these subjects by holding themselves out as authorities. *PTC Therapeutics,* 2017 WL 3705801, at *17-18. Such acts "tend further to bolster the inference" that Trenary and Kenyon either "knew at the time that [their] statements were false or [were] reckless in disregarding the obvious risk of misleading the public." *Id.* (quoting *Avaya*, 564 F.3d at 272). Defendants repeatedly held themselves out as knowledgeable about the Manufacturing Facilities, the FDA's inspections, and the Company's mock inspections. ¶¶96-97, 128-32, 156, 164. Defendants also held themselves out as knowledgeable regarding the

24

number, design, and size of trials required to satisfy the FDA's requirements. *See* ¶¶100, 130, 135, 137.[11]

Before, during, and after the Class Period, Defendants also touted to investors their participation in meetings with the FDA about the BLA and purported agreements on the sufficiency of NORSE 1 and 2 trial sizes. ¶¶100-01. These statements were designed to confirm Defendants' knowledge to investors, and, therefore, contribute to an inference of scienter. *See e.g.*, *PTC Therapeutics,* 2017 WL 3705801, at *15-19 (considering that defendants understood the importance of FDA feedback as part of holistic review that supported scienter).

### iii.    The newly-added CW accounts enhance the inference of scienter

The six additional CWs further bolster the inference of scienter. CW6, who regularly interacted with Trenary, described him as hands-on, corroborated that Trenary was involved in every facet of the Company, and confirmed that the FDA advised the Company that it needed another well-controlled trial. ¶¶165, 175. CW2 and CW3 confirmed that Ajinomoto provided end-of-day inspection updates to drug sponsors regarding FDA inspections, eliminating any doubt that Outlook contemporaneously learned of the facts giving rise to the Form 483 violations. ¶¶114-17, 167.[12] CW3, a long-time Quality Control Operations Manager at Ajinomoto's San Diego facility

---

[11] Defendants impermissibly brush off allegations pertaining to Kenyon, who touted Fujifilm's manufacturing capabilities, holding himself out as an expert in cGMP. ¶99, and spoke extensively about Fujifilm and Ajinomoto's capabilities in the Company's fiscal year 2021 Form 10-K, which both Kenyon and Trenary signed. ¶¶132-34.  In the next year's Form 10-K, Kenyon and Trenary also each signed statements concerning the Company's awareness of competing wet AMD trials, demonstrating their knowledge. ¶148 (Outlook Form 10-K, December 29, 2022). In the leadup to the Class Period, Kenyon spoke authoritatively on the trials, stating that their intent was "to submit a very streamlined clinical program that allows us to very efficiently and quickly move ONS-5010 through the regulatory process." ¶5.

[12] Defendants argue that the Court cannot consider Plaintiffs' CW allegations because CW1, CW2 and CW5 were not employed by the Company (CW1 and CW5) or Ajinomoto (CW2) during the Class Period (MTD at 27); but this does not undermine their allegations. *In re Mylan,* 2023 WL 3539371 at *4-6; *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649 n.2 (E.D. Pa.

who personally handled FDA inspections, attests that the facility gave sponsors like Outlook daily updates and shared FDA responses. ¶¶116-17. Likewise, CW4 confirmed that FujiFilm informed drug sponsors of all CMC issues, including those related to FDA inspections. ¶¶118-20. CW5, former Associate Director at Outlook, explained that FujiFilm communicated manufacturing problems to Outlook directly, including its Chief Operating Officer, and specified one such instance when there was a failed ONS-5010 batch. ¶121. The corroborating accounts of the CWs demonstrate that Defendants were aware of the manufacturing problems leading to the Forms 483. *See In re Mylan*, 2023 WL 3539371 at *6 ("[T]he mutual consistency of the former employees' accounts reinforces their reliability.") Defendants' attacks on the CW accounts fall flat: the law does not require confidential informants to be mind-readers, or a "fly on every relevant wall." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n. 18 (5th Cir. 2023); *Washtenaw Cnty. Emps. Ret. Sys. v. Cetera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012). The detailed, corroborated, and coherent allegations from these reliable witnesses are plausible, *see Avaya*, 564 F.3d at 261-64. Plaintiffs' witnesses are reliable.

