UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHAMBERS OF**<br>**MADELINE COX ARLEO**<br>**UNITED STATES DISTRICT JUDGE** | **MARTIN LUTHER KING COURTHOUSE**<br>**50 WALNUT ST. ROOM 4066**<br>**NEWARK, NJ 07101**<br>**973-297-4903** |

December 23, 2025

VIA ECF
All Counsel of Record

## LETTER ORDER

Re:   In re Outlook Therapeutics, Inc. Securities Litigation
         Civil Action No. 23-21862

Dear Litigants:

Before the Court is Defendant Outlook Therapeutics, Inc.'s ("Outlook"), Defendant C. Russell Trenary III's, and Defendant Lawerence A. Kenyon's (collectively, the "Defendants") Motion to Dismiss (the "Motion") the Plaintiffs' Consolidated Second Amended Class Action Complaint ("SAC"). See ECF No. 61.

This is Plaintiffs' second attempt at amending their Complaint. By Order dated February 6, 2025, the Court dismissed Plaintiffs' Amended Class Action Complaint ("AC") without prejudice after an oral ruling addressing the sufficiency of the claims. See ECF No. 56. The SAC is now the subject of this Motion, which Plaintiffs oppose. See ECF No. 71. For the reasons set forth below, Defendants' Motion to Dismiss is again **GRANTED**.

**I.    BACKGROUND**[1]

   **A.    The Parties**

Outlook is a biopharmaceutical company focused on developing treatments for ophthalmic, or eye-related, conditions. See ECF No. 60, SAC, at ¶ 2. Trenary served as Outlook's Chief Executive Officer ("CEO") from July 2021 to December 2024. See id. ¶ 25. Kenyon served as

---

[1] The Court draws these facts from the SAC and the exhibits the Parties attached to their competing filings that are the proper subject of judicial notice at this stage. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (court may consider documents "integral to or explicitly relied upon in the" complaint (quotation marks omitted)); In re Wellbutrin SR/Zyban Antitrust Litig., 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) (court may consider documents published on government websites); U.S. ex rel. Perri v. Novartis Pharm. Corp., No. 15-6547, 2019 WL 6880006, at *15 n.15 (D.N.J. Feb. 21, 2019) (court may consider publications from federal agencies); Sapir v. Averback, No. 14-7331, 2016 WL 554581, at *1 n. 1 (D.N.J. Feb. 10, 2016) (court may consider press releases, SEC filings, and earnings call transcripts).

Outlook's CEO and President from August 2018 to July 2021 and has served as Outlook's Chief Financial Officer ("CFO") at all relevant times.  See id. ¶ 26.

Plaintiffs are Outlook shareholders that purchased Outlook stock between August 3, 2021 and August 29, 2023 (the "Class Period").  See id. ¶¶ 1, 20–23.

### B. FDA Approval Process for Biologics

The Food and Drug Administration ("FDA") regulates the development and marketing of certain drugs.  See id. ¶ 44.  This includes a class of drugs called biologics.  See id. ¶ 45.

To obtain FDA approval of a biologic, a "sponsor" must file a Biologics License Application ("BLA").  See id. ¶¶ 44–45.  The BLA must be supported by scientific evidence that demonstrates the product is safe and effective for its intended use in humans.  See id. ¶ 44.  That requires providing information regarding, inter alia, testing, product development, and manufacturing.  See id. ¶¶ 46–50, 52, 54.  A sponsor typically conducts testing across three phases of clinical trials.  See id. ¶ 52.  Phase I trials are smaller studies intended to obtain early evidence on effectiveness.  See id.  Phase II trials are larger studies intended to gauge effectiveness and common-short term side effects.  See id.  Phase III trials are the largest studies intended to gauge evidence of the relationship between effectiveness and safety.  See id.

The FDA and a sponsor may meet in-between these different phases "to discuss development plans with [the] FDA" and "ascertain FDA's views on the applicable statutory and evidentiary requirements well in advance of submission of a marketing application."  ECF No. 61.3, Decl. of Caroline Pignatelli in Support of Defs.' Mot. to Dismiss Pls.' Consol. Second Am. Class Action Compl. ("Pignatelli Decl."), Ex. 2 at 18.  An End-of-Phase II ("EOP2") meeting, inter alia, "serve[s] to evaluate the phase 3 plan and protocols" as well as "the adequacy of current studies and plans to assess pediatric safety and effectiveness."  See id. at 19.

After the sponsor files the BLA, the FDA has sixty days to determine whether it will accept the submission for substantive review.  See SAC ¶ 55.  If accepted, the FDA then assigns the BLA a "PDUFA date," which is the deadline by which the FDA is required to review and respond to the BLA under the Prescription Drug User Fee Act.  See id. ¶ 57.  As part of its review, the FDA may inspect the product manufacturing facilities identified in the BLA to ensure their compliance with current Good Manufacturing Practices ("cGMPs").  See id. ¶¶ 60–62, 65.

