UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE OUTLOOK THERAPEUTICS, INC. SECURITIES LITIGATION | Case No. 2:23-cv-21862-MCA-CLW |
| THIS DOCUMENT RELATES TO: ALL FILINGS | **CLASS ACTION** **CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

TABLE OF DEFINITIONS ....................................................................... iv

NATURE OF THE ACTION ...................................................................... 1

JURISDICTION AND VENUE ................................................................ 11

PARTIES .............................................................................................. 12

SUBSTANTIVE ALLEGATIONS ............................................................ 14

    I.      BACKGROUND ............................................................... 14

          A. Age-Related Macular Degeneration Background .............. 14

          B. cGMP Requirement for Biologic Drug Products .............. 17

          C. The Aseptic Manufacturing Processes for Bevacizumab ... 25

          D. Outlook and ONS-5010 ................................................ 38

          E. The FDA's Documented Manufacturing
             Violations at Both Facilities ............................................ 41

          F. Defendants Had Direct, Contemporaneous Knowledge of the
             Manufacturing Violations ............................................... 46

          G. Prior to the Class Period, Defendants Assured Investors That
             They Are Submitting Two, Adequate and Well Controlled
             Phase III Trials .............................................................. 56

          H. FDA's Wet AMD Approval History and Guidance Mandate Two,
             Adequate and Well Controlled Pivotal Phase III Clinical Trials ........ 58

    II.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED
          DURING THE CLASS PERIOD ......................................... 70

    III.    THE TRUTH EMERGES .................................................... 98

IV.    ADDITIONAL ALLEGATIONS OF SCIENTER ................................ 101

V.    POST-CLASS PERIOD ADMISSIONS AND DEVELOPMENTS SUPPORTING SCIENTER ................................................................. 108

VI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................... 112

COUNT I (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS) ................................................................................... 116

COUNT II (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS) ................................. 119

PRAYER FOR RELIEF ..................................................................... 121

DEMAND FOR TRIAL BY JURY ................................................... 122

## TABLE OF DEFINITIONS

| Term or Acronym | Definition |
|---|---|
| **Ajinomoto** | Ajinomoto Bio-Pharma Services |
| **AMD** | Age-Related Macular Degeneration, an eye disease that can blur central vision |
| **Aseptic Guidance** | The FDA published guidance titled "Sterile Drug Products Produced by Aseptic Processing — Current Good Manufacturing Practice" |
| **Bevacizumab** | A biologic drug used off-label to treat wet age-related macular degeneration by blocking the abnormal blood vessel growth beneath the retina that causes vision loss. |
| **Biologics** | A class of large molecule drugs made from living cells or biological sources, rather than synthesized chemically like traditional drugs. |
| **BLA** | Biologics License Application, a formal submission to the FDA requesting approval to market a biologic product in the United States, containing comprehensive data demonstrating the product's safety, efficacy, and manufacturing quality. |
| **CAPAs** | Corrective and Preventive Actions |
| **CDER** | FDA's Center for Drug Evaluation & Research |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **cGMP** | FDA's Current Good Manufacturing Practices Regulations |
| **CHO** | Chinese Hamster Ovary Cell Lines used in the manufacturing of bevacizumab |
| **Class** | All persons and entities that purchased or otherwise acquired Outlook securities between August 3, 2021 and August 29, 2023, both dates inclusive. Excluded from the Class are Defendants herein, the current and former |

iv

| Term or Acronym | Definition |
|---|---|
|  | officers, senior managers, and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. |
| CMC | Chemistry, Manufacturing and Controls |
| CRL | Complete Response Letter |
| CW | Confidential Witness |
| Defendants | Outlook Therapeutics, Inc., Russell C. Trenary III, and Lawrence A. Kenyon |
| European Medicines Agency | The European Union regulatory body responsible for evaluating, supervising, and monitoring the safety and efficacy of medicines for human and veterinary use across European Union member states. |
| Exchange Act | Securities Exchange Act of 1934 |
| FDA | United States Food and Drug Administration |
| FDCA | Federal Food, Drug and Cosmetic Act |
| FEI | FDA Establishment Identifier |
| FujiFilm | FUJIFILM Diosynth Biotechnologies |
| Genentech | Genentech, Inc. |
| Kenyon | Lawrence A. Kenyon |
| NASDAQ | Nasdaq Stock Market |
| NOA | Notice of Availability |
| Outlook / the Company | Outlook Therapeutics, Inc. f/k/a Oncobiologics, Inc. |
| ONS-5010 | Outlook's sole drug candidate: an ophthalmic formulation of the monoclonal antibody bevacizumab for treating wet age-related macular degeneration. |
| PAL | Post-Application Action Letter |

| Term or Acronym | Definition |
|---|---|
| **PDUFA** | Prescription Drug User Fee Act |
| **PHSA** | Public Health Services Act |
| **Plaintiffs** | Lead Plaintiff Jason Solomon and Additional Plaintiffs Ramzy Alsaidi, Michael Lucas, and Mariam Silverman, Trustee for the Mariam Silverman Trust UA Mar. 15, 1969 |
| **Quality Agreement Guidance** | The FDA published guidance titled "Contract Manufacturing Arrangements for Drugs: Quality Agreements Guidance for Industry" |
| **SEC** | United States Securities and Exchange Commission |
| **Sponsor** | The entity or person who initiates the study and has ultimate authority, control, and responsibility over it. |
| **Trenary** | Defendant C. Russell Trenary III |
| **U.S.** | United States |
| **VEGF** | Vascular endothelial growth factor protein, which causes abnormal blood vessels to grow in the wrong place in the back of the eye. |
| **wet AMD** | Wet Age-Related Macular Degeneration (or advanced neovascular AMD) is a less common type of late stage AMD that usually causes faster vision loss. |

Lead Plaintiff Jason Solomon and Additional Plaintiffs Ramzy Alsaidi, Michael Lucas, and Mariam Silverman, Trustee for the Mariam Silverman Trust UA Mar. 15, 1969 (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Outlook Therapeutics, Inc. f/k/a Oncobiologics, Inc. ("Outlook" or the "Company"), analysts' reports and advisories about the Company, interviews with knowledgeable individuals, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>[1]

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Outlook securities

---

[1] Unless otherwise noted, all emphasis is supplied. Plaintiffs acknowledge that the Court's December 23, 2025 Order dismissed with prejudice certain categories of

between August 3, 2021 and August 29, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants herein, the current and former officers, senior managers, and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

2.      Outlook is a small, clinical-stage biopharmaceutical company with just seventeen full-time employees whose entire commercial future depends on a single drug candidate: ONS-5010, an ophthalmic formulation of the monoclonal antibody bevacizumab for treating wet age-related macular degeneration ("wet AMD"). ONS-5010 is an intravitreal injection, meaning that it is injected directly into the vitreous humor—the gel-filled cavity in the back of the eye.

3.      Bevacizumab has been approved for non-ophthalmic use for more than two decades, and compounding pharmacies often compounded the non-ophthalmic

---

alleged misstatements and omissions. Plaintiffs replead such allegations solely to preserve appellate rights with respect to those claims. Allegations pertaining to the dismissed claims are denoted with a double asterisk (**). Allegations pertaining both to claims dismissed with prejudice and to those dismissed with leave to replead have not been so designated; however, with respect to such allegations Plaintiffs intend to only pursue them in the District Court with respect to claims dismissed with leave to replead.

versions for off-label ophthalmic injections. However, such compounding brought considerable safety risks, including infections that caused blindness. If the United States Food and Drug Administration ("FDA") approved ONS-5010, Outlook would be the only company in the United States authorized to sell bevacizumab for the treatment of wet AMD, and federal law would restrict compounding pharmacies from manufacturing competing versions.

4.    Because ONS-5010 is a biologic derived from a monoclonal antibody, Outlook was required to submit a Biologics License Application ("BLA") to the FDA to obtain marketing approval. Approval of a BLA requires, in addition to proof of safety and efficacy, that a sponsor prove that its manufacturing facilities can consistently produce the drug in compliance with the FDA's stringent current Good Manufacturing Practices regulations ("cGMP"). If the manufacturing facilities are not cGMP-compliant, the FDA will not approve the BLA. The FDA has recognized these heightened requirements in statute, regulation, and guidance. There is no exception or workaround.

5.    For ONS-5010, manufacturing compliance was the single most critical and complex element of the entire BLA. ONS-5010 is a recombinant humanized monoclonal antibody produced using Chinese hamster ovary cell lines through a multi-step biological manufacturing process that involves cell culture in large bioreactors, followed by four sequential purification steps to remove host cell

proteins, residual DNA, endotoxins, and protein aggregates.  Because bevacizumab is injected directly into the vitreous cavity of the eye (a confined, immunologically sensitive space), the purity requirements are far more stringent than for any systemically administered biologic.  Even trace impurities that would be clinically insignificant in an intravenous drip (IV) product can provoke severe inflammatory reactions, including sterile endophthalmitis and irreversible vision loss.

6.    Here, the complexity in Chemistry, Manufacturing and Controls ("CMC") was not confined to the bulk drug substance.  Once manufactured, bevacizumab must undergo aseptic fill-finish, a process the FDA and the pharmaceutical industry recognize as one of the most challenging operations in drug production.  Unlike terminally sterilized products, biologics like bevacizumab cannot be subjected to heat or radiation in their final containers because such methods would destroy the protein's therapeutic activity and compromise potency.  There is no post-fill sterilization safety net.  Any contaminant that enters the vial during the filling process remains in the final product that will be injected into a patient's eye.  For this reason, the FDA's cGMP regulations impose exacting requirements on every aspect of the aseptic manufacturing process: environmental monitoring, contamination controls, equipment validation, personnel training, and quality systems.  A failure at any single point in this chain can render the final product unsafe.

7.     Defendants understood all of this.  They said so repeatedly.  Throughout the Class Period, Defendant Trenary, Outlook's CEO, told investors that the strict cGMP standards for ophthalmic products were what differentiated ONS-5010 from the compounded bevacizumab already being used off-label: "to get FDA approval in ophthalmology for a drug that's going to be injected in someone's eye, there are standards that have to be met. These standards relate to sterility, to pH, to osmolarity potency, and all of these requirements are things that we just have to meet all of those in order to get an FDA approval."  Trenary admitted the consequence of failure with equal clarity: if Outlook could not meet those requirements, it "won't get approval to begin with."

8.     But Defendants knew that their manufacturers were not meeting those requirements and they concealed that fact from investors for more than two years. Outlook outsourced all manufacturing of ONS-5010 to two contract manufacturers: FUJIFILM Diosynth Biotechnologies ("FujiFilm") for the bulk drug substance, and Ajinomoto Bio-Pharma Services ("Ajinomoto") for aseptic fill-finish.  Both of these facilities were inspected by the FDA and both were cited for serious cGMP violations—not once, but repeatedly—at the very same facilities designated for ONS-5010 production, before the Class Period began, during it, and even after it ended.  The manufacturing compliance of these two facilities was the single most critical variable in whether the BLA would be approved.

9.     Both facilities failed.  As early as 2021, the FDA inspected both facilities and issued Form 483s to each, documenting numerous cGMP violations. Ajinomoto received a Form 483 in June 2021 citing deficient contamination controls, inadequate equipment cleaning, and incomplete laboratory testing specifications.  FujiFilm received a Form 483 in August 2021 citing nine observations, including failure to prevent cross-contamination, inadequate batch contamination investigation, and missing training records.  Nearly two years later, in January and February 2023, the FDA inspected Ajinomoto again and issued two more Form 483s, citing the same categories of failures—including deficient contamination controls, inadequate environmental monitoring, and failures to follow quality control procedures—demonstrating either that the 2021 violations had never been meaningfully remediated or there was a history and pattern of serious cGMP violations.  In June 2023, FujiFilm received another Form 483 with eight additional observations, including inadequate quality systems, unvalidated analytical methods, and deficient environmental monitoring—again, substantially the same deficiencies as in 2021.  These were not minor paperwork deficiencies.  They went to the core of whether these facilities could produce a sterile biologic drug product safe for injection into the human eye.

10.     Defendants had direct, firsthand knowledge of every Form 483 and every manufacturing deficiency. Confidential witnesses who worked at both

Ajinomoto and FujiFilm confirm that: (i) Outlook's representatives, including Senior Vice President of Technical Operations Chris Yonan and Director of Drug Product Operations Edwin Chan, were physically present on-site at both facilities during the FDA inspections; (ii) both manufacturers provided Outlook with copies of each Form 483 contemporaneously upon receipt from the FDA, typically within a day of the inspection's conclusion; (iii) both manufacturers shared their corrective action responses with Outlook before submitting them to the FDA; (iv) FujiFilm maintained a remediation tracker that was shared in weekly meetings with Outlook, and that tracker showed that the violations cited in the June 2023 Form 483 could not be remediated before the August 29, 2023 PDUFA date; (v) Ajinomoto received a Post-Application Action Letter in June 2023 from the FDA notifying it that the violations noted in the Form 483 remained open and that additional inspections were needed, and the violations were not cleared until January 2024; (vi) Defendants had access to an FDA database tracking whether Form 483 observations remained open or closed; and (vii) quality agreements between Outlook and both manufacturers contractually required this information flow, specifying by name the Outlook personnel designated to receive all FDA communications.

11.    Despite this direct, contemporaneous knowledge of cGMP failures at both manufacturing facilities, Defendants hid the known problems from investors. Throughout the Class Period, Defendants falsely assured investors that their

manufacturing partners had "great capability to not only run a clean shop but be in a position to do what needs to be done to get through FDA inspections in really good shape"; that their "CMC capabilities" were "outstanding"; that Defendants had conducted "mock inspections" at both facilities and "felt all along like both of those companies had great capability"; that the Company had "checked those boxes" for cGMP compliance; and that they had "provided all necessary information in both clinical as well as CMC in order to earn approval." None of this was true. The facilities had not passed their FDA inspections. The violations had not been remediated. And the BLA could not be approved until they were.

12.    The consequences of the concealed risks emerged in stages. On May 31, 2022, Outlook disclosed that the FDA had requested "additional required information" and announced it was voluntarily withdrawing the ONS-5010 BLA— a forced response to manufacturing compliance failures that Defendants had known about since at least 2021 but had never disclosed.

13.    As a result, the Company's stock price declined by nearly 6.96% from its previous day closing price of $1.15 on May 31, 2022 to close at $1.07 on June 1, 2022, on heavy trading volume.[2] On August 30, 2022, Outlook resubmitted the BLA, assuring investors with the promise that it had provided the "additional

---

[2] On March 14, 2024, after the Class Period, Outlook underwent a one-for twenty reverse stock split of its common stock. All Outlook stock prices referenced herein are presented on a non-adjusted basis.

required information that was not included in our March 2022 BLA submission." Yet even after the withdrawal, Defendants continued to assure investors that manufacturing was on track, that cGMP had been met, and that both manufacturers' capabilities were sound.

14.    This too was revealed as untrue on August 30, 2023, when Outlook announced that the FDA had issued a Complete Response Letter ("CRL") declining to approve the ONS-5010 BLA.  Two of the three identified grounds for denial, "several CMC issues" and "open observations from pre-approval manufacturing inspections," directly related to the unremediated cGMP violations at FujiFilm and Ajinomoto relating to potency and purity that Defendants had known about and concealed throughout the Class Period.  The CRL specifically cited 21 C.F.R. Parts 210 and 211, the very cGMP regulations governing the manufacturing practices that the Form 483s had documented as deficient.  When pressed by an analyst whether the CRL items were new, Defendant Trenary admitted they included "old items," a tacit acknowledgement that Defendants had known about these deficiencies before the CRL was issued and had known that they had not been remediated.

15.    The CRL also explained "the FDA conveyed deficiencies to the representative of the drug substance (DS) manufacturing facility listed in this application following a pre-license inspection of the [FujiFilm College Station, Texas facility]. FDA conveyed deficiencies to the representative of the drug product

manufacturing facility listed in this application following a pre-license inspection of the [Ajinomoto San Diego facility]. Satisfactory resolution of the observations is required before this BLA submission may be approved."

16.    The accounts of several Confidential Witnesses ("CW") at Outlook, Ajinomoto, and FujiFilm corroborate Defendants' knowledge of the issues expressed in the CRL. Specifically: Ajinomoto's violation for lacking "scientifically sound and appropriate standards designed to assure that components and in-process materials conform to appropriate standards of identity, strength, quality and purity"; and (FujiFilm's violation for "lacking critical quality analytical test methods and protocols that had not been appropriately validated or released for use in testing to ensure product quality, potency, identity, and quality" and lacking "scientifically sound and appropriate standards designed to assure that drug substances conformed to appropriate standards of identity, strength, quality, and purity."). CWs confirmed that Defendants were aware of these manufacturing issues that remained open at both manufacturing facilities and would not be remediated by the PDUFA date. Trenary further admitted that the CRL cited "open observations from pre-approval manufacturing inspections".

17.    On this news, Outlook's stock price fell $1.141 per share, or 80.92%, to close at $0.269 per share on August 30, 2023.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Outlook is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23.    Lead Plaintiff Jason Solomon acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  (ECF No. 24-3)

24.    Additional Plaintiff Ramzy Alsaidi acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  (ECF No. 1 at pp 31-33)

25.    Additional Plaintiff Michael Lucas acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  (ECF No. 23-3)

26.    Additional Plaintiff Mariam Silverman, Trustee for the Mariam Silverman Trust UA Mar. 15, 1969, acquired Outlook securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  (ECF No. 23-3)

27.    Defendant Outlook is a Delaware corporation with principal executive offices located at 111 S. Wood Avenue, Unit #100, Iselin, New Jersey 08830. Outlook's common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "OTLK".

28.    Defendant C. Russell Trenary III ("Trenary") served as Outlook's Chief Executive Officer ("CEO") from July 2021 to December 3, 2024.

29.    Defendant Lawrence A. Kenyon ("Kenyon") has served as Outlook's Chief Financial Officer ("CFO") at all relevant times.  Defendant Kenyon served as the Company's CEO, CFO, and President from August 2018 to July 2021, when he led Outlook's shift in business strategy from oncobiology to focus solely on ophthalmology.  Defendant Kenyon currently serves as the Company's CFO, Secretary, and Director.