### iv.    Core operations support a strong inference of scienter

ONS-5010 was Outlook's sole clinical-stage drug candidate and was key to its financial prospects. ¶¶3-4, 185. Material misrepresentations concerning core matters of central importance to a company may support an inference of scienter when accompanied by some additional allegations of specific information conveyed to management and related to the fraud. *Carmignac Gestion, S.A. v. Perrigo Co. PLC,* 2019 WL 3451523, at *16 (D.N.J. July 31, 2019). Where a drug

---

2015) (crediting confidential sources who were no longer working for the company by the start of the class period); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("That none of the CWs was employed at Zuora during the *entire* Class Period does not in itself render their statements unreliable as a matter of law.").

26

company misrepresents even a "substantial portion" of the defendant company's operations during the class period, courts do not hesitate to find that the core operations doctrine supports scienter. *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at \*12 (D.N.J. Aug. 6, 2019); *see also Reid v. Hemispherx Biopharma, Inc.*, 2010 WL 11710594, at \*3 (E.D. Pa. Apr. 20, 2010) (inference of scienter appropriate because "Hemispherx is a small company that made only one drug besides Ampligen for commercial distribution."). It is particularly unlikely that a defendant was unaware of adverse FDA communications involving its sole drug candidate. *Orphazyme A/S*, 2022 WL 3299843, at \*22.

### v.    Trenary's "hands-on" role supports a strong inference of his scienter

Trenary's hands-on management style and involvement in every facet of the Company further support the inference that he had knowledge or recklessly disregarded the falsity of his statements. *See* ¶¶165, 171; *compare with Suprema Specialties,* 438 F.3d at 278 (small management team and "hands-on" management style circumstantial evidence of scienter); *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (similar); *SEB Inv. Mgmt. AB v. Endo Int'l*, *PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (defendants' senior positions, "the information available to them, and their public statements, there is a strong and compelling inference they were aware of the adverse surveillance data.").

### vi.    Temporal proximity supports a strong inference of scienter

The temporal proximity between the misleading statements and contradictory adverse events further bolsters a strong inference of scienter. *See Avaya*, 564 F.3d at 268 (temporal proximity of misleading statements should be considered in conjunction with other factors evidencing scienter); *Prudential Fin., Inc.*, 70 F.4th at 676 ("magnitude of the company's reserve charge and its temporal proximity [two months] to the CFO's statements further undercut the CFO's assertion that recent mortality experience was within a normal range").

27

As late as July 28, 2023, Defendants assured investors that they had "provided all necessary information in both clinical as well as [cGMP] *in order to earn approval*" and that they had "found [FujiFilm's and Ajinomoto's] [cGMP] capabilities to be outstanding" after going through "both of their factories several times." ¶¶154, 156, 173, 175. In truth, the paperwork that was unquestionably part of the mock inspections confirmed that both facilities had received Forms 483 identifying unresolved deficiencies only months earlier. ¶¶107-08. This temporal proximity renders implausible any competing inference that Defendants were unaware of the true facts they concealed. A month later, they admitted to receiving a CRL and conceded that the manufacturing and trial deficiencies were largely "*old items*" of the ONS-5010 BLA and Outlook's press release on January 23, 2024, revealing that Outlook knew an FDA trial design agreement was to be documented in an SPA and had done so for the next trial, NORSE 8. ¶¶173-74, 182. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period".[13]