After these inspections, the FDA may issue a Form 483 to the manufacturer that identifies "observations" of potential noncompliance with cGMPs.  See id. ¶ 66; see also, e.g., SAC, Ex. 1 at 2.  A Form 483 "do[es] not represent a final Agency determination regarding [a manufacturer's] compliance" with cGMPs.  See, e.g., SAC, Ex. 1 at 2.  Instead, the FDA considers it, along with an Establishment Inspection Report ("EIR") and any other evidence collected from the inspection, before determining "what further action, if any, is appropriate to protect public health."  Pignatelli Decl., Ex. 6 at 2–3.

If a Form 483 was issued at the end of an inspection, the FDA will typically respond with a follow-up letter within ninety days with two potential classifications: Voluntary Action Indicated ("VAI") or Official Action Indicated ("OAI").  See Pignatelli Decl., Ex. 21 at 2–3.  A VAI indication means the inspection found objectionable conditions but the FDA is not recommending

any formal action because the facility is minimally compliant with cGMPs; an OAI indication means the facility is noncompliant with cGMPs. See id.; Pignatelli Decl., Ex. 20 at 2. A VAI indication "will not directly negatively impact FDA's assessment of any pending marketing application referencing th[e] facility." Pignatelli Decl., Ex. 20 at 2. An OAI indication "may result in non-approval of pending applications." In re Checkpoint Thera. Securities Litig., No. 24-2613, 2025 WL 1434400, at *2 (S.D.N.Y. May 19, 2025) (explaining the same FDA follow-up procedures following the issuance of a Form 483).

At the end of its review, the FDA will either (1) issue an approval letter, or (2) issue a Complete Response Letter ("CRL") that identifies the reasons why the BLA was not approved. See SAC ¶ 67. If a sponsor receives a CRL, it can attempt to address the deficiencies in its BLA and resubmit it for approval. See id. ¶ 69.

### C. FDA Guidance Regarding BLA Clinical Trials

In August 2004, the FDA Dermatology and Ophthalmology Advisory Committee met to review the New Drug Application ("NDA") for what would become the first FDA approved wet age-related macular degeneration ("wet AMD") treatment, Macugen. See id. ¶ 85. Wiley Chambers, the Deputy Director for the Division of Anti-Inflammatory, Analgesic and Ophthalmologic Drug Products, provided information about the then-upcoming Macugen clinical trials. See id. At the outset, he stated that the FDA does not believe there is a single approach that has to be used for all clinical trials and that there may be reasons to vary from what the FDA recommends. See Pignatelli Decl., Ex. 1 at 9 (the "2004 Guidance") at 9. He also noted that clinical trial programs should aim to "identify adverse events that occur at least at a one percent adverse reaction rate," meaning they should enroll at least 300 patients. Id. at 12.

In December 2019, the FDA issued a draft guidance covering, inter alia, the design of clinical trials used to support various FDA submissions, including BLAs. See id. ¶ 74; see also Pignatelli Decl., Ex. 5 (the "2019 Guidance"). It prefaces that "when finalized" it will "not establish any rights for any person and is not binding on FDA or the public" and that sponsors may use "an alternative approach if it satisfies the requirements of the applicable statutes and regulations." 2019 Guidance at 5. It recommended that sponsors conduct two "adequate and well-controlled trials" to assess the efficacy and safety of new biologics. SAC ¶ 76; see also 2019 Guidance at 12–13. It did not include any specific recommendations about the number of participants in these trials, instead only recommending that the trials be sufficient to reach a "statistically significant result." See 2019 Guidance at 10–12.

More than three years later, in February 2023, the FDA issued a draft guidance covering, inter alia, the design of clinical trials used specifically to support BLAs for age-related macular degeneration. See SAC ¶ 80; see also Pignatelli Decl., Ex. 15 (the "2023 Guidance"). It included the same prefatory statement that "when finalized" it would not "be binding on FDA or the public" and that "an alternative approach" could be permissible. 2023 Guidance at 5. It specifically recommended "two adequate and well-controlled studies" that enroll "400 or more patients using the investigational drug." See SAC ¶¶ 81–82; 2023 Guidance at 7–8.

3

### D. Outlook Pursues the Development and Approval of ONS-5010

In early 2018, Outlook shifted its complete focus to developing ONS-5010, a treatment for wet AMD using the antibody bevacizumab. See id. ¶¶ 2–3. Bevacizumab is a biologic. See id. ¶ 45. Therefore, to market ONS-5010, Outlook needs FDA approval. See id. ¶ 45–47.

In April 2018, Outlook attended an EOP2 meeting with the FDA and discussed its Phase III clinical program. See Pignatelli Decl., Ex. 10 at 7. The clinical program consisted of multiple trials, including two trials that Outlook called NORSE 1 and NORSE 2. See id. Outlook stated that at the EOP2 meeting the FDA "accepted the study design / size for the NORSE 1 and NORSE 2 trials and confirmed that each of them is acceptable and may support" a BLA. Pignatelli Decl., Ex. 7 at 2; SAC ¶ 101.

To develop and manufacture ONS-5010, Outlook contracted with two companies. First, in June 2019, Outlook reached an agreement with FUJIFILM Diosynth Biotechnologies ("Fuji") to manufacture the product at its College Station, Texas facility. See SAC ¶¶ 96, 156. Then, in September 2020, Outlook reached an agreement with Ajinomoto bio-Pharma Services ("Ajin") to manufacture the product in its San Diego, California facility. See id. ¶¶ 103, 156.