30.    Outlook's former Chief Operating Officer is deceased and is therefore referenced only by his title.  All statements he made identified herein were made on behalf of the Company within the scope of his employment, and his knowledge is imputed to the Company.

31.    Defendants Trenary and Kenyon are referred to herein collectively as the "Individual Defendants".

32.    The Individual Defendants possessed the power and authority to control the contents of Outlook's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Outlook's SEC filings, press releases, and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Outlook, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts

specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

33.    Outlook and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

## I.    BACKGROUND

### A.    Age-Related Macular Degeneration Background

34.    Age-related macular degeneration ("AMD") is an eye disease that can blur central vision. AMD occurs when aging causes damage to the macula — the part of the eye that controls sharp, straight-ahead vision. The macula is part of the retina — the light-sensitive tissue at the back of the eye.

35.    AMD is a common condition, and it is a leading cause of vision loss for older adults. AMD does not cause complete blindness, but losing the central vision can make it more difficult to see faces, read, drive, or do close-up work like cooking or fixing things around the house.

36.    Most people with AMD have dry AMD (also called atrophic AMD). This is when the macula gets thinner with age. Dry AMD happens in 3 stages: early,

intermediate, and late.  It usually progresses slowly over several years.  There is no treatment for late dry AMD.

37.    Wet AMD (also called advanced neovascular AMD) is a less common type of late AMD that usually causes faster vision loss. Any stage of dry AMD can turn into wet AMD, but wet AMD is always late stage.  It occurs when a protein called vascular endothelial growth factor ("VEGF") makes abnormal blood vessels grow in the wrong place in the back of the eye.

38.    Two treatment options can slow down or stop vision loss from wet AMD: Anti-VEGF injections and photodynamic therapy.

39.    Anti-VEGF injections are the most common treatment doctors prescribe and administer to slow vision loss from wet AMD.  These medicines help stop bleeding and leaking from blood vessels in the back of the eye.  Most patients with wet AMD are prescribed anti-VEGF injections as their only treatment.  An individual anti-VEGF injection is usually effective in treating wet AMD for only a short period of time, so most patients treated with anti-VEGF injections require recurring injections to treat their symptoms.

40.    Anti-VEGF injection therapies are also FDA and European Medicines Agency-approved for the treatment of many forms of cancer.  These medications are frequently prescribed and administered for targeted cancer therapy and are typically combined with other medications.

15

41.     In 2004, the FDA approved Genentech, Inc.'s ("Genentech") Avastin (bevacizumab), for the treatment of metastatic colorectal cancer.  Because Avastin targeted VEGF growth, it was flagged as a potential treatment for wet AMD.  However, the FDA has never approved any formulation of bevacizumab for ophthalmic use.

42.     In June 2006, the FDA approved Genentech's Lucentis (ranibizumab), another anti-VEGF therapy, specifically to treat wet AMD.  The approval was based on two pivotal, Phase III clinical trials, including a total of 1139 patients.

43.     **In October 2006, the National Eye Institute of the National Institutes of Health announced that it would fund a comparative study trial of ranibizumab and bevacizumab to assess the relative efficacy and ocular adversity in treating wet AMD.  In 2008, this study, called the Comparison of Age-Related Macular Degeneration Treatment Trials ("CATT Study"), enrolled approximately 1,200 patients with newly diagnosed wet AMD.  The patients were assigned randomly to different treatment groups, and the data was collected from 2008 to 2009.  The overall conclusions demonstrated no statistical difference between the treatment groups' outcomes after eight years.  The CATT Study also provided guidance to the ophthalmology industry regarding the appropriate size of the clinical trial.

44.     Due in part to the positive results of the CATT Study, bevacizumab became a popular off-label option for the treatment of wet AMD.  Bevacizumab's

use in ophthalmology was "off-label" because it had not been through the rigorous FDA process required for approval to market bevacizumab with an indication to treat ophthalmic pathology, and was not manufactured for that purpose. Instead, it was compounded by pharmacists from non-ocular bevacizumab (Avastin).

45.    Compounded drugs are not FDA-approved and are generally exempt from pre-market drug approval cGMP review. Compounded drugs, while higher risk, fill an important role for patients whose medical needs cannot be met by an FDA-approved drug product.

46.    However, if bevacizumab were to be approved by the FDA for treatment of wet AMD and other ophthalmologic indications, then Sections 503A and 503B of the Federal Food, Drug and Cosmetic Act (the "FDCA") would generally prohibit compounding manufacturers from manufacturing bevacizumab for wet AMD. Outlook, as the drug sponsor, would then be the only entity authorized to market bevacizumab for that indication in the United States. Accordingly, approval had enormous benefits because (a) Outlook would be the only company authorized to sell the drug for the treatment of wet AMD, (b) approval would restrain competition from compounding pharmacies, and (c) Outlook would finally have a drug candidate that would generate revenue.

**B.    cGMP Requirement for Biologic Drug Products**

47.    In the United States, pharmaceutical development and marketing is regulated by the FDA, an agency of the U.S. Department of Health and Human Services.  The modern regulatory regime was enacted in 1962, after Thalidomide, a sleeping pill, caused congenital disabilities in thousands of babies.  In reaction to this tragedy, Congress passed the Kefauver-Harris Amendments to the FDCA, requiring that any company that wanted to market a pharmaceutical product in the United States (in industry parlance, a "sponsor") had to obtain prior approval from the FDA, and that the approval had to be based upon substantial scientific evidence demonstrating that the product was safe and effective for its intended use in humans.

48.    The FDA divides therapeutics into different categories.  Bevacizumab falls into a category known as "biologics," or large molecule drugs, because it is a monoclonal antibody.  Biologics can only be marketed in the United States when the FDA has approved a BLA.

49.    Biologics like bevacizumab are considered "drugs" under the FDCA; thus, they are subject to the requirements of the FDCA. *See* https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequentlyasked-questions-about-therapeutic-biological-products.    As amended, that statute requires the Secretary of the FDA to refuse any drug application if:

(a) "he has insufficient information to determine whether such drug is safe for use under such conditions;"

18

(b) "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof;" or

(c) "the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity."

21 U.S.C. § 355(d)(3)-(5).

50. Biologics are also subject to the provisions of the Public Health Services Act (the "PHSA"). 42 U.S.C. § 262. Because of the complexity of manufacturing and characterizing a biologic, the PHSA emphasizes the importance of appropriate manufacturing control for products. The PHSA provides for a system of controls over all aspects of the manufacturing process. In some cases, manufacturing changes could result in changes to the biological molecule that might not be detected by standard chemical and molecular biology characterization techniques yet could profoundly alter the safety or efficacy profile. Therefore, changes in the manufacturing process, equipment or facilities may require additional clinical studies to demonstrate the product's continued safety, identity, purity and potency.

51. The PHSA requires that a BLA be approved only "on the basis of a demonstration that – (I) "the biological product that is the subject of the application is safe, pure, and potent; and (II) the facility in which the biological product is

manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C).

52. The PHSA clarifies that its requirements are in addition to those enumerated by FDCA and other regulations. 42 U.S.C. § 262(j).

53. Because biologics manufacturing is often substantially more difficult and inconsistent than traditional pharmaceuticals, FDA regulations impose strict requirements that proper manufacturing practices be proved before approval. Specifically, 21 C.F.R. § 601.2(d) provides that BLA approvals require "a determination that the establishment(s) and the product meet applicable requirements to ensure the continued safety, purity, and potency of such products. Applicable requirements for the maintenance of establishments for the manufacture of a product subject to this section shall include but not be limited to the good manufacturing practice requirements." *Id.*

54. The requirement to show good manufacturing practices is well known and repeated throughout FDA regulations governing biologics. For example, FDA regulations clarify that: "A biologics license application shall be approved only upon examination of the product and upon a determination that the product complies with the standards established in the biologics license application and the requirements prescribed in the regulations in this chapter including but not limited to the good

manufacturing practice requirements set forth in parts 210, 211, 600, 606, and 820 of this chapter." 21 C.F.R. § 601.20(a). Defendants acknowledged the same. *See* ¶¶96, 98, 105-08, 197, 199, 201-03, 205, 213-15, 218, 220-21, 227, 235.

55. FDA regulations also require that the biologic be "available for inspection during all phases of manufacture," 21 C.F.R. § 601.20(b)(2) and that "[n]o product shall be licensed if any part of the process of or relating to the manufacture of such product…would impair the assurances of continued safety, purity, and potency as provided by the regulations contained in this chapter," 21 C.F.R. § 601.20(c).

56. Defendants made numerous statements acknowledging the FDA's cGMP requirements regarding the manufacturing of ONS-5010 and specifically that the "manufacturing facilities are subject to continual review and inspections." *See* ¶205.

57. The FDA ensures the quality of drug products by carefully monitoring drug manufacturers' compliance with cGMP regulations. The cGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used to manufacture, process, and pack drug products, including biologic drug products. The regulations ensure that a product is safe for use and has the ingredients and potency it claims to have.

58.    The approval process for new drug marketing applications (including BLAs) includes a review of the manufacturer's compliance with the cGMP.  FDA assessors and investigators determine whether the firm has the necessary facilities, equipment, and ability to manufacture the drug it intends to market.

59.    A sponsor such as Outlook is required to identify on the form for submitting a BLA (FDA Form 356h) each manufacturing facility to be used, so that the FDA can review and inspect those facilities.  The FDA also specifies that those facilities should be identified in a table within module 3 CMC of the BLA, along with the address, contact person, and FDA Establishment Identifier ("FEI") for each facility.  *See, generally,* FDA, Guidance for Industry: Identification of Manufacturing Establishments in Applications Submitted to CDER and CBER, Questions and Answers (October 2019), available at: https://www.fda.gov/media/131911/download.    The FEI and other identifying information allow the FDA to readily pull up historical inspection information for a given facility.

60.    When the FDA inspects a drug manufacturing facility and finds violations in cGMP, the FDA notifies the facility of each observed violation via Form 483.  A Form 483 is used to document violations observed in a specific facility, identified using the FEI number.  A Form 483 is not intended to comprehensively list every minor violation, but rather those that are "significant" and, in the

22

investigator's view, could cause the manufactured drugs to become "adulterated or rendered injurious to health."[3]  At the conclusion of the inspection, the Form 483 is presented to and discussed with the facility's senior management.  *Id.*  Form 483s are relatively rare.  As the FDA notes, "more than 90% of inspections found facilities to have acceptable cGMP compliance."[4]  Form 483s are not published or readily available to investors, but can usually be obtained (at least in redacted form) through the FOIA process or private third-party services that have obtained them through the FOIA process.

61.  If the FDA approves the biologic drug candidate, it will issue an approval letter in writing to the sponsor.  If the FDA finds that the BLA fails to provide the substantial evidence of efficacy and safety required by statute, or has other material shortcomings preventing approval, the FDA will send the sponsor a CRL identifying the reasons why the application was not approved.  A CRL may, but need not always, suggest that the sponsor conduct additional clinical trials.

62.  Prior to July 10, 2025, CRLs were never made public by the FDA when issued and were shielded by regulation thereafter as long as the sponsor was

---

[3]Available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions
[4]Available at https://www.fda.gov/drugs/guidance-compliance-regulatory-information/pharmaceutical-inspections-and-compliance

continuing to pursue the subject drug application.[5]  Accordingly, investors relied on the sponsor companies to provide accurate information regarding CRLs.

63.    On July 10, 2025, the FDA announced that it published more than 200 CRLs for applications submitted to the FDA for drugs or biological products between 2020 and 2024.[6]  However, Outlook's CRL was not contained in the FDA's released CRL database.  The same day, Plaintiffs submitted a FOIA request to the FDA requesting Outlook's CRL.  On January 26, 2026, the FDA responded to the FOIA request and provided Plaintiffs the requested CRL.

64.    On September 4, 2025, the FDA further announced that it would "release future complete response letters [ ] promptly after they are issued to sponsors."  FDA Commissioner Dr. Marty Makary, M.D., M.P.H. stated that "[b]y embracing radical transparency—one of the guiding principles of this administration—we're giving invaluable insights to help speed therapies and cures to market, providing complete context to investors and shareholders, and above all, restoring public trust."[7]

---

[5] The FDA sometimes released CRLs in redacted form years later, after the drug candidate is approved or officially abandoned.
[6] https://www.fda.gov/news-events/press-announcements/fda-embraces-radical-transparency-publishing-complete-response-letters
[7] https://www.fda.gov/news-events/press-announcements/fda-announces-real-time-release-complete-response-letters-posts-previously-unpublished-batch-89

65.    A sponsor may continue to pursue approval of a drug candidate after receiving a CRL by resubmitting its BLA within a year, or longer if that period gets extended.  A BLA resubmission is also called the sponsor's "complete response" to the CRL because it is supposed to respond to all the deficiencies identified in the CRL and the sponsor is supposed to indicate on the cover page of the resubmission that it does so.

### C.    The Aseptic Manufacturing Processes for Bevacizumab

66.    Because bevacizumab and similar anti-VEGF biologics are administered by direct intravitreal injection into the vitreous cavity of the eye, the purity requirements for such products are far more stringent than for systemically administered biologics.  Because the vitreous cavity is immunologically sensitive, even trace levels of impurities that would be clinically insignificant in a systemically administered product can provoke severe inflammatory reactions when injected directly into the eye.

67.    The manufacturing of biologic drug products such as bevacizumab presents unique and heightened challenges beyond those applicable to conventional pharmaceutical manufacturing.  Bevacizumab is a full-length recombinant humanized monoclonal antibody, typically described as a large, complex protein molecule.  It is produced using recombinant DNA technology in Chinese hamster ovary ("CHO") cell lines, which is a complex biological manufacturing process that

inherently carries risks of introducing process-related impurities, including host cell proteins, host cell DNA, endotoxins, and other contaminants.

68.    The process happens in two equally critical steps.    First, the bevacizumab protein must be manufactured in bulk.    Second, the bevacizumab protein must be placed and sealed into a vial while maintaining its potency and purity.

69.    To manufacture a batch of bevacizumab, cells from the CHO cell bank are gradually grown and expanded through a series of progressively larger vessels, from small cultures into mid-size tanks, until enough cells are available to fill a large-scale production bioreactor with a working volume of approximately 12,000 liters (roughly 3,170 gallons).    The cells are grown in a carefully controlled nutrient broth that is free of animal serum, and the process is closely monitored at every stage to ensure consistency.

70.    Once in the large production bioreactor, the CHO cells are fed nutrients and allowed to grow for a prescribed number of days, during which time they continuously secrete bevacizumab protein into the surrounding liquid.    At the end of the production cycle, the cells are separated from the liquid by centrifugation, essentially spinning the mixture at high speed to separate the solid cells from the liquid containing the desired drug protein.    This liquid, now called "harvested cell

culture fluid," contains the bevacizumab along with numerous impurities that must be removed.

71.    The harvested liquid is far from a finished drug product because it also contains unwanted byproducts of the manufacturing process, including residual proteins from the CHO cells called "host cell proteins", fragments of cellular DNA, and other contaminants.  These impurities must be removed.  If left in the final product and injected into a patient's eye, they can trigger severe inflammatory reactions, immune responses, or other serious adverse events.  The purification process is therefore one of the most critical phases of biologic drug manufacturing.

72.    Purification is accomplished through a series of four sequential filtration and chromatography steps, or a process analogous to running the liquid through a series of increasingly fine molecular sieves, each designed to capture and remove specific types of impurities while allowing the bevacizumab protein to pass through.  The first step uses a specialized resin called "Protein A" that acts like a molecular magnet, selectively binding to the bevacizumab and separating it from the vast majority of CHO cell proteins and DNA in a single step.

73.    The next two purification steps use different types of chromatography columns — essentially tubes packed with specially designed beads — to remove progressively smaller and more stubborn impurities, including any remaining host cell proteins, residual antibiotics used during cell culture, leached Protein A from

the first column, and critically, any bevacizumab molecules that have clumped together into aggregates. Protein aggregates are a particularly dangerous impurity in drugs intended for injection into the eye, because they can trigger severe immune and inflammatory reactions. Two separate virus inactivation steps are also performed during purification to ensure the product is free of any viral contamination.

74.    In the final purification step, the bevacizumab solution is concentrated and transferred into its final formulation buffer, with the precise mixture of stabilizers and salts that will keep the protein stable and active, through a process called ultrafiltration/diafiltration. This produces the bulk drug substance, which must then undergo aseptic filling into individual vials under the extraordinarily stringent sterile conditions described above.

75.    At every stage of this multi-step manufacturing process, from cell culture through final purification, in-process testing and quality controls are performed to verify that the product meets pre-established specifications for purity, potency, and safety. A failure or deviation at any single step, whether contamination of the cell culture, incomplete removal of host cell proteins, inadequate virus inactivation, or failure to eliminate protein aggregates, can result in a final drug product that harbors dangerous impurities invisible to the naked eye but capable of causing devastating harm when injected into a patient's eye.

76.    Once the bulk product of bevacizumab is manufactured, it must be fill-finished utilizing an aseptic process designed to uphold the potency and purity of bevacizumab.

77.    In October 2004, the FDA published a guidance regarding the drug products produced by aseptic processing methods, titled Sterile Drug Products Produced by Aseptic Processing — Current Good Manufacturing Practice (the "Aseptic Guidance").[8]  The Aseptic Guidance focuses on the cGMPs in 21 CFR §§210 and 211, the two regulatory sections specifically cited by the August 29, 2023 CRL denying Outlook's BLA.  *See supra* ¶243.

78.    The Aseptic Guidance describes two methods of sterilization, aseptic and terminal.  For products undergoing terminal sterilization, the product is filled and sealed into containers before the containers with the product are sterilized via a heating or irradiation process.

79.    In an aseptic process, the drug product, container, and closure are first subjected to sterilization methods separately, as appropriate, and then brought together.  Because there is no process to sterilize the product in its final container, it is critical that containers be filled and sealed in an extremely high-quality environment.