### vii.    Evasive answers to questions bolster the strong inference of scienter

Defendants' evading questions about cGMP (*see* ¶¶154, 156) during the Class Period, and their refusal to share the minutes of their 2018 meeting with the FDA that purported to show an agreement to undersized trials, (*see* ¶¶100, 170) or the contents of the CRL (*see* ¶¶13, 173), further support an inference of scienter. For example, on July 28, 2023, an analyst specifically asked Trenary whether there were any outstanding manufacturing issues. Trenary's response was

---

[13] Defendants' reliance on *Paxton v. ProventionBio, Inc.* 2022 WL 3098236 (D.N.J. Aug. 4, 2022) and *Hoey v. Insmed Inc.*, 2018 WL 902266 (D.N.J. Feb. 15, 2018) is misplaced. Neither alleged temporal proximity between the misstatements and the revelation of adverse events. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022) is irrelevant because there were no allegations of the bugs before the statements were made. Here the Plaintiffs alleged that Defendants were aware of the chronic cGMP non-compliance, insufficient trial size, and the lack of an agreement with the FDA well before Trenary's July 2023 statements.

deliberately evasive: "so we have not given the marketplace [a] blow by blow on when [the] FDA's gone in for factory inspections… or things like that. But I will say that we think we've got two great factory partners." ¶156. "[S]harp, detailed, and recurring questions that challenge the company's position on important matters can strongly bear on scienter. Why? Because it stands to reason that such questions can ordinarily be expected to be a goad to further inquiry." *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 561 (D.N.J. 2024). "And if after being pushed by such questions, a person nonetheless provides false information, a possible inference is that the person (a) did not investigate before providing the false information (which might establish recklessness) or (b) investigated, determined the truth, but made a false statement anyway (which might establish intent)." *Id.*; *see also In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011) (finding that non-responsiveness to a pointed analyst question raised a strong inference of reckless misconduct).

### E.    The SAC Adequately Alleges Loss Causation

The Supreme Court makes clear that alleging loss causation "should not prove burdensome" as a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Third Circuit has further held that loss causation inquiries are generally inappropriate on a motion to dismiss. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000). Here, there is no pleading deficiency.

A "[p]laintiff may adequately plead loss causation by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 450 (D. Del. 2014); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26. 429 (3d

29

Cir. 2007) (loss causation alleged where "defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss," and that materialization of the risk "is consistent with our loss causation jurisprudence."). The SAC expressly alleges that each corrective disclosure and risk materialization provided the market information that had previously been concealed about the ONS-5010 BLA and were promptly followed by statistically-significant declines in the price of Outlook stock. ¶¶158-61. For each, the SAC reveals what new information was disclosed to the market and how it related to Defendants' prior concealment. Thus, the SAC not only satisfies, but exceeds, the "some indication" standard prescribed by *Dura*.

**IV.  The SAC Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act**

The primary violation, *see* Section III, and Trenary's and Kenyon's roles as control persons are sufficiently alleged. ¶¶200-06. That is sufficient. *PTC Therapeutics*, 2017 WL 3705801, at *19.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Defendants' motion to dismiss should be denied in its entirety. Should this Court find any infirmity in the SAC, Plaintiffs respectfully request leave to amend.

Dated:  May 27, 2025                Respectfully submitted,

**POMERANTZ LLP**

*/s/Thomas H. Przybylowski*
Thomas H. Pryzbylowski

Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Genc Arifi (*pro hac vice*)
POMERANTZ LLLP
10 S La Salle Street, Suite 3505
Chicago, IL 60603-1049
Tel: (312)-881-4859

30

Fax: (312)-377-1184
Email: jbsilverman@pomlaw.com
     boconnell@pomlaw.com
     garifi@pomlaw.com

and

Jeremy A. Lieberman (*pro hac vice*)
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
     tprzybylowski@pomlaw.com

*Lead Counsel for the Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
Alex Heller
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net
     aheller@bm.net

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Thomas H. Przybylowski, hereby certify that on May 27, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

By: */s/Thomas H. Przybylowski*
    Thomas H. Przybylowski

31