In August 2020, Outlook announced that it had completed the NORSE 1 trial. See Pignatelli Decl., Ex. 8 at 2. The trial "demonstrated [a] safety and efficacy profile consistent with previously published ophthalmic bevacizumab research." Id. Then, one year later, in August 2021, Outlook announced that it had completed the NORSE 2 trial. See SAC ¶ 124. The trial provided "highly significant [and] clinically relevant results." Id.

Just before Outlook announced the results of the NORSE 2 trial, in June 2021, Ajin received a Form 483 with three "observations" after an inspection of its San Diego facility. See SAC ¶ 105.[2] Two months later, in August 2021, Fuji received a Form 483 with nine "observations" after an inspection of its College Station facility. See id. ¶ 106.[3]

In March 2022, Outlook announced that it had submitted its BLA for ONS-5010. See id. ¶ 143. Two months later, it announced that it was voluntarily withdrawing its BLA in order to provide additional information requested by the FDA in a supplemental filing. See id. ¶ 142. In response, its stock price dropped from $1.15 to $1.07. See id. ¶ 159. In August 2022, Outlook refiled its BLA. See id. ¶ 144. Two months later, it announced that the FDA had accepted its BLA and set a PDUFA date to complete its review by August 29, 2023. See Pignatelli Decl., Ex. 13 at 2.

---

[2] According to a former Ajin employee who worked at the San Diego facility from February 2006 to June 2023 (identified as CW3), Ajin would communicate a summary of FDA inspections to "drug sponsors" and would inform "drug sponsors" if Ajin received a Form 483. See id. ¶¶ 114–17.

[3] According to a former Fuji employee who worked at the College Station facility from September 2020 to July 2022 (identified as CW4), Fuji would inform "drug sponsors" of any quality issues or any "[chemistry, manufacturing, and controls issues]" identified at its facilities, including those raised after FDA inspections. See id. ¶¶ 118, 120. According to a former Outlook employee who worked for the company from February 2018 to September 2019 (identified as CW5), Fuji also communicated manufacturing problems to Outlook's Chief Operating Officer, including that on one occasion Fuji had "a failed batch while manufacturing Outlook's drug candidate." See id. ¶¶ 121–22.

In January 2023, Ajin received another Form 483 with three "observations" after an inspection of its San Diego facility. See id. ¶ 107. Several months later, in June 2023, Fuji received another Form 483 with eight "observations" after an inspection of its College Station facility. See id. ¶ 108.

In August 2023, Outlook announced that the FDA issued a CRL for ONS-5010. See id. ¶ 160. It stated that the FDA could not approve the BLA "due to several [chemistry, manufacturing, and controls] issues, open observations from pre-approval manufacturing inspections, and a lack of substantial evidence." Id. In response, Outlook's stock price dropped from $1.14 to $0.27. See id. ¶ 161.

### E. Procedural History

On November 3, 2023, a Class Action Complaint was filed alleging that twenty-three statements made by the Defendants between December 2022 and August 2023 were knowingly false or misleading. See ECF No. 1. Court-appointed lead Plaintiffs then filed the AC, alleging that forty-five statements made by the Defendants during the Class Period were knowingly false or misleading. See ECF No. 37.

Defendants moved to dismiss the AC. See ECF No. 42. On February 6, 2025, after oral argument, the Court granted that motion with leave to amend. See ECF No. 56. Plaintiffs then filed the SAC. See ECF No. 60. Defendants have moved to dismiss the SAC in its entirety with prejudice. See ECF No. 61.

The SAC alleges that thirteen statements made by the Defendants during the Class Period were knowingly false or misleading because they concealed the extent to which the Defendants knew that the FDA was likely to deny the BLA for ONS-5010. These statements fall within three categories: (1) statements regarding communications between the FDA and Outlook about trial design ("FDA Trial Design Statements"), see SAC ¶¶ 124, 126, 135, 146, 154; (2) statements regarding Fuji's and Ajin's cGMP compliance ("cGMP Compliance Statements"), see id. ¶¶ 133, 139–40, 144, 146, 150, 152, 154, 156; and (3) statements comparing Outlook's trials to other wet AMD trials ("Comparator Trial Design Statements"), see id. ¶¶ 135, 137.[4] Plaintiffs support their claims about these statements with new allegations including FDA guidance for BLA clinical trials, additional Form 483s issued to Fuji and Ajin, and statements from six confidential witnesses. See generally SAC.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (3007). A claim is facially plausible "when the plaintiff pleads factual content that allows

---

[4] Plaintiffs identify other statements in the "Materially False and Misleading Statements Issued During the Class Period" section of the SAC, but they do allege whether or why these statements are false or misleading. See SAC ¶¶ 128–29, 130–32, 142–43, 148. To the extent Plaintiffs are alleging these statements are false or misleading, their claims are dismissed. See Stitching Pensioenfonds ABP v. Merck & Co., No. 05-5060, 2012 WL 3235783, at *7 (D.N.J. Aug. 1, 2012) (dismissing claims related to identified statements where the complaint failed to "identify the materially misleading contents" in the statements).