---

[8] Available at https://www.fda.gov/media/71026/download

80.     Aseptic processing involves more variables than terminal sterilization. Before aseptic assembly into a final product, the individual parts of the final product are generally subjected to various sterilization processes.  For example, glass containers are subjected to dry heat; rubber closures are subjected to moist heat; and liquid dosage forms are subjected to filtration.  Each of these manufacturing processes requires validation and control.  Each process could introduce an error that ultimately could lead to the distribution of a contaminated product.  Any manual or mechanical manipulation of the sterilized drug, components, containers, or closures prior to or during aseptic assembly poses the risk of contamination and thus necessitates careful control.  A terminally sterilized drug product, on the other hand, undergoes final sterilization in a sealed container, thus limiting the possibility of error.

81.     The Aseptic Guidance warns that "[s]terile drug manufacturers should have a keen awareness of the public health implications of distributing a nonsterile product.  Poor CGMP conditions at a manufacturing facility can ultimately pose a life-threatening health risk to a patient."

82.     The Aseptic Guidance sets out a non-exhaustive list of requirements for drug manufacturing facilities adhering to aseptic processing:

21 CFR 211.42(b) states, in part, that "The flow of components, drug product containers, closures, labeling, in-process materials, and drug products through the building or buildings shall be designed to prevent contamination."

21 CFR 211.42(c) states, in part, that "Operations shall be performed within specifically defined areas of adequate size.  There shall be separate or defined areas or such other control systems for the firm's operations as are necessary to prevent contamination or mixups during the course of the following procedures: * * * (10)  Aseptic processing, which includes as appropriate:  (i)  Floors, walls, and ceilings of smooth, hard surfaces that are easily cleanable; (ii) Temperature and humidity controls;  (iii)  An air supply filtered through high-efficiency particulate air filters under positive pressure, regardless of whether flow is laminar or nonlaminar; (iv) A system for monitoring environmental conditions;  (v) A system for cleaning and disinfecting the room and equipment to produce aseptic conditions; (vi) A system for maintaining any equipment used to control the aseptic conditions."

21 CFR 211.46(b) states that "Equipment for adequate control over air pressure, micro-organisms, dust, humidity, and temperature shall be provided when appropriate for the manufacture, processing, packing, or holding of a drug product."

21 CFR 211.46(c) states, in part, that "Air filtration systems, including prefilters and particulate matter air filters, shall be used when appropriate on air supplies to production areas * * *."

21 CFR 211.63 states that "Equipment used in the manufacture, processing, packing, or holding of a drug product shall be of appropriate design, adequate size, and suitably located to facilitate operations for its intended use and for its cleaning and maintenance."

21 CFR 211.65(a) states that "Equipment shall be constructed so that surfaces that contact components, in-process materials, or drug products shall not be reactive, additive, or absorptive so as to alter the safety, identity, strength, quality, or purity of the drug product beyond the official or other established requirements."

21 CFR 211.67(a) states that "Equipment and utensils shall be cleaned, maintained, and sanitized at appropriate intervals to prevent malfunctions or contamination that would alter the safety, identity, strength, quality, or purity of the drug product beyond the official or other established requirements."

21 CFR 211.113(b) states that "Appropriate written procedures, designed to prevent microbiological contamination of drug products purporting to be sterile, shall be established and followed.  Such procedures shall include validation of any sterilization process."

Aseptic Guidance at p. 4.

83.    Unlike small-molecule chemical drugs, bevacizumab cannot be terminally sterilized—that is, it cannot be subjected to heat, radiation, or other sterilization methods in its final container.  Such methods would destroy or denature

31

the delicate protein structures that give the drug its therapeutic activity. Accordingly, achieving and maintaining potency and sterility for bevacizumab depends on effective aseptic manufacturing.

84.    Aseptic filling is recognized throughout the pharmaceutical industry as one of the most challenging operations in all of pharmaceutical production.[9]  Unlike terminally sterilized products, aseptically filled products carry an inherently higher risk because any viable contaminant that enters the container during the filling process will remain in the final product.  There is no subsequent sterilization step to serve as a safety net.

85.    Human operators are a major source of contamination in aseptic manufacturing.  Even with strict gowning protocols, highly trained personnel, and advanced barrier systems, the presence of human operators in or near the filling environment introduces contamination risk that must be continuously managed and monitored.

86.    Beyond microbial contamination, preserving the integrity and potency of the biologic drug product during aseptic filling presents additional, compounding challenges.  Biologic formulations are inherently complex and sensitive.  For

_____

[9] *See* E. Gopinath et al., *Aseptic Processing Risk Management: A Review*, 1 Int'l J. Pharm. Sci. & Rsch. 30 (2010), http://dx.doi.org/10.13040/IJPSR.0975-8232.1(10).30-40 ("Aseptic processing is the most demanding of pharmaceutical manufacturing processes.")

example, high-concentration monoclonal antibody solutions can be extremely viscous, which complicates filling operations.   Pumping a very viscous liquid through fine needles can cause pressure fluctuations, nozzle clogging from drying of protein solution at the needle tip, and inconsistent fill volumes.

87.    Forcing viscous or foaming biologic liquids through small-diameter pathways can also create shear stresses on the protein molecules.  Such mechanical stress may denature the protein and cause it to lose its potency or cause it to aggregate, that is, to clump together into larger particles.  Protein aggregates are a particularly dangerous form of impurity in intravitreal biologic products because they can trigger immunogenic responses, including sterile endophthalmitis (a severe inflammatory reaction inside the eye) and, in the worst cases, occlusive retinal vasculitis that can result in permanent vision loss.

88.    A January 2015 JAMA Ophthalmology[10] study obtained 21 samples of compounded bevacizumab from 11 different pharmacies and found that 17 of the samples (or 81%) had lower protein concentrations than the sample acquired directly from Genentech.   The study highlighted that when working with bevacizumab, it is difficult to maintain both potency and purity.

---

[10] Yannuzzi NA, Klufas MA, Quach L, et al. *Evaluation of Compounded Bevacizumab Prepared for Intravitreal Injection*. JAMA Ophthalmol. 2015;133(1):32–39. doi:10.1001/jamaophthalmol.2014.3591

89.    The choice of filling equipment itself can introduce impurities. Traditional filling pumps may have numerous product-contact parts that can shed particles or interact with the biologic protein.  Siliconized syringes and syringe components can release silicone oil microdroplets into the drug product, which can act as nucleation sites for protein aggregation and have been clinically documented to cause floaters and inflammatory reactions following intravitreal injection. Peristaltic pumps, while gentler on the product, may shed particles from the tubing over time.  Each type of filling technology thus introduces its own set of risks to product purity that must be understood, validated, and controlled.

90.    Failures in aseptic manufacturing can be catastrophic—resulting in batch loss, clinical trial delays, regulatory enforcement actions, product recalls, and most importantly, serious and potentially irreversible harm to patients who receive adulterated product.

91.    Endotoxin contamination is of particular concern in the manufacture of intravitreal biologics.  Endotoxins are lipopolysaccharide molecules derived from the cell walls of gram-negative bacteria, and the eye is extraordinarily sensitive to even minute quantities of these substances.

92.    Process-related impurities from the biologic manufacturing process, including host cell proteins from the CHO cell lines, residual DNA, and other non-human proteins, pose additional risks for intravitreal products.  These impurities can

act as immunogenic stimuli, potentially triggering anti-drug antibody formation and intraocular inflammation. Noninfectious contamination during the biologic recombination process, including residual endotoxins and immunogenic proteins, can cause serious inflammatory complications when the product is injected intravitreally.

93.     Protein aggregation during manufacturing, storage, and handling is another critical concern specific to biologic products like bevacizumab. Aggregated protein particles are recognized as potent immunogens that can break immunological tolerance and trigger inflammatory immune responses. Agitation of the drug product during manufacturing or compounding, including improper shipping and storage conditions or interaction with container surfaces, can all promote protein aggregation.

94.     For all of these reasons, the aseptic manufacturing process for biologic drug products intended for intravitreal administration requires the highest degree of care, vigilance, and compliance with cGMP standards at every stage of the manufacturing process, from upstream cell culture and protein expression, through downstream purification and formulation, to the final aseptic fill-finish operation. Any failure to maintain these standards can result in a product that, while appearing outwardly acceptable, harbors impurities, aggregates, or contaminants capable of causing severe and irreversible harm when injected into the eyes of patients.

95.   In August 2011, the FDA issued a warning about problems with impurities in compounded bevacizumab.  *See* https://www.fiercepharma.com /pharma/fda-alerts-health-care-professionals-of-infection-risk-from-repackaged-avastin-intravitreal.  The following year, a peer-reviewed study documented serious infections.  *See* "An Outbreak of Streptococcus Endophthalmitis after Intravitreal Injection of Bevacizumab," available at https://pmc.ncbi.nlm.nih.gov/articles /PMC3266537/.

96.   As early as September 21, 2020, Defendant Kenyon admitted understanding the critical importance of safety issues that can arise in the manufacturing process for ONS-5010:

**Q – Leland Gershell**
And with the use of Avastin today as a compounded format, maybe just walk us through the steps with regard to how it's provided today to ophthalmologists. Is this has compounded at that pharmacies and that is sent to doctors, and then they use it or to be able acquired. How should we just think about that current landscape?

**A – Lawrence A. Kenyon**
Well, I mean, I think, I think you kind of hit it right there. Leland. I think different physicians use different methods for holiday repackage of Avastin. I'm sure that there are some physicians out there they are doing it themselves. Another alternative is to use a compounding pharmacy and in all of these cases as you can tell, there is no standard way to repackage unapproved to Avastin phase in retinal diseases. So as a result, you're using non-standard syringes, there are not standard hold times. There is no standards for temperatures holding the drug in the syringes, all of that leads to the potential safety issues and some of that has seen quite frequently.

36

**Q – Leland Gershell**
And then speaking of those safety issues. You know since the -- the New England compounding centered kind of fiasco from some years ago is probably just been greater awareness and concern about compounding pharmacy, particularly for a sterile products. Could you just comment kind of on with the trend has been, we've seen greater levels of enforcement actions, any changes with regard to how the FDA has the regulated or enforced compounding pharmacies?

**A – Lawrence A. Kenyon**
Certainly approximately two years ago. Excuse me, talking all day at your conference approximately two years ago, the FDA actually went through an audited majority of the compounding pharmacies, that's created some issues there were a lot of notice sent out by the societies for supply issues particularly is all of these compounding pharmacies, where many of these compounding pharmacies needed to change the way that they were repackaging of Avastin. So this creates quite a disruption, there is quite a cost advantage currently to using unapproved Avastin, albeit with potential safety issues. And that can create quite a ripple effect throughout the physician community.

97.    Likewise, physicians understood that Outlook was not trying to create a new cure or treatment; it was taking a bevacizumab and attempting to provide an approved ophthalmic formulation by manufacturing it in accordance with the stringent FDA requirements for ophthalmic products.  As a key opinion leader explained, "the strength of the ONS-5010 clinical program is that it is structured to provide the retina community with an approved ophthalmic formulation of a drug that we already use, but in a form that offers physicians and our patients all the

safety, efficacy and consistency that FDA approval and cGMP manufacturing provide."[11]

98.    Outlook's Chief Operating Officer likewise stated that Outlook's "goal is to provide the retina community with an approved ophthalmic bevacizumab that avoids the known risks of the unapproved repackaged IV bevacizumab currently supplied by compounding pharmacies."  *Id.*

**D.    Outlook and ONS-5010**

99.    Outlook is a late clinical-stage biopharmaceutical company focusing on developing and commercializing monoclonal antibodies for various ophthalmic indications.  The Company's lead product candidate is ONS-5010, an ophthalmic formulation of the antibody bevacizumab for treating wet AMD and other retina diseases.

100.    Prior to focusing on the ophthalmology market, Outlook was known as Oncobiologics, Inc., and described itself as a clinical-stage biopharmaceutical company focused on identifying, developing, manufacturing, and commercializing complex biosimilar therapeutics to monoclonal antibodies, or mAbs, in the disease areas of immunology and oncology.

---

[11]    Available    at    https://www.biospace.com/virtual-clinical-day-recap-outlook-therapeutics-joined-by-drs-mark-humayun-and-firas-rahhal-to-discuss-need-for-fda-approved-ophthalmic-bevacizumab-and-status-of-ons-5010

101.   On August 2, 2018, Outlook signaled that it would shift away from oncology and focus solely on ophthalmology.   On the same day, the Company announced in a press release that Defendant Kenyon was appointed CEO and President and that he would be an "ideal fit" as the Company moved ONS-5010 "into the clinic."

102.   On December 3, 2018, the Company issued a press release announcing that it formally changed its name to Outlook Therapeutics, Inc.  Defendant Kenyon explained that "the timing of this corporate rebranding effectively signals the significance of the recent strategic shift in the business and the high value opportunity we are pursuing in the anti-VEGF ophthalmic market."

103.   According to CW1, the Vice President of Manufacturing at Outlook from January 2018 to May 2019, the Company attempted to prepare its manufacturing facility in Cranbury, New Jersey for commercial production of ONS-5010 and a pre-approval inspection.   The Company hired CW1 to revive its manufacturing facilities.   Over the next year, CW1 hired new manufacturing managers and employees and recommissioned the equipment.

104.   The results were unsatisfactory.  Accordingly, in 2019, the Company shut down its in-house manufacturing and partnered with a contract development and manufacturing organization to produce ONS-5010.   The Company utilized contract manufacturers to manufacture ONS-5010 for its clinical trials.

105.   On June 3, 2019, the Company announced that it had signed a master

services agreement with FujiFilm for the bulk substance production of ONS-5010.

Defendant Trenary and Outlook claimed to be familiar with FujiFilm's status,

capabilities and history.  Defendant Trenary stated:

> "Our master services agreement with [FujiFilm] secures a world class
> manufacturing facility for the potential commercial launch of ONS-
> 5010. Most importantly, [FujiFilm] has the ability to rapidly scale
> manufacturing of ONS-5010 while maintaining the quality controls that
> meet or exceed regulatory requirements. Identifying a highly-regarded
> manufacturing partner for ONS-5010 is an important part of our
> commercialization strategy and is a required part of the Biologics
> License Application, or BLA, submission in wet AMD."

106.   The same press release touted FujiFilm's manufacturing history:

> [FujiFilm] is focused on combining technical leadership in cell culture,
> microbial fermentation and viral vectors with world class GMP
> manufacturing facilities to advance tomorrow's medicines. For over 25
> years they have been supporting customers with the development and
> manufacture of recombinant proteins, viral vaccines and gene therapies.

107.   On August 14, 2019, the Company issued a press release in which,

Defendant Kenyon endorsed FujiFilm's manufacturing capacity:

> "I am confident that our engagement of FUJIFILM Diosynth
> Biotechnologies as the global producer of ONS-5010 puts us in a
> stronger position for commercialization as we look past the clinical
> development program and towards seeking regulatory approvals."

108.   On September 30, 2020, the Company announced its partnership with

Ajinomoto "to provide product manufacturing in the best-in-class cGMP global

manufacturing facilities" for aseptic fill finish.  The Company further added that it

had "completed technology transfer and scale-up consistent with global cGMP standards with both Fuji and [Ajinomoto]."

**E.    The FDA's Documented Manufacturing Violations at Both Facilities**

109.  On June 10, 2021, while under contract with Outlook, Ajinomoto received a Form 483 from the FDA, after inspections of its San Diego, California facility from May 5, 2021 to May 25, 2021.  A true and correct copy of this Form 483, which was made available to Defendants, is attached hereto as **Exhibit 1**.  The Form 483 identified three observations of cGMP violations:

(a)       The separate or defined areas and control systems necessary to prevent contamination or mix-ups were deficient.

(b)       Equipment and utensils were not cleaned and sanitized at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality, or purity of the drug product.

(c)       Written specifications for laboratory controls did not include a description of the testing procedures used.

110.  On August 31, 2021, while under contract with Outlook, FujiFilm received a Form 483 from the FDA, after inspections of its College Station, Texas facility from August 23, 2021 to August 31, 2021.  A true and correct copy of this Form 483, which was made available to Defendants, is attached hereto as **Exhibit 2**. The Form 483 identified nine observations of cGMP violations:

(a)       There were not adequate controls to prevent cross-contamination of other products in its multiproduct facility.

(b)    Failed to adequately investigate batch contamination.

(c)    No quantitative or specific measurements had been taken to determine the equipment used in bulk drug substance manufacturing.

(d)    The facility was not following its contamination control strategy for its products.

(e)    Inadequate data integrity corrective measures.

(f)    No procedures/policies required identity testing of cell banks that have been received from outside sources.

(g)    Inadequate handling of inventory and misuse of facilities.

(h)    Failed to perform routine corrective maintenance to assess whether PM plans need to be changed or determine the need for re-qualification of equipment, utilities, or facilities.

(i)    Missing training records and inadequate training for employees that manufacture bulk substance.

111.    On January 16, 2023, while under contract with Outlook, Ajinomoto received another Form 483 from the FDA after the inspection of its San Diego, California facility from January 11-13, and January 16, 2023. A true and correct copy of the Form 483, which was made available to Defendants, is attached hereto as **Exhibit 3**. The Form 483 identified two observations of cGMP violations:

(a)    The building filling line capping and [redacted] machine was validated using only one batch run and not three. The quality control microbiology laboratory's cGMP material ambient storage room was not qualified for 20-25 degrees Celsius.

(b)    Facility and equipment maintenance were deficient in their ability to support cGMP production activities.

(c)        Written specifications regarding the responsibilities and procedures applicable to the quality control unit were not fully followed.

112.   On February 9, 2023, while under contract with Outlook, Ajinomoto received yet another Form 483 from the FDA after the inspection of its San Diego, California facility from February 2-9, 2023.  A true and correct copy of the Form 483, which was made available to Defendants, is attached hereto as **Exhibit 4**.  The Form 483 identified seven observations of cGMP violations:

(a)    Failed to establish and follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile.