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court must accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. See Huertas v. Bayer US LLC, 120 F.4th 1169, 1174 (3d Cir. 2024). But it is not required to accept "naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678. The standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quotation marks omitted).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). First, the complaint must satisfy Rule 9, which requires the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see also In re Hertz Global Hldgs., Inc. Securities Litig., No. 13-7050, 2017 WL 1536223, at *8 (D.N.J. Apr. 27, 2017). This requires a plaintiff to "support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of a newspaper story—that is, the who, what, when, where, and how of the events at issue." Id. (quotation marks omitted).

Second, the complaint must satisfy the "exacting and distinct pleading requirements" established by the Private Securities Litigation Reform Act ("PSLRA"). In re Aetna Sec. Litig., 617 F.3d 272, 277 (3d Cir. 2010). For claims based on false or misleading statements, the PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also Aetna, 617 F.3d at 277. It also requires a complaint to "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter. 15 U.S.C. § 78u-4(b)(2); see also City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 166 (3d Cir. 2014).

### III.   ANALYSIS

#### A.   Claims Based on § 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Pursuant to this provision, the SEC promulgated Rule 10b-5, which makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim for a violation of § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." Pfizer, 754 F.3d at 167. A plaintiff must adequately "allege each element." Adams v. Amplidyne, Inc., No. 99-4468, 2000 WL 34603180, at *4 (D.N.J. Oct. 24, 2000) (emphasis added); see also Pfizer, 754 F.3d at 167 (affirming district court's dismissal of a securities fraud complaint that failed to adequately allege the first element and plead "a material misrepresentation or omission"). The

6

first two elements must be pleaded under Rule 9's and the PSLRA's heightened standards. See City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp., 908 F.3d 872, 879 (3d Cir. 2018).

To plead a "material misrepresentation or omission" a plaintiff must first "specify with particularity the true facts that demonstrate how each statement or omission was indeed false or misleading at the time the statement was made." In re Ocugen, Inc. Sec. Litig., 659 F. Supp. 3d 572, 588 (E.D. Pa. 2023) (quotation marks omitted), aff'd, 2024 WL 1209513 (3d Cir. Mar. 21, 2024). "True facts" are generally "contemporaneous sources" such as "confidential witnesses or documentary evidence such as internal memoranda" that reflect a defendant's knowledge about an issue. Id. at 588–89. They are not "conjecture based on subsequent events" because a securities fraud claim cannot be based on hindsight. Id. at 588–89 (quoting Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017)).

A plaintiff must also show that an alleged misstatement or omission is "material." Id. An alleged omission is material if its disclosure is substantially likely to be viewed by a "reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231–32 (1988). The federal securities laws "do not create an affirmative duty to disclose any and all material information." In re Walmart Inc. Sec. Litig., 151 F.4th 103, 113 (3d Cir. 2025). Disclosure is only required "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Id.

Here, Plaintiffs fail to adequately allege that each of the thirteen identified statements constitute a "material misrepresentation or omission." Pfizer, 754 F.3d at 167. For certain statements, they fail to allege falsity. For others, they fail to plead "true facts" that demonstrate Defendants knew the alleged misstatements or omissions were false or misleading. And for others, they fail to plead the alleged omissions are material.

### 1. FDA Trial Design Statements

Plaintiffs argue that Defendants made five statements related to interactions with the FDA that were materially false and misleading. Specifically, they contend that these statements represented that Outlook had reached an agreement with the FDA that NORSE 1 and NORSE 2 would be sufficient to obtain approval of ONS-5010. But, in reality, Plaintiffs argue Defendants never reached any such agreement with the FDA and knew the FDA would never approve a BLA based on these "undersized" clinical trials. See SAC ¶¶ 124 ("Statement 1"), 126 ("Statement 2"), 135 ("Statement 3"), 146 ("Statement 4"), 154 ("Statement 5").

The Court previously dismissed each of these statements because, inter alia, it "defies logic" that Outlook would represent it met with the FDA and agreed on the size of the clinical trials necessary to obtain final BLA approval, and then proceed to "spend all this money and . . . move forward with this regulatory process" knowing there was no agreement and that its BLA would likely be rejected. Pignatelli Decl., Ex. 19 at 48:22–49:6; see also, e.g., Nguyen v. Endologix, Inc., 962 F.3d 405, 416 (9th Cir. 2020) ("It is improbable that [a company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure."). To sufficiently plead this theory, the Court made clear that Plaintiffs would need particularized facts that Outlook "didn't discuss the trial [with the FDA] and therefore" that Outlook's statements were misleading, or "the FDA told them . . . your trial is too small." Pignatelli Decl., Ex. 19 at 49:6–

7

11. It warned that Plaintiffs would have an "uphill battle" making this showing. Id. at 49:19–21. The SAC fails to make the climb.