(b)    Quality control unit procedures and responsibilities were not followed.

(c)    Failed to establish an adequate system for monitoring environmental conditions in aseptic processing areas.

(d)        Failed to take adequate measures to minimize or prevent the growth of undesirable microorganisms in your facility.

(e)        Laboratory controls do not include the establishment of scientifically sound and appropriate standards designed to assure that components and in-process materials conform to appropriate standards of identity, strength, quality and purity.

113.   On June 7, 2023, while under contract with Outlook, FujiFilm received another Form 483 from the FDA after inspections of its College Station, Texas facility from May 31, 2023 to June 7, 2023. A true and correct copy of the Form

483, which was made available to Defendants, is attached hereto as **Exhibit 5**. The

Form 483 identified eight observations of cGMP violations:

(a)    The responsibilities and procedures applicable to the quality control unit were not fully followed, specifically that the quality systems in place were inadequate to prevent the use of critical quality analytical test methods and protocols that had not been appropriately validated or released for use in testing to ensure product quality, potency, identity, and quality.

(b)    Control procedures which validate the performance of those manufacturing processes that may be responsible for causing variability of drug substances were inadequate.

(c)    Laboratory controls did not include the establishment of scientifically sound and appropriate standards designed to assure that drug substances conformed to appropriate standards of identity, strength, quality, and purity.

(d)    Failed to thoroughly review and document unexplained discrepancies.

(e)    Manufacturing process areas were deficient regarding the system for monitoring environmental conditions.

(f)    The control systems necessary to prevent contamination or mix-ups were deficient.

(g)    Failed to establish adequate written procedures.

(h)    Failed to exercise appropriate controls over computer or related systems to ensure data generated cannot be deleted.

114.    Despite Defendants' repeated boasting about the strength of their

manufacturing partners and framing lack of compliance as a mere hypothetical

44

problem, both FujiFilm and Ajinomoto were cited for the same recurring, unremediated violations in the 2023 Form 483s as they were in 2021.

115.    The FDA's repeated inspections of Ajinomoto's San Diego facility reveal a persistent pattern of cGMP noncompliance that was never meaningfully remediated throughout the period Ajinomoto manufactured ONS-5010 for Outlook. The June 2021 Form 483 cited deficient contamination controls, inadequate equipment cleaning and sanitization, and incomplete laboratory testing specifications. Nearly two years later, the January 2023 Form 483 identified substantially the same categories of deficiencies—including inadequate facility and equipment maintenance to support cGMP production and failures to follow quality control unit procedures—demonstrating that Ajinomoto had failed to correct the contamination-prevention and quality-control shortcomings first identified in 2021. Just weeks after the January 2023 Ajinomoto Form 483s, the February 2023 Ajinomoto Form 483 cited seven additional cGMP violations that further confirmed the entrenched nature of these failures, including the failure to establish procedures to prevent microbiological contamination of sterile drug products, the failure to adequately monitor environmental conditions in aseptic processing areas, the failure to minimize microbial growth in the facility, and the continued absence of scientifically sound laboratory controls—each of which directly implicated the same core deficiencies in contamination prevention, equipment and facility maintenance,

laboratory controls, and quality control oversight that the FDA had flagged nearly two years earlier.

116.    Similar repeat violations or "old issues" were among those cited in the 2023 Form 483 at the FujiFilm facility.  For example, in both 2021 and 2023, FujiFilm was cited for not having adequate controls to prevent cross-contamination and failure to have written procedures.  *Compare* Exhibit 2 at Observations 1 and 2 *with* Exhibit 5 at Observation 6.  FujiFilm was further cited both times for not having proper policies for identity testing of cell banks received from outside sources, meaning that the bevacizumab CHO cell banks were compromised and would lead to impure bevacizumab protein.  *See* Exhibit 2 at Observation 6; Exhibit 5 at Observation 6.

### F.    Defendants Had Direct, Contemporaneous Knowledge of the Manufacturing Violations

117.    CW2 began working at Ajinomoto's San Diego facility in November 2016 as a Compliance Associate and rose to Senior Compliance Associate II by the time CW2 left in September 2020.  CW2 reported to the San Diego facility's compliance manager, Ryan Koed.

118.    CW2 was involved with audits and inspections of the San Diego facility, including those led by the FDA and drug sponsors.  CW2 confirmed that drug sponsors routinely audited the San Diego facility, and that the facility was subject to 50 to 60 drug sponsor audits per year.

119.   With respect to FDA inspections, CW2 stated that a representative of the drug sponsor, such as Outlook, was on-site during the FDA's multi-day inspection.   At the end of each day, Ajinomoto communicated the summary of that day's activities to the drug sponsor.  If the drug sponsor was not on-site, these details were provided via a telephone call.  Ajinomoto also provided the drug sponsor with a summary at the end of the FDA inspection.

120.   CW2 also confirmed that Ajinomoto provided drug sponsors with notice of the Form 483 issued by the FDA and any response to the Form 483 by Ajinomoto.

121.   CW3 worked at Ajinomoto's San Diego facility as a Quality Control Operations Manager from February 2006 to June 2023.  CW3 interfaced with FDA inspectors regarding quality control processes and with drug sponsors regarding FDA inspections and potential remediations.   According to CW3, the FDA had inspected Ajinomoto's San Diego facility numerous times during CW3's tenure.

122.   CW3 confirmed CW2's account that Ajinomoto provided end-of-day and end-of-inspection updates to the drug sponsor regarding what had occurred with the FDA inspection.  CW3 further confirmed CW2's account that Form 483s and Ajinomoto's response to Form 483s were provided to drug sponsors.

123.   CW4 worked at Ajinomoto from April 2012 to June 2021, first as VP and Head of U.S. Operations and then as SVP and Head of U.S. Operations.  From

June 2021 through May 2023, CW4 served as an advisor to Ajinomoto under contract.  CW4 reported to David Enloe, CEO of Ajinomoto.

124.   CW4 functioned as the site head for Ajinomoto's San Diego facility, where CW4 interacted with the FDA when the agency inspected the company's drug product facility.

125.   CW4 confirmed the accounts of CW2 and CW3, that a representative of the drug sponsor was on-site during the FDA inspection, and that Ajinomoto provided the drug sponsor with the Form 483 shortly after Ajinomoto received the Form 483.

126.   CW4 also confirmed that when Ajinomoto receives a Form 483 from the FDA, it must respond within the required time period with its plan to correct the deficiencies.  Ajinomoto must also provide the FDA with a timeline for correcting the deficiencies.  CW4 noted that Ajinomoto involved the drug sponsor in the process of responding to the Form 483 and provided the sponsor with Ajinomoto's response to the FDA, including the timeline for addressing the deficiencies.

127.   CW4 confirmed that Ajinomoto entered into quality agreements with drug sponsors that set out the manufacturing responsibilities and requirements, and the lines of communication between the two parties.  Specifically, the quality agreement specified which personnel at the drug sponsor were to be contacted and/or informed regarding FDA interactions and communications.

128.    CW5 worked at Ajinomoto from November 2016 to May 2025, when it was acquired by PCI Pharma, where CW5 is currently a Senior Project Manager. CW5 served as project manager for the Outlook account for much of CW5's tenure at Ajinomoto, including 2023, when the FDA conducted the pre-approval inspection for ONS-5010, and the months that followed.

129.    CW5 confirmed that, as part of the Ajinomoto quality assurance team's process, they always forwarded Form 483s to Ajinomoto clients.  CW5 confirmed that CW6, *infra at* ¶133, was the individual who led Ajinomoto's quality team.

130.    CW5 and others at Ajinomoto maintained open communication lines with Outlook throughout their relationship.  CW5 regularly interacted with Chris Yonan, Senior Vice President of Technical Operations at Outlook, Edwin Chan, Director of Drug Product Operations for Outlook, and George Bitar, Vice President and Global Head of Quality at Outlook.  According to Trenary, Yonan "heads up [Outlook's] operations area" … and that he was "guiding [Outlook] through the clinical and through all the CMC opportunities that we have with FDA."

131.    CW5 confirmed that, based on CW5's interactions with Messrs. Yonan, Chan, and Bitar, it appeared that there was no question they were fully aware of the February Form 483 and the status of Ajinomoto's efforts to remediate the violations.

132.    CW5 also confirmed that Defendants had conducted a mock inspection of Ajinomoto's San Diego facility.

133.    CW6 worked at Ajinomoto from August 2021 to May 2025, when the facility was acquired by PCI Pharma. CW6 continued working at PCI Pharma until October 2025.  CW6 began as an Associate Director of Quality Assurance and was promoted multiple times, culminating in CW6's role as the Executive Director of Quality and Compliance in September 2024, which CW6 retained through October 2025.

134.    CW6 oversaw Quality Assurance, Quality Control, and Compliance operations at Ajinomoto's San Diego aseptic fill finish facility.  CW6 interacted with the FDA during pre-approval inspections and communicated information to clients, including Outlook, about FDA inspections.

135.    CW6 was present during the FDA's February 2-9, 2023 pre-approval inspection for Outlook's BLA.  CW6 confirmed that Chris Yonan and Edwin Chan were on site at Ajinomoto's San Diego facility during the February 2023 FDA inspection.

136.    CW6 confirmed that an agreement was in place between Ajinomoto and Outlook that established the pre-designated instructions for how Ajinomoto was required to provide the FDA communications to Outlook, who at Outlook was to receive them, and the timeline for receipt.

137.    CW6 also confirmed that a quality agreement was in place between Ajinomoto and Outlook.  The signatories for Outlook were Yonan, Jennifer Kissner,

then Senior Vice President of Clinical and Regulatory Affairs at Outlook, and Lisa Hinshaw, a contract consultant to Outlook. Trenary confirmed that Kissner "heads up [Outlook's] clinical development area." These individuals were designated as recipients of FDA communications, including Form 483s and any responses by Ajinomoto.

138.   A quality agreement is an agreement between a drug owner (such as the sponsor of a drug candidate) and a manufacturing entity. In November 2016, the FDA issued final guidance entitled "Contract Manufacturing Arrangements for Drugs: Quality Agreements Guidance for Industry," available at https://www.fda.gov/media/86193/download ("Quality Agreement Guidance"). The Quality Agreement Guidance explains that quality agreements are used to document acknowledgment of the regulatory requirement that the owner of a drug "is legally responsible for approving or rejecting drug products manufactured by the contract facility, including for final release" and that its "quality unit's responsibilities and procedures be in writing and …. be followed." *Id.* at 4. It also emphasizes that "quality agreements cannot be used to delegate statutory or regulatory responsibilities to comply with CGMP." *Id.* at 5-6.

139.   CW6 confirmed that Ajinomoto emailed the Form 483 to Yonan and others identified in the quality agreement shortly after Ajinomoto received it from

the FDA.  CW6 confirmed that an email chain from Ajinomoto establishes that it shared the Form 483 with Outlook shortly after receiving it.

140.    According to CW6, Ajinomoto shared its response to the Form 483 with Outlook within days of submitting it to the FDA within the allotted 15-day response period.

141.    CW6 established that Ajinomoto received a Post-Application Action Letter ("PAL") from the FDA sometime in June 2023.  CW6 confirmed that the PAL requested a significant additional amount of information from Ajinomoto and that Ajinomoto submitted a large packet in response to the PAL in late June 2023.  CW6 confirmed that Ajinomoto provided the PAL and Ajinomoto's response to Outlook, indicating that the manufacturing violations identified in the February 2023 Form 483 remained outstanding and were not resolved.

142.    Furthermore, CW6 confirmed that Outlook had access to a database maintained by the FDA that tracked the remediation status of the violations evidenced by the Form 483.  The database indicated that the Form 483 had not yet been closed by the PDUFA date, indicating that the issues identified in the Form 483 persisted.

143.    Critically, CW6 confirmed that the FDA was unable to clear the manufacturing violations based on Ajinomoto's PAL response in late June 2023 and had to perform another follow-up inspection in September 2023.  CW6's account of

the FDA's follow-up inspection is corroborated by the September 20, 2023, Form 483, which documented unremediated violations. *See* Ex. 7 ¶¶266-68.

144.   Finally, CW6 confirmed that the FDA did not close the manufacturing violations until January 2024, that Outlook was fully aware that Ajinomoto was still responding to the FDA regarding the deficiencies cited in the February 2023 Form 483, and that those deficiencies remained ongoing until January 2024.

145.   CW7 worked at FujiFilm's College Station, Texas facility as a Quality Control Chemist from September 2020 to July 2022 and reported to QC Chemistry Supervisor Marianela Rodriguez.

146.   CW7's responsibilities included running diverse types of chemistry tests to ensure the drug product was meeting specifications, including tests for purity, concentration, stability, PH levels, and characterization, such as weight and size of the molecule.

147.   CW7 confirmed that the director of quality, Travis Sadowski, and project managers at FujiFilm informed the drug sponsor of any quality issues and any identified CMC issues with the product, including those from FDA inspections.

148.   CW8 worked at Outlook from February 2018 to September 2019, first as an Upstream Supervisor and then promoted to Associate Director.  CW8 initially reported to CW1, but after Outlook shuttered its in-house manufacturing facility,

CW8 reported to Chris Yonan. CW8 assisted in the tech transfer of instructions to FujiFilm regarding the manufacture of ONS-5010.

149. CW8 reported that FujiFilm communicated manufacturing problems directly to Outlook at its highest levels. Specifically, CW8 said that deficiencies were reported directly to Outlook's Chief Operating Officer. CW8 recalled that FujiFilm had a failed batch while manufacturing Outlook's drug candidate, ONS-5010, and had to run experimental batches to attempt to resolve the process.

150. CW9 worked at FujiFilm from December 2019 to October 2024. CW9 began as Director of Quality Assurance and was subsequently promoted to Senior Director of Quality Assurance in August 2023. CW9's responsibilities included working with drug sponsors on quality requirements for manufacturing their drug substance, assisting with due diligence conducted at the facility before the drug sponsor signed a contract, and interacting with the FDA during the drug sponsor's pre-approval inspections.

151. Part of CW9's job was also to meet with drug sponsors to discuss the FDA's findings at the pre-approval inspections and to keep drug sponsors up-to-date regarding FujiFilm's response and correction of deficiencies cited by the FDA during its inspections.

152. CW9 confirmed that the FDA conducted inspections of FujiFilm's College Station facility in connection with Outlook's ONS-5010 in 2021 and 2023.

*See* Exs. 2, 5.  CW9 was present for both of these inspections.  CW9 further confirmed that an Outlook representative was on site at the College Station facility for all inspections related to ONS-5010.

153.  CW9 stated that the Outlook representatives on site received a daily update during the multi-day FDA inspections from the quality team at FujiFilm, including CW9.

154.  CW9 confirmed that FujiFilm provided both the 2021 and 2023 Form 483s to Outlook upon receipt from the FDA.

155.  A major part of CW9's responsibilities included responding to FDA findings during the inspections and preparing Corrective and Preventive Actions ("CAPAs") for submission to the FDA in response to the Form 483.  CW9 confirmed that FujiFilm was fully transparent with Outlook and provided it with all of FujiFilm's responses to the FDA.

156.  Furthermore, CW9 created a tracker for Outlook to track the status of all violations cited in Forms 483, including the expected remediation dates for each violation.  CW9 led the weekly meeting with Outlook representatives to discuss the tracker and the status of remediation of the Form 483 violations. CW9 stated that there was not enough time to remediate all of the cited violations in the June 2023 Form 483 before the August 29, 2023 PDUFA date.  This information was apparent in the tracker made available to Defendants.

157.    Despite having knowledge of the multiple cGMP violations cited in Form 483s at both of its manufacturing facilities, which could not be remediated in time for the PDUFA date, and that the BLA would not be approved before the remediation of the violations, at no point during the Class Period did Defendants disclose these violations to investors or the dire negative impact it would have on the approval of Outlook's BLA.

G.    **Prior to the Class Period, Defendants Assured Investors That They Are Submitting Two, Adequate and Well Controlled Phase III Trials**

158.    **On November 6, 2018, the Company announced that it had commenced its first clinical study for ONS-5010 outside of the United States, later termed "NORSE 1."  NORSE 1 enrolled only 61 patients in nine sites around Australia.  At no time did the Company reach agreement with the FDA through a SPA or otherwise that such a small, underpowered study would provide proof of efficacy sufficient to support approval.

159.    **On August 14, 2019, the Company issued a press release announcing its financial and operational results for the third quarter ended June 30, 2019.  In that press release, the Company formally announced renaming its two Phase III clinical trials to NORSE 1 and NORSE 2 from ONS-5010-001 and ONS-5010-002, respectively.  That release also described NORSE 1 and 2 as the Company's Phase III clinical trials.

160.    **On August 20, 2019, the Company issued a press release and once again misled investors that "[t]he NORSE 1 study design was confirmed in our April 2018 FDA meeting to be one of our two adequate and well controlled clinical trials required to support approval of ONS-5010 to treat wet AMD."  This was not true. The FDA had not "confirmed" in an April 2018 meeting or at any time that the NORSE 1 study was sufficiently sized to support approval as "one of … two" pivotal trials for ONS-5010, the FDA determined that evidence of efficacy was lacking, and by the fact that the Company's response was to implement a full-scale trial, just as had been used in every approved application for a wet AMD treatment.  *See* ¶¶185, 270-72.  Plaintiffs also base their belief on the fact (a) that the FDA's standard response in situations where asked in the absence of a SPA whether a not-yet-conducted trial supported approval is that the issue will be determined when the application is reviewed, *see* ¶169, and (b) on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶176-84.  To ensure that investors did not learn the truth, Outlook has declined to disclose to investors its actual regulatory communications with the FDA, including the correspondence related to this 2018 meeting.  However, the CRL issued by the FDA on August 29, 2023 confirms "[s]pecifically, [Defendants] proposed in 2018 to conduct two adequate and well controlled (AWC) clinical trials, NORSE 1 and NORSE 2, to establish the effectiveness and safety of the product."