Plaintiffs do not allege what would be needed to cure the deficiency—that these statements are false or misleading because Outlook never met with the FDA or that the FDA informed Outlook its clinical trials were too small. They instead double down on their theory that Outlook and the FDA would never have "agreed" that NORSE 1 and NORSE 2 were sufficiently sized to obtain BLA approval. But for Statements 1, 2, and 3, Plaintiffs do not adequately allege falsity. For Statements 4 and 5, they fail to plead "true facts" that show Defendants knew their statements were false or misleading.

First, Statements 1, 2, and 3 do not claim that the FDA "agreed" that NORSE 1 and NORSE 2 were sufficiently sized to obtain BLA approval. Statement 1 is the only statement that indicates Outlook "agreed upon" any requirements of NORSE 1 and NORSE 2 with the FDA at the EOP2 meeting. SAC ¶ 124. But context is important. See Paxton v. ProventionBio, No. 21-11613, 2022 WL 3098236, at *12 (D.N.J. Aug. 4, 2022) (explaining courts "engage in a full reading of a company's statement, rather than a selective reading of it" (quotation marks omitted)). When the allegedly false portion of this statement is read in context, it is clear that Outlook stated only that it had achieved the "primary" and "secondary" endpoints "agreed upon with the FDA" at the EOP2 meeting. Pignatelli Decl., Ex. 9. And, it states that Outlook had "achieved the requirements agreed upon with the FDA" to "complete the clinical package necessary for the submission of the BLA"—a distinct hurdle a sponsor must clear before the FDA substantively reviews the BLA and considers approving it. Id. (emphasis added); SAC ¶¶ 55, 57. Those claimed agreements are consistent with how sponsors engage with the FDA during EOP2 meetings. See Pignatelli Decl., Ex. 2 at 18–19. The statement does not state that Outlook and the FDA reached an agreement about clinical trial size. And it does not state that Outlook and the FDA reached an agreement about the clinical trial design necessary for approval of the BLA. Plaintiffs plead no particularized facts that Outlook and the FDA did not agree at the EOP2 meeting that the "primary or secondary endpoints" for NORSE 2 would be sufficient to support the submission of the ONS-5010 BLA. Therefore, Plaintiffs fail to plead that Statement 1 is false.

Statements 2 and 3 do not even refer to any "agreement" between Outlook and the FDA. Statement 2 says Outlook and the FDA "put a plan together" at the EOP2 meeting regarding the clinical trials. SAC ¶ 126. Statement 3 says that Outlook designed its clinical trials in "consultation" and "communication" with the FDA. Id. ¶ 135. That, again, is consistent with how sponsors engage with the FDA during EOP2 meetings. See Pignatelli Decl., Ex. 2 at 18–19. Plaintiffs plead no particularized facts that the EOP2 meeting did not occur or that Outlook did not discuss, "plan," consult[]," or "communicat[e]" with the FDA at that meeting about its planned clinical trials. SAC ¶¶ 126, 135. Therefore, Plaintiffs fail to plead that Statements 2 or 3 are false. Compare Ocugen, 2024 WL 1209513, at *3 (holding statements not alleged to be not false or misleading where plaintiffs did "not identify any point" at which the defendant "did not actually engage with the FDA as it had announced") with In re MannKind Sec. Actions, 835 F. Supp. 2d 797, 809, 823 (C.D. Cal. 2011) (holding statements were alleged to be false or misleading where defendant stated it met with FDA and that the FDA had "bless[ed]," "vetted," "approved," "accepted," and "agreed to" its entire proposed methodology, but then later recharacterized its prior communications as mere "advice").

Second, for Statements 4 and 5, Plaintiffs plead no "true facts" that show these statements were false or misleading. Ocugen, 659 F. Supp. 3d at 588. Neither statement refers to any meeting (let alone an agreement reached at the EOP2 meeting) between Outlook and the FDA. Statement 4 only says that ONS-5010 was designed "to be fully compliant with the FDA's criteria." SAC ¶ 146. Statement 5 only says that Outlook believed it provided all necessary clinical information to "earn" BLA approval.[5] Id. ¶ 154. Plaintiffs' theory is that Defendants knew neither of these statements were true because they knew Outlook had no agreement with the FDA that its "undersized" clinical trials would be sufficient to support BLA approval. To support that position, Plaintiffs point to two sets of "true facts": (1) the 2004 Guidance, 2019 Guidance, and 2023 Guidance; and (2) the size of prior FDA approved wet AMD drug product clinical trials.

But Defendants never stated that the FDA had agreed NORSE 1 and NORSE 2 were large enough to ensure approval of the ONS-5010 BLA. See supra at 7–8. And, in any event, the "true facts" Plaintiffs point to do not support their position. For starters, the 2023 Guidance was not "contemporaneous" with Statements 4 and 5. Ocugen, 659 F. Supp. 3d at 588. In fact, it was released after Outlook's BLA was accepted by the FDA for review. See Pignatelli Decl., Ex. 13 at 2. Plaintiffs' reliance on its recommendation about trial size—which it itself states is not "binding," Pignatelli Decl., Ex. 15 at 5—is "conjecture based on subsequent events," Ocugen, 659 F. Supp. 3d at 589.