161.    **On June 17, 2020, the Company again misrepresented that the FDA had accepted the size of the NORSE 1 and NORSE 2 trials at the April 2018 End-of-Phase 2 meeting:

> Outlook Therapeutics is currently conducting two registration clinical trials for ONS-5010. At an End-of-Phase 2 meeting in April 2018, the U.S. Food and Drug Administration (FDA) accepted the study design / size for the NORSE 1 and NORSE 2 trials and confirmed that each of them is acceptable and may support a new biologics license application (BLA) under the 351(a) regulatory pathway toward approval for the treatment of wet age-related macular degeneration (wet AMD).

162.    **However, as explained in Paragraph 161 above, the FDA had not actually agreed that the "study design / size for the NORSE 1 and NORSE 2 trials was acceptable" to support approval of a BLA, without additional clinical trials of a scale required by FDA guidance and implemented by every other sponsor that had received approval for a wet AMD treatment, but which Outlook had not conducted.

## H.    FDA's Wet AMD Approval History and Guidance Mandate Two, Adequate and Well Controlled Pivotal Phase III Clinical Trials

163.    **Prior to conducting any clinical research in humans, a sponsor must screen the proposed biologic for toxicity with animal studies, and file an Investigational New Drug ("IND") application with the FDA.  An IND application includes the following information:

> (a)  Animal pharmacology and toxicology studies sufficient to permit an assessment as to whether the product is reasonably safe for initial testing in humans. Any previous experience with the drug in humans (such as use in foreign countries) also must be included.

(b)  <u>Manufacturing information</u> describing the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product. This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.

(c)  <u>Clinical protocols and investigator information</u> including sufficient detail regarding the proposed protocols for clinical studies to assess whether the initial-phase trials will expose human subjects to unnecessary risks.

21 C.F.R. § 312.23. After filing an IND, the sponsor must wait 30 days before commencing human clinical trials.

164. **The sponsor, not the FDA, is responsible for determining the design of clinical trials and the protocols for each trial. If a sponsor wants the FDA to agree to the sufficiency of a particular protocol, the sponsor may request a Special Protocol Assessment ("SPA") pursuant to 21 U.S.C. § 355(b)(5)(C). Under this provision, the FDA and sponsor meet to discuss the sponsor's proposed protocols and reduce any agreements to writings that become part of the administrative record. Such agreements may not be changed except by mutual consent or under exceptional medical or scientific circumstances. *Id*. Outlook did not apply for and did not receive any SPA's in connection with the NORSE 1, NORSE 2, or NORSE 3 clinical trials that would confirm the FDA agreed to accept undersized trials as proof of efficacy for ONS-5010.

165.   **A sponsor generally conducts clinical trials in three phases.  These phases, which are codified in FDA regulations, are as follows:

(a)        Phase I. Phase I studies "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness. ***The total number of subjects and patients included in Phase 1 studies varies with the drug, but is generally in the range of 20 to 80.***"

(b)        Phase II. Phase II studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug." ***Phase II studies are "conducted in a relatively small number of patients, usually involving no more than several hundred subjects."***

(c)        Phase III. Phase III studies are expanded studies "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. ***Phase 3 studies usually include from several hundred to several thousand subjects."***

21 C.F.R. § 312.21.  Phase III clinical trials are also sometimes called "pivotal" clinical trials, referring to their importance to a marketing application.  Such trials are "conducted in a larger and often more diverse target population in order to demonstrate and/or confirm efficacy and to identify and estimate the incidence of common adverse reactions."  *See* Umsched, *et al*., "*Key Concepts of Clinical Trials: A Narrative Review*," available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3272827/.

166.    **For a Phase III clinical trial to be sufficiently powered, it generally needs to include "300 to 3000 subjects; they consequently have the statistical power to establish an adverse event rate of no less than 1 in 100 persons." *Id*.

167.    **When a sponsor believes it has conducted sufficient well-controlled clinical trials and believes that those trials demonstrate substantial evidence of efficacy and safety consistent with the FDCA, the sponsor may prepare and file a BLA with the FDA seeking approval to market the subject drug in a specific dose for the treatment of a specific condition or indication.  The BLA must also specify how the drug will be manufactured, packaged and labeled.  The FDA can only grant approval when presented with scientific evidence meeting the requisite statutory criteria.

168.    **Within sixty (60) days of receiving a BLA, the FDA will accept the BLA for filing if it believes the BLA is sufficiently complete to permit a substantive review of the information contained within the BLA.  The acceptance of a BLA for filing is not a determination of the substantive merits of the BLA, but rather a threshold determination of whether there is enough data to conduct a substantive examination.  If the FDA determines a facial problem preventing a meaningful substantive examination – for example, if the BLA is missing paperwork, fails to include data in the proper format, or suffers from other facial errors that make review

impossible – the FDA may refuse to file the BLA. Otherwise, substantive determinations are reserved for the full application review.

169.  **For example, the drug sponsor for Vabysmo, an FDA-approved wet AMD treatment, as part of its Type B meeting, asked the FDA whether it would agree "that efficacy and safety results from the outlined studies support the submission" of the BLA to which the FDA responded that the studies were "adequate to support the filing of a BLA" but warned that "the adequacy of the study results to support approval is a review issue." U.S. Food & Drug Admin. Type B Meeting Preliminary Meeting Comments (March 29, 2021) at 1-2, Type B Preliminary, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/761235Orig1s000AdminCorres.pdf

170.  The filing of a BLA triggers review deadlines specified in the Prescription Drug User Fee Act ("PDUFA"), enacted in 1992 and reauthorized by amendment every five years thereafter. Under the PDUFA, the FDA is generally required to respond to the BLA within six months. The date by which the FDA must issue its response is frequently referred to as a drug candidate's "PDUFA date."

171.  A BLA accepted for filing is reviewed for substance by the FDA's Center for Drug Evaluation & Research ("CDER") when a biologic drug candidate consists of monoclonal antibodies, such as bevacizumab.

172.    The FDA will, from time to time, release guidance prepared for FDA staff, the regulated industry, and/or the public that describes the FDA's interpretation of, or policy on, a regulatory issue.

173.    FDA's Good Guidance Practices regulation (21 C.F.R. §10.115) governs the development and issuance of guidance documents, and it gives interested persons a number of opportunities to provide input into the guidance development process.

174.    Generally, the FDA solicits public input on guidance prior to implementation.  The Agency posts draft guidance documents on its website and publicizes them by issuing a Notice of Availability ("NOA") of the draft guidance in the *Federal Register*.

175.    Generally, the public has 60 days to provide comments to the FDA on draft guidance.    In some instances, FDA may also hold public meetings or workshops on draft guidance to solicit additional comments or present the draft guidance to an advisory committee for review.  Once the comment period has closed, the Agency reviews and considers the comments it has received, as it prepares the final guidance.

176.    **On December 20, 2019, the FDA published a guidance regarding the demonstration of substantial evidence of effectiveness for biological products, titled Demonstrating Substantial Evidence of Effectiveness for Human Drug and

Biological Products Guidance for Industry (the "2019 Guidance").[12] On the same day, the FDA published an NOA in the *Federal Register*.

177. **The 2019 Guidance states that the "substantial evidence of effectiveness standard in the statute refers to both the quality and the quantity of the evidence." Substantial evidence of effectiveness means:

> evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C.A. § 355.

178. **The 2019 Guidance reiterates that the "standard approach" to generating substantial evidence of effectiveness is through performing two adequate and well-controlled trials. 2019 Guidance at 15. In general, the "FDA requires two adequate and well-controlled trials to establish effectiveness," which "reflects the need for substantiation of experimental results." Adequate and well-controlled, as defined in 21 C.F.R. § 314.126, describes characteristics of an adequate and well-controlled clinical investigation, including choice of control, method of patient assignment to treatment (*e.g.*, randomization), adequate measures to minimize bias

---

[12] Available at https://www.fda.gov/media/133660/download

(*e.g.*, blinding), well-defined and reliable assessment of individuals' response (*i.e.*, efficacy endpoint), and adequate analysis of the clinical investigation's results to assess the effects of the drug (*i.e.*, statistical methods).

179.   **It also explains that "[a] second adequate and well-controlled investigation or confirmatory evidence provides substantiation of experimental results, which is a widely accepted scientific principle.  This approach is intended to minimize the possibility that other influences such as bias and chance findings could result in a false conclusion that a drug is effective when in fact it is not (false positive)."

180.   **The 2019 Guidance explains that statistical considerations support conducting two trials, which must be of sufficient size. "The strength of evidence in each trial contributing to meeting the substantial evidence standard should be assessed by appropriate statistical methods."  Two large trials allow "[t]he uncertainty about the findings from each trial should be sufficiently small and the findings [to] be unlikely to result from chance alone, as demonstrated by a statistically significant result or a high posterior probability of effectiveness."  While there have been exceptions that allowed for drug approval involving only one well-controlled trial, such a trial requires a lower p-value, demonstrating stronger statistical significance than an application with two adequate and well-controlled trials.  2019 Guidance at 16.

181.    **The 2019 Guidance explains the circumstances in which a single trial could be warranted: "[r]eliance on a single large multicenter trial to establish effectiveness should generally be limited to situations in which the trial has demonstrated a clinically meaningful and statistically very persuasive effect on mortality, severe or irreversible morbidity, or prevention of a disease with potentially serious outcome, … *and* confirmation of the result in a second trial would be impracticable or unethical." 2019 Guidance at 9. "Repetition of positive trials showing only symptomatic benefit would generally not present the same ethical concerns." *Id*.    Here, there were no impractical or ethical concerns preventing two adequately sized trials, as demonstrated by the numerous approvals based on two large Phase III studies that preceded Outlook's NORSE 1 and NORSE 2.

182.    **On February 6, 2023, the FDA published a guidance regarding the eligibility criteria, trial design considerations and efficacy endpoints of clinical trials for drug candidates aimed at treating wet AMD, titled *Neovascular Age-Related Macular Degeneration: Developing Drugs for Treatments Guidance for Industry* (the "Wet AMD Guidance").[13]  On the same day, the FDA published an NOA in the *Federal Register*.

---

[13] Available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/neovascular-age-related-macular-degeneration-developing-drugs-treatment

183.   **With regards to efficacy considerations, the Wet AMD Guidance affirmed the 2019 Guidance, recommending that "*safety and efficacy should be demonstrated in at least two adequate and well-controlled, multicenter trials* utilizing different investigative sites," and that a "decrease in the number of administrations of available effective therapies alone is not sufficient for the demonstration of efficacy."

184.   **In order to satisfy the safety requirement, the Wet AMD Guidance recommends:

(a)      *That approximately 400 or more patients using the investigational drug complete treatment* with a concentration of the investigational drug at least as high as proposed for marketing and with a dosing frequency at least as frequent as proposed for marketing.

(b)      Before submission of a marketing application, *the sponsor should ensure that at least 300 patients have completed at least 9 months of follow-up after the initiation of treatment*.

(c)      FDA recommends that at least one concurrently controlled safety trial be conducted for at least 2 years' duration.

185.   **Even before the Wet AMD Guidance was issued, it was well-known throughout the ophthalmic drug industry that the FDA required significant patient populations and at least two adequately sized Phase III trials to establish efficacy for a wet AMD treatment.  Indeed, *every* wet AMD approval involving eye injections has involved at least two Phase III trials consisting of more than 500 patients:

| Wet AMD Treatment | Year of FDA Approval | Number of Patients Enrolled |
|---|---|---|

| Macugen | 2004 | 1190 patients across two pivotal Phase III trials |
| Lucentis | 2006 | 1139 patients across two pivotal Phase III trials |
| Eylea | 2011 | 2457 patients across two pivotal Phase III trials |
| Beovu | 2019 | 1817 patients across two pivotal Phase III trials |
| Vabysmo | 2022 | 1329 patients across two pivotal Phase III trials |

186.    **Each of the above, previously FDA-approved wet AMD approvals, which were referenced by and understood by Defendants, was based on the submission of data from at least two large, well-controlled clinical studies as prescribed in the FDA regulations describing Phase III trials, and reiterated in the FDA's 2019 Guidance and the Wet AMD Guidance.

187.    **What constitutes a large clinical study has remained unchanged since the first wet AMD treatment, Macugen, was approved.    During the FDA's Dermatology and Ophthalmology Advisory Committee Meeting on August 27, 2004, where Deputy Director of the Division of Anti-Inflammatory, Analgesic and Ophthalmologic Drug Products, Dr. Wiley A. Chambers specifically noted that the FDA required at least 300 patients to complete the study and recommended 500 patients in each Phase III trial:

> "That means you need at least 300 patients studied fully through that to be able to determine that. We generally recommend at least 500 patients so that we are not dealing with, "well, I've got 299" or "I've got 298" or "I've got 301." We know in this population, because of the natural age and normal life span, people are not going to necessarily survive

68

through the trial--just not related to the drug but related to other reasons. So, we start out asking for people to do trials of 500 patients or more."

Dermatologic and Ophthalmic Drugs Advisory Committee, Transcript of Review of NDA21-756 (Macugen) (August 27, 2004), at 14-15, https://web.archive.org/web/20170404064152/https://www.fda.gov/ohrms/dockets/ac/04/transcripts/2004-4053T1.htm.

188.    **In the accompanying presentation, the FDA laid out the requirements in plain terms[14]:



189.    **Accordingly, it was known within the ophthalmologic drug industry no later than 2004 that Phase III studies should be sized appropriately with 500 or more subjects, especially where the studied population involves elderly persons who are likely to have adverse health events as a result of age as well as from reactions to a drug or placebo.

190.    **The FDA has likewise emphasized the importance of study size in its review of other wet AMD treatments.  For example, in its review of the BEOVU

---

[14]Available at https://web.archive.org/web/20170404064150/https://www.fda.gov/ohrms/dockets/ac/04/slides/2004-4053S104FDA-Chambers.ppt

BLA, the FDA reiterated the requirement of an adequate patient population and specifically stated that the two Phase III studies with more than 1,800 patients were "adequate and well controlled studies contained in this submission establish the efficacy of BEOVU." U.S. Food and Drug Admin., Summary Review, BLA 761125, at 3 (Sep. 25, 2019), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2019/761125Orig1s000SumR.pdf.

## II.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

191.   **The Class Period begins on August 3, 2021, when the Company issued a press release highlighting the outcome of its NORSE 2 trial. In that press release, Trenary stated:

> "In meeting both the primary and key secondary endpoints in NORSE TWO with highly significant clinically relevant results, we have achieved the requirements agreed upon with the FDA, and when combined with our previously reported clinical trial results, this completes the clinical package necessary for the submission of our BLA."

192.   **The statements identified in Paragraph 191 above were materially false and/or misleading when made because the FDA had never "agreed" that the successful completion of the undersized NORSE 1 and NORSE 2 would be sufficient to support approval of ONS-5010 as the FDA determined that evidence of efficacy was lacking, and by the fact that the Company's response was to implement a full-scale trial, just as had been used in every approved application for a wet AMD

treatment. *See* ¶¶185, 270-72. Plaintiffs also base this belief on the fact that (a) the FDA's standard response in the absence of an SPA is to indicate that the BLA may be filed but that the sufficiency of the trial will be determined when the application is reviewed, *see* ¶169, (b) on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶176-84; and (c) the statements omitted that the FDA required Outlook to prove that its selected contract manufacturers complied with cGMP, which it had not done.

193. The Class Period begins on August 3, 2021, when Outlook hosted a NORSE 2 Top-Line Results Conference Call. Defendant Trenary emphasized to investors the supposed potency and purity of ONS-5010 and suggested the Company was complying with the extensive manufacturing requirements:

> Why do they rely upon this? Part of it is because there are vast requirements associated with, first of all, getting an FDA approval, and secondly, keeping it. ***And there are vast requirements and specifications associated with getting products out of a GMP-approved facility***. When you have products that come out of such a factory, what you are assuring the doctor, the payor, and the patient is that, you're living with to the standards that will ensure that the identity, the strength, the quality, and the purity of that product, which has been studied and manufactured for this condition, which is FDA-approved, that those requirements have been met, so it's a big deal to bring an FDA-approved product to this space.

194. The statements identified in Paragraph 193 above were materially false and/or misleading when made because they omitted that Outlook had not secured

cGMP-compliant manufacturing for ONS-5010, and that the manufacturing facilities with which it was involved were not cGMP-compliant.

195.    **On September 13, 2021, Defendant Trenary attended the HC Wainwright 23rd Annual Global Investment Conference and was questioned about the data from the NORSE 2 trial, to which Trenary responded:

> "Yeah, so this was, the company is engaged in three very important clinical trials in order to gain FDA approval.  This was a plan that was put together between the company and the FDA and, as you know, Doug, the first study and the third study or the so-called NORSE 1 and NORSE 3 had already been completed, showed good safety and efficacy.

196.    **The statements identified in Paragraph 195 above were materially false and/or misleading when made because: (a) using the undersized NORSE 1 and 2 trials, together with the open-label (uncontrolled) NORSE 3 trial, was not "a plan put together with the company and the FDA"; and (b) the FDA had never agreed that the successful completion of those trials would be sufficient to support approval of ONS-5010 as the FDA determined that evidence of efficacy was lacking, and by the fact that the Company's response was to implement a full-scale trial, just as had been used in every approved application for a wet AMD treatment.  *See* ¶¶185, 270-72. Plaintiffs also base this belief on the fact that (a) the FDA's standard response in the absence of an SPA is to indicate that the BLA may be filed but that the sufficiency of the trial will be determined when the application is reviewed, *see* ¶169, (b) on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶176-84; and (c) the

statements omitted that the FDA required Outlook to prove that its selected contract manufacturers complied with cGMP, which it had not done.

197.   During a September 13, 2021 presentation at the HC Wainwright 23rd Annual Global Investment Conference, Defendant Trenary was asked about the need for ONS-5010 when patients could use the compounded version:

**Q – Doug Tsao:**

If bevacizumab is obviously widely used, is there a need for an ophthalmic formulation? And maybe just help everybody understand what are the differences between the products that is already being used and acquired through compounding pharmacies and what you're going to be supplying to the market?