Although the remaining "true facts" were available before Outlook made these two statements, they do no better to support the view that Defendants knew Outlook's BLA was doomed to fail. Both the 2004 Guidance the 2019 Guidance represent non-binding guidance and explicitly state that (1) the proffered recommendations are not one-size-fits-all, and (2) variation among clinical trials may be warranted. See 2004 Guidance at 9, 12; 2019 Guidance at 5. That undermines the view that either of these sources conveyed a requirement regarding trial size that Defendants knew Outlook's clinical trials would fail to meet. See Ocugen, 659 F. Supp. 3d at 590 (rejecting argument that statements were misleading based on non-binding FDA guidance that "included a disclaimer on each guidance document explaining that [] developers could pursue alternative approach[es]"). Moreover, although true that the prior approved wet AMD clinical trials each consisted of more subjects than Outlook's trials, that fact does not convey any requirement about trial size. Plaintiffs' allegations based on these prior studies are conjecture in light of their size, and that is insufficient to satisfy their heightened pleading requirement. See Checkpoint, 2025 WL 1434400, at *27 (explaining conjecture about defendant's knowledge to support allegations of falsity is insufficient to satisfy securities fraud pleading requirements).

In short, Plaintiffs fail to adequately allege that the five identified FDA Trial Design Statements are false or misleading. Their claims based on these statements are dismissed.[6]

---

[5] Statement 5 is also an opinion statement regarding Defendants' belief about Outlook's BLA submission, and Plaintiffs plead no particularized facts to suggest Defendants did not sincerely believe the BLA was sufficient to "earn approval." See Ocugen, 659 F. Supp. 3d at 595 (explaining a statement "that Defendants believed the data would be acceptable to the FDA was a statement of optimism and opinion."); In re Aetna, 617 F.3d at 283; ("[S]tatements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism . . . constitute no more than puffery and are understood by reasonable investors as such" (quotation marks omitted).).

[6] Plaintiffs also claim that two statements made before the Class Period about the alleged "agreement" with the FDA

## 2. cGMP Compliance Statements

Plaintiffs argue that nine statements in which Defendants purportedly described Outlook's manufacturing partners as cGMP compliant are false or misleading because Defendants knew these manufacturing partners were not cGMP compliant but omitted that information from disclosures and statements. See SAC ¶¶ 133, 139–40, 144, 146, 150, 152, 154, 156. The crux of this theory is that Defendants knew that Ajin and Fuji were issued Form 483s from the FDA in 2021 and 2023 that revealed each manufacturer was not cGMP compliant. See SAC ¶¶ 105–08. Plaintiffs, however, have not sufficiently alleged falsity on this basis for at least two reasons.

First, Plaintiffs have not "concrete[ly]" alleged particularized facts that Defendants were "ever notified by [the manufacturers] about any of the . . . Form 483s, much less that [Defendants] w[ere] privy to their contents before [they] made the statements the [S]AC challenges as misleading." Checkpoint, 2025 WL 1434400, at *16. Plaintiffs point to one confidential witness, CW3, that "confirmed" Ajin provided "drug sponsors" with updates following FDA inspections and notice of any issued Form 483s. See SAC ¶ 114–17.[7] Plaintiffs also point to two confidential witnesses, CW4 and CW5, who "confirmed" that Fuji would inform "drug sponsors" of any manufacturing issues with the sponsor's drug and that Fuji directly informed Outlook's Chief Operating Officer ("COO") about any manufacturing issues, including that Fuji had "failed a batch" of ONS-5010. Id. ¶¶ 118, 120–22.[8] But this is insufficient to surmount their heightened pleading threshold.

These witnesses refer vaguely to Ajin and Fuji informing "drug sponsors" about FDA inspections and Form 483s, but they do not allege that Defendants were informed about the at-issue Form 483s or was informed of any issues following any FDA inspections conducted pursuant to the BLA for ONS-5010. The allegations that are particularized to Outlook all come from a witness that left the company in September 2019. Id. ¶ 121. They therefore predate any of the at-issue Form 483s and the submission of Outlook's BLA (along with any FDA inspections conducted pursuant to the FDA's review of the BLA). And, in any event, these allegations claim Outlook's COO was informed of Fuji's manufacturing issues up to September 2019—but neither Trenary nor Kenyon, Outlook's alleged control persons, was the COO. See id. ¶¶ 25–28. "To plead falsity, Rule 9(b) and the PSLRA demand specificity." City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc., 70 F.4th 668, 680 (3d Cir. 2023) (emphasis added). Vague

---

regarding the NORSE 1 and NORSE 2 trials are also false. See SAC ¶ 1 (stating class period begins August 1, 2021); id. ¶¶ 100–01 (pointing to statements from August 2019 and June 2020). "A defendant, however, is liable only for those statements made during the class period. Plaintiffs could have sought to include th[ese] statement[s] in the class period but they did not." See In re Int'l Business Machines Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted). Neither statement is therefore actionable.

[7] CW2's account is irrelevant. CW2 left Ajin in September 2020, before the at-issue Form 483s were issued or any inspections could have been conducted by the FDA pursuant to the ONS-5010 BLA. See id. ¶ 112.