**A – Trenary:**

It's a great question, and I think this has actually, Doug, a little bit of an untold story because ***to get FDA approval in ophthalmology for a drug that's going to be injected in someone's eye, there are standards that have to be met. These standards relate to sterility, to PH, to osmolarity potency, and all of these requirements are things that we just have to meet all of those in order to get an FDA approval in ophthalmology for these conditions***. Bevacizumab for other modalities, that's outside of ophthalmology, don't have to meet a lot of those requirements.

And then on top of that, obviously what the doctor and the patient are going to get from us is going to be a final product, packaged either in a vial with a companion syringe with it, or in a prefilled syringe, sterile, and straight off of our fill lines through packaging to the customer. There's no rehandling, there's no repackaging that's involved. What happens with the bevacizumab drug that comes to the compounding pharmacy, they rehandle that, they're repackaging it, whether there's consistency in hold time, shelf life, if you will, PH, osmolarity. Those are just not requirements for bevacizumab that's used in an IV drip to

treat the oncology conditions and the other modalities that drug is used for. So I think there are two places that we can show differentiation. *One is in the actual drug itself as it comes off of our fill line because we have to meet all these FDA requirements that are not requirements for beva that's used outside of ophthalmology*. And then on top of that, we don't have to worry about our product and the doctor's not going to have to worry about it, and the patient's not going to have to worry about our product being rehandled, repackaged and the things that can happen with that.

And we're not just casting doubt that something could happen. There have been a lot of studies that have been done and examinations of this bevacizumab product that comes out of the compounding pharmacies. There have been JAMA articles, for example, that have been published. These are peer reviewed articles that show that 81% of the samples that they looked at did not have the drug concentration that it should have. FDA has had to deliver warning letters to some of these compounding pharmacies who ran into problems with endophthalmitis and other things that have occurred. And the ASRS has issued communications around syringe adverse events and other things, so it's not just the possibility that something can go wrong, if you're utilizing a drug that doesn't meet all these other stringent requirements.

It's been published that there have been issues associated with that, so we think that we're going to be able to deliver both a differentiated drug, and on top of that, we're in the process with a research group of developing some relatively proprietary delivery systems in the form of a prefilled syringe with special materials that we think is going to be a real winner in the marketplace in terms of minimizing silicon particulates and other things that have been, they've been problematic in some of the products that have come out of the compounding pharmacy. *So differentiation with the drug, differentiation with the delivery system, honest to goodness FDA approval that has to meet all these strict standards, we think that's a winning combination*.

198.  The statements identified in Paragraph 197 above were materially false and/or misleading when made because they omitted that Outlook had not secured cGMP-compliant manufacturing for ONS-5010, that neither Outlook nor the

manufacturing facilities with which it was involved had established the ability to consistently manufacture ONS-5010 with the required "sterility" and "osmolarity potency," and that the manufacturing facilities with which it was involved were not cGMP-compliant.

199.    On September 28, 2021, Cantor Fitzgerald hosted Defendant Trenary at a fireside chat.  Trenary touted his experience and expertise in the ophthalmology field, and specifically:

> "Yeah, so I've been involved in what at the time were four of the ten largest launches in the history of medical devices in ophthalmology. And they ranged from intraocular lens implants to lasers to phacoemulsification equipment.  So it's really, my experience has kind of run the gamut."

200.    Defendant Trenary also specifically admitted understanding the importance of cGMP in the approval of ophthalmology treatments: "*[t]he requirements around osmolarity and drug concentration and pH and all the cGMP standards that we have to live to in ophthalmology*, even the ophthalmologist, they know there's a difference."

201.    Defendant Trenary further acknowledged that Defendants understood the criticality of meeting the strict cGMP requirements for ophthalmology treatments and touted that meeting these extraordinary requirements would set ONS-5010 apart from compounded Avastin:

> We think that we're going to be able to bring a tremendous level of potential enhanced quality, efficacy and safety to this. Because first of

all, the standards that you have to live to get an FDA approval include standards associated with pH, lack of particulates. There are packaging requirements, there are shelf and hold time requirements, there are drug concentration requirements. These are all things that we have to prove that we can do in order to get FDA approval and retain FDA approval. And of course, the product that comes out of our factories is going to be the final finished sterile wrapped product.

The circumstances that we have to live to are different and those standards are different than what Avastin and a drip IV has to live with. So we believe that by having to live to FDA approved standards and not allowing, not having our product go through the repackaging process will allow us to go into that market segment that's 50% of all injections and say, "Hey doctor, we did a real-life FDA studies, got a real-life FDA approval in ophthalmology. This is on label, honest to goodness FDA-approved bevacizumab," and we believe that that's going to take that segment by storm.

202.   Defendant Trenary further fortified that Defendants understood the importance of meeting the cGMP requirements in order to get approval for ONS-5010:

We get it. We understand there's a standard that we have to live to in ophthalmology that you just don't have to before you get into the things that can happen in the compounding process.

203.   Defendant Trenary then specifically told investors that Defendants, with these strict cGMP requirements in mind, were "***going through putting together all of the requirements for the BLA associated with CMC, all of our chemistry and manufacturing and control test methods and test results in order to make those part of the BLA filing***."

204.   The statements identified in Paragraph 203 above were materially false and/or misleading when made because Outlook was not then "putting together all of the requirements for the BLA associated with CMC" because it had not and could not establish that ONS-5010 would be manufactured in compliance with cGMP, since the two manufacturers it selected were not cGMP-compliant.

205.   On December 23, 2021, the Company filed with the SEC a Form 10-K Annual Report, signed by Defendants Trenary and Kenyon.  In that filing, the Company made numerous statements acknowledging the FDA's cGMP requirements regarding the manufacturing of ONS-5010 and specifically that the "manufacturing facilities are subject to continual review and inspections":

> Manufacturers and manufacturing facilities are required to comply with extensive FDA, and comparable foreign regulatory authority, requirements, including ensuring that quality control and manufacturing procedures conform to current Good Manufacturing Practices, or cGMP, regulations.  As such, our current and future manufacturing partners will be subject to continual review and inspections to assess compliance with cGMP and adherence to commitments made in any non-disclosure agreement, BLA or marketing authorization application.

206.   In that same 10-K Annual Report, the Company discussed compliance with the FDA's cGMP requirements at FujiFilm's and Ajinomoto's manufacturing facilities:

**Manufacturing**

***We are working with FujiFilm Diosynth Biotechnologies, or Fuji, and Ajinomoto Bio-pharma Services, or AjiBio, to provide product***

*manufacturing in current Good Manufacturing Practices, or cGMP, manufacturing facilities…*

207.    The statements identified in Paragraph 206 above were materially false and/or misleading when made because they (a) omitted that the Company lacked evidence that the two contract manufacturers it had engaged to manufacture ONS-5010, FujiFilm and Ajinomoto, complied with cGMP; (b) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010. As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

208.    **On January 10, 2022, Defendant Trenary attended a presentation organized by HC Wainwright and, in response to a pointed question about the NORSE trials, assured that the Company had consulted and complied with the FDA's requirements regarding the NORSE trials:

**Q – Doug Tsao**: So why don't we talk about the approval process for Lytenava or your Bevacizumab. You've obviously now reported strong results from your pivotal study.  So how does that position you and where are you in terms of preparation for filing your BLA?

**A – Russ Trenary**: Yeah, so the filing of the BLA is really soon. We're going to be doing that this quarter.  And what the company did was, in consultation with FDA and in communication with FDA, designed a three-study program in order to get approval for our version of bevacizumab.  There was a clinical experience trial that was performed initially that really informed the company of how our product would perform.  And as expected, the results of it were very similar to what you would see in the literature over the last 14, 15 years pertaining to bevacizumab results.

209.   **The statements identified in Paragraph 208 above were materially false and/or misleading when made because they omitted that: (a) although Outlook had met with the FDA, the FDA had not provided Outlook any assurance that the "three-study program" featuring the undersized NORSE 1 and NORSE 2 as pivotal clinical trials was sufficient "to get approval for [their] version of bevacizumab," as demonstrated by the fact that the FDA refused to approve the BLA on the basis of those studies even though they met specified endpoints; and (b) the trials were not remotely similar to the trials "you would see in the literature over the last 14, 15 years pertaining to bevacizumab" in that those trials were appropriately sized and consistent with FDA regulations and guidance, and Outlook's trials were intentionally undersized to reduce time and cost.  Plaintiffs also base their belief on the fact that the FDA's standard response in situations where asked in the absence of an SPA whether a not-yet-conducted trial supported approval is that the issue will

be determined when the application is reviewed, *see* ¶169, and on the FDA's regulations and guidance regarding trial sizing, *see* ¶¶176-84.  To ensure that investors did not learn the truth, Outlook has declined to disclose to investors its actual regulatory communications with the FDA, including the correspondence related to this 2018 meeting, Outlook's voluntary withdrawal of the ONS-5010 BLA, and the CRL identifying Outlook's lack of "substantial evidence."

210.   **At the same event, analyst Doug Tsao asked Defendant Trenary regarding the comparison between the NORSE trials and the CATT Study:

> **Q – Doug Tsao**: And when you look at this data and the strength of it, what do you think, sort of... And clearly I think the results were even better than you sort of might've assumed.  And really the study I think was sort of designed around the effect that you had typically seen from your previous studies with CATT and so forth.  And what do you think might've helped get somewhat incrementally better results versus prior studies that were relying on compounded Avastin?

> **A – Russ Trenary:** Yeah. So I think there's probably a couple of things.  I mean, in all fairness, part of this would be associated with trial design, right?  So when we performed the study, the bevacizumab arm, we did monthly injections of bevacizumab, which is comparable to what all the other companies did in order to gain FDA approval for their drug.  So we needed to do that.  Having said that, getting almost 43% of the patients with three-line gainers was, by any measure, fantastic.

211.   **The statements identified in Paragraph 210 above were materially false and/or misleading when made because the NORSE 1-3 trials were not "comparable to what all the other companies did in order to gain FDA approval for their drug" or to the CATT study referenced in the analyst question.

212.    Defendant Trenary also explained that the main differentiator between ONS-5010 and its compounded cousin, Avastin, is ONS-5010's ability to meet the strict cGMP standards relating to potency and purity:

> But I think there's something else that we need to consider. And that is, if you look at Avastin, Avastin is approved for certain oncology conditions. It's used primarily in a drip IV configuration. So it's not injected into the body. It's a drip IV. It's certainly not injected in the eye except in these off-label cases. ***And the standards that we have to live to in ophthalmology in order to earn the privilege of being approved by FDA and allowed to be injected into the eye are standards that are different than what the standards are for a drip IV***.
>
> ***So for example, when it comes to sterility, when it comes to stability data, when you look at lack of particulates, when you look at pH levels that we have to prove and achieve, drug potency levels, osmolarity requirements, and endotoxin levels, and all the other CGMP requirements for FDA-approved ophthalmic formulations that are injected in the eye, these are all standards that we have to meet that you just don't have to for something that's used in a drip IV***.
>
> ***
>
> When a compounding pharmacy gets a load of Avastin and then aliquots that into smaller containers into vials or syringes, how long does that product sit around and how is it stored? And what is the stability of the drug in those containers? We have to prove all of that before it ever comes... Once it comes off of our sterile fill line operation, we've already provided FDA data on and requirements around what the shelf life is for having those products sitting in inventory before they're actually used and things like that. So those are some... And this really gets back to the standards that I was talking about, ***the standards that a pharmaceutical manufacturer has to live to go way above and beyond what's being provided in the marketplace today as it pertains to off-label Avastin that's being used***.
>
> Compounding pharmacies are not drug manufacturers. And they're not manufacturing this product, but they're repackaging it. ***And then in***

*addition to that, there have been complaints in the past around particulates emanating out of these off-the-shelf syringes and needles that the compounding pharmacies use. So our packaging goes through an FDA approval process. And it's specific to our products, specific to this condition and for these doctors. So there's a lot of differentiation.*

213.    Defendant Trenary admitted that if Defendants could not meet these stringent requirements, then Outlook "*won't get approval to begin with*."

214.    The statements identified in Paragraph 212 above were materially false and/or misleading when made because they omitted that Outlook had not secured cGMP-compliant manufacturing for ONS-5010, and that the manufacturing facilities with which it was involved were not cGMP-compliant.  As a result, it had no way to establish that its product too would not suffer from impurities or potency problems, and the "differentiation" claimed from compounded bevacizumab was non-existent.

215.    Furthermore, at the January 25, 2022 Virtual Investor Conference, Defendant Trenary again confirmed that cGMP compliance was critical for approval of the BLA, and specifically regarding the required potency and purity levels, and touted FujiFilm's and Ajinomoto's ability to meet the FDA's cGMP requirements:

I talked at the beginning about the fact that we're actually differentiating our product, and we are. FDA will be reviewing our stability that supports our shelf life. *They'll be looking at the particulate amount in our drug solution. They'll be looking at our pH levels, the drug potency, our osmolarity specifications, our endotox levels, and all the other things that go into being a cGMP approved ... Having those cGMP approved facilities, processes, and products*.

82

Everything in green, we have to check those boxes. ***We did check those boxes in order to use the drug solution that was injected during the clinical trials. We think we bring a level, of pristine level, of safety and efficacy partially associated to meeting the requirements that FDA makes you meet in ophthalmology***.

216.   In connection with Outlook's presentation at this investor conference, Defendant Trenary used a slide portraying differences between compounded bevacizumab and (in green) the CMC items for which Outlook "check[ed] those boxes" in order to obtain FDA approval for ONS-5010, including cGMP:

| Ophthalmic Solution Requirement | Off-Label Compounded Repackaged IV Solution | FDA Approved Ophthalmic Solution for Intravitreal Injection |
|---|---|---|
| Sterile USP <71>[1] | ? | Yes |
| FDA approved ophthalmic package consistent with USP <771>[1] | No | Yes |
| FDA reviewed stability data supporting shelf life[1,3] | No | Yes |
| Particulates per USP <789> for ophthalmic solutions[1] | ? | Yes |
| pH FDA approved and consistent with USP <771>[1,2,3] | No | Yes |
| Potency FDA approved specifications for shelf life[2,3] | No | Yes |
| Osmolarity specification for ophthalmic solution[2,3] | No | Yes |
| Bacterial endotoxins USP <85>[1] | ? | Yes |
| GMP[2,3] | ? | Yes |

217.   The statements identified in Paragraphs 215 and 216 above were materially false and/or misleading when made because: (a) the Company had not met cGMP requirements "in order to use the drug solution that was injected during the clinical trials"; (b) the statements omitted that the Company lacked evidence that its selected manufacturers complied with cGMP; and (c) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP

83

violations at the very facilities designated for manufacture of ONS-5010.   As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

218.   At the same conference, Defendant Trenary further expounded on the dangers of not meeting the FDA's strict requirements for an ophthalmic product that would be injected into a patient's eye, and which would be assuaged because ONS-5010 was purportedly being manufactured to meet those strict standards:

> Well, there's a lot of history around product Bevacizumab, off-label Bevacizumab, that's come out of the compounding pharmacies. There was a JAMA article that talked about the variability in the drug potency, and they indicated in that article, that's a peer-reviewed article, 81% of the samples had lower protein concentrations than what we would be required to have.
>
> ***
>
> FDA has also issued warning letters pointing out there have been unvalidated hold times for the syringes. Remember I said we have to prove our shelf life and stability. Well, these syringes and vials, once they get filled at the compounding pharmacy, how long are they sitting there? They don't have the same requirements that we do for an

ophthalmic indication. FDA has issued warning letters regarding recalls that ... Because of there has been product that's gone out unsterile, it has resulted in endophthalmitis, sometimes blindness, sometimes even enucleation.

One of the ophthalmologists on our board of directors who's in Germany, just in the fairly recent past, had six patients show up in his clinic who ... Treated by doctors in another country with compounded pharmacy product. They were all blind. These are not the things that could happen, these are the things that have happened and continue to happen.

***Now, aside from the fact that we want doctors to feel compelled to use our product because of the level of safety and efficacy, and our clinical data and the quality standards that we have to meet in ophthalmology, we want them to want to use it, but there's something ... There's another dynamic that compounding pharmacies are going to have to deal with, and that is this.***

219.   The statements identified in Paragraph 218 above were materially false and/or misleading when made because they omitted that Outlook had not secured cGMP-compliant manufacturing for ONS-5010, and that the manufacturing facilities with which it was involved were not cGMP-compliant.   As a result, Outlook was not equipped to meet "the quality standards that we have to meet in ophthalmology."

220.   On February 18, 2022, Trenary participated in the 11th Annual SVB Leerink Global Healthcare Conference.   Trenary again confirmed that Defendants understood the critical importance of meeting cGMP requirements and that both of Outlook's manufacturers were required to meet these requirements for ONS-5010:

There was a JAMA article that was published within the last few years that did a study and they looked at samples that had come out of the compounding pharmacies, and what they found was 81% of those samples had lower protein concentrations than what we are required to put out as an FDA approval in ophthalmology. So that puts in the doctor's mind a question around dosing. Are they providing a placebo or are they providing enough drug concentration to get the kind of efficacy that they're looking for?

JAMA is a peer reviewed article, so this is a real life study and this is not good news coming out of that situation. In addition to that, FDA's had to issue warning letters repeatedly, and the reasons for those warning letters have ranged from pointing out that there's not validation going on in the hold times for these syringes in a lot of these compounding pharmacies, and some patients have lost eyesight due to infections, and ophthalmitis is a culprit here. When you repackage and rehandle Bevacizumab in these compounding pharmacies, endophthalmitis can be one of the eventualities that can cause blindness or even a nucleation of the eye. In addition to that, there have been recalls associated with just the general unsterile practices that have occurred in compounding pharmacies. In addition to that, ASRS has also issued warnings in the past, talking about the variability and repackaging and some of the issues that have occurred coming out of the compounding pharmacies and silicone oil droplets due to some of the packaging components that are off the shelf.