[8] Plaintiffs also argue that Trenary's remarks that Outlook conducted several "mock inspections" of Ajin's and Fuji's facilities support the inference that Defendants were aware of the Form 483s. SAC ¶ 156. Aside from whether this is an inactionable opinion statement (which the Court does not decide here), this statement does not indicate what these "mock inspections" entailed or why conducting them would prompt Outlook to uncover the at-issue Form 483s. Plaintiffs offer no particularized allegations about either of these issues. Their argument is therefore mere "conjecture as to the information gleaned during such a visit," and conjecture based on "mere access to information alone" is insufficient to impute knowledge upon the Defendants and plead falsity. Checkpoint, 2025 WL 1434400, at *27.

10

allegations that do not specifically show Defendants had awareness of the Form 483s or manufacturing issues detected following FDA inspections conducted for the ONS-5010 BLA are insufficient to show Defendants' purported statements about cGMP compliance were knowingly false. This is particularly true here, where the SAC's "theory of access concerns information not in the [defendant's] records or plant, but in those of a third-party manufacturer." Checkpoint, 2025 WL 1434400, at *27.[9]

Second, Plaintiffs have not sufficiently alleged the Form 483s represented a "material" issue of cGMP non-compliance requiring disclosure. Walmart Inc. Sec. Litig., 151 F.4th at 113. By their own terms, the Form 483s "do not represent a final Agency determination regarding [a manufacturer's] compliance with cGMPs." See, e.g., SAC, Ex. 1 at 2. Instead, they identify "observations" of potential noncompliance which are considered with other collected evidence before the FDA determines "what further action, if any, is appropriate." Id.; Pignatelli Decl., Ex. 6 at 2–3. That further action may be to issue a VAI letter, which means the manufacturer is minimally compliant with cGMPs and that the flagged "observations" "will not directly negatively impact FDA's assessment of any pending marketing application referencing th[e] facility." See Pignatelli Decl., Ex. 20 at 1; Pignatelli Decl., Ex. 21 at 2–3. Or it could be to issue an OAI letter, which means noncompliance with cGMPs and which "may result in non-approval of pending applications." See Pignatelli Decl., Ex. 21 at 2–3; Checkpoint, 2025 WL 1434400, at *2.

Given the equivocal nature of Form 483s, courts have found that they are not material and that companies do not have an independent legal duty to disclose them. Checkpoint, 2025 WL 1434400, at *17; see also Schaeffer v. Nabriva Therapeutics plc, No. 19-4183, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020) ("Because a Form 483 is interim FDA feedback, there is no standalone duty to disclose its existence."). Instead, courts generally only find the omission of Form 483s actionable if the FDA issued some form of follow-up that concretely identifies manufacturing noncompliance. See In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 41–42 (1st Cir. 2014); see also, e.g., Oklahoma Police Pension Fund & Ret. Sys. v. Teligent, Inc., No. 19-3354, 2020 WL 3268531, at *3 (S.D.N.Y. June 17, 2020) (defendant received a Form 483 "followed by an [EIR] that elaborated on the findings in the . . . 483 Letter and an additional follow-up letter emphasizing certain compliance issues"); In re Able Lab'ys Sec. Litig., No. 05-2681, 2008 WL 1967509, at *16 (D.N.J. Mar. 24, 2008) (defendant received a Form 483 followed by a "further warning letter . . . regarding problems identified during the inspection" that informed defendant it was "responsible for investigating and determining the causes of the [cGMP] violations identified" therein); Yanek v. Staar Surgical Co., 388 F. Supp. 2d 1110, 1119, 1129–30 (C.D. Cal. 2005) (defendant received a Form 483 followed by a warning letter identifying cGMP violations).

Here, Plaintiffs separately fail to allege that the "observations" identified in the Form 483s were later cited by the FDA as cGMP violations that could jeopardize the review of the ONS-5010 BLA. There are no allegations that there was any follow-up from the FDA following the issuance

---

[9] Plaintiffs argue that this case is more akin to Salzman v. ImmunityBio, Inc., 753 F. Supp. 3d 1050 (S.D. Cal. 2024), than to Checkpoint, the only two cases cited by the Parties involving an issue of whether a defendant knew about Form 483s issued to its third-party manufacturer. But Salzman is not helpful. There, plaintiffs alleged that the defendant learned of Form 483s and other cGMP violations pursuant to a "[q]uality [a]greement" it had with the third-party manufacturers. See id. at 1056–57. They also alleged that the defendants took active steps themselves to try to remediate these violations. See id. at 1057. Those particularized allegations, taken as true, revealed the defendants knew of manufacturing issues but represented otherwise. No comparable allegations are present in the SAC.

11

of the at-issue Form 483s whatsoever. Without such allegations, even if the Defendants did know about the Form 483s, it is unclear whether they represented "material" information about cGMP noncompliance that should have been disclosed. Walmart Inc. Sec. Litig., 151 F.4th at 113.