These compounding pharmacies have used silicon oil droplets. When injected in the vitreous cavity can cause visual disturbances and sometimes it takes a procedure to remove those in order to get the patient what they were looking for. So that's not the only problem that's associated with that. Here's the next thing. Once we get an FDA approval in ophthalmology for Bevacizumab, US law states that once a drug or biologic is FDA approved and commercially available, then compounding is no longer authorized. So we think the world tilts when we get our approval. Life is going to change in this industry and half of this market that's being served by compounding pharmacies really are not supposed to be served in the future like they have been in the past according to US law.

221.    During the same conference, Defendant Trenary again acknowledged the importance of meeting the strict cGMP requirements but assured investors that Outlook and its manufacturing partners met those requirements:

> And further to that, the other characteristics of our drug are noteworthy in that FDA requires companies who are going to earn the right to inject something in patient's eyes to meet certain specifications that are not required for a drip IV application.
>
> ***There are requirements for sterility, for packaging, for stability, and your proof of shelf life, lack of particulates, pH levels that have to be met. Potency specifications are required for the actual drug potency itself. Osmolarity specifications exist. Endotoxin levels are requirements, and these are all areas that we met in our drug solution that was used in the clinical trial***, maybe that helped produce the data that we had, but there are also things that are not required or reticent in a drug that is first designed to go into a drip IV and then secondly gets repackaged and rehandle by compounding pharmacies. So we've got a level of differentiation in our Bevacizumab that we are going to be producing and offering.

222.    The statements identified in Paragraph 221 above were materially false and/or misleading when made because: (a) the Company had not met cGMP requirements "in [their] drug solution that was used in the clinical trial"; (b) the statements omitted that the Company lacked evidence that its selected manufacturers complied with cGMP; and (c) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for manufacture of ONS-5010.  As confirmed by CW5,

CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

223.   On May 31, 2022, the Company issued a press release announcing that the FDA requested additional information regarding the Company's ONS-5010 BLA submission:

> Outlook Therapeutics, Inc. (Nasdaq: OTLK), a pre-commercial biopharmaceutical company working to develop and launch the first FDA-approved ophthalmic formulation of bevacizumab for use in retinal indications, today announced that the U.S. Food and Drug Administration (FDA) has requested additional information in order to complete the filing of the Company's Biologics License Application (BLA) for ONS-5010/ LYTENAVA™ (bevacizumab-vikg) for the treatment of wet age-related macular degeneration (wet AMD). Outlook Therapeutics has voluntarily withdrawn its BLA for ONS-5010 and is actively working to respond to the FDA's request. The Company plans to re-submit a revised BLA by September 2022.

224.   On June 14, 2022, the Company issued a press release announcing:

> As previously announced, Outlook Therapeutics submitted its BLA for ONS-5010 to the FDA in March 2022 and subsequently voluntarily withdrew its submission in May 2022 to provide additional information requested by the FDA. Following receipt of further correspondence from the FDA, Outlook Therapeutics has confirmed the additional information necessary to re-submit the BLA for ONS-5010.

225.    On August 30, 2022, the Company issued a press release reporting that it had resubmitted its ONS-5010 BLA to the FDA.  In that press release, Defendant Trenary stated:

> Over the past three months*, we have worked diligently to provide the additional required information that was not included in our March 2022 BLA submission, to address requests from the Agency to ensure our BLA is complete for acceptance and review.  We believe that this re-submission addresses each of the comments and recommendations from the Agency, and we are confident in the revised BLA application."*

226.    The statements identified in Paragraph 225 above were materially false and/or misleading when made because: (a)  the re-submission did not address "each of the comments and recommendations from the Agency;" (b)  the statements omitted that the Company lacked evidence that its selected manufacturers complied with cGMP; and (c) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010.  As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants

understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

227.   On October 28, 2022, the Company issued another press release and touted its BLA resubmission:

> "We are pleased the FDA has begun its review of our application. ***ONS-5010 is designed and manufactured to be fully compliant with the FDA's criteria for ophthalmic intravitreal biologics*** and we are excited about the prospect of filling the public health need for an FDA-approved ophthalmic formulation of bevacizumab."

228.   The statements identified in Paragraph 227 above were materially false and/or misleading when made because: (a) ONS-5010 was not "manufactured to be fully compliant with the FDA's criteria for ophthalmic intravitreal biologics" because the selected manufacturing facilities were not cGMP compliant; and (b) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010.

229.   **On December 29, 2022, the Company filed a Form 10-K Annual Report with the SEC, signed by Defendants Trenary and Kenyon.  In that filing, the Company made numerous statements acknowledging their knowledge of the other FDA-approved treatments:

> The current FDA approved market leaders for the treatment of wet AMD are VEGF inhibitors, including EYLEA, BEOVU, LUCENTIS,

SUSVIMO and VABYSMO.  Recently, BYOOVIZ was approved and launched which will be followed by CIMERLI, both ranibizumab biosimilars.

\*\*\*

The initial recently approved biosimilar versions of LUCENTIS are also expensive, although they are available at a discount to the reference drug.  Bevacizumab, BYOOVIZ, CIMERLI, EYLEA, BEOVU, LUCENTIS and VABYSMO are all administered via intravitreal injections directly into the eye.  SUSVIMO is an implantable refillable port delivery system that delivers anti-VEGF for 4-6 months, upon which the device is refilled.

230.  \*\*The FDA's public database maintains all documents, correspondence, minutes, and review materials in connection with the BLAs/NDAs submitted for FDA-approved wet AMD drug products Byooviz, Cimerli, Eylea, Beovu, Lucentis and Vabysmo.  These documents detail the study design of each drug product, including the number of Phase III clinical trials and the number of patients in each Phase III trial, and include the FDA's feedback on each respective study design.  Defendants had access to these documents and information within at all relevant times, and held themselves out to investors as having an understanding of the FDA's approach to ophthalmic treatments.

231.  On December 29, 2022, the Company filed a Form 10-K Annual Report with the SEC, signed by Defendants Trenary and Kenyon.  In that filing, the Company further assured that its manufacturing partners, FujiFilm and Ajinomoto, could provide cGMP-compliant manufacturing:

**Manufacturing**

*We are working with FujiFilm Diosynth Biotechnologies, or Fuji, and Ajinomoto Bio-pharma Services, or AjiBio, to provide product manufacturing in current Good Manufacturing Practices, or cGMP, manufacturing facilities*.

232.  The statements identified in Paragraph 231 above were materially false and/or misleading when made because the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010.  As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

233.  In the same filing, the Company included language purportedly disclosing risks regarding its manufacturing partners:

We rely on third parties to manufacture and test ONS-5010, conduct our preclinical and clinical trials and perform other tasks for us*. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or comply with regulatory requirements, we*

*may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be harmed.*

234.   The statements identified in Paragraph 233 above were materially false and/or misleading when made because: (a) the risk that FujiFilm or Ajinomoto would violate the FDA's cGMP regulations was not hypothetical but had already materialized; and (b) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with a Form 483 documenting that each had serious cGMP violations at the very facilities designated for the manufacture of ONS-5010.   As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.   *See* ¶¶128-44, 150-56.

235.   On July 28, 2023, Defendant Trenary attended an event on age-related macular degeneration hosted by Chardan Capital Markets LLC where he once again confirmed that Defendants understood the critical nature of meeting the cGMP requirements, the complicated manufacturing process, the potency and purity issues

with producing the finished product, and touted that Defendants had hired experts to

address these issues:

> First, I think it's important to understand that the bevacizumab that was designed to treat oncology was also designed to go into a drip IV. It was not designed to be injected in a patient's eyes. And FDA has spent a lot of time and study trying to determine what should the requirements be to earn the right to inject a biologic into a patient's eyes. And so they came up with a lot of standards associated with that. One of those was you're only allowed to have X number of particulates in your solution to earn an FDA approval to be injected in somebody's eyes. That number is a fraction of the number of particulates that they allow per their standards to go into a molecule that goes into a drip IV.

> So, if you look at particulate account, if you look at pH levels, FDA wants a certain pH level for use in eyecare. If you look at osmolarity specifications, FDA approved packaging and ophthalmology, endotox levels, shelf life and stability data, all of these are things that we must prove in order to get our biologic into the clinic for clinical trial and then to earn the approval. All of that stuff I just mentioned, the standards are different for oncology, for something that's going to go into a drip IV, than for something that gets injected in somebody's eyes. Then on top of all of that, then you get subjected to the things that happen during the repackaging process. So you start with a molecule that doesn't meet ophthalmic standards. Then you repackage it, and what happens during that process? ***Well, one study showed, there was a group called Dr Yanutsi et al., and Solard Kiss was one of the authors who's an advisor of ours. He's out of Cornell. They did a random sampling of off-label bevacizumab that was going to be used in ophthalmology. They took a random sample from 11 different compounding pharmacies, and they ran a series of tests on them and they compared the results of those tests to the solution that's used in oncology***.

> ***And what they found was in 81% of the samples, the drug protein concentration level was less in the off-label bevacizumab that was about to be injected into a patient's eyes***, compared to the oncology version of Bevacizumab. So what that meant was you started with a product that doesn't meet ophthalmic standards, then you subject it to

the vagaries of the repackaging process. And on the other side of that, in this study, 81% of the samples had insufficient drug protein concentration compared to the control, which was bevacizumab for oncology. So what was happening there?

*Well, we've hired a gentleman who spent a good portion, the last 15 years of his professional life, building one of the leading market share positions of off-label bevacizumab for ophthalmology*. And we hired him. In fact, he called me several quarters ago and said, "Look, I've built this great business. I see what you guys are doing. You're going to provide a pristine level of safety and efficacy potentially that I can't deliver in my compounding pharmacy, but I still want to be part of the Bevacizumab story. I still want to take this great molecule and help get it to the next level." *So we hired him away from that compounding pharmacy, and what he taught us is that when you're drawing the biologic out of the container that was meant for oncology and putting it through a filtering process and back into a small volume syringe or vial that's appropriate for use in retina, there's a shearing of the molecule that occurs and a re-aggregation of that on the other side*.

*And he said, "Aside from lack of temperature control and things like that, this is one of the things that happens during the repackaging process,"* and it's why that study lack of temperature control and the shearing of this molecule are the probable causes of why there was 81% of the samples with less drug in it than in the original bevacizumab container for oncology*. So I think it's really exciting for us to be able to peer into a marketplace where 50% of the injections are being served by a great molecule that's just never been in its ideal format. And so, we're looking forward to earning an FDA approval and earning other regulatory approvals around the world, so that we can get this product into patient's eyes as soon as possible.

236.    At the same event, Defendant Trenary affirmatively stated, "[a]s far as we know *we've provided all necessary information in both clinical as well as CMC in order to earn approval*."

237.    The statements identified in Paragraphs 235 and 236 above were materially false and/or misleading when made because: (a) the Company had not "provided all necessary information in both clinical as well as CMC in order to earn approval"; (b) the statements omitted that they had not provided proof that ONS-5010 would be consistently manufactured with sufficient potency and sterility; (c) the statements omitted that the Company had not provided proof that ONS-5010 would be manufactured in compliance with cGMP; and (d) the statements omitted that both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with multiple and repeated Form 483s documenting that each had serious cGMP violations at the very facilities designated for manufacture of ONS-5010.  As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

238.    In response to a pointed question about the Company's manufacturing partners, Defendant Trenary assured that the Company had worked directly with

FujiFilm and Ajinomoto to ensure their respective compliance with FDA cGMP regulations, including analyzing their CMC capabilities and executing mock FDA inspections:

> **Q – Host**: So in terms of manufacturing, so you're utilizing manufacturing partners to make Lytenava can you comment whether all the necessary FDA inspections have been completed, any other outstanding CMC issues?

> **A – Trenary**: *Yes, so we have not been given the marketplace blow by blow on when FDA's gone in for factory inspections or clinical site inspections or things like that.  But I will say that we think we've got two great factory partners in FujiFilm Diosynth in their location in College Station, Texas, and in Ajinomoto Biopharma with their location in San Diego.  Both are experienced companies in this whole area.  We have found their CMC capabilities to be outstanding.  We did a lot of work with them on mock inspections.  We went through both of their factories several times with our mock inspection teams that we hired and just felt all along like both of those companies had great capability to not only run a clean shop but be in a position to do what needs to be done to get through FDA inspections in really good shape.  So we're confident in those folks and believe that they've got all the capabilities required to get us to the finish line.*

239.    The statements identified in Paragraph 238 above were materially false and/or misleading when made because: (a) Defendants were provided the "marketplace blow by blow on when FDA's gone in for factory inspections or clinical inspections" via multiple Forms 483, each immediately after the FDA had completed the inspection of each manufacturing facility;  (b) the statements omitted that the Company had not provided in its BLA resubmission evidence that its selected manufacturers complied with cGMP; and (c) the statements omitted that

both of the contract manufacturers Outlook hired, while under contract to Outlook, were cited by the FDA with multiple and repeated Form 483s documenting that each had serious and continuing cGMP violations at the very facilities designated for manufacture of ONS-5010.  As confirmed by CW5, CW6, and CW9, (i) Defendants' representatives were present on site during every FDA inspection; (ii) Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; (iii) Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; (iv) Defendants monitored the remediation status of those violations; and (v) Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  *See* ¶¶128-44, 150-56.

## III.    THE TRUTH EMERGES

240.   On May 31, 2022, the Company issued a press release announcing that the FDA requested additional information regarding the Company's ONS-5010 BLA submission.

241.   As a result of this partial disclosure and/or materialization of concealed risks, the Company's stock price declined by nearly 6.96% from its previous day closing price of $1.15 on May 31, 2022, to close at $1.07 on June 1, 2022, on heavy trading volume.

242.   On August 30, 2023, during pre-market hours, Outlook issued a press release announcing that the FDA had issued a CRL to the ONS-5010 BLA and could not approve the ONS-5010 BLA during the present review cycle because of unresolved CMC and manufacturing site inspection issues, as well as "a lack of substantial evidence".  Specifically, that press release stated, in relevant part:

> [T]he U.S. [FDA] has issued a CRL to the Company's BLA for ONS-5010, an investigational ophthalmic formulation of bevacizumab under development to treat wet AMD. While the FDA acknowledged the NORSE TWO pivotal trial met its safety and efficacy endpoints, **the Agency concluded it could not approve the BLA during this review cycle due to several CMC issues, open observations from pre-approval manufacturing inspections, and a lack of substantial evidence**.

> "We continue to believe in the public health need to provide the retina community with an FDA-approved bevacizumab treatment option for wet AMD. We will request a formal meeting as soon as possible with the FDA to further understand the BLA deficiencies and how best to resolve them. Following this meeting with the FDA, the Company will be able to discuss next steps and the expected timing for resolution," said Russell Trenary, President and CEO of Outlook Therapeutics.

243.   The CRL that Outlook received, but did not release to investors, specifically advised the Defendants that Outlook's BLA could not be approved because of three reasons:

a.   The methods to be used in, and the facilities and controls used for, the manufacture, processing, packing, or holding of the drug substance for the drug product are inadequate to preserve its identity, strength, quality, purity, stability, and bioavailability.

b.   The methods to be used in, and the facilities and controls used for, the manufacture, processing, packaging, or holding of the drug substance or the drug product do not comply with current good

manufacturing practice regulations in parts 210 and 211. FDA conveyed deficiencies to the representative of the drug substance (DS) manufacturing facility listed in this application following a pre-license inspection of the [FujiFilm College Station, Texas facility]. FDA conveyed deficiencies to the representative of the drug product manufacturing facility listed in this application following a pre-license inspection of the [Ajinomoto San Diego facility]. Satisfactory resolution of the observations is required before this BLA submission may be approved.

c.  There is a lack of substantial evidence consisting of adequate and well-controlled investigations, as defined in § 314.126, that the drug product will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in its proposed labeling. Specifically, you proposed in 2018 to conduct two adequate and well controlled (AWC) clinical trials, NORSE 1 and NORSE 2, to establish the effectiveness and safety of the product. NORSE 2 met its primary endpoint for effectiveness. NORSE1 failed to meet its primary endpoint for effectiveness and unexpectedly, the results of the primary and secondary endpoints numerically favored ranibizumab. NORSE 2 is not adequate to stand on its own as a single persuasive effectiveness study. You will need to conduct an adequately powered AWC study that successfully demonstrates the effectiveness of bevacizumab-vikg in the treatment of nAMD.

A true and correct copy of this 2023 CRL is attached hereto as **Exhibit 6**.

244.  On this news, Outlook's stock price fell $1.141 per share, or 80.92%, to close at $0.269 per share on August 30, 2023.

245.  As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant damages.

## IV.    ADDITIONAL ALLEGATIONS OF SCIENTER

246.    Several facts demonstrate that Defendants knowingly made false statements or, at a minimum, acted with reckless disregard for the truth or falsity of their Class Period representations to investors.

247.    First, Defendant Trenary admitted that he was familiar with the status and compliance of Ajinomoto and FujiFilm.  He assured investors over the years that he understood the critical importance of complying with the FDA's strict CMC and cGMP requirements for the ophthalmic version of bevacizumab.  ¶¶96, 98, 105-08, 197-203, 205, 213, 215, 218, 220, 221, 227, 235.  He led investors to believe that he worked with Ajinomoto and FujiFilm to ensure compliance with CMC and cGMP and that he went "through putting together all of the requirements for the BLA associated with CMC, all of our chemistry and manufacturing and control test methods and test results" (¶203) and confirmed he was aware of the status of the manufacturing facilities because he affirmatively told investors that "we did check those boxes in order to use the drug solution" in regards to meeting the CMC and cGMP requirements for ONS-5010.  ¶215.  Moreover, he used the term "we" to imply to investors that, along with others, he was personally involved in the mock inspections.  ¶238.

248.    Second, Defendants monitored the remediation status of manufacturing violations at both facilities through a formal tracking system and weekly meetings,

and knew those violations could not be remediated before the PDUFA date. CW9 created a tracker for Outlook to track the status of all violations cited in Forms 483, including the expected remediation dates for each violation. CW9 led the weekly meeting with Outlook representatives to discuss the tracker and the status of remediation of the Form 483 violations. CW9 stated that there was not enough time to remediate all of the cited violations in the June 2023 Form 483 before the August 29, 2023 PDUFA date. This information was apparent in the tracker made available to Defendants.