In short, "[t]he facts alleged do make it possible" that Defendants knew of the at-issue Form 483s at the time they made the statements purportedly representing their manufacturing partners' cGMP compliance. Checkpoint, 2025 WL 1434400, at *27. "But they do not plead more than a possibility of that." Id. Rule 9(b) and the PSLRA demand more than "possible" to state a claim for securities fraud. Because Plaintiffs fail to adequately allege that Defendants knew of the at-issue Form 483s or knew that they represented serious cGMP violations, they have not alleged that the nine cGMP Compliance Statements are false or misleading. Their claims based on these statements are dismissed.

### 3. Comparator Trial Design Statements

Plaintiffs allege that two statements in which Defendants compared Outlook's clinical trials to other FDA approved wet AMD trials are false or misleading because, according to Plaintiffs, Defendants knew NORSE 1 and NORSE 2 were far smaller in size than other approved wet AMD trials. See SAC ¶¶ 135 ("Statement 6"), 137 ("Statement 7"). Here, Plaintiffs fail to adequately allege each statement's falsity.

Again, context is key. See Paxton, 2022 WL 3098236, at *12. Statement 6 says that Outlook designed three studies to obtain approval for ONS-5010. See SAC ¶ 135. It then proceeds to discuss the "results" of the "initial[]" "clinical experience trial," NORSE 1. Id. And it states that the "results" from NORSE 1 were "very similar to what you would see in the literature over the last 14, 15 years pertaining to bevacizumab results." Id. It says nothing about the size of the NORSE 1 trial. It says nothing about the design of the NORSE 1 trial. It only makes a comparison between the "results" of the NORSE 1 trial and other "bevacizumab results." Plaintiffs plead no particularized facts that Defendants misrepresented the results of NORSE 1 or that the results of NORSE 1 were incomparable to other bevacizumab results. Therefore, Plaintiffs fail to plead that Statement 6 is false.

Statement 7 fares no better. In this statement, Trenary said that during one of Outlook's clinical trials it completed "monthly injections," which he then stated was "comparable to what all the other companies did in order to gain FDA approval for their drug." SAC ¶ 137. Like Statement 6, Statement 7 says nothing about the size of Outlook's clinical trials. See id. It instead talks about one particular facet of one trial's design—that it employed monthly injections. See id. And it says that this facet was "comparable" to other companies' trials. Plaintiffs have not alleged particularized facts that Defendants misrepresented the injection rate Outlook employed in its clinical trials or that this was not comparable to other wet AMD trials. Therefore, Plaintiffs fail to plead that Statement 7 is false.

In short, Plaintiffs fail to adequately allege that the two identified Comparator Trial Design Statements are false or misleading. Their claims based on these statements are dismissed.

12

### B. Claims Based on § 20(a)

Section 20(a) of the Securities Exchange Act imposes joint and several liability on any person that "controls" a corporation found liable under the Act. 15 U.S.C. § 78t(a). But it is "premised on an independent violation of the federal securities laws." In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 275–76 (3d Cir. 2005) (quotation marks omitted). If plaintiffs fail to allege a separate violation of the Act, their § 20(a) claim must be dismissed. Id. at 276.

Here, Plaintiffs claims based on § 20(a) are dismissed because they have failed to adequately plead a violation of § 10(b) or Rule 10b-5. See Pfizer, 754 F.3d at 177.

### C. Dismissal With Prejudice

Dismissal with prejudice is warranted if amendment would be futile. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). This "means the complaint, as amended, would fail to state a claim upon which relief could be granted." Hertz, 2017 WL 1536223, at *24 (quotation marks omitted). In the context of securities fraud claims, courts generally "allow plaintiffs to replead claims . . . that fail for lack of particularity." Id.

Here, further amendment for claims based on the FDA Trial Design Statements and the Comparator Trial Design Statements would be futile. Plaintiffs were put "on notice of [the complaint's] factual deficiencies" regarding liability under these statements by the Court's prior motion to dismiss decision. Id.; see also Pignatelli Decl., Ex. 19 at 49:6–11. Instead of addressing the Court's concerns, Plaintiffs either tried to repackage their allegations to fit a square peg in a round hole, or repeated prior arguments already rejected as insufficient. There is no indication a third opportunity to plead any additional "true facts" can make any of these statements say something they don't. Ocugen, 659 F. Supp. 3d at 588. Claims that these statements are false or misleading under either Plaintiffs' FDA Trial Design Statements theory of liability or their Comparator Trial Design Statements theory of liability are therefore dismissed with prejudice.

The Court, however, has recognized that Plaintiffs' new allegations make certain of their claims based on the cGMP Compliance Statements "possible," see supra at 10–12, and they currently fail based on a "lack of particularity," Hertz, 2017 WL 1536223, at *24. Claims based on these statements are therefore dismissed without prejudice. Inching these statements over the necessary pleading threshold may too be an uphill battle. But Plaintiffs will be given one final opportunity to amend their complaint to do so and are on notice that dismissal of these claims following a third meritorious motion to dismiss will be with prejudice.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 61, is **GRANTED**. The SAC is **DISMISSED in part WITH PREJUDICE** and **in part WITHOUT PREJUDICE**.

**SO ORDERED**.

*s/ Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**