249. Third, Defendants had access to an FDA database that tracked the remediation status of the violations evidenced by the Form 483. CW6 confirmed that Outlook had access to a database maintained by the FDA that tracked the remediation status of the violations. The database indicated that the Form 483 had not yet been closed by the PDUFA date, indicating that the issues identified in the Form 483 persisted.

250. Fourth, Defendants' own statements to investors also show that they had access to information about the cGMP issues with FujiFilm and Ajinomoto. For example, as alleged in Paragraph 238, Defendant Trenary stated that the Company had worked directly with FujiFilm and Ajinomoto to ensure their respective compliance with FDA cGMP regulations, including analyzing their CMC capabilities and executing mock FDA inspections to gauge each facility's readiness

for an FDA inspection.  During the purported inspections, the Defendants would no doubt have inquired about any Form 483 FujiFilm and Ajinomoto had received.

251.  CW2 confirmed Defendant Trenary's statement in Paragraph 238 because drug sponsors like Outlook conducted audits of Ajinomoto's facility throughout their contractual relationship.  CW2 and CW3 further confirmed that drug sponsors were present for FDA inspections, and Ajinomoto provided daily and end-of-inspection summaries regarding FDA inspections to the drug sponsor.  CW7 confirmed that FujiFilm also provided updates to drug sponsors regarding any issues that impacted the drug sponsor's product.  CW8 confirmed that FujiFilm encountered manufacturing issues and reported them directly to Outlook's highest levels.  Outlook's quality agreements with the manufacturers confirm that the information was passed to Defendants in this manner.  ¶¶127, 137-40.

252.  Fifth, CW5, CW6, and CW9 establish that Defendants' representatives were present on site during every FDA inspection; that Defendants received each Form 483 contemporaneously upon conclusion of the FDA's inspections; Defendants were kept informed of both manufacturers' ongoing exchanges with the FDA regarding violations; Defendants monitored the remediation status of those violations; and Defendants understood that the violations remained unresolved and would materially jeopardize BLA approval before the PDUFA date.  ¶¶128-44, 150-56.

253.   That knowledge is dispositive as two of the three grounds on which the FDA issued the CRL are directly tied to manufacturing violations at Ajinomoto and FujiFilm, and the FDA did not close those violations until January 2024 — five months after the CRL was issued.

254.  For example, the CRL cited both manufacturing facilities as "inadequate to preserve its identity, strength, quality, purity, stability, and bioavailability." Ex. 6; ¶¶112(a)-(e); 109(a), (c); (Ajinomoto's violation for lacking "scientifically sound and appropriate standards designed to assure that components and in-process materials conform to appropriate standards of identity, strength, quality and purity"); and ¶113(a)-(c), (e)-(f) (FujiFilm's violation for "lacking critical quality analytical test methods and protocols that had not been appropriately validated or released for use in testing to ensure product quality, potency, identity, and quality" and lacking "scientifically sound and appropriate standards designed to assure that drug substances conformed to appropriate standards of identity, strength, quality, and purity."). Both CW6 and CW9 confirmed that Defendants were aware of these manufacturing issues that remained open at both manufacturing facilities and would not be remediated by the PDUFA date. ¶¶133-44, 150-56. Trenary further admitted that the CRL cited "**open observations from pre-approval manufacturing inspections**". ¶263.

255.    Defendants thus possessed actual, contemporaneous knowledge of both manufacturers' cGMP compliance status at the very moment they were making contrary representations to investors.    If Defendants did not inquire about Ajinomoto's and FujiFilm's cGMP compliance, then Defendants acted with reckless disregard when they disseminated false representations regarding each manufacturer's ability to comply with cGMP.

256.    Sixth, Defendants held themselves out as knowledgeable regarding the specific cGMP requirements.  *See* ¶197 ("to get FDA approval in ophthalmology for a drug that's going to be injected in someone's eye, there are standards that have to be met … and all of these requirements are things that we just have to meet all of those in order to get an FDA approval); ¶200 ("[t]he requirements around osmolarity and drug concentration and pH and all the cGMP standards that we have to live to in ophthalmology"); ¶213 (if Outlook could not meet those requirements, it "won't get approval to begin with.")

257.    Seventh, CW10 served as Executive Director of Payer Market Access at Outlook from February 2023 to December 2023.  CW10 reported to Alicia Tozier, Outlook's Senior Vice President and Overseer of Market Access.  CW10 interacted regularly with Defendant Trenary.  According to CW10, Defendant Trenary was a very hands-on CEO who regularly interacted with other employees of the Company regarding every facet of the Company.

258. Eighth, Outlook was a small company with only approximately seventeen (17) employees, approximately five (5) of whom were in operations. *See* https://theorg.com/org/outlook-therapeutics/teams/operations-team. The Chief Operating Officer reported directly to Defendant Trenary, and it would be absurd to believe that either Trenary or Kenyon, who each claimed familiarity with manufacturing needs and readiness, were shielded from the Forms 483 and other CMC deficiencies communicated to that team. At the January 25, 2022 Virtual Investor Conference, Trenary emphasized that Defendant Kenyon and the Chief Operating Officer were "great teammates" and confirmed that the Chief Operating Officer shared regulatory communications with Defendant Trenary.

259. Ninth, the temporal proximity between the Form 483 violations in 2023, Trenary's July 28, 2023 statements regarding mock inspections, and the August CRL further corroborates the fraud. Barely a month before the truth was revealed, and after the 2023 Form 483 violations had occurred, Trenary said that Outlook "went through both of their factories several times with our mock inspection teams" and that "both of those companies had great capability to not only run a clean shop [but were] in a position to do what needs to be done to get through FDA inspections in really good shape." ¶238. That Defendant Trenary made these statements after the manufacturing facilities were cited for the violations, but just

before the FDA denied Outlook's application, further enhances the inference of fraud.

260.    Tenth, obtaining approval for ONS-5010 was a core operation and the predominant function of Outlook during the Class Period, as it was a small company without any other late-stage drug candidates.  Additionally, Defendants were active in all aspects of the business.  For these reasons, it would be absurd to assume that Defendants were unaware of the enormous actual problems with cGMP and trial sizing that were misrepresented to investors.

261.  Eleventh, in SEC filings signed by Individual Defendants, the Company repeatedly demonstrated actual knowledge (a) that its manufacturing contractors were required to adhere to cGMP requirements at all times, ¶¶205-06, 231, 233, and (b) the existence of other FDA-approved wet AMD treatments and the size of their two Phase III trials, ¶¶176-85.

262.  **Twelfth, Defendants also had access to information and held themselves out as knowledgeable regarding the number, design, and size of trials required to satisfy the FDA's requirements.  *See* ¶199 (Defendant Trenary touting experience in ophthalmology field); ¶160 ("NORSE 1 study design was confirmed in our April 2018 FDA meeting to be one of our two adequate and well-controlled clinical trials"); ¶208 ("And what the company did was, in consultation with FDA and in communication with FDA… very similar to what you would see in the

literature over the last 14, 15 years"); ¶210 ("which is comparable to what all the other companies did in order to gain FDA approval for their drug").

## V.    POST-CLASS PERIOD ADMISSIONS AND DEVELOPMENTS SUPPORTING SCIENTER

263.    The above is further supported by Defendant Trenary's post-Class Period admission that Defendants were aware of the deficiencies in ONS-5010 BLA submission.  On August 30, 2023, Defendant Trenary was asked about the contents of the CRL:

> **Q – Kristen Kluska**: Hi. Good morning, everybody. Also sorry to hear about to this news. Just wanted to ask on some of these items. *I know that you've had frequent dialogue with them in the past and also withdrew your initial filing to address questions that they have now. First, can you comment if some of the items that were brought up were essentially new, relative to those previous discussions?*

> **A – Russ Trenary**: Yes. Thank you, Kristen. I think as we read through that, *it looked like there were a couple of new things but a couple of clarifications that the FDA was looking for on <u>old items</u>*. And so, I think they're – I think for us, *the good news was it appeared that everything that they had in there required either a clarification, or some additional information from us*, or some new information from us, because it was a question that had never been received before. So a little bit of a mix there. But I think the – our read as we went through the CMC section was we can handle this.

Thus, the Defendants had knowledge of the BLA's deficiencies from at least May 31, 2022, but omitted to disclose them.

264.    **\*\*Defendant Trenary's admission starkly contrasts with his statements regarding confirmations from the FDA that the NORSE 1-3 trials were sufficient to

support approval of the ONS-5010 BLA as set forth in Paragraphs 195, 208, 210, 225.

265.    On September 13, 2023, Defendant Trenary participated in the HC Wainwright 25th Annual Global Investor Conference.  Defendant Trenary, once again, admitted that Defendants understood the critical nature of adhering to the strict cGMP requirements, especially as it related to purity and potency because those were the main issues Defendants claimed would be addressed by ONS-5010:

> So if we look at the requirements that we have, if you look at our requirements for sterility, for number of particulates, for bacterial endotox levels, the CGMP requirements that we have, the packaging that we have to get approved by FDA, the particular pH levels that we have to live to. The potency that we're required to have, which again, the JAMA article shows is problematic with the off-label product and even osmolarity specifications.

> These are all areas that we've got to meet FDA requirements in ophthalmology. And so for particulates, for example, if you're a parenteral that's going to treat oncology and go into a drip IV, if you're looking at particulates that are 10 microns or larger, you can have up to 6,000 particulates in that container that goes into the drip IV. We get 50. So there's a lot of different requirements in ophthalmology, and that's why we say we're going to be bringing to the market a differentiated form of Bevacizumab.

266.    On September 20, 2023, Ajinomoto received a *fourth* Form 483 from the FDA, which was made available to Defendants, after inspections of its San Diego, California facility from September 12, 2023 to September 20, 2023.  A true and correct copy of this Form 483 is attached hereto as **Exhibit 7**.  The Form 483 confirmed the CMC issues listed in the CRL and confirmed that many remained

ongoing and unremediated, just as they had throughout the Class Period. CW6 confirmed that the FDA reinspected the facility in September 2023 and ultimately closed the open issues in January 2024. ¶¶143-46.

267. This Form 483 specifically highlighted how between "2021 to 2023," [Ajinomoto] received 6 complaints related to particulates observed in your finished commercial products." Ex. 7 at 2. The Form 483 further admonished Ajinomoto that its "investigation of the complaints was inadequate" "there was a lack of risk assessment of products with potentially undetected particulates" and "*there is a lack of scientific justification for this large variations of particulates observed from batch to batch in the same or different products in order to minimize the risk of particulates in finished drug products*." Ex. 7.

268. Accordingly, from 2021 to 2023, Ajinomoto lacked the capability to produce ONS-5010 in accordance with cGMP, especially as it relates to the requirement for sterility, as Defendant Trenary admitted was required, *see* ¶¶197, 212, 221, 265, but as Trenary assured investors that cGMP requirements were met by Outlook's manufacturing partners. *See* ¶¶206, 215-16, 227, 231.

269. On November 7, 2023, FujiFilm *also* received a *third* Form 483 from the FDA, which was available to Defendants, after inspections of its College Station, Texas facility from October 30, 2023 to November 7, 2023. A true and correct copy of this Form 483 is attached hereto as **Exhibit 8**. The Form 483 confirmed the CMC

issues listed in the CRL and confirmed that many remained ongoing and unremediated, just as they had throughout the Class Period.

270.  **On November 27, 2023, the Company issued a press release announcing receipt of the October 2023 FDA Type A meeting minutes.  In that press release, the Company confirmed the requirement for a second, adequate and well-controlled pivotal trial:

> As previously reported, ***the FDA requires an additional adequate and well-controlled study to support the ONS-5010 BLA***. The FDA has informed Outlook Therapeutics that it can conduct a non-inferiority study evaluating ONS-5010 versus ranibizumab in a 3-month study of treatment naïve patients with a primary endpoint at 2 months. As recommended by the FDA at the Type A meeting, Outlook Therapeutics has been working with the Division of Ophthalmology to design an appropriate study to satisfy the FDA's requirements. The FDA and Outlook Therapeutics have also identified the approaches needed to resolve the CMC comments in the CRL.

271.  **On December 22, 2023, the Company filed a Form 10-K with the SEC.  In that filing, the Company conceded that the FDA requirement for a second adequate and well-controlled pivotal trial was only then being addressed (*i.e.*, it was not satisfied by the prior BLA):

> ***We agreed to conduct an additional adequate, and well-controlled clinical trial following discussions with the FDA in support of our BLA for ONS-5010***. In December 2023, we submitted a Special Protocol Assessment, or SPA, to the FDA for this study (NORSE EIGHT) seeking confirmation that, if successful, ***it will address the FDA's requirement for a second adequate and well-controlled clinical trial to support our planned resubmission of the ONS-5010 BLA***. The FDA is expected to respond to the SPA in early February 2024.

272.    **On January 23, 2024, the Company issued a press release announcing that it had received a SPA for NORSE 8.  In that press release, the Company confirmed that NORSE 8 would comply with the parameters set out in FDA regulations, the 2019 Guidance, Wet AMD Guidance, and other FDA-approved wet AMD treatments:

> NORSE EIGHT will be a randomized, controlled, parallel-group, masked, non-inferiority study of ***approximately 400 newly diagnosed, wet AMD subjects*** randomized in a 1:1 ratio to receive 1.25 mg ONS-5010 or 0.5 mg ranibizumab intravitreal injections. Subjects will receive injections at Day 0 (randomization), Week 4, and Week 8 visits. The primary endpoint will be mean change in BCVA from baseline to week 8. Outlook Therapeutics expects NORSE EIGHT topline results and resubmission of the ONS-5010 BLA by the end of calendar year 2024.

## VI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

273.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Outlook securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the current and former officers, senior managers, and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

274.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Outlook securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are several hundreds of members in the proposed Class. According to the Company's 2022 Form 10-K, "there were approximately 96 stockholders of record," but the "actual number of stockholders is greater than this number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers and other nominees."   Record owners and other members of the Class may be identified from records maintained by Outlook or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

275.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

276.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.   Plaintiffs have no interests antagonistic to or in conflict with those of the Class, and have retained experienced counsel for the benefit of the Class.

277.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants misrepresented their regulatory communications with the FDA;

  whether Defendants misrepresented the evidence of efficacy submitted to the FDA;

- whether Defendants concealed cGMP violations at their selected manufacturing partners, FujiFilm and Ajinomoto;

- whether Defendants' misrepresentations violated the Securities Exchange Act of 1934;

- whether Defendants acted knowingly or recklessly in making these misrepresentations to investors;

- whether the prices of Outlook securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether Plaintiffs and other members of the Class have sustained damages and, if so, what is the proper measure of damages.

278.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

279.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Outlook securities are traded in an efficient market;

- the Company's shares were liquid and traded actively during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Outlook securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

280.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

281.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

282.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

283.  This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

284.  During the Class Period, Defendants made as detailed above untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Outlook securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Outlook securities and options at artificially inflated prices.

285.   By virtue of their access to the actual facts, interactions and positions detailed above, review of other approved drugs, claims to investors that they were knowledgeable about the regulatory process and competitive landscape,

participation in and knowledge of confidential regulatory communications with the Company, and inspections of and discussions with their manufacturing partners, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

286.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of Outlook directly involved in describing the Company's regulatory progress, clinical progress, and manufacturing partners to investors, the Individual Defendants had knowledge of the actual facts that were omitted and/or misrepresented.

287.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the

content of the statements of Outlook.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Outlook's key drug candidate, ONS-5010.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Outlook securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Outlook which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Outlook securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

288.    During the Class Period, Outlook securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Outlook securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions

by Plaintiffs and the Class, the true value of Outlook securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Outlook securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

289.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating materially false and misleading statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

290.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

291.   During the Class Period, the Individual Defendants participated in the operation and management of Outlook, a company with only twenty-four full-time employees, and conducted and participated, directly and indirectly, in the conduct of Outlook's business affairs.  Because of their senior positions and day-to-day control, they knew the adverse non-public information about Outlook's misstatement of its ONS-5010 BLA submission, the Company's communications

with the FDA regarding the ONS-5010 BLA, and the status of the Company's manufacturing partners' facilities.

292.    As CEO and CFO of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to every aspect of Outlook's ONS-5010 BLA submission, and to correct promptly any public statements issued by Outlook which had become materially false or misleading.

293.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, investor conferences, press releases and public filings that Outlook disseminated in the marketplace during the Class Period concerning Outlook's ONS-5010 BLA submission.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Outlook to engage in the wrongful acts complained of herein.

294.    Each of the Individual Defendants, therefore, acted as a controlling person of Outlook.    By reason of their senior management positions and/or being directors of Outlook, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Outlook to engage in the unlawful acts and conduct complained of herein.    Each of the Individual Defendants exercised control over the general operations of Outlook and possessed the power to control

the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

295.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Outlook.

296.    Defendant Kenyon reported to Defendant Trenary, either directly or indirectly.    As CEO, Defendant Trenary had the ability to control Defendant Kenyon's day-to-day conduct.    As a result, Defendant Trenary is also liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Kenyon.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  February 27, 2026 Respectfully submitted,

POMERANTZ LLP

*/s/    Brian Calandra*
    Brian Calandra

Joshua B. Silverman (*pro hac vice*)
Brian O'Connell (*pro hac vice*)
Genc Arifi (*pro hac vice*)
POMERANTZ LLP
10 S La Salle Street, Suite 3505
Chicago, IL 60603-1049
Tel: (312)-881-4859
Fax: (312)-377-1184
Email: jbsilverman@pomlaw.com
    boconnell@pomlaw.com
    garifi@pomlaw.com

and

Jeremy A. Lieberman (*pro hac vice*)
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
    bcalandra@pomlaw.com

*Lead Counsel for the Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
Alex Heller
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bergermontague.com
        aheller@bergermontague.com

*Additional Counsel for Lead Plaintiff, Additional Plaintiffs, and the Proposed Class*